Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, Montana 59807
(406) 721-1435
tim@bechtoldlaw.net

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, BOLD ALLIANCE, CENTER FOR BIOLOGICAL DIVERSITY, FRIENDS OF THE EARTH, NATURAL RESOURCES DEFENSE COUNCIL, INC., and SIERRA CLUB,<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS A. SHANNON, JR., in his official capacity as Under Secretary of State for Political Affairs; UNITED STATES DEPARTMENT OF STATE; RYAN ZINKE, in his official capacity as Secretary of the Interior; UNITED STATES DEPARTMENT OF THE INTERIOR; and BUREAU OF LAND MANAGEMENT,<br><br>Defendants. | CV<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*.; Administrative Procedure Act, 5 U.S.C. §§ 701-706) |

**INTRODUCTION**

1.      This case challenges federal agency approvals for the proposed

Keystone XL pipeline (Keystone XL), which would move massive quantities of tar

sands crude oil from Canada to the Gulf Coast via Steele City, Nebraska. Tar sands

crude oil—named for its thick, tar-like consistency—is one of the planet's most

environmentally destructive energy sources. Tar sands crude oil is an extremely

carbon-intensive fuel, meaning that its production and use causes the release of

very high levels of carbon dioxide and other greenhouse gases that cause climate

change. The mining and transportation of tar sands also pollutes land, air, and

water. Because of these effects, communities around the world have come together

to oppose Keystone XL and the dirty fuel it would carry.

2.      In their haste to issue a cross-border permit requested by TransCanada

Keystone Pipeline L.P. (TransCanada), Keystone XL's proponent, Defendants

United States Department of State (State Department) and Under Secretary of State

Shannon have violated the National Environmental Policy Act and other law and

ignored significant new information that bears on the project's threats to the

people, environment, and national interests of the United States. They have relied

on an arbitrary, stale, and incomplete environmental review completed over three

years ago, for a process that ended with the State Department's denial of a cross-

border permit. On information and belief, Defendants Secretary Zinke, United

States Department of the Interior, and Bureau of Land Management are poised to issue additional approvals that rely on the same stale environmental review.

3.     If it is ever built, Keystone XL will be one of the world's largest crude oil pipelines. Every day, it would move up to 830,000 barrels (≈35 million gallons) of tar sands crude oil from Canada to Steele City, Nebraska. In Steele City, Keystone XL would connect to existing pipeline infrastructure that reaches Gulf Coast refineries. Much of the refined oil would be exported to foreign countries.

4.     Keystone XL poses significant threats to people and the environment in this country and around the world. It takes a great deal of energy to transform tar sands into finished oil products, and the generation of that energy causes the release of immense amounts of greenhouse gases that contribute to climate change. Tar sands must be harvested from the ground by open-pit strip mining or by injecting heat deep into the Earth to liquefy tar sands deposits so they can be pumped up to the surface. Because it is so heavy, tar sands crude oil is also much more energy intensive to refine than conventional crude oil. The burning of gasoline and other refined products releases yet more greenhouse gases.

5.     Keystone XL also poses significant threats to the many hundreds of streams, rivers, lakes, aquifers, and wetlands it would cross, due to construction-related impacts and the risk of oil spills during operation. Because tar sands crude oil is so heavy and viscous, spills are nearly impossible to clean up. The

3

construction and operation of Keystone XL and its network of associated roads, power lines, and other facilities would harm the wildlife who live along its more than 1,200-mile route, including endangered species. Perhaps most alarming, an oil spill from Keystone XL could pollute aquifers and other precious water sources that supply drinking and irrigation water to millions of people.

6.     In 2015, citing the project's climate impacts and other significant threats to human health and the environment, defendant State Department found that Keystone XL was contrary to the national interest and denied TransCanada's application for a U.S.-Canada cross-border permit. On January 24, 2017, however, President Donald J. Trump issued a presidential memorandum inviting TransCanada to reapply for a cross-border permit and directing the State Department to make a permitting decision within sixty days of TransCanada's submission.

7.     On March 23, 2017, Under Secretary of State for Political Affairs Thomas A. Shannon, Jr., on behalf of the State Department, found that Keystone XL "would serve the national interest" and issued TransCanada a cross-border permit for the project. In issuing the permit, Defendants Shannon and the State Department relied on an Environmental Impact Statement that the Department had completed in January 2014 (the 2014 EIS), pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*

8. The State Department's 2014 EIS—inadequate at that time—is now woefully out of date, as Plaintiffs noted in a series of recent letters urging the State Department and other federal agencies to supplement their environmental review of Keystone XL before issuing any approvals. Most notably, the 2014 EIS grossly underestimated the pipeline's impacts on the rate of tar sands development, concluding that substantially the same amount of tar sands would likely be mined, transported, and refined regardless of whether Keystone XL were built. That conclusion is wrong: Keystone XL will enable the mining, transport, refining, and consumption of millions of additional gallons of tar sands crude oil per day and cause significant environmental harm that would not occur otherwise.

9. The State Department's 2014 EIS also downplays or ignores other significant environmental impacts of Keystone XL, including harms to land, air, water, and wildlife. The document also does not account for recent oil-market changes and other developments that cast further doubt on the State Department's analysis of climate and other impacts and further undermine the conclusion that Keystone XL is in the national interest.

10. By relying on a stale and inadequate EIS to issue a cross-border permit for Keystone XL, and arbitrarily reversing its earlier determination that Keystone XL is not in the United States' national interest, the State Department violated NEPA and the Administrative Procedure Act (APA).

11.     Because the pipeline would cross approximately forty-five miles of federal land administered by the Bureau of Land Management (BLM) at and immediately south of the border crossing, TransCanada must also secure right-of-way grants from BLM. Like the State Department's issuance of a cross-border permit, BLM's granting of rights of way is "major federal action" for which NEPA requires the preparation of a current and complete environmental impact statement. On information and belief, BLM will grant rights of way very soon, and will do so in reliance on the State Department's stale and inadequate 2014 EIS.

12.     Plaintiffs Northern Plains Resource Council, Bold Alliance, Center for Biological Diversity, Friends of the Earth, Natural Resources Defense Council, Inc., and Sierra Club are non-profit organizations with members who will be harmed by the project. Plaintiffs participated in the comment process that culminated in the State Department's issuance of the 2014 EIS, and identified serious problems with that EIS that the State Department never cured. The U.S. Environmental Protection Agency (EPA) also found that the 2014 EIS was "insufficient" to satisfy NEPA and recommended that the State Department revise it to address many of the same issues Plaintiffs raised. The State Department ignored many of EPA's recommendations.

13.     Defendants' reliance on a stale, incomplete, and inadequate EIS to approve Keystone XL defeats NEPA's dual goals of ensuring informed

government and promoting full public participation in agency actions that

significantly affect the environment. The State Department has also arbitrarily

reversed its position on whether Keystone XL is in the national interest.

Defendants' approvals must be set aside.

## JURISDICTION AND VENUE

14.    This case arises under NEPA, 42 U.S.C. §§ 4321 *et seq*., and the

APA, 5 U.S.C. §§ 701-706. This Court has jurisdiction over this action pursuant to

28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (mandamus), 28 U.S.C.

§§ 2201-2202 (declaratory judgment), and 5 U.S.C. §§ 701-706 (APA).

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because

the proposed route for Keystone XL enters the United States in Montana, crosses

Montana, and passes through BLM-administered lands at and south of the border

in Montana. Therefore, a substantial part of the events or omissions giving rise to

the claim occurred in this district and a substantial part of the property that is the

subject of this action is situated in this district. In addition, Plaintiff Northern

Plains Resource Council resides in this district.

16.    Assignment to the Great Falls division of this Court is appropriate

because Keystone XL would cross the U.S.-Canada border near Morgan, Montana,

in Phillips County. The proposed route also crosses Valley County. Phillips and

Valley Counties are both within the Great Falls Division. L.R. 1.2(c)(3).

## THE PARTIES

17.    Plaintiff Northern Plains Resource Council (Northern Plains), based in Billings, Montana, organizes citizens to protect Montana's water, land, air, and working landscapes and pass them on unimpaired to future generations. Northern Plains was founded in the 1970s to protect Eastern Montana's people and agricultural economy from becoming a sacrifice zone for energy development. Northern Plains has over 3,000 members, many of whom live directly on the path of the Keystone XL pipeline and/or close to the pipeline route. Since the federal and state permitting processes for Keystone XL began in 2009, Northern Plains and its members have participated at every step. That includes working to improve reclamation and liability protections for member families whose land the pipeline would cross.

18.    Plaintiff Bold Alliance (Bold) is a network of individuals and not-for-profit environmental- and landowner-rights groups based in Nebraska and other rural Midwest and southern states. It has more than 92,000 supporters across the country. Bold advocates for clean energy, fights fossil fuel projects, and works to protect rural landowners, in cooperation with Tribal nations, farmers, ranchers, hunters, anglers, and environmentalists. Bold and its allies have spent years working to raise awareness of Keystone XL's threats to the people, land and

water of Nebraska and other states, and to persuade our national and state officials to reject it.

19.     Plaintiff Center for Biological Diversity (the Center) is a national non-profit organization that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center has over 52,000 members and more than 1.2 million online supporters worldwide. The Center has worked for years to protect several imperiled species that would be harmed by Keystone XL, and one of the Center's central goals is to combat climate change and its impacts on habitats and communities.

20.     Plaintiff Friends of the Earth (FoE) is a non-profit advocacy organization founded in 1969. FoE has more than 275,000 members and more than 900,000 activists across the United States. It is a member of Friends of the Earth International, which is the world's largest grassroots environmental network with seventy-five affiliates worldwide. FoE's mission is to defend the environment and champion a healthy and just world. Ending destructive tar sands development is one of FoE's top priorities.

21.     Plaintiff Natural Resources Defense Council, Inc. (NRDC) is a national, not-for-profit public-health and environmental advocacy organization whose purpose is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends. NRDC has hundreds of thousands of

members. Since its founding in 1970, NRDC has worked to enforce environmental laws and to reduce air and water pollution from, and destruction of natural lands by, industrial activity. NRDC has fought to curb greenhouse-gas emissions that contribute to climate change, including by working to educate people about, and combat the threats posed by, Canadian tar sands crude oil.

22.    Plaintiff Sierra Club is the nation's oldest grassroots organization dedicated to the protection and preservation of the environment. Sierra Club has over one million members and supporters dedicated to exploring, enjoying, and protecting the wild places of the Earth; practicing and promoting the responsible use of the Earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives. The Sierra Club has chapters and members in each of the states through which Keystone XL would pass. The Sierra Club's concerns encompass the protection of wildlands, wildlife habitat, water resources, air, climate, public health, and the health of its members, all of which stand to be affected by Keystone XL.

23.    Plaintiffs have members and other supporters who live in Montana, South Dakota, and Nebraska—the states that Keystone XL would cross. Some of Plaintiffs' members own property on and near the proposed pipeline route. Plaintiffs bring this lawsuit on behalf of members and other supporters who live,

work, and recreate in places threatened by Keystone XL and depend on resources the project may damage. Defendants' approvals threaten these members' and supporters' health, recreational, economic, and aesthetic interests. Because they failed to prepare and publish a current and complete assessment of Keystone XL's environmental impacts before issuing their approvals, Defendants have also deprived Plaintiffs' members and supporters of their right to participate in and seek to influence the approval process.

24.    The declaratory and injunctive relief Plaintiffs seek in this lawsuit will redress their members' and supporters' injuries by setting aside Defendants' approvals and requiring Defendants to comply with NEPA and the APA.

25.    Defendant Department of State (the State Department) is a federal agency. The State Department decides whether to permit the construction, operation, and maintenance of oil pipelines that cross the U.S.-Canada border. In carrying out its permitting responsibilities, the State Department must comply with NEPA and the APA, which apply generally to federal agencies. The State Department issued the cross-border permit for Keystone XL and prepared the NEPA documents for the permit.

26.    Defendant Thomas A. Shannon, Jr. is the State Department's Under Secretary of State for Political Affairs. Under Secretary Shannon signed the State Department's March 23 cross-border permit and supporting record of

11

decision and national interest determination for Keystone XL. In issuing these documents and making the findings they include, Under Secretary Shannon was required to ensure the State Department's compliance with NEPA and the APA.

27.    Defendant Department of the Interior (Interior Department) is a federal agency. The Interior Department's chief administrator is the Secretary of the Interior. The Interior Department, through its sub-agency Bureau of Land Management, decides whether to grant rights of way for the construction, operation, and maintenance of oil pipelines and associated facilities that cross land administered by the Bureau of Land Management. In carrying out its permitting responsibilities, the Interior Department must comply with NEPA and the APA.

28.    Defendant Bureau of Land Management (BLM) is a sub-agency of the Interior Department. BLM decides whether to grant rights of way for the construction, operation, and maintenance of oil pipelines and associated facilities that cross land it administers. In carrying out its permitting responsibilities, BLM must comply with NEPA and the APA, which apply generally to federal agencies.

29.    Defendant Ryan Zinke is the Secretary of the Interior. In his official capacity, Secretary Zinke, or his subordinates, are responsible for deciding whether to grant rights of way for the construction, operation, and maintenance of oil pipelines and associated facilities that cross land administered by BLM. In carrying

12

out these duties, Secretary Zinke must ensure the Interior Department's and BLM's compliance with NEPA and the APA.

## STATUTORY AND REGULATORY BACKGROUND

**The National Environmental Policy Act (NEPA)**

30.     The National Environmental Policy Act (NEPA) is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Congress enacted it in 1969 "to promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

31.     NEPA's goal is to ensure "that environmental information is available to public officials and citizens before decisions are made and before actions are taken" and to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(b), (c). When the federal government acts before fulfilling its NEPA obligations, courts may set the action aside until the government complies with NEPA.

32.     The Council on Environmental Quality (CEQ) is an agency created by NEPA and housed within the Executive Office of the President. 42 U.S.C. § 4342. CEQ has promulgated general regulations implementing NEPA. 40 C.F.R. §§ 1500-1508. The State Department has adopted NEPA regulations that incorporate and supplement the CEQ regulations. *See* 22 C.F.R. §§ 161.1-161.12.

33.    NEPA requires all federal agencies to prepare a "detailed statement" for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement—commonly known as an environmental impact statement (EIS)—must describe the environmental impacts of the proposed action. *Id.* § 4332(2)(C)(i), (ii). The EIS is an "action-forcing device" that ensures NEPA's goals "are infused into the ongoing programs and actions" of the federal government. 40 C.F.R. § 1502.1.

34.    An EIS must include a "full and fair discussion" of the "direct," "indirect," and "cumulative" effects of the action, as well as a discussion of "[m]eans to mitigate adverse environmental impacts." *Id*. §§ 1502.1, 1502.16(a), (b) & (h), 1508.25(c). Direct impacts are "caused by the action and occur at the same time and place." *Id.* § 1508.8(a). Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8(b). Cumulative impacts are the "incremental impact[s] of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7. Cumulative impacts "can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

35.    Agencies must include analysis of any "connected" actions in the same EIS. *Id.* § 1508.25(a)(1). Connected actions are those that "[a]utomatically

14

trigger other actions which may require environmental impact statements,"
"[c]annot or will not proceed unless other actions are taken previously or
simultaneously," or "[a]re interdependent parts of a larger action and depend on the
larger action for their justification." *Id.*

36.     The EIS must also inform federal agency decision-makers and the
public of the "reasonable alternatives" that would "avoid or minimize adverse
impacts or enhance the quality of the human environment." *Id.* § 1502.1. This
analysis of alternatives is the "heart" of the EIS—i.e., where the agency should
"present the environmental impacts of the proposal and the alternatives in
comparative form, thus sharply defining the issues and providing a clear basis for
choice among options." *Id.* § 1502.14. The EIS must "[r]igorously explore and
objectively evaluate all reasonable alternatives," including the alternative of "no
action." *Id.* § 1502.14(a), (d).

37.     An EIS must also "specify the underlying purpose and need to which
the agency is responding" in proposing the action the EIS describes and the
alternatives the EIS identifies. *Id.* § 1502.13.

38.     Any federal agency that is considering approving an activity that may
significantly affect the environment must first prepare a draft EIS. The agency
must solicit comments on that draft from the public, any other federal agency that
has jurisdiction or special expertise on the subject matter, and Indian Tribes when

15

the project may affect a reservation. *See id.* §§ 1502.9(a), 1503.1(a). The agency

must then prepare a final EIS based on its consideration of those comments. *Id.* §§

1502.9(b), 1503.4(a). The agency must respond to comments by either making

changes to the EIS or explaining why the comments do not warrant further agency

response. *Id.* §§ 1502.9(b), 1503.4(a). At the conclusion of the EIS process, an

agency must issue a record of decision pursuant to 40 C.F.R. § 1505.2.

39.   If, after the EIS is prepared, there are significant new circumstances or

information relevant to the environmental impacts of a proposed action, the agency

must prepare a supplemental EIS before deciding whether to approve the action.

*Id.* § 1502.9(c)(1). A supplemental EIS must be prepared and circulated in the

same way as the draft EIS and final EIS. *Id.* § 1502.9(c)(4). State Department

regulations similarly require preparation of a supplemental EIS if there are

significant new circumstances or information relevant to the environmental

impacts of a proposed action, or if a prior EIS is stale. 22 C.F.R. § 161.9(k).

40.   A "cooperating agency" is a federal agency other than the lead agency

that has jurisdiction by law or special expertise about any environmental impact of

the project. 40 C.F.R. § 1508.5. Cooperating agencies are required to participate in

the NEPA process at the earliest possible time and assume responsibility, at the

lead agency's request, for preparing environmental analyses in areas concerning

the cooperating agency's special expertise. *Id.* § 1501.6(b). A cooperating agency

16

may adopt without recirculating the EIS of a lead agency "when, after an

independent review of the statement, the cooperating agency concludes that its

comments and suggestions have been satisfied." *Id.* § 1506.3(c).

**The Administrative Procedure Act (APA)**

41.    The Administrative Procedure Act (APA) provides for judicial review

of federal agencies' and officials' compliance with NEPA and the APA. Under the

APA, courts "shall . . . hold unlawful and set aside agency action, findings, and

conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," 5 U.S.C. § 706(2), and "compel agency

action unlawfully withheld or unreasonably delayed," *id.* § 706(1).

## FACTS

**The Keystone XL Pipeline**

42.    If built, Keystone XL would be an approximately 1,200-mile-long

pipeline, made of steel pipe three feet in diameter. It would stretch from Canada's

tar sands mining region through Montana and South Dakota to southern Nebraska.

TransCanada would build the pipeline in an approximately 110-foot-wide

construction right of way; the pipeline's permanent right of way for most stretches

of the route would be fifty feet. Approximately the first forty-five miles of the

proposed route through the United States, including at the border crossing with

Canada, lie on BLM-administered federal land. The pipeline's entire route through

17

Nebraska remains undetermined and subject to approval by that state's Public Service Commission. In its March 23 record of decision, the State Department also noted "minor … alterations" from the route it analyzed in the January 2014 EIS, due to changes in right-of-way and easement agreements with local landowners.

43.     Keystone XL would import Canadian tar sands and other crude oil from Hardisty in Alberta, Canada to Steele City, Nebraska. In Steele City, Keystone XL would connect to TransCanada's existing pipeline network, which serves refineries and export terminals on the Gulf Coast. Connecting Keystone XL to the existing network would allow TransCanada to move as many as 830,000 additional barrels (about 35 million gallons) of crude oil from Canada to the Gulf Coast every day. If TransCanada receives a waiver to operate the pipeline at higher pressure, its capacity may increase to 900,000 barrels per day. Keystone XL would be one of the largest oil pipelines ever built in the United States.

44.     There is no requirement that gasoline and other finished products made from Keystone XL's oil be sold on U.S. markets, and the majority of the refined products would likely be exported to other countries.

45.     Keystone XL would increase the extraction, transport, refining, and burning of oil derived from tar sands, one of the dirtiest and most destructive fuels on our planet. Tar sands crude oil—also known as oil sands crude oil, bitumen, or Western Canadian Sedimentary Basin crude oil—is an unconventional petroleum

source that is mined from a mixture of sand and clay underlying the boreal forests and wetlands of Alberta, Canada. These tar sands deposits underlie an area roughly the size of Florida.

46.     Tar sands crude oil is not extracted from the ground like other types of oil. Instead, oil companies use two unconventional mining methods to extract oil from tar sands deposits: strip mining and in-situ drilling. At open-pit strip mines, large swaths of boreal forest are cleared so that excavators and trucks can dig the tar sands from the ground. At in-situ drilling operations, steam is injected into the ground to melt the subterranean tar sands deposits. The oil gathers in wells and is pumped up to the surface for processing. These tar sands mining methods are energy intensive and cause significant air and water pollution. They also destroy and fragment habitat for the wildlife of Canada's boreal forests, including lynx, caribou, grizzly bears, songbirds, and waterfowl.

47.     The mining and subsequent processing of tar sands also generates large amounts of carbon dioxide and other greenhouse gases that contribute to climate change. As oil companies clear the land to create tar sands mines, they destroy forests and wetlands, which serve as carbon sinks. It also takes a significant amount of energy to mine tar sands; the burning of fossil fuels to create that energy releases greenhouse gases. After it is mined from the ground, the bitumen must be processed and diluted with various chemicals to make it liquid

19

enough to be pumped at high pressure through an oil pipeline. This process, which converts the bitumen into "diluted bitumen," or "dilbit," requires yet more energy and releases yet more greenhouse gases. Once the dilbit reaches refineries, the added chemicals must be separated from the bitumen before the bitumen can be refined into gasoline and other finished oil products. Refining heavy bitumen is significantly more energy (and thus greenhouse-gas) intensive than refining conventional crude oil. The ultimate use and burning of tar sands-derived products, like gasoline, also releases significant amounts of greenhouse gases.

48.     During the NEPA process for Keystone XL, which ended in 2014, the State Department and the EPA both concluded that greenhouse-gas pollution from tar sands is much higher than that from other forms of crude oil—about seventeen percent higher, after accounting for the pollution caused by both producing and burning the refined crude oil. The State Department's March 23 record of decision quotes both that seventeen percent estimate and EPA's 2015 comment that "oil sands crude is substantially more carbon intensive than reference crudes and its use will significantly contribute to carbon pollution."

49.     The significant greenhouse-gas emissions enabled by Keystone XL would exacerbate climate change, one of the predominant environmental crises of our age. The Earth's temperature is regulated by the greenhouse effect, through which visible radiation from the sun is absorbed and emitted as infrared radiation,

20

some of which is trapped by carbon dioxide, methane, and other greenhouse gases in the atmosphere. The delicate balance between incoming solar energy and outgoing energy radiated into space maintains the Earth's average temperature. However, since the Industrial Revolution, humans have been releasing greater volumes of greenhouse gases into the atmosphere through the burning of fossil fuels, changes in land use (such as deforestation), and other processes associated with population growth and industrialization. Those additional greenhouse gases trap heat, causing the Earth's temperature to rise and its climate to change.

50.     According to the National Oceanic and Atmospheric Administration, 2016 was the hottest year on record and the third in a row to set a new record for global average temperatures at the Earth's surface. Higher surface temperatures cause a wide range of human and ecological harms, including sea-level rise, coastal flooding, heat waves, increased risk of stronger hurricanes and extreme weather, increased risk of wildfires, water shortages, species extinction, habitat destruction, and shifting disease pathways.

51.     The movement of tar sands crude oil through the Keystone XL pipeline also poses other serious threats to human health and the environment. Oil pipelines routinely leak and spill oil, and dilbit is extremely difficult to clean up after a spill—much more so than conventional crude oils. The chemicals used to dilute the bitumen can vaporize into air or dissolve into water, leaving behind the

heavy bitumen. Because it does not readily biodegrade and is incredibly viscous and sticky, bitumen is nearly impossible to remove from the natural environment, where it can linger and serve as a persistent source of oil pollution.

52.     Two recent dilbit spills from pipelines have highlighted how costly and damaging such spills can be. A 2010 tar sands crude oil spill in Michigan's Kalamazoo River led to a more than $1.2 billion cleanup effort, the most expensive oil pipeline cleanup in U.S. history. A 2013 spill in Mayflower, Arkansas contaminated an entire neighborhood and caused extensive health problems for residents, including headaches, nausea, fatigue, nosebleeds, bowel issues, and breathing problems.

53.     Problems with a Keystone XL predecessor, the Keystone I pipeline, underscore the significant spill risks associated with crude oil pipelines. When it began shipping oil through Keystone I in June 2010, TransCanada claimed that "[c]onstruction and operation of the Keystone Pipeline system will continue to meet or exceed world class safety and environmental standards." But in its first year of operation alone, Keystone I leaked at least fourteen times and was temporarily shut down by U.S. authorities. Canadian authorities recorded more than twenty spills and other accidents between June 2010 and July 2011.

54.     Spills from Keystone XL could be particularly harmful because they threaten aquifers that serve as the main or sole source of drinking and irrigation

water for many people. The proposed route described in the State Department's 2014 EIS would cross parts of the Northern High Plains Aquifer in South Dakota and Nebraska, including the Northern Great Plains Aquifer System that supplies communities in eastern Montana and the Ogallala Aquifer that supplies most of Nebraska's drinking and irrigation water. The Ogallala is the United States' largest freshwater aquifer. As development and climate change increase competition for and stress on water supplies, protecting our freshwater aquifers will become ever more important.

55.     Because moving diluted bitumen hundreds of miles requires significant amounts of energy, the Keystone XL project includes a series of new pump stations and will lead to a proliferation of power lines along the pipeline's route. The power lines will present a direct, mortal threat to some of the few remaining whooping cranes in the wild, whose migratory pathway from Alberta, Canada to the United States' Central Flyway overlaps almost exactly with the Keystone XL route. The loss of even a few breeding individuals from this last wild population could jeopardize the survival or recovery of the whooping crane.

56.     Keystone XL's construction would also harm rivers and wetlands and threaten human health and welfare. The State Department's 2014 EIS found that the proposed route would cross more than one thousand rivers and streams and more than three hundred acres of wetlands. TransCanada would drill tunnels under

23

the largest rivers, which include the Yellowstone, Missouri, Milk, Frenchman, Cheyenne, Bad, White, Elkhorn, and Platte, and use an "open cut" method—excavating a trench in the streambed while water is flowing—to cross most other streams and rivers. In larger waterways, TransCanada would place construction equipment in the channel. These activities will increase sediment pollution and increase the risk of oil spills in waters that support fish and other wildlife and that people along the proposed route use for drinking, recreation, and agriculture.

57.    Construction in wetlands would be particularly damaging. Keystone XL would cut a 75-to-110-foot-wide path through wetlands along the proposed route. (For comparison, Interstate 15 in central Great Falls is approximately 115 feet wide.) Construction in wetlands can damage and destroy precious wildlife habitat, including foraging, nesting, spawning, rearing, and resting sites for migratory birds. It can also damage and destroy the wetland plants that influence water chemistry and trap sediments and other pollutants, harming water quality.

**The State Department's Review and Rejection of a Cross-Border Permit for Keystone XL**

58.    In 1968, President Lyndon B. Johnson signed Executive Order 11,423, which provided that no oil pipeline could be constructed or operated across the U.S. border without a permit from the State Department. Exec. Order No. 11,423, 33 Fed. Reg. 11,741 (Aug. 16, 1968). The Order allowed the State

Department to issue a permit only if, following consultation with other federal agencies, it found the pipeline would "serve the national interest." *Id.* § 1(b), (d).

59.    In 2004, President George W. Bush issued Executive Order 13,337, which amended the permitting process outlined in Executive Order 11,423. Exec. Order No. 13,337, 69 Fed. Reg. 25,299 (May 5, 2004). Under Executive Order 13,337, much like the previous order, the State Department may approve the construction, operation, and maintenance of an oil pipeline across the U.S. border only if it finds that issuance of the permit "would serve the national interest." *Id.* § 1(g). Before issuing a permit, the State Department must consult with the heads of eight federal agencies specified in the order, including the Environmental Protection Agency. *Id.* § 1(b). The State Department makes the final decision on the permit unless one of the eight consulting agencies appeals that decision to the president. *Id.* § 1(i).

60.    TransCanada first applied for a cross-border permit for the Keystone XL pipeline in September of 2008. Because the issuance of the permit is a "major federal action," triggering NEPA, the State Department acted as the lead agency in the preparation of an EIS. The State Department issued a Draft EIS in April 2010, supplemented that draft in April 2011, and issued a Final EIS in August 2011.

61.    In November of 2011, the State Department announced that it needed to conduct further environmental review of the project's impacts, particularly those

concerning the Ogallala Aquifer and Nebraska's Sand Hills region, where the Aquifer lies close to the surface, under a thin layer of porous, sandy soil.

62.     In December of 2011, Congress passed the Temporary Payroll Tax Cut Continuation Act of 2011, which required a final decision on TransCanada's cross-border permit application for Keystone XL within sixty days.

63.     In early 2012, the State Department denied TransCanada's application for a cross-border permit, explaining that the sixty-day deadline was arbitrary and left the agency insufficient time to complete its consideration of Keystone XL's environmental impacts.

64.     Shortly after the State Department's 2012 decision to deny a cross-border permit for Keystone XL, TransCanada announced that it would proceed with construction of the southern segment of the original proposed pipeline, which runs from Cushing, Oklahoma to the Gulf Coast. TransCanada renamed this segment the "Gulf Coast Pipeline." Because the Gulf Coast Pipeline does not cross the U.S. border, TransCanada did not seek a cross-border permit before building it.

65.     On May 4, 2012, TransCanada submitted a new application to the State Department, requesting a cross-border permit for the northern segment of the original proposed Keystone XL pipeline, which runs from Alberta, Canada to Steele City, Nebraska.

66.     In March 2013, the State Department released a draft supplemental EIS on TransCanada's May 2012 cross-border permit application for Keystone XL (the Draft EIS). Plaintiffs and millions of others commented on the Draft EIS, noting mistaken assumptions and gaps in the analysis.

67.     In April 2013, EPA, pursuant to its legal authority under NEPA and the Clean Air Act, submitted a letter on the Draft EIS that criticized the analysis of greenhouse-gas emissions, pipeline safety, alternative routes, and environmental-justice impacts. EPA rated the Draft EIS "EO-2 ('Environmental Objections-Insufficient Information')," meaning that the project had significant environmental impacts that must be avoided and that the Draft EIS provided insufficient information to evaluate those impacts.

68.     In January 2014, the State Department issued a Final Supplemental EIS (the 2014 EIS) for Keystone XL. The 2014 EIS failed to cure many of the problems EPA, Plaintiffs, and others noted in their comments on the Draft EIS.

69.     Perhaps most importantly, the State Department downplayed Keystone XL's climate impacts by claiming that, despite enabling the transport of 830,000 (or more) additional barrels per day of tar sands crude oil to Gulf Coast refineries, the pipeline was unlikely to encourage Canadian tar sands extraction. Instead, the State Department asserted that development of the tar sands would likely occur at the same pace, whether or not Keystone XL was built. The State

27

Department based this assertion on an assumption that oil prices would remain high and that sufficient additional export capacity—via pipeline or, more likely, rail—would become available, giving Canada's tar sands industry unfettered access to refinery markets.

70.     Plaintiffs challenged the State Department's assumption in comments on the 2014 EIS. They noted that because tar sands deposits are landlocked in northern Alberta and are far more expensive to extract than conventional crude oil, their continued development is particularly dependent on additional pipeline capacity.

71.     In the 2014 EIS, as an additional basis for its assertion that Keystone XL would not cause a significant increase in tar sands development, the State Department assumed the construction of alternative infrastructure projects that still have not been built. One of those is Enbridge's proposed expansion of the Alberta Clipper (otherwise known as the "Line 67") tar sands pipeline, for which the State Department has also been considering a cross-border permit since 2012.

72.     The State Department also failed to fully analyze a reasonable range of action alternatives in the 2014 EIS. These include clean energy and alternative pipeline routes, which were feasible and would have resulted in fewer impacts than the proposed project. The State Department also failed to include a proper no-action alternative in the 2014 EIS. Here again, the State Department relied on its

28

erroneous assumption that substantially the same amount of tar sands crude oil would move by pipeline or rail, even if Keystone XL were never built.

73.    In the spring of 2014, the State Department suspended its review of Keystone XL in response to state-court litigation that made it impossible for the Department to know what route the pipeline would take through Nebraska. (Although the Department resumed the NEPA process in January 2015, TransCanada still does not have a state-approved route through Nebraska.)

74.    On February 2, 2015, EPA submitted a comment letter on the 2014 EIS. EPA's letter pointed out that oil prices had already dropped dramatically, and that this drop further undermined the State Department's conclusion that Keystone XL would have no substantial effect on tar sands development. EPA also found that the 2014 EIS failed to evaluate a reasonable range of alternatives. EPA recommended that the State Department revise the EIS to correct these errors.

75.    On November 3, 2015, then-Secretary of State John Kerry, on behalf of the State Department and pursuant to the process outlined in Executive Order 13,337, determined that Keystone XL would not serve the national interest and denied TransCanada's request for a cross-border permit. The State Department also issued a record of decision pursuant to NEPA.

76.    In a letter explaining the permit denial, Secretary Kerry wrote that he had "based this decision on key findings by the State Department" in the 2014 EIS.

He acknowledged the State Department's conclusion that Keystone XL would not "by itself" significantly impact the rate of tar sands development or crude oil demand, but also referenced concerns about the pipeline's impacts on local communities and water supplies, and noted that it would "facilitate the transportation to the United States of one of the dirtiest sources of fuel on the planet." He wrote that "[t]he critical factor in my determination was this: moving forward with this project would significantly undermine [the United States'] ability to continue leading the world in combatting climate change." He added that "[t]he United States cannot ask other nations to make tough choices to address climate change if we are unwilling to make them ourselves."

77.     Developments over the more than three years since the State Department published its 2014 EIS have further undermined that document's core assumptions and associated predictions about Keystone XL's environmental impacts. Oil prices have dropped and stayed low, and are predicted by reputable sources to remain low for decades. Rail transport of tar sands crude oil has also failed to emerge as a viable alternative to pipelines. Safety regulations finalized in 2015 require the phase out of some puncture-prone tank cars and place speed, braking, and other restrictions on oil trains that restrict rail capacity for oil transport. Community opposition to on- and off-loading terminals for oil trains has

also made it more difficult to build these facilities and further limited the amount of tar sands crude oil that can be transported by rail.

**The State Department's Reversal of its Decision on and Issuance of a Cross-Border Permit for Keystone XL**

78.     On January 24, President Trump issued a presidential memorandum (the Trump memorandum) "invit[ing]" TransCanada "to promptly re-submit its application to the Department of State" for a cross-border permit for Keystone XL. Mem. § 2, Construction of the Keystone XL Pipeline, 82 Fed. Reg. 8663 (Jan. 30, 2017). The Trump memorandum instructed the State Department to expedite the approval process under Executive Order 13,337 by "reach[ing] a final permitting decision, including a final decision as to any conditions on issuance of the permit that are necessary or appropriate to serve the national interest, within 60 days of TransCanada's submission of the permit application." *Id*. The memorandum also called on the Department of Interior, BLM, and other federal agencies to expedite their reviews. *Id.* § 3.

79.     The Trump memorandum did not direct the State Department to approve the permit, nor did it purport to waive applicable environmental review laws. Rather, it stated that the State Department "shall," to the "maximum extent permitted by law," deem the 2014 EIS sufficient to satisfy NEPA and any other provision of law that requires executive department consultation. *Id.* § 3(a)(ii).

80.     The Trump memorandum did purport to waive provisions of Executive Order 13,337 that allow other federal agencies to object to the State Department's final national interest determinations and appeal those decisions to the president. Executive Order 13,337 requires the State Department to notify eight consulting agencies of the proposed granting or denial of a cross-border permit, and gives those agencies fifteen days to request that the State Department refer the application to the president to resolve any disagreements about whether the permit should be granted. The Trump memorandum states that those provisions are "waived on the basis that, under the circumstances, observance of these requirements would be unnecessary, unwarranted, and a waste of resources." *Id.* § 3(a)(iv). The memorandum thus removed the only mechanism by which the State Department's permitting decision for Keystone XL could be referred to the President himself.

81.     On or about January 26, TransCanada filed a new application for a Keystone XL cross-border permit with the State Department.

82.     On January 27, February 22, and March 13 and 17, Plaintiffs wrote to the State Department to note that significant new circumstances and information relevant to the environmental impacts of Keystone XL have arisen since publication of the 2014 EIS. These developments require the State Department and cooperating federal agencies, including BLM, to prepare and take public comment

32

on a supplemental EIS before deciding whether to issue approvals for Keystone
XL. *See* 40 C.F.R. § 1502.9(c).

83.     On February 16, TransCanada applied to Nebraska's Public Service
Commission for approval of a Keystone XL route through Nebraska. Nebraska law
gives the Commission a minimum of 210 days to act on TransCanada's
application, and allows the Commission to add up to five months to that review
period (for a total of approximately 360 days) for just cause. More than 100 people
and organizations, including more than ninety landowners, three labor unions, the
Nebraska Ponca and Yankton Sioux Tribes, Bold Alliance, the Nebraska Chapter
of the Sierra Club, and other environmental and public-health advocacy groups,
have petitioned to intervene in the Commission's proceeding. TransCanada's
proposed route through Nebraska still threatens the Sand Hills, and Keystone XL's
impacts to this precious and vulnerable region still have not been adequately
addressed.

84.     On March 23, Under Secretary of State for Political Affairs Shannon
signed and the State Department issued a cross-border permit and accompanying
record of decision and national interest determination for Keystone XL. The cross-
border permit purports to allow TransCanada "to construct, connect, operate, and
maintain pipeline facilities at the international border of the United States and

Canada at Morgan, Montana, for the import of crude oil from Canada to the United States," subject to conditions specified in the document.

85.     In its March 23 record of decision and national interest determination, the State Department asserts that NEPA, the APA, the Endangered Species Act, and "other similar laws and regulations" are "inapplicable" to its decision to issue a cross-border permit for Keystone XL, but goes on to say that the State Department's review of Keystone XL "has, as a matter of policy, been conducted in a manner consistent with NEPA."

86.     The State Department's March 23 decision refers to and paraphrases the 2014 EIS. It includes little to no new information on the issues NEPA required the State Department to address before issuing a cross-border permit.

87.     With respect to Keystone XL's impacts on tar sands development, the State Department asserts, consistent with its conclusions in the 2014 EIS, that Keystone XL "is unlikely to have a substantial effect on the rate of extraction of the oil sands" or "to directly result in significant change in production."

88.     With respect to greenhouse-gas pollution, the State Department now acknowledges—based on a supplemental EIS it prepared for the Alberta Clipper pipeline—that "[greenhouse gas] emissions from [Western Canadian Sedimentary Basin] crude may be five to 20 percent *higher* than previously indicated" (emphasis added). It also acknowledges that oil prices are roughly half what they

34

were when it published the 2014 EIS: Crude oil that sold for more than $98 a barrel then now sells for $48 a barrel. But the State Department denies the significance of this and other new information. It asserts that the 2014 EIS still "reflects the expected environmental impacts" of Keystone XL and "continues to inform the Department's national interest determination" on topics including the state of the oil market and greenhouse-gas pollution.

89.     The State Department also denies the significance of new information about the dangers of an oil spill from Keystone XL. It acknowledges that there have been several new studies on cleanup of diluted bitumen since it published the 2014 EIS, and notes that a 2016 National Academy of Science (NAS) study "found that diluted bitumen presents more challenges for cleanup response than other types of oil commonly moved by pipeline." The Department also notes that, according to the 2016 NAS study, EPA, the Coast Guard, the Pipeline and Hazardous Materials Safety Administration, and first responders are all "in need of more training and better communication in order to adequately and effectively address spills." Nonetheless, the State Department goes on to assert that mitigation measures it described in the 2014 EIS, without the benefit of this and other new information, "adequately address" spill and cleanup concerns.

90.     With respect to Keystone XL's other threats to water supplies and public health in Montana, South Dakota, and Nebraska, the State Department

simply summarizes the information and conclusions it included in its 2014 EIS and older documents. It does the same with respect to Keystone XL's threats to wetlands. For wildlife, the State Department says it consulted with the Fish and Wildlife Service (FWS) on possible impacts to two species added to the endangered species list as threatened species in 2015, and "received confirmation from FWS that [Endangered Species Act] Section 7 consultations need not be reinitiated for any other species and that, following implementation of the conservation measures contained within [FWS's 2013 Biological] Opinion, no other species included in the project area would be adversely affected."

91.     The State Department relies on simple summaries of its 2014 EIS to discuss alternatives to Keystone XL and the cumulative effects of Keystone XL and other projects. For cumulative effects, this means that a half-decade after receiving cross-border permit applications for Keystone XL and the Alberta Clipper expansion project, the State Department still has not analyzed the combined effects on tar sands development and greenhouse-gas pollution of the 1.3 million barrels per day of additional oil these two pipelines could carry.

92.     The State Department lists a series of factors that informed its determination to issue a cross-border permit for Keystone XL. Many of those factors are ones the State Department referenced in its November 2015 decision to deny a cross-border permit. With respect to climate, the State Department

36

acknowledges its 2015 finding that approving Keystone XL "would have undercut the credibility and influence of the United States in urging other countries to address climate change." It asserts that "[s]ince then, there have been numerous developments related to global action to address climate change, including announcements by many countries of their plans to do so. In this changed global context, a decision to approve this proposed Project at this time would not undermine U.S. objectives in this area." The State Department does not discuss what impact its approval of Keystone XL may have on "global action to address climate change." Nor does it refer to or purport to analyze the impacts of other major Trump-administration actions that are likely to spur new fossil-fuel development and greenhouse-gas pollution.

93.     The State Department did not prepare a supplemental EIS, or any other new NEPA document, before issuing its March 23 cross-border permit, record of decision, and national interest determination for Keystone XL. The State Department also never answered Plaintiffs' January, February, and March 2017 letters requesting supplementation of the 2014 EIS, nor acknowledged much of the new information those letters referenced. The State Department did say it had "taken all information provided by [TransCanada] into account in making the national interest determination." The State Department cited 2015 and February and March 2017 TransCanada letters that it has not yet released to the public.

**BLM's Preparation of Right-of-Way Grants for Keystone XL**

94.     As described in the State Department's 2014 EIS, Keystone XL would cross approximately forty-five miles of BLM-administered land in Montana, including at and extending south from the U.S. Canadian border.

95.     Under the Mineral Leasing Act of 1920, the BLM must approve any right-of-way grants and temporary-use permits for pipelines that cross BLM-administered land. 30 U.S.C. § 185(a); 43 C.F.R. Part 2880. These grants must comply with all applicable NEPA requirements. 30 U.S.C. § 185(h)(1).

96.     Similarly, under the Federal Land Policy and Management Act, BLM must approve any right-of-way grants for other types of facilities on BLM-administered land, such as electrical power generation, transmission, and distribution systems. 43 U.S.C. § 1761(a); 43 C.F.R. Part 2800. These grants must comply with all applicable laws, including NEPA requirements. *See* 43 U.S.C. § 1764(c); 43 C.F.R. § 2804.2(d)(1).

97.     To build Keystone XL, TransCanada needs right-of-way grants from BLM for the parts of the pipeline that cross BLM-controlled land, and for electrical transmission lines that would power the proposed pumping stations. *See* 74 Fed. Reg. 5019, 5020 (Jan. 28, 2009). TransCanada applied for grants in 2008, but withdrew its application after the State Department denied TransCanada a cross-border permit in November 2015.

98.     In early February, TransCanada reapplied to BLM for right-of-way grants for the Keystone XL pipeline and associated electrical transmission lines. BLM's regulations indicate that, in most instances, it will process an application for a right-of-way grant within sixty calendar days. 43 C.F.R. §§ 2804.25(c), 2884.21(b).

99.     BLM has not responded to Plaintiffs' January, February, and March 2017 letters noting significant new information and requesting supplementation of the State Department's 2014 EIS, which identifies BLM as a cooperating agency. On information and belief, BLM does not plan to issue a supplemental EIS before granting rights of way for Keystone XL.

100.    On information and belief, BLM will grant rights of way for Keystone XL very soon, and will rely on the State Department's 2014 EIS to do so.

## FIRST CLAIM FOR RELIEF

**Violation of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*.,
and Administrative Procedure Act, 5 U.S.C. §§ 701-706,
by Defendants State Department and Under Secretary Shannon**

101.    Plaintiffs incorporate by reference all preceding paragraphs.

102.    The State Department's issuance of a cross-border permit for the Keystone XL pipeline was a major federal action that requires compliance with NEPA. 42 U.S.C. § 4332(2)(C). The Department, as lead agency, prepared an EIS before approving the permit. That EIS was last supplemented in January 2014.

103.   The State Department, in violation of NEPA, did not include in the 2014 EIS a full and fair analysis of Keystone XL's significant direct, indirect, and cumulative environmental effects. *Id.*; 40 C.F.R. §§ 1502.1, 1502.16(a), (b) & (h), 1508.25(c). Among other things, the State Department did not adequately analyze Keystone XL's significant negative climate, air quality, water quality, pipeline safety, and biological impacts. The State Department also did not adequately analyze the impact of connected actions, including, but not limited to, the many power lines that will serve the project, and cumulative actions, including, but not limited to, the Enbridge Alberta Clipper (Line 67) pipeline expansion and TransCanada's Gulf Coast Pipeline. 40 C.F.R. § 1508.25. The Department relied on an arbitrary, outdated, and incomplete analysis of greenhouse-gas emissions to conclude that Keystone XL is unlikely to have significant climate impacts.

104.   The State Department also violated NEPA by failing to articulate a clear, rational "purpose and need" for, or analyze a reasonable range of alternatives to, Keystone XL. 40 C.F.R. §§ 1502.1, 1502.13, 1502.14. The State Department did not analyze a proper no-action alternative. It also failed to analyze action alternatives that would reduce the project's impacts, including viable clean-energy alternatives and reasonable route alternatives.

105.   The State Department also violated NEPA by arbitrarily and unlawfully refusing to prepare a supplemental EIS in response to significant new

40

information and circumstances that bear on Keystone XL's threats to people and the environment and the question of whether the project is in the United States' national interest. 40 C.F.R. § 1502.9(c); 22 C.F.R. § 161.9(k). That new information includes, but is not limited to, (a) a large drop in oil prices and other market developments that weaken commercial demand for Keystone XL that further undermine the State Department's January 2014 assessment of the project's purpose and need and pollution impacts; (b) new impediments to the rail transport that the State Department assumed would result in substantially the same amount of oil being transported, refined, and burned with or without Keystone XL; (c) new spills and analyses that underscore the risks of moving tar sands crude oil by pipeline; and (d) associated concerns about Keystone XL's threats to drinking and irrigation water for communities along the route. There is also ongoing uncertainty about Keystone XL's route through Nebraska. The EIS the State Department published more than three years ago is patently insufficient to support federal approvals today and in the future.

106.   The State Department has violated NEPA by issuing a cross-border permit for Keystone XL. The State Department's permitting decision is arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of the APA.

107.   Unless and until the State Department prepares an EIS that complies with NEPA, and provides for public comment on that EIS, Plaintiffs and their

members will be irreparably harmed. The relief Plaintiffs seek will redress these

injuries by setting aside the State Department's cross-border permit for Keystone

XL and requiring the State Department to comply with NEPA and the APA.

## SECOND CLAIM FOR RELIEF

**Violation of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*.,
and Administrative Procedure Act, 5 U.S.C. §§ 701-706,
by Defendants Interior Department, Bureau of Land Management,
and Secretary Zinke**

108.   Plaintiffs incorporate by reference all preceding paragraphs.

109.   At the U.S.-Canada border crossing and for approximately forty-five

miles south of the crossing, the proposed Keystone XL route crosses federal land

administered by BLM. Before TransCanada can build the Keystone XL pipeline

and associated facilities, BLM must grant rights of way under the Mineral Leasing

Act and the Federal Land Policy and Management Act. 30 U.S.C. § 185(a); 43

U.S.C. § 1761(a).

110.   BLM is a cooperating agency under NEPA because it has jurisdiction

by law over the land on which TransCanada seeks rights of way. 40 C.F.R. §

1508.5. As a cooperating agency, BLM must undertake an independent review of

the EIS before granting any rights of way. *Id.* § 1506.3(c).

111.   In early February, TransCanada reapplied for right-of-way grants. On

information and belief, BLM will soon grant rights of way for the Keystone XL

42

pipeline and the associated electrical transmission lines, and will rely on the State Department's 2014 EIS to purport to satisfy its NEPA obligations.

112.   The 2014 EIS violates NEPA for the same reasons pleaded in the first claim for relief (paragraphs 101 through 107). BLM's reliance on that document to grant rights of way will violate NEPA. BLM's action will also be arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of the APA.

113.   Unless and until BLM prepares (or cooperates in the preparation of) an EIS that complies with NEPA, and provides for public comment on that EIS, Plaintiffs and their members will be irreparably harmed. The relief Plaintiffs seek will redress these injuries by setting aside BLM's right-of-way grants for Keystone XL and requiring BLM to comply with NEPA and the APA.

### THIRD CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706, by Defendants State Department and Under Secretary Shannon

114.   Plaintiffs incorporate by reference all preceding paragraphs.

115.   On November 3, 2015, the State Department, pursuant to the process outlined in Executive Order 13,337, denied TransCanada a cross-border permit for Keystone XL, finding that the pipeline would be contrary to the national interest. The State Department issued a record of decision explaining its reasoning.

116.   On March 23, the State Department reversed course, issued TransCanada a cross-border permit for Keystone XL, and found that the pipeline

43

would "serve the national interest." The State Department made this finding in reliance on the same 2014 EIS and other federal agency review documents that existed in 2015, when it denied a cross-border permit for Keystone and found that the pipeline would not serve the national interest.

117.   The State Department's March 23 issuance of a cross-border permit and supporting record of decision and national interest determination for Keystone XL violated the APA. The State Department has failed to adequately explain and justify (a) its reversal of positions on whether Keystone XL is in the national interest, and (b) its reliance on a stale and inadequate environmental review. Its approval decision is arbitrary and capricious.

118.   Unless and until the State Department complies with the APA by providing a reasoned explanation for its issuance of a cross-border permit for Keystone XL and the reversal of its earlier national-interest determination for Keystone XL, Plaintiffs and their members will be irreparably harmed. The relief Plaintiffs seek will redress these injuries by setting aside the State Department's cross-border permit and national interest determination for Keystone XL and requiring the State Department to comply with the APA.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Declare that Defendants have violated NEPA and the APA by issuing a cross-border permit and any right-of-way grants for Keystone XL, in reliance on an arbitrary, stale, and incomplete EIS;

B.      Declare that Defendants State Department and Under Secretary Shannon violated the APA by reversing, without a reasoned justification, the State Department's earlier determination that Keystone XL would not serve the United States' national interest and that TransCanada should not be granted a cross-border permit;

C.      Issue an injunction requiring Defendants to comply with NEPA and the APA;

D.      Issue an injunction setting aside Defendants' cross-border permit and any right-of-way grants for Keystone XL and prohibiting any activity in furtherance of the construction or operation of Keystone XL and associated facilities;

E.      Award Plaintiffs their costs of litigation, including reasonable attorney and expert witness fees; and

F.      Grant such other and further relief as the Court deems just and proper.

Dated:      March 30, 2017

/s/Timothy M. Bechtold
Bechtold Law Firm, PLLC

*Attorney for all plaintiffs*

Selena Kyle (*Pro Hac Vice* Applicant)
(California Bar No. 246069)
Cecilia Segal (*Pro Hac Vice* Applicant)
(California Bar No. 310935)
Natural Resources Defense Council
20 North Wacker Drive, Suite 1600
Chicago, IL 60606
(312) 651-7906
skyle@nrdc.org
111 Sutter Street, Floor 21
San Francisco, CA 94104
(415) 875-6112
csegal@nrdc.org

*Attorneys for Bold Alliance and Natural
Resources Defense Council*

Jared Margolis (Oregon Bar No. 146145)
Center for Biological Diversity
Amy R. Atwood (*Pro Hac Vice* Applicant)
(Oregon Bar No. 060407)
P.O. Box 11374
Portland, OR 97211-0374
(971) 717-6401
jmargolis@biologicaldiversity.org
atwood@biologicaldiversity.org

*Attorneys for Center for Biological Diversity
and Friends of the Earth*

Doug Hayes (*Pro Hac Vice* Applicant)
(Colorado Bar No. 39216)
Eric Huber (*Pro Hac Vice* Applicant)
(Colorado Bar No. 40664)
Sierra Club Environmental Law Program
1650 38th Street, Suite 102W
Boulder, CO 80301
(303) 449-5595
doug.hayes@sierraclub.org
eric.huber@sierraclub.org

*Attorneys for Sierra Club and Northern Plains Resource Council*