Jeffery J. Oven
Mark L. Stermitz
Jeffrey M. Roth
CROWLEY FLECK PLLP
490 North 31st Street, Ste 500
P.O. Box 2529
Billings, MT 59103-2529
Telephone: 406-252-3441
Email: joven@crowleyfleck.com
        mstermitz@crowleyfleck.com
        jroth@crowleyfleck.com

*Attorneys for Counsel for TransCanada Keystone Pipeline LP
and TransCanada Corporation*



APR 2 6 2017

Clerk, U S District Court
District Of Montana
Billings

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, BOLD ALLIANCE, CENTER FOR BIOLOGICAL DIVERSITY, FRIENDS OF THE EARTH, NATURAL RESOURCES DEFENSE COUNCIL, INC., and SIERRA CLUB. <br><br> Plaintiffs, <br><br> -v.- <br><br> THOMAS A. SHANNON, JR., in his Official Capacity as Under Secretary of State for Political Affairs, UNITED STATES DEPARTMENT OF STATE, RYAN ZINKE, in his official Capacity as Secretary of the Interior; UNITED STATES DEPARTMENT OF THE INTERIOR; and BUREAU OF LAND MANAGEMENT. <br><br> Defendants. | Civil Action No. 4:17-cv-00031-BMM <br><br> **MEMORANDUM IN SUPPORT OF MOTION BY TRANSCANADA KEYSTONE PIPELINE, LP AND TRANSCANADA CORPORATION TO INTERVENE IN SUPPORT OF DEFENDANTS** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................ii

FACTUAL BACKGROUND ............................................................................. 6

I.     History of TransCanada's Proposed Keystone XL Pipeline and the
       Administrative Processes for Permitting the Keystone XL Pipeline.............. 6

II.    Federal Defendants' Issuance of a Presidential Permit and the Record
       Of Decision/National Interest Determination (ROD/NID)........................... 12

III.   Plaintiffs' Claims ..................................................................................... 13

ARGUMENT ..................................................................................................... 14

I.     TRANSCANADA SHOULD BE ALLOWED TO INTERVENE AS
       OF RIGHT ........................................................................................... 15

       A.    This Motion Is Timely ........................................................................ 15

       B.    TransCanada Has Legally Protected Interests at Stake ...................... 16

       C.    Disposition of This Case May Impair TransCanada's Ability to
             Protect Its Interests............................................................................. 20

       D.    The Federal Defendants Can Not Adequately Represent
             TransCanada's Interests...................................................................... 21

II.    ALTERNATIVELY, TRANSCANADA SHOULD BE PERMITTED
       TO INTERVENE UNDER RULE 24(b)(1)(B)............................................ 23

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Animal Prot. Instit. v. Mosbacher,*
   799 F. Supp. 173 (D.D.C. 1992) ...................................................... 14

*Beck v. U.S. Dep't of Commerce,*
   982 F.2d 1332 (9th Cir. 1992) ........................................................ 16

*Brotherhood of R.R. Signalmen v. STB,*
   638 F.3d 807 (D.C. Cir. 2011) ....................................................... 14

*Californians for Safe & Competitive Dump Truck Transp. v.*
   *Mendonca,*
   152 F.3d 1184 (9th Cir. 1998) ....................................................... 18

*Citizens for Balanced Use v. Mont. Wilderness Ass'n,*
   647 F.3d 893 (9th Cir. 2011) ......................................................... 17

*County of Fresno v. Andrus,*
   622 F.2d 436 (9th Cir. 1980) ..................................................... 13, 18

*Earthworks v. U.S. Dep't of Interior,*
   Civ. 09-01972 (HHK), 2010 U.S. Dist. LEXIS 77894 (D.D.C.
   Aug. 3, 2010) ................................................................................ 20

*In re Estate of Ferdinand E. Marcos Human Rights Litig.,*
   536 F.3d 980 (9th Cir. 2008) ......................................................... 11

*Freedom from Religion Found., Inc. v. Glickman,*
   644 F.3d 836 (9th Cir. 2011) ......................................................... 19

*Iberdrola Renewables, Inc. v. FERC,*
   597 F.3d 1299 (D.C. Cir. 2010) ..................................................... 14

*Idaho Farm Bureau Fed'n v. Babbitt,*
   58 F.3d 1392 (9th Cir. 1995) ..................................................... 12, 19

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ...................................................................... 15

*Nat. Res. Def. Council v. Costle,*
    561 F.2d 904 (D.C. Cir. 1977) ........................................................... 14

*Nat. Res. Def. Council v. Envtl. Prot. Agency,*
    99 F.R.D. 607 (D.D.C. 1983) ........................................................... 14

*Nat. Res. Def. Council v. U.S. Dep't of State,*
    658 F. Supp. 2d 105 (D.D.C. 2009) ........................................... 3, 13

*Perry v. Schwarzenegger,*
    630 F.3d 898 (9th Cir. 2011) ........................................................... 15

*Ripplin Shoals Land Co., LLC v. U.S. Army Corps of Eng'rs,*
    440 F.3d 1038 (8th Cir. 2006) ......................................................... 14

*Roeder v. Islamic Republic of Iran,*
    333 F.3d 228 (D.C. Cir. 2003) ......................................................... 15

*Sagebrush Rebellion, Inc. v. Watt,*
    713 F.2d 525 (9th Cir. 1983) ........................................................... 17

*Sierra Club v. Clinton,*
    746 F. Supp. 2d 1025 (D. Minn. 2010) ............................................ 13

*Sierra Club v. EPA,*
    995 F.2d 1478 (9th Cir. 1993) ......................................................... 14

*Sierra Club v. Espy,*
    18 F.3d 1202 (5th Cir. 1994) ........................................................... 18

*Sierra Club v. Glickman,*
    82 F.3d 106 (5th Cir. 1996) ............................................................. 14

*Sierra Club v. Van Antwerp,*
    523 F. Supp. 2d 5 (D.D.C. 2007) .................................................... 20

*Sisseton-Wahpeton Oyate v. U.S. Dep't of State,*
    659 F. Supp. 2d 1071 (D.S.D. 2009) ............................................... 13

*So. Utah Wilderness v. Norton,*
    No. Civ. A 01-2518 (CKK), 2002 WL 32617198 (D.D.C. 2002) ..................... 14

*Southwest Center for Biological Diversity v. Berg*,
    268 F.3d 810 (9th Cir. 2001)...................................................... 13, 14, 16, 17, 18

*United States v. City of Los Angeles*,
    288 F.3d 391 (9th Cir. 2002).............................................................. 12, 13, 19

*Venegas v. Skaggs*,
    867 F.2d 527 (9th Cir. 1989)........................................................................ 19, 20

**Statutes**

Pub. L. No. 112-78 ............................................................................... 4

30 U.S.C. § 185 .................................................................................... 8

42 U.S.C. § 4321, *et seq.* ..................................................................... 4

**Other Authorities**

69 Fed. Reg. 25,299 (Apr. 30, 2004)................................................... 3

73 Fed. Reg. 11,456 (Mar. 3, 2008) .................................................... 3

76 Fed. Reg. 55,155 (Sept. 6, 2011).................................................... 4

82 Fed. Reg. 8663 (Jan. 30, 2017)....................................................... 7

Fed. R. Civ. P. 24 .......................................................................... 20, 21

TransCanada Keystone Pipeline, LP ("Keystone") and TransCanada Corporation (collectively "TransCanada") hereby respectfully move for leave to intervene as of right pursuant to Federal Rule of Civil Procedure 24(a)(2) or, alternatively, to intervene permissively pursuant to Federal Rule of Civil Procedure 24(b)(1)(B). Plaintiffs claim that the Federal Defendants violated federal law in issuing permits and granting approvals in connection with TransCanada's proposal to construct and operate the Keystone XL Pipeline, a multi-billion dollar oil pipeline from Hardisty, Alberta to Steele City, Nebraska.[1] Because Plaintiffs are seeking to block TransCanada's Keystone XL Pipeline, TransCanada should be permitted to intervene and defend its substantial interests in completing the Keystone XL Pipeline.

---

[1] At Steele City, Nebraska, the Keystone XL Pipeline would connect to the existing Keystone Pipeline System, for which TransCanada Keystone Pipeline, LP, a wholly owned subsidiary of TransCanada Corporation, obtained a Presidential Permit in 2008. The original Keystone Pipeline System extends from Hardisty, Alberta, across the U.S.-Canadian border, through Steele City, Nebraska, to an oil refinery and an oil terminal in Illinois, and to Cushing, Oklahoma. The Keystone Pipeline System also includes the Gulf Coast Project, which extends from Cushing, Oklahoma to Nederland, Texas, and the Houston Lateral Project, which extends from Liberty, Texas to Houston, Texas. *Id.* Another wholly owned TransCanada Corporation subsidiary, TC Oil Pipeline Operations, Inc., operates and maintains the Keystone Pipeline System. Hereinafter, references to "Keystone" include both TransCanada Keystone Pipeline, LP and TC Oil Pipeline Operations, Inc., and references to "TransCanada" include both those subsidiaries and their parent TransCanada Corporation.

## FACTUAL BACKGROUND

TransCanada Corporation and its subsidiary Keystone build and operate energy infrastructure. This case concerns TransCanada's proposal to construct, maintain and operate the Keystone XL Pipeline ("Keystone XL" or "the Project"), a critical infrastructure project that will provide economic strength and energy security for the United States.

## I.    History of TransCanada's Proposed Keystone XL Pipeline and the Administrative Processes for Permitting the Keystone XL Pipeline

In 2008, TransCanada proposed the Keystone XL Pipeline as an expansion to the Keystone Pipeline System in order to facilitate the transport of crude oil to the interior and Gulf Coast regions of the United States from Alberta and Montana. TransCanada proposed making available approximately 100,000 barrels per day of capacity to transporting crude oil extracted in Montana. As originally proposed, the Project included a Canadian segment of some 327 miles from Hardisty, Alberta to the U.S.-Canada border, as well as three principal segments in the United States: (i) a segment from the U.S.-Canadian border to Steele City, Nebraska, connecting with the Keystone Pipeline (approximately 850 miles); (ii) the Gulf Coast segment (approximately 478 miles extending from Cushing, Oklahoma to Nederland, Texas); and (iii) the "Houston Lateral" pipeline segment (approximately 47 miles long, extending from Liberty, Texas to Houston, Texas).

In September 2008, TransCanada applied to the State Department for a permit to construct facilities on and near the border, specifically the 1.2 mile segment from the U.S.-Canada border to the first pipeline isolation valve in Montana. Because this segment would cross the U.S.-Canada border, TransCanada's subsidiary applied for a Presidential Permit authorizing the border crossing as part of the overall construction and operation of the entire facility. *See,* Declaration of Tony Palmer, ¶ 7 ("Palmer Decl."), attached as Exh. A. This was required because the President historically has interpreted his inherent Constitutional powers over foreign affairs to include the power to authorize the construction, operation and maintenance of border crossing facilities such as oil pipelines that cross international borders. *See Nat. Res. Def. Council v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 109 (D.D.C. 2009). For oil pipeline projects, the President has delegated this authority to the State Department.

More specifically, the State Department is authorized to issue a border-crossing permit if the project is found to serve the "national interest." *See* Exec. Order 13,337, 69 Fed. Reg. 25,299 (Apr. 30, 2004) ("E.O. 13337").[2] As a matter

---

[2] TransCanada obtained a Presidential Permit in 2008 to construct the existing Keystone Pipeline after the State Department conducted extensive environmental reviews and concluded "that the Keystone Pipeline Project serves the national interest." U.S. Dep't of State, Record of Decision (Feb. 28, 2008), 73 Fed. Reg. 11,456 (Mar. 3, 2008). Thereafter, TransCanada expended approximately $6.2 billion to construct the existing Keystone Pipeline, which became operational in 2010 and currently can deliver up to 591,000 barrels of crude oil per day ("bpd").

7

of policy and in order to inform the Department's determination regarding the national interest, the State Department coordinated an extensive, multi-year review of the environmental impacts of the entire Keystone XL Project in a manner consistent with the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* This process resulted in a Final Environmental Impact Statement ("FEIS") issued by the State Department in August 2011. *See* 76 Fed. Reg. 55,155 (Sept. 6, 2011).

In November 2011, the State Department decided that before making a national interest determination on the Keystone XL application, it would prepare a supplement to the FEIS after controversy arose over the proposed pipeline route within Nebraska. *See* Palmer Decl. ¶ 8. Thus, TransCanada reinitiated consultation with state and federal officials regarding alternative routes in Nebraska.

As the events involving the pipeline route in Nebraska were unfolding, President Obama, on December 23, 2011, signed tax legislation that included a provision requiring him to grant a permit for the Keystone XL Project within 60 days, unless he determined that the Project would not serve the national interest. Pub. L. No. 112-78, title V, subtitle A. In response, on January 18, 2012, President Obama denied the Keystone XL Project application, explaining that the 60-day timeframe was not long enough to assess the then-unresolved issues concerning an alternative route in Nebraska.

Shortly after that action by President Obama, TransCanada made two important decisions. First, TransCanada informed the State Department that it would go forward with the Gulf Coast segment as a separate, stand-alone project because that segment had immediate utility, independent of the segment between Hardisty, Alberta and Steele City, Nebraska.

Second, TransCanada re-applied for a Presidential Permit. In May 2012, TransCanada submitted a renewed application to the State Department for a cross-border permit for the proposed facility that would cross the border in Phillips County, Montana and interconnect with the Keystone Pipeline at Steele City, Nebraska. Palmer Decl. ¶ 11. The pipeline route proposed in the May 2012 application would transit the same route as originally proposed through Montana and South Dakota. However, TransCanada stated that it would supplement the application with an alternative route in Nebraska, once Nebraska selected the route.

For its part, the Nebraska Department of Environmental Quality ("NDEQ") conducted a year-long public process to consider proposed alternative routes through Nebraska. In December 2012, the NDEQ submitted a report to the Governor of Nebraska evaluating a route that would avoid the Sandhills areas. The Governor of Nebraska approved the route in January 2013, and advised the

President as well as the Secretary of State of his approval by letter dated January 22, 2013.[3]

In March 2013, the State Department released a Draft SEIS ("DSEIS"), reflecting the new route through Nebraska. The State Department completed its Final Supplemental Environmental Impact Statement ("SEIS") in January 2014 and, in January 2015, resumed its broader review of the Keystone XL Pipeline by requesting the views of the Departments of Defense, Energy, Justice, Interior, Commerce, Homeland Security, and Transportation, and the Environmental Protection Agency, as provided for in E.O. 13337. Then, on November 6, 2015, the Obama Administration announced that it had denied the border crossing permit for the Keystone XL Pipeline, based on the premise that approval would undermine U.S. climate leadership in the international arena.

On January 24, 2017, President Trump invited TransCanada to re-submit its application for a Presidential Permit. President Trump directed the Secretary of State to receive TransCanada's application, if submitted, and "take all actions necessary and appropriate to facilitate its expeditious review," including: (i) reaching a final permitting determination within 60 days of TransCanada's

---

[3] Due to legal uncertainty regarding the Nebraska statute that authorized the Governor's approval of an alternate route, TransCanada filed an application for route approval with the Nebraska Public Service Commission (PSC) on February 16, 2017. By statute, the PSC has until November 23, 2017 to rule on that application. For this and other reasons, TransCanada is not in a position to begin construction of the XL Pipeline for at least a year.

submission of its application; and (ii) declaring the January 2014 SEIS as satisfying all applicable requirements of NEPA; and "any other provision of law that requires executive department consultation or review (including the consultation or review required under section 7(a) of the Endangered Species Act of 1973, 16 U.S.C. 1536(a))." Memorandum of January 24, 2017: Construction of the Keystone XL Pipeline, 82 Fed. Reg. 8663, § 3(i)-(ii) (Jan. 30, 2017).

On January 26, 2017, TransCanada re-submitted an application for a border crossing permit for the Keystone XL Pipeline. The re-submitted application includes minor route refinements, but the route remains entirely within the areas surveyed in the 2014 SEIS. On March 23, 2017, the State Department determined that the issuance of a permit to TransCanada would serve the national interest. Pursuant to E.O. 13337 and the January 24, 2017 Presidential Memorandum, it granted the Presidential Permit that TransCanada had applied for in January. Department of State Record of Decision and National Interest Determination, TransCanada Keystone Pipeline L.P. Application for Presidential Permit, Keystone XL Pipeline, attached as Exhibit 1 to Palmer Decl. ("ROD/NID"). The Presidential Permit issued to TransCanada includes "authorizations to construct, connect, operate and maintain facilities at the border of the United States facilities for the transport of crude oil from Canada to the United States as described in [TransCanada's] Presidential permit application." ROD/NID, § 7.0.

In addition, the Keystone XL route crosses approximately 46 miles of federal land administered by the Bureau of Land Management ("BLM") in Montana, requiring TransCanada to obtain a right-of-way and authorization from BLM under the Mineral Leasing Act of 1920, as amended, 30 U.S.C. § 185(a). TransCanada's application for authorization from BLM is pending.  Palmer Decl. ¶ 16.

## II. Federal Defendants' Issuance of a Presidential Permit and the Record Of Decision/National Interest Determination (ROD/NID)

On March 23, 2017, Thomas A Shannon, Jr., Under Secretary of State for Political Affairs, signed a Presidential Permit and ROD/NID, determining that issuance of a permit to TransCanada for the border crossing segment of the Keystone XL Pipeline would serve the national interest.  The ROD/NID explained that, although the State Department's review of TransCanada's Presidential Permit application was conducted "in a manner consistent with NEPA," the determination to issue the permit "is Presidential action, made through the exercise of Presidentially delegated authorities and, therefore, the requirements of [NEPA], the National Historic Preservation Act of 1966 (NHPA), the [ESA], the Administrative Procedure Act (APA), and other similar laws and regulations that do not apply to Presidential actions are also inapplicable here."  ROD/NID, § 1.0.  Although it found NEPA inapplicable, the State Department said that the March 2017 ROD/NID was informed by the January 2014 SEIS and the "department has

reviewed the potential impacts of the proposed project on the environment and cultural resources." ROD/NID, § 5.0. Moreover, it found that events occurring since the issuance of the January 2014 SEIS "do not represent substantial changes, do not present significant new information, and do not affect the continued reliability of the [SEIS]." *Id.* Accordingly, the Department continued to rely upon that study when it prepared the ROD/NID.

When it issued the March 2017 ROD/NID, the State Department concluded after "weigh[ing] multiple policy considerations," that the proposed Keystone XL Pipeline's

> "potential to bolster U.S. energy security by providing additional infrastructure for the dependable supply of crude oil, its role in supporting, directly and indirectly, a significant number of U.S. jobs and providing increased revenues to local communities that will bolster the U.S. economy, its ability to reinforce our bilateral relationship with Canada, and its limited impact on other factors considered by the Department, all contribute to a determination that issuance of a Presidential permit for this proposed Project serves the national interest." ROD/NID, § 6.0.

## III.  Plaintiffs' Claims

Plaintiffs filed suit against the United States Department of State, United States Department of the Interior, and Bureau of Land Management, and individual officials to challenge federal agency approvals for the Keystone XL Pipeline. In one instance, however, the complained-of action has not occurred because that matter remains pending and under consideration by the federal defendants.

13

Plaintiffs make three claims for relief: (1) Defendants State Department and Under Secretary Shannon violated NEPA and the APA by issuing the cross-border permit to Keystone XL (Complaint, ¶¶ 101-107); (2) Defendants Interior Department, Bureau of Land Management, and Secretary Zinke "will violate NEPA" and the Administrative Procedure Act by relying on the 2014 SEIS for the expected right of way for Keystone XL that "BLM will soon grant" (Complaint, ¶¶ 108-113); and (3) Defendants State Department and Under Secretary Shannon violated the APA by issuing the March 23 cross-border permit and supporting ROD/NID without providing a reasoned explanation (Complaint, ¶¶ 114-118).

Plaintiffs seek declaratory and injunctive relief that would invalidate Keystone XL's federal permits and approvals and prevent TransCanada from performing any activity in furtherance of construction or operation of Keystone XL.

## ARGUMENT

TransCanada should be allowed to intervene as of right or, alternatively, permissively under Federal Rule of Civil Procedure 24 and Local Civil Rule 24.1, in order to obtain a favorable resolution of this case.[4]

---

[4] Because this Motion to Intervene is being filed so soon after the Complaint was served, the time in which to file an answer or dispositive motion has not yet run. TransCanada respectfully requests that its deadline under Federal Rule of Civil Procedure 24(c) and Local Rule 24.1 for pleading or filing a dispositive motion be

## I. TRANSCANADA SHOULD BE ALLOWED TO INTERVENE AS OF RIGHT

TransCanada is entitled to intervene as of right to defend its interests in pursuing the Keystone XL Pipeline. Under Fed. R. Civ. P. 24(a)(2), to intervene as of right, an applicant must show that "(1) it has a significant protectable interest relating to the property or transaction that is the subject of the action; (2) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; (3) the application is timely; and (4) the existing parties may not adequately represent the applicant's interest." *In re Estate of Ferdinand E. Marcos Human Rights Litig.*, 536 F.3d 980, 984 (9th Cir. 2008) (internal quotations and citation omitted). TransCanada plainly satisfies these requirements.

### A. This Motion Is Timely

TransCanada's Motion fulfills are requirements for timeliness. The Complaint in this case was served on the Federal Defendants on March 30, 2017, less than one month ago. The administrative record has yet to be filed. Indeed, one of the alleged violations has not yet occurred because the Federal Defendants at BLM have not yet taken any action on the requested right-of-way. Further, no motion has yet been filed to consolidate the two similar actions that were filed

---

deferred until seven days after the date that such filing by the Federal Defendants is due.

15

against the Federal Defendants. In addition, the Federal Defendants have not yet filed an answer or dispositive motion.

Given the early stage of this legal action, TransCanada satisfies all of the elements related to the timeliness analysis under Rule 24(a)(2). Courts have found motions to intervene to be timely when they have been filed under similar, if not later, circumstances. *E.g.*, *United States v. City of Los Angeles*, 288 F.3d 391, 398 (9th Cir. 2002) (noting that a timely motion to intervene was filed "only approximately one and [a] half months after the suit was filed"); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995) (permitting a "very early" motion to intervene submitted four months after the filing of the action, two months after defendants had filed an answer and submitted the administrative record, and "before any hearings or rulings on substantive matters").

### B. TransCanada Has Legally Protected Interests at Stake

TransCanada has sufficient interests in this litigation because its subsidiary Keystone is the owner, developer, and permit holder for the Keystone Pipeline and the owner and permit applicant for the Keystone XL Pipeline project that gives rise to Plaintiffs' claims. The Ninth Circuit has explained that a movant for intervention has adequate interests in a suit where "the resolution of the plaintiffs' claims actually will affect the applicant." *City of Los Angeles*, 288 F.3d at 398 (internal quotation marks and citations omitted). The interest test directs courts to

make a practical, threshold inquiry, and is a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process. *See id.*; *see also County of Fresno v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980) (agreeing that the interest test is primarily a practical guide and a threshold inquiry).

In two cases filed to challenge the Presidential Permit issued for the initial Keystone Pipeline, Keystone's entitlement to intervene was not disputed. *See Sisseton-Wahpeton Oyate v. U.S. Dep't of State*, 659 F. Supp. 2d 1071 (D.S.D. 2009); *Nat. Res. Def. Council v. U.S. Dep't of State*, 658 F. Supp. 2d 105 (D.D.C. 2009). Similarly, Enbridge Pipeline was granted intervention to defend against NEPA claims aimed at its Presidential Permit for the transnational Alberta Clipper oil pipeline. *Sierra Club v. Clinton*, 746 F. Supp. 2d 1025, 1028 (D. Minn. 2010). Because this case also challenges a Presidential Permit and because TransCanada's interests in this suit are no different than the interests found adequate for mandatory intervention in those earlier and similar cases, TransCanada's intervention here is proper.

Courts routinely grant intervention to parties with property or other commercial interests that could be directly affected by another party's challenges to government action. For example, in *Southwest Center for Biological Diversity v. Berg*, this Court held that a construction company's interest in development

projects entitled the company to intervene to defend against environmentalists' challenges to the government's conservation programs. 268 F.3d 810, 818-22 (9th Cir. 2001).[5] Likewise, entities that obtain federal permits have protectable interests in defending against challenges to those permits. *E.g.*, *Sierra Club v. EPA,* 995 F.2d 1478, 1482 (9th Cir. 1993) (owner of a facility with a Clean Water Act permit could intervene to defend against suit to invalidate the permit); *see also, e.g., Animal Prot. Instit. v. Mosbacher*, 799 F. Supp. 173, 175 (D.D.C. 1992) (aquarium with permit to import marine mammals intervened to defend against suit to invalidate the permit); *Ripplin Shoals Land Co., LLC v. U.S. Army Corps of Eng'rs*, 440 F.3d 1038, 1039 (8th Cir. 2006) (developer with a Corps permit to construct a bridge intervened to defend against plaintiffs' NEPA challenges).

---

[5] *See also, e.g., Brotherhood of R.R. Signalmen v. STB*, 638 F.3d 807, 808 (D.C. Cir. 2011) (railroad intervened to defend challenge to its sale of railroad track and assets); *Iberdrola Renewables, Inc. v. FERC*, 597 F.3d 1299, 1300-1301 (D.C. Cir. 2010) (pipeline owner intervened to defend agency's refusal to review rates charged to petitioning shipper); *Sierra Club v. Glickman,* 82 F.3d 106, 109 (5th Cir. 1996) (association representing farmers with rights to pump water under a challenged government program has a legally protected interest); *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 906 (D.C. Cir. 1977) (rubber and chemical companies intervened to participate in settlement of plaintiffs' suit to force EPA to issue Clean Water Act regulations that would affect intervenors' businesses); *So. Utah Wilderness v. Norton*, No. Civ. A 01-2518 (CKK), 2002 WL 32617198, *5 (D.D.C. 2002) (holder of oil and gas leases had sufficient interests because plaintiffs' requested relief would require "rescission of the leases until [Federal] defendants comply with the requirements of NEPA and NHPA"); *Nat. Res. Def. Council v. Envtl. Prot. Agency,* 99 F.R.D. 607, 609 (D.D.C. 1983) (pesticide manufacturers subject to regulation under challenge have a legally protected interest).

Under these precedents, TransCanada plainly has substantial, protectable

interests. First, TransCanada has protectable interests in pursuing the Keystone XL

Pipeline and defending its permits and other federal approvals. TransCanada also

has a multi-billion dollar commercial interest in completing the Keystone XL

Pipeline. To date, TransCanada has invested three billion dollars (US) in

development of the Project, and it plans to spend another eight billion dollars (US)

to complete it. Palmer Decl. ¶ 19. Third, TransCanada has substantial business

expectations with respect to customers seeking to transport crude oil through the

pipeline as soon as it is completed. *Id.* ¶ 18. Plaintiffs' suit seeks to invalidate

these federal approvals which, as a result, would put those substantial investments

and expectations at risk. *Id.* ¶ 17. Finally, TransCanada has substantial, direct, and

protectable property and commercial interests in the existing Keystone Pipeline,

the value of which would be diminished if the Keystone XL Pipeline is further

delayed. *See id.* These are more than ample interests to support intervention.

While the Ninth Circuit does not require that intervenors demonstrate its

constitutional standing, *see Perry v. Schwarzenegger*, 630 F.3d 898, 906 (9th Cir.

2011), the above facts regarding TransCanada's substantial interest for intervention

also show that TransCanada has Article III standing. *See Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 560 (1992); *see also Roeder v. Islamic Republic of Iran*,

333 F.3d 228, 233 (D.C. Cir. 2003) ("[A]ny person who satisfies Rule 24(a) will

also meet Article III's standing requirement.") (citing *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 946 (7th Cir. 2000)). TransCanada will suffer injury-in-fact if Plaintiffs succeed in obtaining the relief sought here. Delay or termination of Keystone XL would cause serious economic harm to TransCanada, and that potential injury is best redressed by mounting a stalwart defense of Federal Defendants' actions allowing the Project to proceed. *See, e.g.*, *Beck v. U.S. Dep't of Commerce*, 982 F.2d 1332, 1338 (9th Cir. 1992) (noting that to satisfy the case or controversy requirement of Article III, an intervenor must show that it has suffered an injury in fact, which is traceable to the challenged action and is likely to be redressed by the requested relief).

## C. Disposition of This Case May Impair TransCanada's Ability to Protect Its Interests

Under this factor, courts consider whether an applicant for intervention is so situated "that disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect [its] interest." *Southwest Center for Biological Diversity*, 268 F.3d at 817-18. TransCanada is clearly so situated. The Plaintiffs seek to halt the Keystone XL Pipeline by invalidating critical permits. If Plaintiffs' views prevail, this suit could derail the Keystone XL Pipeline entirely. Any relief of that nature would obviously impair TransCanada's ability to recover on its investments and meet commercial demand for oil transportation service. Because

the relief Plaintiffs seek would have direct, immediate and harmful impact on TransCanada's interests, this criterion of Rule 24(a)(2) is satisfied. *See id.*

## D. The Federal Defendants Can Not Adequately Represent TransCanada's Interests

It is well settled that a putative intervenor only needs to show that representation of its interests by existing parties "'may be' inadequate" and that "the burden of making that showing should be treated as minimal." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011); *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983) (citing *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)). The Ninth Circuit has held that private entities may intervene when the government representation is inadequate, even if the private entities and the government share the same ultimate objective. *See Southwest Center for Biological Diversity*, 268 F.3d at 823. This rule reflects that "the government's representation of the public interest may not be identical to the individual parochial interest of a particular group just because both sides occupy the same posture in the litigation." *Citizens for Balanced Use*, 647 F.3d at 899 (internal quotation marks and citation omitted).

Here, the Federal Defendants cannot adequately represent TransCanada because they will necessarily pursue a broader set of interests than TransCanada's specific and narrower interests in constructing and operating the Keystone XL Pipeline. The Federal Defendants are administering environmental statutes and are

21

charged by law with representing the public interest of citizens as a whole. Indeed, E.O. 13337 expressly commands the State Department to decide TransCanada's application based on whether such a permit will serve the "national interest." This criterion is not equivalent to the "more narrow and 'parochial'" interest advanced by TransCanada. *See Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1190 (9th Cir. 1998) (distinguishing between the narrower and more parochial interest of intervenor and the broader interests of the public at large); *see also Southwest Ctr. for Biological Diversity*, 268 F.3d at 823-24 (noting that "[t]he priorities of defending government agencies are not simply to confirm the Applicants' interests" and that "on some issues Applicants will have to express their own unique private perspectives."). In contrast, TransCanada's interests are focused on completing Keystone XL for reasons apart from the "national interest" analysis that will guide the Federal Defendants. This difference is sufficient to justify intervention. *E.g.*, *Californians for Safe & Competitive Dump Truck Transp.*, 152 F.3d at 1190; *Sierra Club v. Espy*, 18 F.3d 1202, 1208 (5th Cir. 1994) (permitting intervention because the government represented the broad public interest rather than the economic concerns of intervenors); *County of Fresno*, 622 F.2d at 438-39 (noting that the government did not fully represent intervenor).

## II. ALTERNATIVELY, TRANSCANADA SHOULD BE PERMITTED TO INTERVENE UNDER RULE 24(b)(1)(B)

In the alternative, the Court should permit TransCanada to intervene under Rule 24(b)(1)(B). The Court may do so provided that three conditions are met: (1) the movant must show an independent ground for jurisdiction, (2) the motion must be timely, and (3) the movant's claim or defense and the main action must have a question of law and fact in common. *See, e.g.*, *Venegas v. Skaggs*, 867 F.2d 527, 529 (9th Cir. 1989). In exercising its discretion to grant or deny permissive intervention, the Court must consider whether the intervention will unduly delay or prejudice the original parties' rights. *Id.* at 530.

First, because this is a federal question case and TransCanada does not seek to bring any counterclaims or cross-claims, the independent jurisdictional grounds requirement does not apply. *See, e.g.*, *Freedom from Religion Found., Inc. v. Glickman*, 644 F.3d 836, 843 (9th Cir. 2011).

Second, as explained above, there can be no question that this application for intervention is timely, having been filed some XX days after the Complaint was served on the Federal Defendants. *See, e.g.*, *City of Los Angeles*, 288 F.3d at 398 (motion was timely when filed "only" one and a half months after filing of suit); *Idaho Farm Bureau Fed'n*, 58 F.3d at 1397 (successful motion to intervene was submitted four months after the filing of the action, two months after defendants

had filed an answer and submitted the administrative record, and "before any hearings or rulings on substantive matters").

Third, TransCanada's defenses share "common questions" of law and fact with Plaintiffs' suit. Fed. R. Civ. P. 24(b)(1)(B). Intervention has been permitted when a movant's claims share only a single common question. *See, e.g.*, *Venegas*, 867 F.2d at 530. The questions that TransCanada would address overlap completely with the existing case, which would certainly affect its rights. As for factual questions, TransCanada would address exactly the same factual questions, based on the same administrative record that it helped build through active participation in the permit-application process and the NEPA and ESA consultations. In respect to the legal issues, TransCanada seeks to defend against Plaintiffs' efforts to have this Court invalidate the Federal Defendants' actions. TransCanada's intervention, therefore, fully satisfies the requirements for permissive intervention under Rule 24(b)(1)(B). *See, e.g.*, *Earthworks v. U.S. Dep't of Interior*, Civ. 09-01972 (HHK), 2010 U.S. Dist. LEXIS 77894, at *5 (D.D.C. Aug. 3, 2010) (allowing permissive intervention because movants "have an interest in keeping the agencies' rules in place and therefore have a 'defense that shares with the main action a common question of law or fact'"); *Sierra Club v. Van Antwerp*, 523 F. Supp. 2d 5, 10 (D.D.C. 2007) (allowing permissive intervention by parties that "hold[] the section 404 permit that plaintiffs challenge"

because they "have an interest in retaining the permit and in continuing to develop [the project], and they present defenses to the precise claims brought by plaintiffs").

Finally, TransCanada's intervention would not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). TransCanada seeks to address questions that the Court will already be addressing, and TransCanada would be participating from this case's inception. As in past challenges to its federal permits, TransCanada's intervention will cause no delay. TransCanada has been participating extensively in the proceedings before the Federal Defendants. Its continued participation would not proliferate different issues or cause any confusion or prejudice. Further, TransCanada pledges to abide by any scheduling deadlines agreed to by Plaintiffs and the Federal Defendants.

## CONCLUSION

WHEREFORE, TransCanada respectfully requests leave to intervene as of right in this matter as allowed by Federal Rule of Civil Procedure 24(a)(2). Alternatively, TransCanada respectfully requests leave for permissive intervention as provided by Federal Rule of Civil Procedure 24(b)(1)(B). TransCanada also respectfully requests that its time period for filing a responsive pleading or dispositive motion as intervenor be extended to allow for it to file its answer or

motion seven days after the deadline by which the Federal Defendants must file such pleading or motion.

Dated this 26th day of April, 2017.

CROWLEY FLECK PLLP

By: _Victoria M. Marquis for_
      Jeffery J. Oven
      Mark L. Stermitz
      Jeffrey M. Roth
490 North 31st Street, Ste 500
P.O. Box 2529
Billings, MT 59103-2529
*Attorneys for Counsel for TransCanada Keystone
Pipeline LP and TransCanada Corporation*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(d)(2) of the United States Local Rules, I certify that this Brief contains 4,940 words, excluding caption and certificates of service and compliance, printed in at least 14 points and is double spaced, including for footnotes and indented quotations.

DATED this 26th day of April, 2017.

By: _Victoria M. Marquis for_
      Jeffery J. Oven

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served upon the following counsel of record, by the means designated below, this 26th day of April, 2017:

2 - 9       MAIL
1       Hand Delivered
_____       CM/ECF
_____       E-mail

1.       Clerk of U.S. District Court

2.       Cecilia D. Segal
NATURAL RESOURCES DEFENSE COUNCIL - San Francisco
111 Sutter Street, Floor 21
San Francisco, CA 94104
*Attorneys for Northern Plains Resource Council, Bold Alliance, Center for Biological Diversity, Friends of the Earth, Natural Resources Defense Council, Sierra Club*

3.       Selena Kyle
NATURAL RESOURCES DEFENSE COUNCIL - Chicago
20 North Wacker Drive, Suite 1600
Chicago, IL 60606
*Attorneys for Northern Plains Resource Council, Bold Alliance, Center for Biological Diversity, Friends of the Earth, Natural Resources Defense Council*

4.       Timothy M. Bechtold
BECHTOLD LAW FIRM
PO Box 7051
Missoula, MT 59807-7051
*Attorneys for Northern Plains Resource Council, Bold Alliance, Center for Biological Diversity, Friends of the Earth, Natural Resources Defense Council, Sierra Club*

5.  Amy R. Atwood
    CENTER FOR BIOLOGICAL DIVERSITY - PORTLAND
    PO Box 11374
    Portland, OR 97211-0374
    *Attorneys for Bold Alliance, Center for Biological Diversity, Friends of the*
    *Earth, Natural Resources Defense Council, Sierra Club*

6.  Douglas P. Hayes
    SIERRA CLUB
    1650 38th Street, Suite 102W
    Boulder, CO 80301
    *Attorneys for Sierra Club*

7.  Eric E. Huber
    SIERRA CLUB
    Environmental Law Program
    1650 38th St., Suite 102W
    Boulder, CO 80301
    *Attorneys for Sierra Club*

8.  Luther L. Hajek
    U.S. DEPARTMENT OF JUSTICE - DENVER
    South Terrace, Suite 370
    999 18th Street
    Denver, CO 80202
    *Attorneys for Thomas A. Shannon, Jr., US Department of State, Ryan Zinke,*
    *US Department of the Interior and Bureau of Land Management*

9.  Mark Steger Smith
    U.S. ATTORNEY'S OFFICE - BILLINGS
    2601 Second Avenue North
    Suite 3200
    Billings, MT 59101
    *Attorneys for Thomas A. Shannon, Jr., US Department of State, Ryan Zinke,*
    *US Department of the Interior and Bureau of Land Management*

By  *Victoria O'Marquis for*
    Jeffery J. Oven

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, BOLD ALLIANCE, CENTER FOR BIOLOGICAL DIVERSITY, FRIENDS OF THE EARTH, NATURAL RESOURCES DEFENSE COUNCIL, INC., and SIERRA CLUB. <br><br> Plaintiffs, <br><br> -v.- <br><br> THOMAS A. SHANNON, JR., in his Official Capacity as Under Secretary of State for Political Affairs, UNITED STATES DEPARTMENT OF STATE, RYAN ZINKE, in his official Capacity as Secretary of the Interior; UNITED STATES DEPARTMENT OF THE INTERIOR; and BUREAU OF LAND MANAGEMENT. <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) )Civil Action No. 4:17-cv-00031-BMM ) ) ) ) ) **DECLARATION OF** ) **TONY PALMER** ) ) ) ) ) ) ) |

EXHIBIT

A

Blumberg No. 5208

## I.    **INTRODUCTION**

1.    My name is Tony Palmer and I am the President, Keystone XL, Energy East and Prince Rupert Gas Transmission, for TransCanada Corporation. My business address is 450 – 1st Street SW, Calgary, Alberta T2P 5H1.

2.    In my role as President, Keystone XL, I am responsible for the overall development of the Keystone XL Pipeline Project (the "Project"). My responsibilities for the Project include general oversight of development and implementation of the project. This includes acquiring the necessary property rights and securing all necessary permits to construct and operate the Project. I am also responsible for, the Project's engineering, procurement, construction, commissioning, start-up, and testing.

3.    I have a Bachelor of Arts degree in Economics from Concordia University in Montreal which I received in 1979.

4.    I have worked at TransCanada for over 30 years. Prior to my current roles, I was Senior Vice President of Stakeholder Relations. I have also led a number of TransCanada's major business development initiatives.

5.    I am offering this Declaration in support of TransCanada Keystone Pipeline, LP and TransCanada's Motion to Intervene. The facts I provide are within my personal knowledge.

6.    TransCanada Keystone Pipeline, LP is a Delaware limited partnership owned by TransCanada Keystone Pipeline LLC and TransCanada Keystone Pipeline GP, LLC, wholly owned subsidiaries of TransCanada Corporation, a Canadian public company organized under the laws of Canada. TransCanada Keystone Pipeline, LP was

created for the purpose of constructing and operating pipelines to transport crude oil. TransCanada Keystone Pipeline, LP is the sponsor of the Keystone XL Pipeline and will construct the Project. Another wholly owned TransCanada Corporation subsidiary, TC Oil Pipeline Operations, Inc., operates and maintains the Keystone Pipeline System, described below, and will also operate and maintain the Keystone XL Pipeline. For the remainder of this declaration, references to "Keystone" and "Keystone XL" include both TransCanada Keystone Pipeline, LP and TC Oil Pipeline Operations, Inc., and references to "TransCanada" include both those subsidiaries and their parent TransCanada Corporation.

7.    TransCanada originally proposed the Keystone XL Project in 2008 as an expansion to its Keystone Pipeline System. TransCanada's Motion to Intervene, to which this declaration is appended, presents a detailed summary of the significant events involving TransCanada and the governmental entities reviewing TransCanada's several applications as the company sought the federal approvals needed to construct, operate and maintain the project. As originally proposed, the Keystone XL Project included a 327-mile Canadian pipeline segment from Hardisty, Alberta to the U.S.-Canada border, as well as three principal segments in the United States. They were: (i) a segment from the U.S.-Canadian border to Steele City, Nebraska, connecting with the existing Keystone Pipeline (approximately 850 miles); (ii) the Gulf Coast segment (approximately 478 miles, extending from Cushing, Oklahoma to Nederland, Texas); and (iii) the "Houston Lateral" pipeline segment (approximately 47 miles long, extending from Liberty, Texas to Houston, Texas).

3

7.     In September 2008, TransCanada first applied to the U.S. Department of State ("State Department") for a Presidential border-crossing permit for the Keystone XL Pipeline segment that would cross the U.S.-Canada border in Montana. The State Department coordinated an extensive, multi-year review of the environmental impacts of the entire Keystone XL Project, resulting in its release of a Final Environmental Impact Statement ("FEIS") in August 2011.

8.     In November 2011, after controversy arose over the proposed pipeline route within Nebraska, the State Department decided that it needed to prepare a supplement to the FEIS prior to making the national interest determination on the Keystone XL application.

9.     On December 23, 2011, President Obama signed tax legislation that included a provision requiring him to grant a permit for the Keystone XL Project within 60 days, unless he determined that the Project would not serve the national interest. Pub. L. No. 112-78, title V, subtitle A. On January 18, 2012, President Obama denied the Keystone XL Project application, explaining that the 60-day statutory window did not provide enough time to assess the then-unresolved issues concerning an alternative route in the Nebraska.

10.     Shortly after President Obama's denial of the Keystone XL application, TransCanada  decided that it would go forward with the Gulf Coast segment as a separate, stand-alone project because that segment had immediate utility, independent of the Hardisty, Alberta to Steele City segment. The Gulf Coast Pipeline was completed and placed in service in January 2014.

11. In addition, in May 2012, TransCanada submitted a renewed application to the State Department for a cross-border Presidential permit for the proposed facility that would cross the border in Phillips County, Montana and interconnect with the Keystone Pipeline at Steele City, Nebraska as originally proposed in 2008.

12. As the State Department was considering TransCanada's 2012 application, the Nebraska Department of Environmental Quality ("NDEQ") conducted a year-long public process to consider proposed alternative routes through Nebraska. In December 2012, the NDEQ submitted a report to the Governor of Nebraska evaluating a route that would avoid the Sandhills areas. The Governor of Nebraska approved that route in January 2013, and advised the President and the Secretary of State of his approval by letter dated January 22, 2013.

13. In March 2013, the State Department released a Draft Supplemental EIS ("DSEIS"), reflecting the new route through Nebraska. The State Department completed its Final Supplemental Environmental Impact Statement ("SEIS") in January 2014. On November 6, 2015, the Obama Administration announced that it had denied the border crossing permit for the Keystone XL Pipeline, based on the premise that approval would undermine U.S. climate leadership in the international arena.

14. On January 24, 2017, President Trump invited TransCanada to re-submit its application for a presidential permit. On January 26, 2017, TransCanada re-submitted an application for a border crossing permit for the Keystone XL Pipeline. The re-submitted application includes minor route refinements, but the route remains entirely within the areas surveyed by the Department of State in its 2014 SEIS.

15.     On March 23, 2017, pursuant to E.O. 13337 and the January 24, 2017

Presidential Memorandum, the State Department determined that the issuance of a permit

to TransCanada would serve the national interest and granted the Presidential permit as

applied for on January 26, 2017. Department of State Record of Decision and National

Interest Determination, TransCanada Keystone Pipeline L.P. Application for Presidential

Permit, Keystone XL Pipeline,("ROD/NID") attached as Exhibit 1. The Presidential

permit issued to TransCanada includes "authorizations to construct, connect, operate and

maintain facilities at the border of the United States facilities for the transport of crude oil

from Canada to the United States as described in [TransCanada's] Presidential permit

application." ROD/NID, § 7.0.

16.     Although it now holds a final decision from the Department of State,

TransCanada is still awaiting decisions from the U.S. Army Corps of Engineers on its

applications under sections 404 and 408 of the Clean Water Act, 33 U.S.C. §§ 1344,

1348, as well as a decision from Interior's Bureau of Land Management on a right-of-

way over a small segment of federal land in Montana pursuant to section 185 of the

Mineral Leasing Act, 30 U.S.C. § 185. TransCanada also is participating in a public

process before the Nebraska Public Service Commission on matters involving the

project's routing through Nebraska. A decision by the Commission is not expected until

November of this year, at the earliest. For these and other reasons, TransCanada is not in

a position to begin construction of the Keystone XL pipeline for at least twelve months

from the date of this declaration.

17.     As the owner and operator of Keystone XL and the larger Keystone Pipeline system, TransCanada has a significant interest in the continued operation and economic viability of this system. The other portions of the Keystone Pipeline system are in operation and are delivering products for TransCanada's customers. Keystone XL is an expansion of the existing pipeline system. The completion of the application processes and subsequent construction of Keystone XL is essential to protecting and promoting TransCanada's interests in the entire Keystone Pipeline system. Efforts to further delay or derail the multi-year permitting process will not only affect Keystone XL, but also the entire Keystone Pipeline system.

18.     TransCanada has a significant interest in being able to satisfy market demand for transportation service on the Keystone XL Pipeline. The Project would connect the world's largest source of heavy crude oil production with the world's largest refining complex capable of refining heavy crude oil. Given the passage of time since its prior Presidential Permit application was denied in 2015, TransCanada is updating its shipper contracts. TransCanada expects this process to be complete within a few months and expects demand for the Project to be substantially similar to that which existed when it applied for a Presidential Permit in 2012.

19.     TransCanada has a significant interest in preserving the integrity of its investment of time and resources already devoted to this project that was originally proposed in 2008. To date, TransCanada has invested roughly three billion dollars (US) in the Keystone XL Pipeline Project. That investment has supported standard and

traditional project development activities. The overall cost of the Project is estimated to be approximately eight billion dollars (US).

20.     Many of TransCanada's expenses related to Keystone XL represent ongoing expenditure that cannot be avoided in the case of a further delay in the permitting processes and construction schedule. These costs relate to engineering acquisitions of long lead-time materials, commitments to utility power companies, ongoing easements and regulatory activities, activities to maintain staff and equipment, and financing including the costs to borrow funds, and pay taxes.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _24th_ day of April 2017.

_____

Tony Palmer
President, Keystone XL
TransCanada Corporation

Signed before me at the City of Calgary,
in the Province of Alberta
this 24th day of April, 2017

_____
Peter Piliounis
Barrister & Solicitor
A Notary Public in and for the
Province of Alberta
My commission does not expire

ACTIVE 220925237

# DEPARTMENT OF STATE
# RECORD OF DECISION AND NATIONAL INTEREST
# DETERMINATION

**TransCanada Keystone Pipeline, L.P. Application for Presidential Permit, Keystone XL Pipeline**

**Contents:**

1.0 Summary

2.0 Legal Authority

3.0 Agency and Tribal Involvement and Public Comment

4.0 Project Background

5.0 Issues Considered in the Final Supplemental Environmental Impact Statement

6.0 Basis for Decision

7.0 National Interest Determination



## 1.0 Summary

On May 4, 2012, TransCanada Keystone Pipeline, L.P. (Keystone) submitted an application to the U.S. Department of State (Department) for a Presidential permit that would authorize construction, connection, operation, and maintenance of pipeline facilities at the U.S.-Canada border in Phillips County, Montana, to import crude oil from Canada into the United States. The proposed project, called Keystone XL (the proposed Project), would consist of approximately 1,204 miles of new, 36-inch-diameter pipeline extending from Hardisty, Alberta, to Steele City, Nebraska. The proposed Project would have the capacity to deliver up to 830,000 barrels per day (bpd) of crude oil. It would predominantly transport crude oil from the Western Canadian Sedimentary Basin (WCSB), but, subject to commercial demand, would also transport quantities of crude oil from Montana and North Dakota via a proposed pipeline and associated facilities known as the Bakken Marketlink Project. If issued, the permit would authorize operations at the border segment, which is from the international border near Morgan, Montana, to the first mainline shut-off valve within the United States located approximately 1.2 miles from the international border.

On November 6, 2015, Secretary of State Kerry determined under Executive Order 13337 that issuing a Presidential permit to Keystone for the proposed Keystone XL pipeline's border facilities would not serve the national interest, and denied the permit application (2015 Decision). On January 24, 2017, President Trump issued a Presidential Memorandum Regarding Construction of the Keystone XL Pipeline (Presidential Memorandum) which, *inter alia*, invited Keystone "to re-submit its application to the Department of State for a Presidential permit for the construction and operation of the Keystone XL Pipeline..." On January 24, 2017, President Trump also issued an Executive Order on Expediting Environmental Reviews and Approvals for High Priority Infrastructure Projects in which he set forth the general policy of the Executive Branch "to streamline and expedite, in a manner consistent with law, environmental reviews and approvals for all infrastructure projects, especially projects that are a high priority for the Nation," and cited pipelines as an example of such high priority projects.

On January 26, 2017, the Department received a re-submitted application from Keystone for the proposed Project. The re-submitted application includes minor route alterations due to agreements with local property owners for specific right-of-ways and easement access, but remains entirely within the areas previously surveyed by the Department in the 2014 Supplemental Environmental Impact Statement (EIS).

Keystone is a limited partnership organized under Delaware law with a primary business address in Houston, Texas. Its affiliate, TC Oil Pipeline Operations Inc. would operate the proposed Project. TC Oil Pipeline Operations Inc. is a limited company organized under the laws of Canada with its headquarters located in Calgary, Alberta, Canada. Both Keystone and TC Oil Pipeline Operations Inc. are owned by affiliates of TransCanada Corporation, a Canadian company with stock publicly traded on the Toronto and New York stock exchanges.

Executive Order 13337 (April 30, 2004) delegates to the Secretary of State the President's authority to receive applications for permits for the construction, connection, operation, or maintenance of facilities for the exportation or importation of petroleum, petroleum products, coal, or other fuels (except for natural gas) at the borders of the United States and to issue or deny such Presidential permits upon a national interest determination. The determination is Presidential action, made through the exercise of Presidentially delegated authorities, and therefore the requirements of the National Environmental Policy Act of 1969 (NEPA), the National Historic Preservation Act of 1966 (NHPA), the Endangered Species Act of 1973 (ESA), the Administrative Procedure Act (APA), and other similar laws and regulations that do not apply to Presidential actions are also inapplicable here. Nevertheless, the Department's review of the Presidential permit application for the proposed Project has, as a matter of policy, been conducted in a manner consistent with NEPA. A Final Supplemental EIS was released on January 31, 2014 as noted above. In the Supplemental EIS, the Department evaluated the potential construction and operational impacts of the proposed Project and alternatives that may occur without the proposed Project on a wide range of environmental and cultural resources. Similarly, as a matter of policy, the Department conducted reviews of the proposed Project consistent with Section 106 of the NHPA, as amended, and with Section 7 of the ESA. The Department solicited public comment and conducted a broad range of consultations with state, local, tribal, and foreign governments and other federal agencies as it considered Keystone's application.

Acting on behalf of the President under delegated authorities in accordance with Executive Order 13337 and the Presidential Memorandum, the Under Secretary of State for Political Affairs has determined that issuing a Presidential permit to Keystone to construct, connect, operate, and maintain at the border of the United States pipeline facilities for the import of crude oil from Canada to the United States as described in the Presidential permit application for the proposed Project would serve the national interest. Accordingly, the request for a Presidential permit is approved.

## 2.0 Legal Authority

The President of the United States has authority to require permits for transboundary infrastructure projects based upon his Constitutional powers. In Executive Order 13337, acting pursuant to the Constitution and laws of the United States, including Section 301 of Title 3 of the United States Code, the President delegated to the Secretary of State the authority to receive applications and make determinations regarding approval or denial of a Presidential permit for certain types of border facilities, including those for cross-border petroleum pipelines, based on the Secretary's finding as to whether issuance of a permit would serve the national interest. Because the proposed Project seeks to build new petroleum facilities that cross the international border, the authority to make a determination for the issuance of a Presidential permit for the border facilities is within the scope of authority delegated to the Secretary of State by the President. The functions assigned to the Secretary have been further delegated within the Department including to the Deputy Secretary of State, the Under Secretary of State for Political Affairs, and the Under Secretary of State for Economic Growth, Energy, and the Environment.

(Department of State Delegations of Authority No. 245-1, 118-2).

As noted above, when reviewing an application for a Presidential permit, the Secretary or his delegate is required by the Executive Order to determine if issuance of the permit would serve the national interest. The determination is made pursuant to the President's Constitutional authority. No statute establishes criteria for this determination. The President or his delegate may take into account factors he or she deems germane to the national interest. With regard to the proposed Project, the Under Secretary of State for Political Affairs has considered a range of factors, including but not limited to foreign policy; energy security; environmental, cultural, and economic impacts; and compliance with applicable law and policy. The determination is Presidential action, made through the exercise of Presidentially delegated authorities, and therefore the requirements of NEPA, the ESA, the NHPA, the APA, and other similar laws and regulations that do not apply to Presidential actions are also inapplicable here. Nevertheless, as a matter of policy and in order to inform the Under Secretary's determination regarding the national interest, the Department has reviewed the potential impacts of the action on the environment and cultural resources in a manner consistent, where appropriate, with these statutes. The purpose of preparing an environmental impact statement and undertaking the other statutory processes noted above was to produce a comprehensive review to inform decisionmakers and the relevant Executive Branch agencies about the potential environmental impacts of the proposed Project.

In accordance with the Presidential Memorandum, the agency notification and fifteen-day delay requirements of sections 1(g), 1(h) and 1(i) of Executive Order 13337 have been waived with respect to this re-submitted application.

## 3.0 Agency and Tribal Involvement and Public Comment

The Department conducted extensive public outreach and consultation during several stages of its consideration of Keystone's Presidential permit application in order to solicit input on issues to be considered. The Department also conducted government-to-government consultation with Indian tribes regarding historic properties in a manner consistent with the NHPA, and consulted with relevant agencies consistent with the ESA and other statutes as appropriate. Finally, the Department sought views of other federal agencies as required by Executive Order 13337. The public notice, outreach, and consultation efforts during consideration of Keystone's application are further detailed below. The Department has taken all comments and relevant information into account in making the national interest determination.

*3.1 Public Notice:* Upon receipt of Keystone's application in 2012, the Department published in the Federal Register a Notice of Receipt of the Keystone XL Pipeline Application (77 FR 27533, May 10, 2012). At that time, the Department also established a website that it updated with information and significant documents throughout its review of the Presidential permit application (*see* https://keystonepipeline-xl.state.gov/). In February 2017, the Department also published in the Federal Register a Notice of Receipt of TransCanada Keystone Pipeline, L.P.'s Re-Application for a Presidential

Permit to Construct, Connect, Operate, and Maintain Pipeline Facilities on the Border of the United States and Canada (82 FR 10429, Feb. 10, 2017).

***3.2 Public Comment Periods:*** There has been significant opportunity for public comment on this project. On June 15, 2012, the Department published a notice in the Federal Register informing the public that it intended to prepare a Supplemental EIS (77 FR 36032). The notice also announced plans for developing the scope of the environmental review and content of the Supplemental EIS, and invited public participation in that process, including soliciting public comments. The Department received over 400,000 comments during the scoping period (including letters, cards, emails, and telephone calls), which were considered and reflected as appropriate in developing the scope of the Supplemental EIS. The Department also published all comments received during this and all other public comment periods in the review, consistent with its commitment to conduct an objective, rigorous, and transparent review process.

In March 2013, the Department released a Draft Supplemental EIS, which was posted on the Department's website for the project. The Department distributed copies to public libraries along the pipeline route and to interested Indian tribes, federal and state agencies, elected and appointed officials, media organizations, non-governmental organizations (NGOs), private landowners, and other interested parties. On March 27, 2013, the Department published a notice in the Federal Register inviting the public to comment on the document (78 FR 18665). The Department then held a public meeting on April 18, 2013, in Grand Island, Nebraska, to receive further views from the public and other interested parties. In total, the Department received more than 1.5 million submissions during the public comment period for the Draft Supplemental EIS. These submissions came from members of the public, federal, state, and local representatives, government agencies, Indian tribes, NGOs, and other interested groups and stakeholders. All comments were considered as part of the Supplemental EIS; Volumes V and VI of the Supplemental EIS address the comments that were received.

On February 5, 2014, five days after releasing the Supplemental EIS, the Department published a notice in the Federal Register inviting members of the public to comment within 30 days on any factors they deemed relevant to the national interest determination (79 FR 6984). Executive Order 13337 allows for such a public comment process, but does not require the Department to solicit public input. The response during the 30-day public comment period was unprecedented. The Department received more than three million submissions.

All comments were reviewed by subject matter experts from several Department bureaus who were knowledgeable about the proposed Project and involved in drafting sections of this Record of Decision and National Interest Determination, as well as by the third-party contractor engaged to assist the Department with tasks relating to the review of the permit application. The contractor, with guidance from Department experts, sorted the comments into six overarching issue areas discussed in the comments—environmental impacts (including climate change), cultural resources impacts, socioeconomic impacts, energy security, foreign policy considerations, and compliance with relevant federal and

state laws and regulations. For each of these issue areas, the contractor identified a number of themes that captured the ideas or points raised by public comments. The Department's subject matter experts directly reviewed all of the issues and information raised in the public comments. The Department determined that the comments largely addressed issues that were also raised during preparation of the Supplemental EIS.

**3.3 *Tribal Consultation:*** The Department directly contacted 84 Indian tribes within the United States that could have an interest in the resources potentially affected by the proposed Project. Of the 84 Indian tribes, 67 notified the Department that they would like to consult on the proposed Project or were undecided. The Department conducted extensive government-to-government consultations with those 67 Indian tribes on the environmental, cultural, and other potential impacts of the proposed Project. In addition to communications by phone, email, and letter, Department officials held tribal meetings in October 2012 (three meetings), May 2013 (one meeting), and July 2013 (teleconference). The face-to-face meetings were held in four locations: Billings, Montana; Pierre, South Dakota; Rapid City, South Dakota; and Lincoln, Nebraska.

In addition to the government-to-government consultations, the Department engaged in discussions consistent with Section 106 of the NHPA with Indian tribes, Tribal Historic Preservation Officers, State Historical Preservation Officers, and the Advisory Council on Historic Preservation. The topics of these discussions included cultural resources, in general, as well as cultural resources surveys, Traditional Cultural Properties surveys, effects on cultural resources, and potential mitigation. Additionally, Indian tribes were provided cultural resources survey reports for the proposed Project and were invited both to conduct Traditional Cultural Property surveys funded by Keystone and to help develop and participate in the Tribal Monitoring Plan. New cultural resources survey information provided by Keystone in its re-submitted application will be shared as appropriate according to the terms and conditions of the 2013 Amended Programmatic Agreement.

**3.4 *Consultation with Federal and State Agencies:*** Ten federal entities agreed to assist the Department as Cooperating Agencies during preparation of the Supplemental EIS: the U.S. Army Corps of Engineers, the Farm Service Agency, the Natural Resource Conservation Service, the Rural Utilities Service, the Department of Energy, the Bureau of Land Management, the National Park Service, the U.S. Fish and Wildlife Service (FWS), the Pipeline and Hazardous Materials Safety Administration's Office of Pipeline Safety (PHMSA), and the U.S. Environmental Protection Agency (EPA). These agencies had significant input into the drafting of the Draft and Final Supplemental EIS.

Consistent with Section 7 of the ESA, the Department consulted with the FWS and submitted a Biological Assessment on the proposed Project. The FWS issued a Biological Opinion in 2013 that is available as an attachment to the Supplemental EIS. Prior to issuance of the 2015 Decision, consultations with the FWS were reinitiated regarding the rufa red knot (*Calidris canutus rufa*), designated a threatened species effective January 12, 2015, and the northern long-eared bat (*Myotis septentrionalis*), designated a threatened species effective May 4, 2015. Following publication of the Supplemental EIS, the Department and FWS have concluded Section 7 consultations with

regard to both the rufa red knot and the northern long-eared bat to supplement the existing Biological Opinion for the proposed Project. The Department also reviewed the 2013 Biological Opinion and received confirmation from FWS that Section 7 consultations need not be reinitiated for any other species and that, following implementation of the conservation measures contained within that Opinion, no other species included in the project area would be adversely affected.

Executive Order 13337 requires that the Secretary request the views of eight specified U.S. federal agencies with regard to the permit application. Accordingly, the Department requested the views of the Department of Defense, the Department of Justice, the Department of the Interior, the Department of Commerce, the Department of Transportation, the Department of Energy, the Department of Homeland Security, and the EPA. The Department of Justice and the Department of Commerce informed the Department that they did not plan to provide any views with regard to the permit application. The other six agencies provided their views in writing; those views were released in conjunction with the 2015 Decision.

The Department has also monitored other federal and state permitting and licensing processes, including, for example, litigation and the recent application to the Nebraska Public Service Commission concerning the proposed Project's route through that state.

*3.5 Information Provided by Keystone:* The Department had robust communication with Keystone throughout the review of the application for the proposed Project. Keystone responded to multiple requests for information and provided supplemental views and information on its own initiative, including through letters on February 24, 2015, June 29, 2015, February 3, 2017, and March 17, 2017. The Department has taken all information provided by Keystone into account in making the national interest determination.

## 4.0 Project Background

*4.1 Keystone XL Project:* The proposed Project would consist of approximately 1,204 miles of new, 36-inch-diameter pipeline extending from Hardisty, Alberta, to Steele City, Nebraska. Approximately 875 miles of the pipeline would be located in the United States. The pipeline would cross the international border between Saskatchewan, Canada and the United States near the town of Morgan, Montana, in Phillips County. The border segment is from the international border near Morgan, Montana, to the first mainline shut-off valve within the United States located approximately 1.2 miles from the international border. The pipeline would have the capacity to deliver up to 830,000 bpd of crude oil. Annual quantities would likely vary based on market conditions and other factors.

Subject to commercial demand, Bakken crude will enter the pipeline within the United States through the proposed Bakken Marketlink Project—a five-mile pipeline with pumps, meters, and storage tanks that would connect to the Keystone XL pipeline near Baker, Montana. The facilities would supply up to 100,000 bpd of Bakken crude oil to the proposed Keystone XL pipeline.

At its southern terminus, the proposed Project would connect to the existing Keystone Cushing Extension pipeline, which extends from Steele City, Nebraska, to Cushing, Oklahoma. The Keystone Cushing Extension in turn connects to Keystone's Gulf Coast pipeline, which extends south to Nederland, Texas, in order to serve Gulf Coast refineries.

In addition to the pipeline and potential Bakken Marketlink Project facilities, the proposed Project would include ancillary facilities. Eighteen pumping stations would be located along the Keystone XL pipeline, and two pumping stations would be added to the Keystone Cushing Extension. Keystone further anticipates new pumping capacity on the Keystone Cushing Extension in Kansas. The pipeline would be located in a 50-foot-wide permanent right of way (ROW). The temporary construction ROW would be wider— 110 feet—and access roads, construction camps, and related facilities would be needed during construction.

According to the application submitted by Keystone, the primary purpose of the proposed Project would be to transport crude oil from the border with Canada to delivery points in the United States (primarily to the Gulf Coast area). The proposed Project is meant to supply U.S. refineries with crude oil of the kind found in the WCSB (often called heavy crude oil). Subject to commercial demand, the proposed Project may also provide transportation for the kind of crude oil found within the Bakken formation of North Dakota and Montana (often called light crude oil).

Most recent U.S. production growth has been from tight oil formations—unlocked through technical innovations like hydraulic fracturing and horizontal drilling—that typically yield light, sweet crude. As a result, U.S. crude production growth has tended to displace imports from other countries also producing light, sweet crude— predominately in Africa. Oil sands bitumen consists of heavy, sour, viscous crude oil that is produced and marketed differently than most domestic unconventional crudes. Many U.S. refineries, particularly in the Midwest and Gulf Coast, are optimized to process heavy crudes like those from the oil sands.

As the Supplemental EIS explains, North American production growth coupled with constraints on transporting landlocked crude oil to market have contributed to discounts on the price of landlocked crude and led to growing volumes of crude shipped by rail. This has heightened the attractiveness of the proposed Project to many in industry. Keystone has stated that the proposed Project is commercially viable and sees the demand to be substantially similar to that which existed when Keystone first applied.

The Department notes that the ultimate disposition of crude oil that would be transported by the proposed Project, as well as any refined products produced from that crude oil, would be determined by market demand and applicable law. In the absence of heavy crude oil from Canada, U.S. refineries, particularly in the Gulf Coast, will continue to rely on comparable foreign heavy crudes.

***4.2 Prior Permit Application:*** Keystone's first application for the Keystone XL pipeline was submitted to the Department on September 19, 2008. A Final EIS was published on August 26, 2011 (2011 Final EIS). The route proposed in 2008 included the same U.S.-Canadian crossing as the border currently proposed Project, but a different pipeline route in the United States. That route traversed a substantial portion of the Sand Hills Region of Nebraska, as identified by the Nebraska Department of Environmental Quality (NDEQ). Moreover, the 2011 Final EIS route went from Montana to Steele City, Nebraska, and then from Cushing, Oklahoma, to the Gulf Coast area.

In November 2011, the Department determined that additional information was needed to fully evaluate the application—in particular, information about alternative routes within Nebraska that would avoid the NDEQ-identified Sand Hills Region. In late December 2011, Congress enacted a provision of the Temporary Payroll Tax Cut Continuation Act that sought to require the President to make a decision on the Presidential permit for the 2008 application within 60 days. At the time, the prior administration determined that the deadline did not allow sufficient time for the Department to prepare a rigorous, transparent, and objective review of an alternative route through Nebraska. Accordingly, the Presidential permit was denied.

In February 2012, Keystone informed the Department that it considered the Gulf Coast portion of the originally proposed pipeline project (from Cushing, Oklahoma, to the Gulf Coast area) to have independent economic utility, and indicated that Keystone intended to proceed with construction of the Gulf Coast pipeline as a separate project, called the Gulf Coast Project. The Gulf Coast Project did not require a Presidential permit because it does not cross an international border. Construction on the Gulf Coast Project is now complete.

On May 4, 2012, Keystone filed a new Presidential permit application for the Keystone XL Project. The proposed Project has a new route and a new stated purpose and need. The new proposed route differs from the 2011 Final EIS Route in two significant ways: 1) it would avoid the environmentally sensitive NDEQ-identified Sand Hills Region and 2) it would terminate at Steele City, Nebraska. From Steele City, existing pipelines would transport the crude oil to the Gulf Coast area. The proposed Project no longer includes a southern segment.

In addition to the NDEQ-identified Sand Hills Region, the proposed Project route would avoid other areas in Nebraska (including portions of Keya Paha County) that have been identified by the NDEQ as having soil and topographic characteristics similar to the Sand Hills Region. The proposed Project route would also avoid or move further away from water wellhead protection areas for the towns of Clarks and Western, Nebraska.

On November 6, 2015, Secretary of State Kerry determined under Executive Order 13337 that issuing a Presidential permit to Keystone for the proposed Keystone XL pipeline's border facilities would not serve the national interest, and denied the permit application in the 2015 Decision. On January 24, 2017, President Trump issued the Presidential Memorandum which, inter alia, invited Keystone "to re-submit its application to the

Department of State for a Presidential Permit for the construction and operation of the Keystone XL Pipeline. . . ." On January 26, 2017, the Department received a re-submitted application from Keystone for the proposed Project. The proposed route in the re-submitted application includes minor route alterations due to changes in right-of-way and easement agreements with local property owners, but remains entirely within the area previously examined by the Department in the Supplemental EIS.

## 5.0 Issues Considered in the Final Supplemental Environmental Impact Statement

This Record of Decision and National Interest Determination is informed by the Supplemental EIS prepared by the Department and published in January 2014, which identified and analyzed a broad range of potential impacts of the proposed Project. The Presidential Memorandum directed the Department to consider to the maximum extent permitted by law the Supplemental EIS "and the environmental analysis, consultation, and review described in that document (including appendices)" to satisfy any provision of law that requires executive department consultation or review, including any applicable requirements of NEPA. As described above, the Department's determination with respect to an application for a Presidential permit is Presidential action, made through the exercise of Presidentially delegated authorities, and therefore the requirements of NEPA, the ESA, the NHPA, the APA, and other similar laws and regulations that do not apply to Presidential actions are inapplicable. As a matter of policy, however, and in order to inform the Department's determination regarding the national interest, the Department has reviewed the potential impacts of the proposed Project on the environment and cultural resources in a manner consistent, where appropriate, with these statutes.

The Supplemental EIS presents information and analysis on a range of potential impacts of the proposed Project. It also describes the tribal consultations undertaken as part of the Supplemental EIS process. The Supplemental EIS also considers reasonable alternative pipeline routes and No Action Alternative scenarios.

Key topics in the Supplemental EIS, particularly those that received significant public interest, are described below. The Supplemental EIS reflects the expected environmental impacts of the proposed Project. Certain topics examined therein such as greenhouse gas (GHG) emissions analysis and market analysis are dynamic, although, for the reasons discussed below, the Supplemental EIS continues to inform the Department's national interest determination in respect of these topics. With respect to other topics such as threatened and endangered species, changes brought about either by the passage of time or differences in underlying law or regulations are noted. The Department has reviewed and considered these changes and concluded that they do not represent substantial changes, do not present significant new information, and do not affect the continued reliability of the Supplemental EIS.

*5.1 Greenhouse Gas (GHG) Emissions:* GHG emissions and the potential climate change impacts associated with the proposed Project were key areas of interest highlighted by the comments received by the Department. The Supplemental EIS evaluates the relationship between the proposed Project with respect to GHG emissions

and climate change from the following perspectives:

> • The GHG emissions associated with the construction and operation of the proposed Project and its connected actions;
>
> • The indirect lifecycle (wells-to-wheels) GHG emissions associated with the WCSB crude oil that would be transported by the proposed Project as compared to the GHG emissions of the crudes it may displace; and
>
> • How the GHG emissions associated with the proposed Project cumulatively contribute to climate change.

GHG Emissions Associated with Construction and Operation

According to the Supplemental EIS, the proposed Project would emit approximately 0.24 million metric tons of carbon dioxide ($CO_2$) equivalents (MMTCO2e) per year during the construction period. These emissions would be emitted directly through fuel use in construction vehicles and equipment as well as land clearing activities, including open burning, and indirectly from electricity usage. To operate and maintain the pipeline, approximately 1.44 MMTCO2e would be emitted per year, largely attributable to electricity use for pump station power, fuel for vehicles and aircraft for maintenance and inspections, and fugitive methane emissions at connections. The 1.44 MMTCO2e emissions would be equivalent to GHG emissions from approximately 300,000 passenger vehicles operating for one year, or 71,928 homes using electricity for one year.

GHG Emissions Associated with the Indirect Lifecycle of WCSB Crudes

To enable a more comprehensive understanding of the potential indirect GHG impact of the proposed Project, it is important to consider the wider GHG emissions associated with the crude oil that would be transported by the proposed Project. A lifecycle analysis is a technique used to evaluate the environmental aspects and impacts (in this case GHGs) that are associated with a product, process, or service from raw materials acquisition through production, use, and end-of-life (wells-to-wheels). This approach evaluates the GHG implications of the WCSB crudes that would be transported by the proposed Project compared to other crude oils that would likely be replaced or displaced by those WCSB crudes in U.S. refineries (hereinafter, reference crudes). The actual increase in GHG lifecycle emissions attributable to the proposed Project depends on whether or how much approval and use of the pipeline would cause an increase in oil sands production. Conclusions drawn from the Department's market review, detailed further below, indicate that the proposed Project would be unlikely to significantly impact the rate of extraction in the oil sands and is therefore not likely to lead to a significant net increase in GHG emissions.

The Supplemental EIS analysis considers wells-to-wheels GHG emissions, including extraction, processing, transportation, refining, and refined product use (such as combustion of gasoline in cars) of WCSB crudes compared to other reference crudes, including heavy slates. The lifecycle analysis also considers the implications associated with other generated products during the lifecycle stages (so-called co-products) such as

petroleum coke. The largest single source of GHG emissions in the lifecycle analysis is the finished-fuel combustion of refined petroleum fuel products, which is consistent for different crude oils.

WCSB crudes are generally more GHG intensive than other crudes they would replace or displace in U.S. refineries, and emit an estimated 17 percent more GHGs on a lifecycle basis than the average barrel of crude oil refined in the United States. As the EPA notes in its letter of February 2, 2015 to the Secretary, "oil sands crude is substantially more carbon intensive than reference crudes and its use will significantly contribute to carbon pollution."

According to the Supplemental EIS, the total lifecycle emissions associated with production, refining, and combustion of 830,000 bpd of oil sands crude oil transported through the proposed Project is approximately 147 to 168 MMTCO2e per year. The annual lifecycle GHG emissions from 830,000 bpd of the four reference crudes examined in the Supplemental EIS are estimated to be 124 to 159 MMTCO2e. The range of incremental GHG emissions for crude oil that would be transported by the proposed Project is estimated to be 1.3 to 27.4 MMTCO2e annually. The estimated range of potential emissions is large because there are many variables, such as which reference crude is used for the comparison and which study is used for the comparison. Nevertheless, at the high end, the Supplemental EIS states that 27.4 MMTCO2e per year is equivalent to the annual GHG emissions from 5.7 million passenger vehicles or 7.8 coal-fired power plants.

GHG lifecycle emissions analysis performed by the Department after publication of the Supplemental EIS in the context of the environmental review for a Presidential permit for another pipeline, Enbridge's Line 67 Expansion, estimates that GHG emissions from WCSB crude may be five to 20 percent higher than previously indicated. Using the Greenhouse Gases, Regulated Emissions, and Energy Use in Transportation (GREET) model, an alternative "well-to-wheels" fuel-cycle model developed by the Argonne National Laboratory (Argonne National Laboratory 2016, 2015), the Line 67 Expansion Draft Supplemental EIS places emissions per barrel of WCSB at 584 kg CO2-eq per barrel, compared to approximately 485-555 kg CO2-eq per barrel to in the Supplemental EIS for the proposed Project.[1]

The estimates provided in the Supplemental EIS characterize the potential increase in emissions attributable to the proposed Project if one assumes that approval or denial of the proposed Project would directly result in a change in production of 830,000 bpd of oil sands crudes in Canada. That is because the estimates represent the total incremental emissions associated with production and consumption of 830,000 bpd of oil sands crude

---

[1] The primary driver for the Department's determination for Line 67 is the assumption that coke produced in the process of extraction of WCSB would not offset the use of coal as a source of energy to fuel WCSB extraction. If coke displaces coal, WCSB emissions would be 528 kg CO2-eq per barrel according to the Line 67 Expansion Supplemental EIS. We note that comparing lifecycle greenhouse gas emissions to the U.S. average mix in GREET could potentially lead to over-estimating the change in emissions from using heavy WCSB crude oil, and under-estimating the change from using lighter WCSB crude oil.

above and beyond the current baseline compared to the reference crudes. However, as discussed further below, the Department's analysis continues to show that the approval of this proposed Project is unlikely to have a substantial effect on the rate of extraction of the oil sands and is also therefore unlikely to directly result in significant change in production in oil sands crudes in Canada.

## *5.2 Market Analysis*

### Proposed Project's Impact on Oil Sands Production

The Supplemental EIS utilizes analysis of evolving market conditions, transportation costs, oil-sands supply costs, and varying supply-demand scenarios to inform conclusions about the proposed Project's potential impact on oil sands production. The analysis concluded at the time it was published in January 2014 that approval or denial of any one crude oil transport project, including the proposed Project, would be unlikely to significantly impact the rate of extraction in the oil sands, or the continued demand for heavy crude oil at refineries in the United States. The Supplemental EIS balances this position by emphasizing that uncertainty underlies a number of key variables critical to projecting Canadian production growth.

Generally, the dominant drivers of oil sands development remain more global than any single infrastructure project. Oil sands production and investment could slow or accelerate depending on oil price trends, regulations, and technological developments, but the potential effects of those factors on the industry's rate of expansion need not be conflated with the more limited effects of individual pipelines. Under most market conditions, alternative transportation infrastructure would allow growing oil sands production to reach markets irrespective of the proposed Project. Most recently, this has been demonstrated by the growth in rail loading capacity in Western Canada, which as of February 25, 2017, the National Energy Board (NEB) of Canada now estimates at over 1,075,000 bpd. This significant rail capacity has been utilized to export over 160 million barrels of Canadian crude oil to the United States since 2011. The Supplemental EIS also determined that construction of the proposed Project would have some effect on discrete decisions about whether to develop specific oil sands projects if (1) no new pipeline capacity to Canadian ports or to the United States becomes operational and (2) the price of oil in the long run persists at a level where other transport options are no longer economical.

Coupled with supply growth in the WCSB, major crude oil export pipelines from the region have largely operated at, or near, capacity for several years; an observation highlighted by Prime Minister Trudeau on November 29, 2016 when he announced the conditional approval of Kinder Morgan's expansion of the Trans Mountain pipeline from Alberta to the port at Vancouver, British Columbia, which would increase the pipeline's capacity from 300,000 bpd to 890,000 bpd of crude oil. Kinder Morgan expects to begin construction of the Trans Mountain pipeline in September 2017. Current market projections from the Energy Information Administration (EIA) and the International Energy Agency (IEA) anticipate production growth in Canadian WCSB to continue, even when factoring in delays and cancellations of certain planned large-scale greenfield

projects resulting from the current crude oil price environment, further stressing the capability of existing pipeline infrastructure to keep pace with supply growth, and suggesting that there continues to be sustained demand for additional pipeline capacity. This near-term production growth in the WCSB is due largely to the start of other projects with long lead-times and continued incremental investment by certain market players to expand production from existing brownfield projects.

The impact on oil sands development is difficult to gauge with precision, in part because the cost differential between other modes of transport and pipelines may change over time, and production costs vary from one oil sands development to another. While the Department does not know all of the production costs or other investment factors for specific Canadian projects, the Supplemental EIS concluded that many projects are expected to break even when sustained oil prices are in the range of $65-$75 per barrel. On this basis, the Department's analysis found that oil sands production is expected to be most sensitive to transport costs with oil prices in or below that range.

Since the publication of the Supplemental EIS, the price of benchmark West Texas Intermediate (WTI) crude oil has declined by over 50 percent from $98.23 per barrel in January 2014 to approximately $48 per barrel at present. This represents a sizeable near-term price decline; however, the Department notes that the 30-year real price average (i.e., the nominal price adjusted for inflation using March 2017 $) of WTI crude is $55 per barrel. Although prices have rebounded from 2016 lows, global liquids production for the time being continues to outpace consumption. Organization for Economic Cooperation and Development commercial stocks of crude oil remain approximately 300 million barrels above the five-year average. This includes U.S. commercial oil stocks, which are at an all-time high of 528 million barrels or approximately 35 days of domestic supply needs. The EIA expects a relatively balanced oil market in the next two years, with inventory builds averaging 100,000 bpd in 2017 and 200,000 bpd in 2018. However, the Department underscores that short-term fluctuations in price driven by current market supply and demand dynamics are less indicative of the industry's general outlook than the broader macroeconomic forces that drive investment in the oil and gas sector.

In making long-term investment decisions, companies often distinguish between new development and production from existing projects with previously sunk capital costs. While oil prices consistently below supply costs over the long-term may lead some investors to delay or even cancel some future projects, decisions about proceeding with or expanding existing projects and those already under construction or with financing in place are largely based on marginal operating costs. In general, existing projects and those under development are unlikely to slow or stop unless revenues persistently fall below current operating costs, which are much lower than total supply costs ($20 to $40 per barrel according to most estimates reviewed). Most reports further indicate that oil sands supply costs have fallen in the lower-price environment. Collectively, these factors help to explain why Canadian crude oil production, including from the oil sands, has proven resilient despite lower oil prices, including a period during the first quarter of 2016 when price remained at or below $40 per barrel. These market observations also

explain the growth trends expected by the Department and other market energy information organizations, such as the EIA, which predicts 340,000 bpd in crude production growth in Canada through 2018.

The Department recognizes that oil prices are volatile, particularly over the short term. However, the long-term trends that drive WCSB crude oil production and the amount of new transportation capacity needed to meet them, coupled with the documented ability of Canadian upstream producers to sustain production during a period of lower oil prices, lead the Department to have confidence in the forecasts presented by market experts at the EIA and IEA, and affirm the Department's conclusion that such infrastructure is supported by mid- and long-term market outlooks.

### Crude-by-Rail

In recent years, industry has looked toward existing Canadian crude oil production forecasts and commercial realities tied to prevailing midstream bottlenecks as justification for further investment in alternative crude oil transportation. Although there are a number of possible alternative transportation avenues for crude from the oil sands to reach U.S. or other markets, significant investment has been made in the development of crude-by-rail loading and off-loading facilities throughout North America. Current WCSB rail loading capacity has been estimated to exceed 1,075,000 bpd, with potential to expand further. Under current market conditions, existing pipelines coupled with crude-by-rail facilities will likely have the capacity to accommodate new supply from upstream projects under construction and in various stages of completion in western Canada. Although existing rail capacity moderates the impact of pipeline constraints, according to NEB of Canada, it remains a more expensive form of transportation than pipelines, an observation that supports the economic utility and commercial viability of new pipeline infrastructure. Additionally, as stated in the Supplemental EIS, per unit rail transport of WCSB oil would be more GHG-intensive than transport by pipeline when accounting for the total aggregate lifecycle GHG emissions (including direct and indirect emissions).

The extent to which rail transport will actually occur, however, or would prove to be a major form of transport for WCSB crude to the United States in the long term, remains uncertain. Utilization of rail facilities will depend upon many factors, including the availability of cheaper pipeline transport options from the respective production areas, the rate of growth in emerging areas of crude production, demand from refineries that may be better served by rail from these sources, differences in the price of oil paid in the production areas and the price of oil paid at the refinery markets (particularly on the coasts), and arbitrage opportunities that may be available through faster rail-based transport.

Producers seeking to preserve margins in the face of narrowing price gaps between Western Canada Select crude, WTI, and other crudes such as the Mexican Maya, may seek to maximize the efficiency of existing pipeline infrastructure in lieu of rail. Moreover, implementation of new Department of Transportation rules intended to improve the safe transportation of large quantities of crude-by-rail may lead to a marginal

increase in crude-by-rail costs.

*5.3 Potential Spill Risk and Safety Impacts:* Many concerns were raised in comments received by the Department regarding the potential environmental effects of a pipeline release, leak, and/or spill. The Supplemental EIS analyzes impacts from potential releases from the proposed Project by analyzing historical spill data. The analysis identifies the types of pipeline system components that historically have been the source of spills, the sizes of those spills, and the distances those spills would likely travel. The resulting potential impacts to natural resources, such as surface waters and groundwater, are also evaluated and mitigation measures are included that are designed to prevent, detect, minimize, and respond to oil spills.

The Supplemental EIS analyzes historical crude oil pipeline incident data within the PHMSA and National Response Center incident databases. Over a period of ten years, from January 2002 through July 2012, a total of 1,692 incidents were reported in the United States, of which 321 were reported to be pipe incidents and 1,027 incidents were reported to involve different equipment components such as tanks, valves, or pumps.

Most spills over this period were small. Of the 1,692 incidents between 2002 and 2012, 79 percent of the incidents were in the small (zero to 50 barrel) range—roughly equivalent to a spill of up to 2,100 gallons. Four percent of the incidents were in the large (greater than 1,000 barrel) range. If a pipeline spill were to occur, the severity of its impact would depend on the volume and aerial extent of oil released; the distance of the impacted entity from the spill source; site-specific environmental circumstances, including climate and species present; and the timing and nature of response efforts.

An oil spill that reaches a surface waterbody or wetland could cause effects such as reduced dissolved oxygen levels or high benzene contaminant levels. The Supplemental EIS states that acute toxicity could occur if substantial amounts of crude oil were to enter rivers and streams. If diluted bitumen is accidentally released and it flowed into surface water, the diluent fraction would tend to volatilize or dissolve into the water, leaving bitumen behind to sink or become suspended. Upwards of 25 percent of residual hydrocarbons could be reasonably removed by natural attenuation, while active recovery methods would be required for remediation of the remaining spill volume. Aggressive cleanup methods could mix oil and water, which might result in longer-lasting impacts to sensitive waterbody habitat. Passive cleanup methods are less likely to impact resources, but require a timeframe on the order of tens of years.

There are 39 stream crossings within 40 miles upstream of protected or specially designated segments of the Niobrara and Missouri rivers, which are in proximity to the proposed Project route. The shortest distance an oil spill would have to travel to impact a protected waterbody is approximately 28.5 miles. Based on an analysis of PHMSA historical incident data of large-diameter pipeline releases, the probability of a spill occurring that would convey oil to a protected waterbody is once every 542 years.

Spilled crude oil could affect wildlife directly and indirectly. Direct effects include

physical processes such as oiling and toxicological effects, which could cause sickness or mortality. Indirect effects include habitat impacts, nutrient cycling disruptions, and alterations to the ecosystem.

A surface release could produce localized effects on plant populations by direct oiling or by oil permeating through the soil, affecting root systems and indirectly affecting plant respiration and nutrient uptake. Generally, most past spills on terrestrial habitats have caused minor ecological damage, and ecosystems have shown a good potential for recovery.

At the time of the release of the Supplemental EIS, there were 1,232 identified wells within the potential range of a large spill from the proposed Project. In Nebraska, the potential spill range from the proposed Project overlaps with the Steele City Wellhead Protection Area. Keystone agreed to provide an alternative water supply if an accidental release from the proposed Project contaminates groundwater or surface water used as potable water or for irrigation or industrial purposes.

Normal operations would be expected to result in less than one human injury per year. In the event of a spill, human health exposure pathways could include direct contact with crude oil, inhalation of airborne emissions from crude oil, or consumption of food or water contaminated by either the crude oil or components of the crude oil. Mitigation measures, including spill response and containment and emergency response plans, would reduce and minimize human and environmental exposures.

Keystone has agreed to incorporate additional mitigation measures in the design, construction, and operation of the proposed Project, in some instances exceeding what is normally required, including 59 Special Conditions, 57 of which were recommended by PHMSA. These commitments by Keystone remain in effect. Many of these mitigation measures are intended to reduce the likelihood of a release occurring. Other measures provide mitigation intended to reduce the consequences and impact of a spill should such an event occur.

Since the publication of the Supplemental EIS, several new studies related to cleanup of diluted bitumen have been published. The National Academy of Science (NAS) 2016 study, Spills of Diluted Bitumen from Pipelines: A Comparative Study of Environmental Fate, Effects, and Response, found that diluted bitumen presents more challenges for cleanup response than other types of oil commonly moved by pipeline. The NAS 2016 study also found that various government agencies (PHMSA, EPA, and the U.S. Coast Guard) and first responders are in need of more training and better communication in order to adequately and effectively address spills of diluted bitumen.

But as described in the Supplemental EIS, Appendix Z, Compiled Mitigation Measures, Keystone has agreed to develop and carry out multiple mitigation measures including developing monitoring plans and response plans, among other spill and spill-prevention mitigation measures. For example, if a spill were to occur, Keystone would provide material safety data sheets to first responders within one hour of the occurrence, and

would provide potable water for any affected communities, businesses, or affected entities within the spill area. Additionally, during the development and construction phase of the project, Keystone has agreed to consult with local emergency responders during development of an Emergency Response Plan (ERP) and update its mitigation and spill response plans with new knowledge or information on the chemistry of diluted bitumen as it becomes available. Accordingly, the measures that Keystone has already committed to—including commitments relating to development of an ERP and other mitigation plans that account for new information –adequately address the new challenges, training needs, and communication needs identified in the NAS 2016 study.

The Supplemental EIS also discusses transportation by rail, in particular as part of the No Action Alternative scenarios (in other words, scenarios that may occur if the proposed Project were denied), and concludes that transport by rail likely results in a greater number of injuries and fatalities per ton-mile than transportation by pipeline, as well as a greater number of accidental releases of crude oil and a greater overall volume of crude oil released. However, the average size of an accidental release associated with crude-by-rail transportation is smaller than the average size of an accidental release associated with a pipeline.

***5.4 Socioeconomic Impacts:*** Socioeconomic impacts associated with the proposed Project were also of particular concern in the comments received by the Department throughout its process. The Supplemental EIS analyzes these impacts and provides information regarding economic activity that may result from an approval of the proposed Project.

### Employment and Economic Activity
The Department utilized subject matter experts and established methodologies to characterize the macroeconomic impacts of the proposed Project in the Supplemental EIS. Benchmarking against 2010 economic data, construction spending on the proposed Project was found to support a combined total of approximately 42,100 jobs throughout the United States for the up to two-year construction period. Of these jobs, approximately 16,100 would be direct jobs supported at firms that are awarded contracts for goods and services, including construction, by Keystone. The other approximately 26,000 jobs would result from indirect and induced spending; this would consist of goods and services purchased by the construction contractors and spending by employees working for either the construction contractor or for any supplier of goods and services required in the construction process. About 12,000 jobs, or 29 percent of the total 42,100 jobs, would be supported in Montana, South Dakota, Nebraska, and Kansas.

Of the 42,100 supported jobs described above, approximately 3,900 (or 1,950 per year if construction took two years) would comprise a direct, temporary, construction workforce in the proposed Project area. Employment supported by construction of the proposed Project would translate to approximately $2.05 billion in employee earnings. Of this, approximately 20 percent ($405 million in earnings) would be allocated to workers in the proposed Project area. The remaining 80 percent, or $1.6 billion, would occur in other locations around the country.

According to Keystone, once the proposed Project enters service, operations would require approximately 50 total employees in the United States: 35 permanent employees and 15 temporary contractors. This small number would result in negligible impacts on population, housing, and public services in the proposed Project area.

The total estimated property tax from the proposed Project in the first full year of operations would be approximately $55.6 million spread across 27 counties in three states. This impact to local property tax revenue receipts would be substantial for many counties, constituting a property tax revenue benefit of 10 percent or more in 17 of these 27 counties. Operation of the proposed Project is not expected to have an impact on residential or agricultural property values.

Construction contracts, materials, and support purchased in the United States would total approximately $3.1 billion. Another approximately $233 million would be spent on construction camps for workers in remote locations of Montana, South Dakota, and northern Nebraska. Construction of the proposed Project would contribute approximately $3.4 billion to the U.S. gross domestic product (GDP). This figure includes not only earnings by workers, but all other income earned by businesses and individuals engaged in the production of goods and services demanded by the proposed Project, such as profits, rent, interest, and dividends.

According to the U.S. Bureau of Economic Analysis, the U.S. oil and gas industry contributed 1.1% to total U.S. GDP in 2015. The proposed Project would make a meaningful contribution to this critically important sector of U.S. economy.

Since 2010, from which data the economic data was benchmarked, the U.S. economy has returned closer to full employment capacity but simultaneously has seen relative economic weakness in certain sectors and states due to the downturn in global energy prices in 2014. As a result, the economic benefits in terms of job creation from the proposed Project may be significantly different than the initial estimates.

### Health Impacts

A number of commenters raised concerns about the potential for impacts on human health associated with the proposed Project. The Department took into account, with peer-reviewed research where appropriate, impacts to human health throughout the various resource areas in the Supplemental EIS.

For example, in the Potential Releases chapter, the Supplemental EIS examined potential health risks associated with exposure to crude oil and other relevant chemicals, were there to be a spill. In the Air Quality and Noise chapter, the Supplemental EIS addressed air pollution that would be associated with the construction and operation of the proposed Project. In the Cumulative Effects Assessment and Extraterritorial Concerns chapter, the Supplemental EIS described potential changes in pollution associated with refineries. Finally, the Supplemental EIS also examined potential human health impacts in Canada associated with oil sands development and pipeline construction and operation.

<u>Environmental Justice</u>
According to the Office of Environmental Justice in EPA, environmental justice refers to
the "fair treatment and meaningful involvement of all people regardless of race, color,
national origin, or income with respect to the development, implementation, and
enforcement of environmental laws, regulations, and policies." A total of 17 separate
census areas with minority and/or low income populations could potentially be affected
by construction or operation of the proposed Project. Temporary environmental justice
impacts during construction could include exposure to construction dust and noise,
disruption to traffic patterns, and increased competition for medical or health services in
underserved populations. Positive impacts could include increased employment and
earnings.

Minority or low-income populations could be more vulnerable should an oil release occur
along the segment of the pipeline that transits through their communities. Further, Indian
tribes with significant dependence on natural resources could be disproportionately
affected.

Mitigation of environmental justice concerns would include ensuring adequate
communication with affected populations, such as through public awareness materials in
appropriate languages so as to ensure an appropriate level of emergency preparedness.
With respect to employment opportunities, Keystone has committed to employee and
supplier diversity and has programs in place to mitigate impacts on vulnerable
populations.

Some comments, particularly from Indian tribes, have expressed concern that temporary
camps of construction workers along the proposed Project route may increase crime and
otherwise disrupt local communities. In their letters to the Department of February 2,
2015, the Department of Homeland Security and the Department of the Interior also
expressed concerns in this regard. Keystone committed to take several measures to
ensure greater safety for those communities along the route, including security provisions
and a code of conduct for the workers.

### 5.5 Physical Disturbance Impacts:

<u>Water Resources</u>
Construction and operation of the proposed Project could result in temporary and
permanent surface water impacts, including stream sedimentation, changes in stream
channels and stability, and temporary reduction in stream flow. The proposed Project's
pipeline route would avoid surface water whenever possible, but would cross
approximately 1,073 surface water bodies, including 56 perennial rivers and streams, as
well as approximately 24 miles of mapped floodplains. Mitigation measures would
include tunneling the pipeline underneath major rivers to mitigate construction impacts,
erosion control during construction, and restoration of waterbodies as soon as practical
after construction.

Wetlands
The proposed Project would affect approximately 383 acres of wetlands, two acres of which may be permanently lost. Remaining wetlands affected by the proposed Project would remain as functioning wetlands, provided that impact minimization and restoration efforts described in the mitigation plan are successful. The proposed route includes modifications to the route that Keystone originally proposed in 2012 to avoid wetland areas (such as the sensitive NDEQ-identified Sand Hills Region) and Keystone has committed to additional mitigation measures. Additionally, Keystone has identified mitigation measures for the protection of sensitive areas, including wetlands, such as industry-standard avoidance measures and best practices for working near sensitive areas as described in the Construction, Mitigation, and Reclamation Plan (CMRP), as well as a commitment to abide by all state, local, and tribal regulations and requirements. Finally, Keystone will work with state and local response agencies to develop and carry-out mitigation measures related to work near wetlands.

Threatened and Endangered Species
Thirteen federally listed threatened or endangered species occur in the proposed project area. The endangered American burying beetle (*Nicrophorus americanus*) is the only species that is likely to be adversely affected by the proposed Project, but other species could potentially be affected. These include the federally endangered black-footed ferret (*Mustela nigripes*), interior least tern (*Sternula antillarum*), whooping crane (*Grus americana*), and pallid sturgeon (*Scaphirhynchus albus*); and the threatened piping plover (*Charadrius melodus*), western prairie fringed orchid (*Platanthera praeclara*), northern long-eared bat (*Myotis septentrionalis*), and rufa red knot (*Calidris canutus rufa*).

The FWS issued a Biological Opinion in May 2013 to the Department regarding potential impacts of the proposed Project on seven federally protected species. The American burying beetle was the only species determined by the FWS to likely be adversely affected by the proposed Project. Since that time, two additional species have become federally listed as threatened—the northern long-eared bat and the rufa red knot. The consultations for both species were completed, with the FWS concurring in a "may affect, but is not likely to adversely affect" determination. The Department also reviewed the 2013 Biological Opinion and received confirmation from FWS that Section 7 consultations need not be reinitiated for any other species and that, following implementation of the conservation measures contained within that Opinion, no other species included in the project area would be adversely affected. The Department is committed to ensuring that all measures identified in the 2013 Biological Opinion, as supplemented, are implemented, including by Keystone.

Geology and Soils
The proposed Project's pipeline route extends through relatively flat and stable areas, and the potential for seismic hazards (earthquakes), landslides, or subsidence (sink holes) is low. The route would avoid the NDEQ-identified Sand Hills Region, where soils are particularly susceptible to damage from pipeline construction. Potential impacts to soil resources in other areas associated with construction or operation of the proposed Project and connected actions include soil erosion, loss of topsoil, soil compaction, an increase in

the proportion of large rocks in the topsoil, soil mixing, soil contamination, and related reductions in the productivity of desirable vegetation or crops. Mitigation measures would include construction of temporary erosion control systems, implementation of topsoil segregation methods, and restoration of the ROW after construction.

### Terrestrial Vegetation
Potential construction and operations-related impacts to terrestrial vegetation resources associated with the proposed Project include impacts to cultivated crops, developed land, grassland/pasture, upland forest, open water, forested wetlands, emergent herbaceous wetlands, and shrub-scrub communities. The proposed Project route would impact biologically unique landscapes and vegetation communities of conservation concern. Keystone committed to restore areas to preconstruction conditions as practicable, and reseed disturbed areas, and to use specific best management practices and procedures to minimize and mitigate the potential impacts to native prairie areas.

### Wildlife
The proposed Project would cause minor impacts to wildlife and wildlife habitat. Potential impacts to wildlife include habitat loss, alteration, and fragmentation; direct mortality during construction and operation (e.g., wildlife collisions with vehicles and power lines/power poles); and reduced survival or reproduction due to stress or avoidance of feeding caused by factors such as construction and operations noise and increased human activity. Mitigation measures to reduce potential construction and operations-related effects to wildlife where habitat is entered would include construction timing restrictions and buffer zones developed in consultation with regulatory agencies as well as measures to minimize adverse effects to wildlife habitats. Keystone committed to develop and implement a conservation plan for migratory birds and bald and golden eagles and their habitats in consultation with the FWS.

### Fisheries
Impacts to fisheries within the rivers and perennial streams crossed by the proposed Project route would occur during construction and would be temporary. The CMRP contains measures for waterbody crossings to reduce potential effects on fish and aquatic/stream bank habitat and otherwise minimize potential impacts to fisheries resources. Mitigation measures would include best practices in open-cut stream crossings to reduce stream bed disturbance, sediment impacts, and interference with spawning periods; crossing under large rivers using horizontal directional drilling methods; minimization of vehicle contact with surface waters; and development of site-specific contingency plans to address unintended releases of drilling fluids that include preventative measures and a spill response plan.

### Land Use, Recreation, and Visual Resources
Approximately 15,296 acres of land would be affected by construction of the proposed Project, though only approximately 5,569 acres would be retained for operation within permanent easements along the pipeline ROW and at the locations of ancillary facilities (e.g., access roads, pump stations). Approximately 89 percent of the total affected acreage (13,597 acres) is privately owned and the remainder government-owned.

Rangeland (approximately 63 percent) and agricultural land (approximately 33 percent) comprise the vast majority of land use types that would be affected by construction. Impacts to land use resources include lease or acquisition and development of the pipeline ROW and land for ancillary facilities (e.g., access roads, pump stations, and construction camps), damage to agricultural features and productivity, visual impacts, and increased dust and noise.

Construction activities would temporarily affect recreational traffic and use patterns in special management and recreational areas, such as historic or scenic trails and rivers with recreational designations. Impacts of operation of the proposed Project on recreation would be minimal.

Visual impacts associated with the proposed Project would primarily occur during construction, when pipeline and ancillary facility construction, trenching, and facilities such as pipe yards would be visible. Permanent visual impacts following operation would include the presence of new ancillary facilities as well as visual disturbances in the landscape, such as tree removal, along the pipeline route.

Keystone committed to compensate landowners for construction- and operation-related impacts. It would implement measures to reduce impacts to land uses, recreation, and visual resources such as topsoil protection, restoring disturbed areas, and developing traffic access and management plans.

Air Quality and Noise
Construction dust and emissions from construction equipment would typically be localized, intermittent, and temporary since pipeline construction would move through an area relatively quickly. During normal operation of the proposed Project, there would be only minor emissions from valves and pumping equipment at the pump stations. Keystone would implement mitigation measures to reduce air quality impacts, including dust control measures and compliance with state and local air quality restrictions.

Construction noise impacts would also be localized, intermittent, and temporary. Noise impacts from operation of the pipeline would be limited to the electrically driven pump stations. During construction, Keystone would limit the hours during which activities with high-decibel noise levels are conducted in residential areas, require noise mitigation procedures, and develop site-specific mitigation plans to comply with regulations. During operations, Keystone would implement a noise control plan to mitigate noise impacts at affected sites and, as necessary, install sound barriers.

*5.6 Cultural Resources:* Pipeline construction may present a risk to historic and cultural resources unless appropriately addressed through avoidance or mitigation. This risk was a key concern for Indian tribes and other commenters. The Department of Interior in its February 2, 2015 letter to the Secretary reiterated these concerns. The Department concluded a Programmatic Agreement (an agreement with several interested parties that contemplates mitigation of certain cultural resources impacts in the event of construction). The Programmatic Agreement is appended to the Supplemental EIS, and

was concluded in consultation with Indian tribes, federal and state agencies, and the permit applicant. The Department incorporated input from Indian tribes to amend the Programmatic Agreement on cultural resources that had been developed for Keystone's 2008 permit application. The Programmatic Agreement describes the processes that would be followed by Keystone and applicable state and federal agencies to identify cultural resources and to avoid or mitigate adverse impacts.

The proposed Project was designed to avoid disturbing cultural resources listed in the National Register of Historic Places (NRHP), those considered to be eligible for listing in the NRHP, and others of potential concern that have not been evaluated for NRHP listing, to the extent possible. With regard to cultural resources that cannot be avoided, Keystone has committed to minimize and mitigate impacts whenever feasible. Additionally, Keystone would implement Unanticipated Discovery Plans in order to ensure minimization of impacts to as-yet-unknown cultural resources that might be inadvertently encountered during construction or operation of the proposed Project.

*5.7 Cumulative Effects:* The cumulative effects analysis in the Supplemental EIS evaluates the way that the proposed Project's impacts interact with the effects of other past, present, or reasonably foreseeable future actions or projects. The goal of the cumulative impacts analysis is to identify situations where sets of comparatively small individual impacts, taken together, constitute a larger collective impact. Cumulative effects associated with the proposed Project and connected actions vary among individual environmental resources and locations. Generally, where long-term or permanent impacts from the proposed Project are absent, the potential for additive cumulative effects with other past, present, and reasonably foreseeable future projects is negligible.

*5.8 Alternatives:* The Supplemental EIS provides a detailed description of the categories of alternatives to the proposed Project that were analyzed, as well as the alternative screening process and the detailed alternatives identified for further evaluation.

Consistent with NEPA and Council on Environmental Quality (CEQ) regulations, the Department compared the proposed Project with four reasonable alternatives: a pipeline that partly follows an alternative route (the "I-90 Corridor Pipeline Alternative"), and three different "No Action Alternative" scenarios that could result if the Presidential permit is not granted and the crude oil from the WCSB and the Bakken formations is carried on a different form of transport.

Consistent with CEQ regulations and the Department's authority, the Supplemental EIS specifically identifies the alternatives that are before the decisionmaker in considering the application and making the national interest determination pursuant to Executive Order 13337: the No Action Alternative (Permit denial) and the proposed Project (Permit approval).

No Action Alternative
The Supplemental EIS separately analyzed three No Action Alternative scenarios, which are described briefly below. The No Action Alternative analysis considers what would

likely happen if the Presidential permit would be denied or the proposed Project would not otherwise implemented. It includes the Status Quo Baseline, which serves as a benchmark against which other alternatives are evaluated. Under the Status Quo Baseline, the proposed Project would not be constructed, its capacity to transport WCSB crude would not be replaced, and the resulting direct, indirect, and cumulative impacts that are described in this Supplemental EIS would not occur. The Status Quo Baseline is a snapshot of the crude oil production and delivery systems at January 2014 levels.

The No Action Alternative includes analysis of three alternative transport scenarios that, based on the findings of the market analysis, are believed to meet the proposed Project's purpose (i.e., providing WCSB and Bakken crude oil to meet refinery demand in the Gulf Coast area) if the Presidential permit for the proposed Project were denied, or if the pipeline were otherwise not constructed. Under the alternative transport scenarios, other environmental impacts would occur in lieu of the proposed Project. The Supplemental EIS includes analysis of various combinations of transportation modes for oil, including truck, barge, tanker, and rail. These scenarios are considered representative of the crude oil transport alternatives with which the market could respond in the absence of the proposed Project. These three alternative transport scenarios (the Rail and Pipeline Scenario, Rail and Tanker Scenario, and Rail Direct to the Gulf Coast Scenario) are described below.

*Rail and Pipeline Scenario:* Under this scenario, WCSB and Bakken crude oil (in the form of dilbit or synbit) would be shipped via rail from Lloydminster, Saskatchewan, and Epping, North Dakota respectively (the nearest rail terminal served by two Class I rail companies for both locations), to Stroud, Oklahoma, where it would be temporarily stored and then transported via existing and expanded pipelines approximately 17 miles to Cushing, Oklahoma to interconnect with the interstate oil pipeline system. This scenario would require the construction of two new or expanded rail loading terminals in Lloydminster, Saskatchewan (the possible loading point for WCSB crude oil), one new terminal in Epping, North Dakota (the representative loading point for Bakken crude oil), seven new terminals in Stroud, and up to 14 unit trains (consisting of approximately 100 cars carrying the same material and destined for the same delivery location) per day (12 from Lloydminster and two from Epping) to transport the equivalent volume of crude oil as would be transported by the proposed Project.

*Rail and Tanker Scenario:* The second transportation scenario assumes WCSB and Bakken crude oil would be transported by rail from Lloydminster to a western Canada port (assumed to be Prince Rupert, British Columbia), where it would be loaded onto Suezmax tankers (capable of carrying approximately 986,000 barrels of WCSB crude oil) for transport to the U.S. Gulf Coast (Houston and/or Port Arthur) via the Panama Canal. Bakken crude would be shipped from Epping to Stroud via BNSF Railway or Union Pacific rail lines, similar to the method described under the rail and pipeline scenario. The rail and tanker scenario would require up to 12 unit trains per day between Lloydminster and Prince Rupert, and up to two unit trains per day between Epping and Stroud. This scenario would require the construction of two new or expanded rail loading facilities in Lloydminster with other existing terminals in the area handling the

majority of the WCSB for shipping to Prince Rupert. Facilities in Prince Rupert would include a new rail unloading and storage facility and a new marine terminal encompassing approximately 4,200 acres and capable of accommodating two Suezmax tankers. For the Bakken crude portion of this Scenario, one new rail terminal would be necessary in both Epping, North Dakota, and Stroud, Nebraska.

*Rail Direct to the Gulf Coast Scenario:* The third transportation scenario assumes that WCSB and Bakken crude oil would be shipped by rail from Lloydminster, Saskatchewan, and Epping, North Dakota, directly to existing rail facilities in the Gulf Coast region capable of off-loading up to 14 unit trains per day. These existing facilities would then either ship the crude oil by pipeline or barge the short distance to nearby refineries. As with the rail and tanker scenario, this scenario would likely require construction of up to two new or expanded terminals to accommodate the additional WCSB shipments out of Canada. One new rail loading terminal would be needed in Epping to ship Bakken crude oil. Sufficient off-loading rail facilities currently exist or are proposed in the Gulf Coast area such that no new terminals would need to be built under this scenario.

Comparison of Alternatives Before the Decisionmaker
The Supplemental EIS provides detailed analysis of the differences between these alternatives. With regard to GHG emissions, during operation of the No Action Alternative transportation scenarios, including rail and combination modes, the increased number of trains along the rail routes would produce GHG emissions from diesel fuel combustion and electricity generation to support rail terminal operations. Annual GHG emissions (direct and indirect) attributed to the No Action transportation scenarios would be greater than for the proposed Project, but those emissions relate solely to the movement of equivalent amounts of oil from Alberta to the Gulf Coast. Construction of the rail terminals would also involve large numbers of truck trips to transport construction materials and equipment. This increased traffic could cause congestion on roads. Increased shipment of crude by rail could reduce rail capacity available for other goods.

Transportation by rail would likely lead to a greater number of injuries and fatalities per ton-mile than transportation by pipeline, as well as a greater number of accidental releases of crude oil and a greater overall volume of crude oil released. However, the average size of an accidental release associated with crude-by-rail transportation is smaller than the average accidental release associated with a pipeline. Physical disturbance impacts of the No Action Alternative would vary depending upon the modes of transportation chosen by shippers. All three scenarios would require new or expanded facilities, likely concentrated near loading and off-loading terminals. Nevertheless, expansion of infrastructure would affect fewer acres of land (1,500-6,427) during construction than a new pipeline. During operations, the No Action Alternative would permanently affect between 1,500 acres and 6,303 acres of land, compared to 5,309 acres for the proposed Project.

**6.0 Basis for Decision**

Acting on behalf of the President of the United States under authority delegated by the Secretary of State to him, the Under Secretary of State for Political Affairs has determined that it serves the national interest to issue a Presidential permit to TransCanada Keystone Pipeline, L.P. to construct, connect, operate, and maintain pipeline facilities at the U.S.-Canada border in Phillips County, Montana, as part of the proposed Project. In accordance with the Presidential Memorandum dated January 24, 2017, and Executive Order 13337, the Department has considered Keystone's Presidential permit application originally filed with the Department on May 4, 2012 and re-submitted to the Department on January 26, 2017, and all input received over the course of the Department's review. The determination to issue a Presidential permit for the proposed Project is based on consideration of a broad range of factors, including the following assessments:

- The Department finds that the proposed Project will meaningfully support U.S. energy security by providing additional infrastructure for the dependable supply of crude oil. Global energy security is a vital part of U.S. national security. Moreover, crude oil is vital to the U.S. economy and is used to produce transportation fuels, fuel oils for heating and electricity generation, asphalt for our roads, and petrochemical feedstocks used for the manufacturing of chemicals, synthetic rubber, and a variety of plastics. Accordingly, the Department works closely with our international partners to ensure that adequate supplies of energy reach the global economy and to help manage geopolitical changes arising from shifting patterns of energy production and consumption. Whether promoting national and regional markets that facilitate financing for transformational and clean energy or inspiring civil society and governments to embrace transparent and responsible development of natural resources, the Department works to ensure energy is employed as a tool for stability, security, and prosperity. For U.S. policymakers, this has often translated into an acute focus on oil markets. Historically, oil has been a major source of U.S. energy security concerns due to our relatively high volume of net imports, and oil's economic importance and military uses. Such concerns are well founded. Over the past year, crude oil supply disruptions internationally have trended noticeably higher when controlling for Iran's return to the international oil market. Largely attributable to political instability and manipulative market tactics on the part of OPEC, when compared to disruptions at the time of the 2015 Decision, today unplanned disruptions are over 500,000 bpd higher, having reached a peak high of nearly one million bpd in September 2016. Moreover, OPEC's total spare capacity remains at or below two million bpd, which provides very little cushion for fluctuations in supply in a context of rapidly rising demand or further geopolitical disruptions. While U.S. oil imports have abated sharply in recent years, the United States remains a net oil importer. Moreover, even if the United States were self-sufficient in terms of meeting its domestic energy needs, because oil is traded globally, the United States would stay integrated with global oil markets and subject to global price volatility. Accordingly, the U.S. national interest in ensuring access to stable, reliable, and affordable energy supplies will persist in the foreseeable future.

- Canada's role as the largest and fastest-growing source of U.S. crude imports cannot

be dismissed. According to the latest statistics from the EIA, the United States imported 3.17 million bpd of crude oil from Canada in 2016, which accounted for more than 43 percent of total U.S. crude oil imports. Although domestic production growth from tight oil formations, which is predominately light crude, continues to supplant the majority of international alternatives, U.S. imports of Canadian crude oil are increasing. The vast majority of these imports reach U.S. markets via existing pipeline infrastructure between Canada and the United States. A growing share, however, reaches markets by rail. Over 160 million barrels of Canadian crude oil has been imported by rail from Canada since 2011. Current estimates for WCSB rail loading capacity show crude oil transport by rail has potential to grow further.

- Canadian oil is a relatively stable and secure source of energy supply for many reasons, and few countries share all of the political or physical characteristics that enable Canada to remain in this position. Its producing areas are physically close to the U.S. market, and there are limited chokepoints to disrupt trade between Canada and the United States. Canada has a low likelihood of political unrest, resource nationalism, or conflict—above-ground factors that sometimes disrupt oil production in other regions. Additionally, it is not a member of OPEC, which acts to restrict oil production and influence market conditions. The Canadian oil sector is efficiently run, without undue political interference. Canadian oil sands projects have low production decline rates compared to conventional oil fields, providing greater geologic certainty of future supply levels. Moreover, as the Canadian Government's conditional approval of the Trans Mountain pipeline illustrates, failure to approve new transboundary pipeline infrastructure may redirect this source of reliable supply to Asian markets.

- Any impact on prices for refined petroleum products would be minimal if the proposed Project is approved. The Supplemental EIS recognized that the proposed Project is unlikely to have a meaningful effect on crude flows and domestic fuel prices. While crude oil prices matter to those involved in producing oil or refining oil into products, most Americans are mainly concerned with the price of gasoline and other refined products. The price of those refined products in the United States continues to be set largely by global crude prices, which are tied to global production and consumption, rather than the availability of pipelines. The findings in the Supplemental EIS have been reinforced by EIA studies that assert that U.S. gasoline prices move with the international benchmark Brent crude oil price rather than WTI. Accordingly, energy security concerns stemming from the proposed Project's impact on domestic fuel prices are largely unwarranted—cross-border pipeline capacity does not measurably translate into lower retail gasoline prices. Oil trade is driven by commercial considerations and occurs in the context of a globally traded market in which crude oil and products are relatively fungible. The market continually adjusts both logistically and in terms of price to balance global supply and demand. As a result, the level or origin of U.S. oil imports has a minimal impact on the prices U.S. consumers pay for refined products.

- By itself the proposed Project is unlikely to significantly impact the level of GHG-

intensive extraction of oil sands crude or the continued demand for heavy crude oil at refineries in the United States. As stated in the Supplemental EIS, the dominant drivers of oil sands development remain more global than any single infrastructure project. Moreover, under most market conditions, alternative transportation infrastructure would allow growing oil sands production to reach markets irrespective of the proposed Project. Still, uncertainties about the future growth of oil sands production remain. Oil prices are volatile, particularly over the short term. However, the long-term price and technological trends that drive WCSB crude oil production and subsequently the amount of new transportation capacity needed to meet them, coupled with the documented ability of Canadian upstream producers to sustain production during a brief period of lower oil prices, leads the Department to have confidence in the forecasts presented by market experts at the EIA and IEA, and affirms the Department's conclusion that such infrastructure is supported by mid- and long-term market outlooks.

- In the 2015 Decision, the Department determined that approval of the proposed Project at that time would have undercut the credibility and influence of the United States in urging other countries to address climate change. Since then, there have been numerous developments related to global action to address climate change, including announcements by many countries of their plans to do so. In this changed global context, a decision to approve this proposed Project at this time would not undermine U.S. objectives in this area. Moreover, a decision to approve this proposed Project would support U.S. priorities relating to energy security, economic development, and infrastructure.

- The Department recognizes the importance of the proposed Project to Canada and places great significance on maintaining strong bilateral relations. The United States and Canada are the closest of allies, economic partners, and friends. This unique bilateral relationship is based on shared history, common values, and a vast and intricate network of ties between our federal governments, states, cities, and people. In many economic sectors the United States and Canada enjoy deeper, more integrated structures than found even among European Union member states. The United States has over $2 billion in trade per day, U.S.-Canadian supply chains are interlinked, and U.S. and Canadian companies are heavily invested in each other's markets. The two countries coordinate closely on most foreign policy issues and have a robust partnership in critical areas around the world. Irrespective of the proposed Project, our relationship with Canada will endure. However, the United States recognizes Canada's interest in the completion of the proposed Project and finds that it is in the United States' interest to strengthen the role Canada plays as a secure conduit for crude oil to reach the U.S. market, and more broadly, to ensure our shared interests in energy, environmental, and economic issues continue to prosper.

- The Department considered the economic benefits of the proposed Project for the United States using an input-output model calibrated to 2010 data. During construction over a two-year period, the model estimates spending on the proposed Project would support approximately 42,100 jobs (direct, indirect, and induced jobs

combined), of which approximately 3,900 would be direct construction jobs. The majority of these jobs would be short-term in nature. According to the applicant, were the proposed Project to enter service, operations would require approximately 50 employees in the United States, consisting of 35 full-time employees and 15 temporary contractors. The proposed Project would also generate tax revenue for communities in the pipeline's path and it was estimated that pipeline activity would contribute \$3.4 billion to U.S. GDP. Since 2010, the U. S. economy has returned closer to full employment capacity but simultaneously has seen relative economic weakness in certain sectors and states due to the downturn in global energy prices in 2014. As a result, the economic benefits in terms of job creation from the proposed Project may be more significant than the initial estimates. The economic benefits are likely to be meaningful and reflect the importance policymakers place on positive near- and long-term economic growth.

- There are a variety of potential environmental and cultural impacts associated with the proposed Project, just as there would be for alternative methods of transporting crude oil. TransCanada Keystone Pipeline, L.P. has agreed to abide by all the terms and conditions of the mitigation measures outlined in the Supplemental EIS, including all Appendices and supplements, follow all state, local, and tribal laws and regulations with respect to the construction and operation of the proposed Project, follow monitoring and reporting requirements, and carry out response activities of any spills if they occur. Additionally, the Department has considered the concerns of some Indian tribes raised in the context of the proposed Project regarding sacred cultural sites and avoidance of adverse impacts to the environment, including to surface and groundwater resources.

Having weighed multiple policy considerations, the Under Secretary of State for Political Affairs finds that, at this time, the proposed Project's potential to bolster U.S. energy security by providing additional infrastructure for the dependable supply of crude oil, its role in supporting, directly and indirectly, a significant number of U.S. jobs and provide increased revenues to local communities that will bolster the U.S. economy, its ability to reinforce our bilateral relationship with Canada, and its limited impact on other factors considered by the Department, all contribute to a determination that issuance of a Presidential permit for this proposed Project serves the national interest.

## 7.0 National Interest Determination

Pursuant to the authority vested in me under Executive Order 13337 of April 30, 2004, the Presidential Memorandum dated January 24, 2017, and Department of State Delegation of Authority No. 118-2 of January 26, 2006, I hereby determine that issuance of a permit to TransCanada Keystone Pipeline, L.P. (Keystone), a limited partnership organized under the laws of the State of Delaware, to construct, connect, operate, and maintain facilities at the border of the United States and Canada for the transport of crude oil from Canada to the United States across the international boundary in Phillips County, Montana, would serve the national interest.

The Presidential permit issued to TransCanada Keystone Pipeline, L.P. shall include authorizations to construct, connect, operate and maintain facilities at the border of the United States facilities for the transport of crude oil from Canada to the United States as described in the Presidential permit application dated January 26, 2017. No actions shall be taken by TransCanada Keystone Pipeline, L.P. pursuant to this authorization prior to Keystone's acquisition of all other necessary federal, state, and local permits and approvals from agencies of competent jurisdiction.

23 March 2017

Date

Thomas A. Shannon, Jr.
Under Secretary of State for Political Affairs