Timothy M. Bechtold (Montana Bar No. 4376)
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, Montana 59807
(406) 721-1435
tim@bechtoldlaw.net
Attorney for Plaintiffs
(additional counsel listed on signature pages)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, BOLD ALLIANCE, CENTER FOR BIOLOGICAL DIVERSITY, FRIENDS OF THE EARTH, NATURAL RESOURCES DEFENSE COUNCIL, INC., and SIERRA CLUB, <br><br> Plaintiffs, <br><br> v. <br><br> THOMAS A. SHANNON, JR., in his official capacity; U.S. DEPARTMENT OF STATE; RYAN ZINKE, in his official capacity; U.S. DEPARTMENT OF THE INTERIOR; U.S. FISH AND WILDLIFE SERVICE, <br><br> Defendants, <br><br> TRANSCANADA CORPORATION and TRANSCANADA KEYSTONE PIPELINE LP, <br><br> Intervenor-Defendants. | CV 17-31-GF-BMM <br><br> **Plaintiffs' Combined Opposition to Defendants' Motions to Dismiss** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................3

STANDARD OF REVIEW ................................................................................7

ARGUMENT .....................................................................................................8

I.    This Court has jurisdiction over Plaintiffs' claims against
      the State Department.............................................................................8

      A.    Congress, through the APA, has waived the State
            Department's sovereign immunity to Plaintiffs' claims ...................10

      B.    The State Department took "final agency action" by issuing
            the cross-border permit, ROD, and EIS for Keystone XL..................11

            1.    The State Department took "final agency action" by
                  making the final, discretionary decisions to issue the
                  cross-border permit and ROD and rely on the 2014 EIS..........12

            2.    The State Department's ROD and EIS for Keystone XL
                  are independently reviewable as "final agency action"............16

      C.    The Court has "meaningful standards" to apply in reviewing
            Plaintiffs' claims against the State Department, and no
            "foreign policy" or "security" considerations preclude review ..........19

            1.    NEPA, the APA, federal regulations, the State
                  Department's decision documents for Keystone XL,
                  and case law supply "meaningful standards" ...........................20

            2.    No foreign-policy or security considerations insulate
                  the State Department's actions from judicial review................23

D.      The President has no power to exempt agencies from the
        APA and NEPA, and the Trump Memorandum and the State
        Department's regulations recognize that NEPA applies....................27

E.      This Court can redress the injuries caused by the State
        Department's NEPA and APA violations ...........................................31

II.     Plaintiffs have standing to pursue their claim against the Service ...............32

III.    To promote judicial economy, if the agency has not yet acted, the
        Court should hold Plaintiffs' claim against the Bureau in abeyance ............37

CONCLUSION .......................................................................................................39

WORD COUNT CERTIFICATION ....................................................................42

# TABLE OF AUTHORITIES

## Cases

*ASSE International, Inc. v. Kerry*,
    803 F.3d 1059 (9th Cir. 2015) ................................................................ passim

*Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v.*
    *Board. of Oil and Gas Conservation*,
    792 F.2d 782 (9th Cir. 1986) ....................................................................... 10

*Bancoult v. McNamara*,
    445 F.3d 427 (D.C. Cir. 2006) ...................................................................... 31

*Baker v. Carr*,
    369 U.S. 186 (1962) ...................................................................................... 25

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................. 12, 13

*Border Power Plant Working Group v. Department of Energy*,
    260 F. Supp. 2d 997 (S.D. Cal. 2013) ......................................................... 17

*Bowen v. Michigan Academy of Family Physicians*,
    476 U.S. 667 (1986) ...................................................................................... 28

*Cantrell v. City of Long Beach*,
    241 F.3d 674 (9th Cir. 2001) ........................................................................ 34

*Center for Biological Diversity v. Hagel*,
    80 F. Supp. 3d 991 (N.D. Cal. 2015) ........................................................... 30

*Center for Biological Diversity v. U.S. Fish & Wildlife Service*,
    807 F.3d 1031 (9th Cir. 2015) ................................................................. 36-37

*Chamber of Commerce v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ...................................................................... 13

*Chicago & Southern Airlines v. Waterman S.S. Corporation*,
    333 U.S. 103 (1948) ...................................................................................... 26

iv

*Dalton v. Specter*,
    511 U.S. 462 (1994)............................................................. 12-13

*Department of the Navy v. Egan*,
    484 U.S. 518 (1988)................................................................24

*Detroit International Bridge Co. v. Government of Canada*,
    189 F. Supp. 3d 85 (D.D.C. 2016)..............................................15

*DeVilbiss v. Small Business Administration,*
    661 F.2d 716 (8th Cir. 1981) .....................................................11

*District No. 1, Pacific Coast District, Marine Engineers'*
*Beneficial Association v. Maritime Administration*,
    215 F.3d 37 (D.C. Cir. 2000).....................................................26

*Ecological Rights Foundation v. Pacific Lumber Co.*,
    230 F.3d 1141 (9th Cir. 2000) ...................................................35

*FDIC v. Meyer*,
    510 U.S. 471 (1994)................................................................11

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992)................................................................12

*Gallo Cattle Co. v. USDA*,
    159 F.3d 1194 (9th Cir. 1998) ...................................................10

*Ground Zero Center for Non-Violent Action v. U.S. Department*
*of the Navy*,
    383 F.3d 1082 (9th Cir. 2004) ........................................... 14, 26-27

*Harger v. U.S. Department of Labor*,
    No. CV-06-5071-RHW, 2007 WL 1430214
    (E.D. Wash. May 14, 2007).......................................................39

*Heckler v. Chaney*,
    470 U.S. 821 (1983)................................................................24

*Hunt v. Washington State Apple Advertising Commission*,
    432 U.S. 333 (1977)........................................................................33

*Jensen v. National Marine Fisheries Service*,
    512 F.2d 1189 (9th Cir. 1975) ............................................14, 26

*Lane v. Pena*,
    518 U.S. 187 (1996)........................................................................11

*Laub v. U.S. Department of Interior*,
    342 F.3d 1080 (9th Cir. 2003) ....................................................16

*League of Wilderness Defenders/Blue Mountains Biodiversity*
    *Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ......................................................20

*Lefer v. Murry*,
    No. CV 13-06-BIL-DWM, 2013 WL 2070877,
    (D. Mont. May 14, 2013)......................................................... 32-33

*Legal Assistance for Vietnamese Asylum Seekers v. U.S. Department*
    *of State*,
    104 F.3d 1349 (D.C. Cir. 1997)..................................................26

*Lehman v. Nakshian*,
    453 U.S. 156 (1981)........................................................................11

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)................................................................33, 35

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) ....................................................26

*Maya v. Centex Corporation*,
    658 F.3d 1060 (9th Cir. 2011) ....................................................37

*Mendez-Gutierrez v. Ashcroft*,
    340 F.3d 865 (9th Cir. 2003) ................................................19, 21

*Missouri ex rel. Koster v. Harris*,
    847 F.3d 646 (9th Cir. 2017) ........................................................39

*No GWEN Alliance of Lane County, Inc. v. Aldridge*,
    855 F.2d 1380 (9th Cir. 1988) ....................................................27

*No Oilport! v. Carter*, 520 F. Supp. 334 (W.D. Wash. 1981) ..............26

*NRDC v. Jewell*,
    749 F.3d 776 (9th Cir. 2014) ........................................33, 35, 36

*NRDC v. U.S. Department of State*,
    658 F. Supp. 2d 105 (D.D.C. 2009).............................................15

*Ocean Advocates v. U.S. Army Corps of Engineers*,
    402 F.3d 846 (9th Cir. 2005) ......................................................20

*Oregon Natural Desert Association v. Bureau of Land Management*,
    625 F.3d 1092 (9th Cir. 2010) ..............................................16, 22

*Organized Village of Kake v. USDA*,
    795 F.3d 956 (9th Cir. 2015) ......................................................22

*Pacific Northwest Generating Cooperative v. Bonneville Power
    Administration*,
    596 F.3d 1065 ..............................................................................26

*Pinnacle Armor, Inc. v. United States*,
    648 F.3d 708 (9th Cir. 2011) ............................................9, 19, 22

*Protect Our Communities Foundation v. Chu*,
    No. 12-cv-3062, 2014 WL 1289444 (S.D. Cal. Mar. 27, 2017) ............17, 20

*Rattlesnake Coalition v. EPA*,
    509 F.3d 1095 (9th Cir. 1997) ..............................................16, 18

*Regan v. Wald*,
    468 U.S. 222 (1984)......................................................................26

*Safe Air for Everyone v. Meyer*,
   373 F.3d 1035 (9th Cir. 2004) ............................................................ 7-8, 37

*Salmon Spawning & Recovery Alliance v. Gutierrez*,
   *See* 545 F.3d 1220 (9th Cir. 2008) ............................................................30

*San Luis Unit Food Producers v. United States*,
   709 F.3d 798 (9th Cir. 2013) ...........................................................................7

*Sierra Club v. Clinton*,
   689 F. Supp. 2d 1147 (D. Minn. 2010) ................................................17, 27

*Sierra Club v. U.S. Army Corps of Engineers*,
   64 F. Supp. 3d 128 (D.D.C. 2014)...................................................................39

*Sisseton-Wahpeton Oyate v. U.S. Department of State*,
   659 F. Supp. 2d 1071 (D.S.D. 2009) ............................................................15

*Socop-Gonzalez v. INS*,
   208 F.3d 838 (9th Cir. 2000) ................................................................21, 23

*Spencer Enters., Inc. v. United States*,
   345 F.3d 683 (9th Cir. 2003) ...........................................................................21

*Sprawldef v. FEMA*,
   No. 15-cv-02331, 2016 WL 6696046 (N.D. Cal. Nov. 15, 2016) ...............18

*United States v. 12 200-Ft. Reels of Super 8mm. Film*,
   413 U.S. 123 (1973)...........................................................................................29

*United States v. Clark*,
   435 F.3d 1100 (9th Cir. 2005) ........................................................................29

*United States v. Mitchell*,
   463 U.S. 206 (1983)...........................................................................................11

*United States v. Testan*,
   424 U.S. 392 (1976)...........................................................................................11

*Warth v. Seldin*,
    422 U.S. 490 (1975).................................................................33, 37

*Webster v. Doe*,
    486 U.S. 592 (1988).................................................................24, 26

*White Earth Nation v. Kerry*,
    No. 14-1427, 2015 WL 8483278 (D. Minn. Dec. 9, 2015)...........................15

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 3....................................................................29

U.S. Const. art. II, § 3 ........................................................................9, 28

## Statutes

Administrative Procedure Act

5 U.S.C. § 701(a)(2)............................................................................28

5 U.S.C. § 706(2)(A)............................................................................8

5 U.S.C. § 706(2)(C)............................................................................8

5 U.S.C. § 706(2)(D)............................................................................8

National Environmental Policy Act

42 U.S.C. § 4321 ................................................................................9

42 U.S.C. § 4332(2)(C).........................................................................9

Other

3 U.S.C. § 301 ..................................................................................28

28 U.S.C. § 1331 ...............................................................................10

50 U.S.C. § 403(c) .............................................................................24

## Regulations

22 C.F.R. § 161.7 ...........................................................................20, 30

22 C.F.R. § 161.10 .........................................................................20, 30

40 C.F.R. § 1506.3(c)............................................................................18

43 C.F.R. § 2884.20(d) ..........................................................................38

50 C.F.R. § 402.14(a)............................................................................36

50 C.F.R. § 402.14(g)(5)........................................................................36

50 C.F.R. § 402.14(h)(3)........................................................................36

50 C.F.R. § 402.15(a)............................................................................36

74 Fed. Reg. 5019 (Jan. 28, 2009) .........................................................30

## Rules of Court

Fed. R. Civ. P. 1 ...................................................................................39

## Other Authorities

January 24, 2017 Trump Memorandum ....................................5, 6, 29, 38

March 23, 2017 Record of Decision for Keystone XL.....................................passim

March 23, 2017 Permit for Keystone XL ...................................3, 6, 12, 32

Executive Order, 13,337 (2004)..........................................................6, 30

Executive Order 11,423 (1968) ...............................................................30

# INTRODUCTION

Keystone XL is a massive commercial pipeline that would move close to a million barrels a day of Canadian heavy crude oil across three states; deepen the world's climate crisis; and threaten freshwater aquifers, critically endangered birds, and other resources that millions of Americans depend on and cherish. In March, the State Department issued a permit that allows Keystone XL to cross the border onto U.S. soil. The agency acted without supplementing its stale January 2014 Environmental Impact Statement (EIS) for the project, in violation of the National Environmental Policy Act (NEPA). It also gave no reasoned explanation for reversing its earlier decision to deny a cross-border permit, in violation of the Administrative Procedure Act (APA). It asserts that these laws and others like the Endangered Species Act (ESA), which require federal agencies to account for the environmental consequences of their choices and explain them to the public, are "inapplicable." March 23 Record of Decision, ECF No. 42-6 (ROD), at 4.[1]

No binding case supports Defendants' position that the State Department's decisions on Keystone XL are unreviewable for compliance with the APA and NEPA. The APA establishes a strong presumption that agencies' final, discretionary decisions are judicially reviewable. Here, the President left the final decisions on whether to issue a cross-border permit, and whether to update the EIS,

_____

[1] Citations to the ROD and other filed documents use the ECF numbering.

in the State Department's hands. The agency's own regulations recognize that NEPA applies to such decisions, and its own decision documents for Keystone XL, as well as statutes and case law, provide meaningful standards for review of those decisions. That the agency considered some "foreign policy" and energy "security" issues does not preclude review of its action, as the Ninth Circuit has recognized.

This Court is therefore empowered to review the State Department's January 2014 EIS and March 23 Record of Decision (ROD) for Keystone XL, and to set aside these documents and the cross-border permit to ensure that the project does not move forward before the agency complies with NEPA and the APA. Because those remedies and the others Plaintiffs request will help to redress the injuries their members have suffered as a result of the agency's violations, Plaintiffs have Article III standing to pursue their claims against the State Department.

Plaintiffs also have Article III standing to pursue their claim against the U.S. Fish and Wildlife Service (Service), which unlawfully concurred with the State Department's conclusion that Keystone XL is not likely to adversely affect the critically endangered whooping crane and two other migratory bird species protected by the ESA. As Plaintiffs' Second Amended Complaint (SAC) illustrates, Plaintiffs' members study and value these species and have been injured by the Service's decision. A favorable ruling would help redress those injuries by mandating a fuller review of Keystone XL's threats to the protected birds. That

review could lead federal officials and others to make different choices about whether, or on what terms, the project should move forward.

Plaintiffs also reasonably expect that the Bureau of Land Management (Bureau) will issue its own approvals for Keystone XL soon, and rely on the same inadequate NEPA and ESA documents Plaintiffs challenge in their claims against the State Department and Service. To promote judicial economy, the Court should hold Plaintiffs' claim against the Bureau in abeyance until the Bureau acts.

Congress has vested federal courts with the power to ensure that federal agencies conduct thorough environmental reviews, and share their findings and reasons with the public, before letting giant industrial projects like Keystone XL move forward. The facts of this case underscore why it is so important for this Court to exercise that power. The motions to dismiss should be denied.

## BACKGROUND

Although Keystone XL requires federal and state approvals, would cross public land, and would rely on public infrastructure, the project is fundamentally a private commercial venture. TransCanada would build, operate, and own the pipeline, and holds the cross-border permit the State Department issued. SAC, ECF No. 46 ¶¶ 9, 62-63, 113, 116;[2] cross-border permit, ECF No. 42-8 (Permit), at 2.

---

[2] The Second Amended Complaint is the operative complaint for purposes of deciding Defendants' June 9 and 16 motions to dismiss. Order, ECF No. 49.

Keystone XL would be one of the largest oil pipelines ever built. SAC ¶ 63. Each day, it would pump up to 830,000 barrels (roughly thirty-five *million* gallons) of heavy crude oil over 1,200 miles, from Alberta's tar sands through Montana, South Dakota, and Nebraska. *Id.* ¶¶ 62-63. If TransCanada gets permission to run the pipeline at a higher pressure, this daily flow could increase to 900,000 barrels. *Id.* ¶ 64. Existing pipelines would carry Keystone XL's crude oil from southern Nebraska to Gulf Coast refineries, where much of it would be refined for export. *Id.* ¶¶ 63-64. The proposed Keystone XL route crosses more than 1,000 rivers and streams and hundreds of acres of wetlands, as well as freshwater aquifers that local communities rely on for drinking and irrigation. *Id.* ¶¶ 74-75. A spill could be devastating to the people and wildlife who depend on these resources, and the response could cost billions. *See id.* ¶¶ 71-73 (discussing spills from existing tar sands crude oil pipelines, including TransCanada's Keystone I).

Keystone XL's construction and operation would also exacerbate air pollution and climate change by increasing the extraction, refining, and burning of one of the world's dirtiest and most greenhouse gas-intensive fossil fuels. *Id.* ¶¶ 65-69, 120. The human and ecological harms associated with climate change include sea-level rise, flooding, extreme weather, increased risk of wildfires, water shortages, extinctions, and shifts in disease pathways. *Id.* ¶ 70. The pipeline and its support infrastructure would also threaten scarce and precious resources in the

4

project's path. *Id*. ¶¶ 74-77. For example, substantial portions of the proposed pipeline route follow the migratory corridor of the world's last wild, migratory population of whooping cranes. *Id*. ¶¶ 78-79, 81. New power lines built to serve Keystone XL's pump stations would pose a lethal threat to these iconic birds, and could jeopardize the species' survival. *Id*. ¶¶ 80-83, 85.

In November 2015, citing Keystone XL's threats to the climate and the communities and natural areas the project would pass through, the State Department denied TransCanada's application for a cross-border permit. *Id*. ¶¶ 107-08. In denying the application, the State Department relied on the EIS it completed in January 2014, and on ESA documents from 2012 and 2013. *See* ROD 4-5, 7-8, 29-31; SAC ¶¶ 100, 107-08, 126-28.

This January, President Trump issued a memorandum inviting TransCanada to "re-submit its application to [the State Department]." SAC ¶ 110; Jan. 24 Memorandum, ECF No. 42-7 ("Trump Memorandum"), § 2. The Trump Memorandum directed the Secretary of State to "make a final permitting determination" within sixty days, *id*. § 3(a)(i), and to rely on the January 2014 EIS to satisfy "all applicable requirements of [NEPA]" and "any other provision of law that requires executive department consultation or review," including ESA section 7, "to the maximum extent permitted by law," *id*. § 3(a)(ii). It also "waived" the provision in Executive Order 13,337 that provides for the Secretary of State to

5

refer a cross-border permit application "to the President for consideration and a final decision" in the event of an inter-agency dispute. *Id*. § 3(a)(iv) (referencing paragraph 1(i) of the Executive Order); Executive Order 13,337 § 1(i).

In March, Under Secretary Shannon, acting for the State Department, signed and issued the cross-border permit and ROD for Keystone XL. ROD at 32; Permit at 6. The agency made its permitting decision "in accordance with" the Trump Memorandum provision waiving any possible appeal to and final decision by the President. ROD at 5. The permit "may be terminated or amended at any time by" State Department officials, at their discretion, Permit at 3 (art. 1(1)), and is "subject to" other conditions imposed by the agency, *id*. at 3-6.

The State Department's ROD confirms that the agency did not supplement its NEPA and ESA analyses for Keystone XL before reversing course and issuing a cross-border permit, even though those documents were inadequate when issued and are now three or more years out of date. *See* SAC ¶¶ 100-04, 125. For example, the ROD repeatedly refers to and relies on the same 2014 EIS the State Department cited in its earlier permit denial, even though radical changes in the oil market have undermined critical assumptions that document made in assessing Keystone XL's climate and other threats.[3] *Id.* ¶¶ 109, 114, 118-23, 125; *see also*

---

[3] In early 2017, Plaintiffs wrote to the State Department and Bureau to note sharp declines in the price of oil and other significant new information that NEPA

ROD at 3-4, 7-8, 29-31 (referencing EIS). The ROD also refers to the State

Department's Biological Assessment, which it finished in 2012 and the Service

concurred with in 2013. *See* ROD at 7-8; SAC ¶¶ 126-38.

Plaintiffs are not-for-profit organizations dedicated to protecting the

environment, public health, and the rural landowners and landscapes of the Great

Plains. SAC ¶¶ 19-24. They stand in the shoes of people whose land the Keystone

XL pipeline would cross, who study the whooping crane and other wild species

whose survival and recovery the project threatens, and who are concerned about

the project's impacts on the climate and other natural resources. *Id*. ¶¶ 25-31.

Plaintiffs' members are among the many people who have been harmed by the

State Department's and Service's violations of the APA and environmental laws,

and who will benefit if these agencies do the complete reviews Congress mandated

before deciding whether Keystone XL should move forward. *Id*. ¶¶ 31-32.

## STANDARD OF REVIEW

Defendants' attacks on this Court's jurisdiction are governed by Rule

12(b)(1). *See San Luis Unit Food Producers v. United States*, 709 F.3d 798, 801

(9th Cir. 2013) (construing "final agency action" requirement as

jurisdictional); *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir.

---

required the agencies to analyze in a supplemental EIS. *See id.* ¶¶ 48, 114, 120-21,
124. The agencies never responded. *Id*. ¶¶ 125, 144.

2004) (defining 12(b)(1) attacks). Plaintiffs agree with the federal Defendants' characterization of the review standards for Rule 12(b)(1) motions. *See* Fed. Defs.' Opening Br. ("Fed. Br."), ECF No. 42-1, at 13-14.

## ARGUMENT

I.     **This Court has jurisdiction over Plaintiffs' claims against the State Department**

Plaintiffs' claims against the State Department and Under Secretary Shannon (collectively the "State Department" or "agency") are straightforward. The agency violated the APA and NEPA by issuing a cross-border permit for Keystone XL without providing the reasoned explanation and the current and complete EIS those laws required. SAC ¶¶ 146-52, 159-63. Plaintiffs ask this Court to declare that the agency violated the APA and NEPA, *id*. ¶¶ A-B, and to set aside the March 2017 cross-border permit and ROD and the January 2014 EIS. *Id*. ¶¶ D-E.

This relief is authorized by the APA, which provides that federal courts "*shall . . .* hold unlawful and set aside" final agency action that was "arbitrary and capricious, an abuse of discretion, or otherwise contrary to law."[4] It will redress Plaintiffs' injuries by ensuring that Keystone XL does not move forward before the agency supports its decision with a reasoned explanation and a lawful EIS. That

---

[4] 5 U.S.C. § 706(2)(A) (emphasis added); *see also id*. § 706(2)(C)-(D) (empowering federal courts to set agency aside action that violated a statutory constraint, or was taken "without observance of procedure required by law").

EIS would help Plaintiffs' members and many others to better understand Keystone XL's environmental consequences. It could lead the federal Defendants and other government officials to make different choices about whether to approve the project at all, about how to choose among design and other alternatives, and about which mitigation measures to require. *See* SAC ¶¶ 43-48 (summarizing NEPA's requirements for the contents of EISes and for supplementation of EISes).

Defendants' characterizations of the State Department's actions as "presidential" and unreviewable contravene binding precedent and the APA's and NEPA's purposes. NEPA helps "prevent or eliminate damage to the environment," 42 U.S.C. § 4321, by requiring agencies to publish detailed impact studies of all "major Federal actions significantly affecting the quality of the human environment," *id*. § 4332(2)(C); *see also* SAC ¶¶ 39-49. And the APA establishes a "strong presumption that Congress intends judicial review of administrative action." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015). It helps keep agencies accountable by making their actions reviewable except in "narrow circumstances," such as where there is "no meaningful standard against which to judge the agency's exercise of discretion." *Id*. (quoting *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 719 (9th Cir. 2011)) (internal quotation marks omitted). The President has no power to exempt agencies from NEPA and the APA, and must ensure those laws' faithful execution. *See* U.S. Const. art. II, § 3.

Plaintiffs' claims against the State Department meet the APA's liberal tests for judicial review, and none of the rare exceptions to review apply. The State Department made the final, discretionary decisions to issue the cross-border permit and ROD for Keystone XL, and to rely on its stale 2014 EIS. Those decisions are accordingly "final agency action." They are also reviewable by reference to meaningful standards set forth in NEPA, the APA, the State Department's regulations and decision documents for Keystone XL, and case law. This Court therefore has the power to adjudicate Plaintiffs' claims against the agency and to redress Plaintiffs' injuries, including by setting aside the cross-border permit, ROD, and EIS. Nothing further is required.

### A. Congress, through the APA, has waived the State Department's sovereign immunity to Plaintiffs' claims

The APA "provide[s] a waiver of sovereign immunity in suits seeking judicial review of a federal agency action under [28 U.S.C.] § 1331." *Gallo Cattle Co. v. USDA*, 159 F.3d 1194, 1198 (9th Cir. 1998); SAC ¶ 16 (citing the APA and 28 U.S.C. § 1331). The waiver "applies to every action in a court of the United States seeking relief other than money damages," *Assiniboine & Sioux Tribes of Fort Peck Indian Reserv. v. Bd. of Oil & Gas Conserv.*, 792 F.2d 782, 793 (9th Cir. 1986) (internal quotation marks omitted), and accordingly applies to Plaintiffs'

claims for declaratory and injunctive relief against the State Department and other federal Defendants.[5] *See generally* SAC ¶¶ 146-72, A-E.

**B.** **The State Department took "final agency action" by issuing the cross-border permit, ROD, and EIS for Keystone XL**

Defendants' theory that the State Department took "presidential" rather than "final agency" action, Fed. Br. 15; TransCanada Br. 19, does not square with the Supreme Court cases recognizing that "final agency action" occurs when an agency takes the last, discretionary step in the government's decision-making process—as the State Department did here by issuing the cross-border permit, ROD, and EIS for Keystone XL. Defendants also ignore or misconstrue the Ninth Circuit cases that recognize RODs and EISes are reviewable upon issuance to enforce agencies' compliance with NEPA, even where the actions underlying those documents may not be independently reviewable. *Contra* Fed. Br. 21-22.

//

//

//

//

---

[5] The cases TransCanada cites, TransCanada's Opening Br. ("TransCanada Br."), ECF No. 44, at 20-21, concern non-APA-based claims for damages and similar monetary relief and are inapposite. *See Lane v. Pena*, 518 U.S. 187, 192 (1996); *FDIC v. Meyer*, 510 U.S. 471, 475-77 (1994); *United States v. Mitchell*, 463 U.S. 206, 207, 212-13 (1983); *Lehman v. Nakshian*, 453 U.S. 156, 157-58, 161 (1981); *United States v. Testan*, 424 U.S. 392, 400-401 (1976); *DeVilbiss v. Small Bus. Admin.*, 661 F.2d 716, 718 (8th Cir. 1981).

### 1. The State Department took "final agency action" by making the final, discretionary decisions to issue the cross-border permit and ROD and rely on the 2014 EIS

To be final for purposes of APA section 704, an agency's action (1) "must mark the consummation of [its] decisionmaking process," meaning that "it must not be of merely a tentative or interlocutory nature," and (2) "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks omitted). It is undisputed that the State Department's decisions to issue the cross-border permit and ROD, and to rely on the January 2014 EIS, were final. They consummated the government's environmental review and decision-making process for TransCanada's cross-border permit application, and "authoriz[ed]" the company to "construct, connect, operate, and maintain" the pipeline at the border, subject to specified conditions. Permit at 2 (authorization), 3-6 (conditions); *see also* ROD at 32.

The State Department also took "final *agency* action" by issuing the cross-border permit, ROD, and EIS. Defendants' reliance on *Franklin v. Massachusetts* and *Dalton v. Specter* to argue those decisions were "presidential" is misplaced; *Franklin* and *Dalton* concerned agencies' submissions of nonbinding reports and recommendations to the President, under statutes that committed the final decision to the President himself. *Franklin*, 505 U.S. 788, 797-98 (1992); *Dalton*, 511 U.S.

462, 464-65, 469-71 (1994). The agencies' submissions were "purely advisory and in no way affected the legal rights of the relevant actors." *Bennett*, 520 U.S. at 168 (discussing *Franklin* and *Dalton*). Here, however, Under Secretary Shannon did not "recommend" or "advise" that President Trump issue a cross-border permit for Keystone XL. He issued the permit himself, pursuant to a memorandum that expressly left the determination in the State Department's hands and *foreclosed* any possible referral of the "final decision" to the President. *Supra* Background (citing Trump Memorandum § 3(a)(iv) and Executive Order 13,337 § 1(i)).

By making the final decisions, those with "direct and appreciable legal consequences" for TransCanada's ability to build and operate Keystone XL, the State Department took "final agency action" for purposes of APA section 704. *Bennett*, 520 U.S. at 168 (holding that issuance of a Biological Opinion that allowed water project to keep operating, pursuant to conditions the Opinion specified, was "final agency action"). Because the State Department's conduct falls within the broad category of action Congress has made judicially reviewable through the APA, it makes no difference whether the agency was also acting pursuant to an Executive Order or other guidance from the President. *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1326-27 (D.C. Cir. 1996) ("[T]hat the

[agency's] regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA.").[6]

The Ninth Circuit has recognized that presidential involvement in agency action does not insulate the agency's discretionary conduct from APA and NEPA review. In *Ground Zero Center for Non-Violent Action v. U.S. Department of the Navy*, Plaintiffs argued NEPA required the Navy to prepare an EIS for a nuclear-missile-upgrade program (known as the "Backfit Program") at the Bangor, Washington naval base. 383 F.3d 1082, 1084-86 (9th Cir. 2004). The Navy argued NEPA was inapplicable because President Clinton had directed the missiles' deployment to the base, necessitating the upgrade. *Id*. at 1088. The Court agreed that the President had ordered the deployment, but found that did not end the inquiry because "the Navy retained some discretion over the implementation of the Backfit Program at Bangor." *Id*. at 1089. The Court went on to analyze "whether within the purview of this limited discretion the Navy complied with NEPA's procedural requirements." *Id*.

The same is true here. The State Department took the final step in the cross-border permitting process for Keystone XL—by issuing the permit and ROD and

---

[6] *Jensen v. National Marine Fisheries Service*, 512 F.2d 1189 (9th Cir. 1975), predates the *Franklin/Bennett* line and the Ninth Circuit's decision in *Ground Zero*, discussed below, and is no longer good law on APA section 704.

cutting off further NEPA review—and retained discretion over that step. This was final agency action, reviewable under the APA.

The out-of-Circuit, district-court opinions that found other cross-border permits unreviewable, and that Defendants rely on here, turned on different facts concerning the State Department's authority. *NRDC v. U.S. Department of State* and *Sisseton-Wahpeton Oyate v. U.S. Department of State* ascribed significance to the language in Executive Order 13,337 that provides for the President to make the "final decision"—language the Trump Memorandum *waived* for the permitting decision here.[7] *White Earth Nation v. Kerry* relies on those opinions' reasoning.[8] To the extent that these opinions also rely on more general reasoning about the President's foreign-affairs power, they remain unpersuasive. They overlook the President's duty to ensure that agencies comply with NEPA and the APA; the breadth of Congress's own foreign-affairs power; and the State Department's

---

[7] *Compare* Background & Arg. I.B.1 *with NRDC*, 658 F. Supp. 2d 105, 111 (D.D.C. 2009) ("That the President chose to retain ultimate authority to settle any interagency dispute signals his belief that the issuance of presidential permits is ultimately a presidential action."), *and Sisseton-Wahpeton*, 659 F. Supp. 2d 1071, 1081 (D.S.D. 2009) ("Here, Executive Order 13,337 explicitly states that the President retains the authority to issue a final decision on whether or not to issue the Presidential permit. It is clear, then, that the President is the final actor in determining whether a permit should be issued." (citation omitted))

[8] *White Earth Nation v. Kerry*, No. 14-1427, 2015 WL 8483278, at *7 (D. Minn. Dec. 9, 2015); *see also Detroit Int'l Bridge Co. v. Gov't of Can.*, 189 F. Supp. 3d 85, 103 (D.D.C. 2016) (quoting *NRDC*'s reference to the provision in Executive Order 13,337 that the Trump Memorandum waived for Keystone XL).

acknowledgments that NEPA applies to the agency's cross-border permitting

decisions, discussed at Argument I.D below.

### 2. The State Department's ROD and EIS for Keystone XL are independently reviewable as "final agency action"

Even if the Defendants were correct that the State Department's cross-border

permit is not reviewable as "final agency action," the agency's ROD and EIS are

independently reviewable.

The Ninth Circuit has held that "once an EIS's analysis has been solidified

in a ROD, the agency has taken final agency action, reviewable under [APA

section] 706(2)(A)." *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d

1092, 1118-19 (9th Cir. 2010) (distinguishing case law on section 706(1) of the

APA and citing similar holdings by seven other circuits); *Laub v. U.S. Dep't of*

*Interior*, 342 F.3d 1080, 1088 (9th Cir. 2003) (rejecting argument that final ROD

and EIS for water-management program were not "final agency action," and

deeming "the question of whether an agency has complied with NEPA's

procedural requirements in formulating [the] EIS is immediately ripe for review"

even though no further agency action had occurred). An agency's decision not to

prepare or supplement an EIS is also final agency action. *Rattlesnake Coal. v. EPA*,

509 F.3d 1095, 1104 (9th Cir. 1997) ("[A]n agency's decision not to issue an EIS

concludes the agency's procedural inquiry into the environmental impact of a

proposed project and therefore constitutes a final agency action . . . .").

Agency decisions to end NEPA review are "final agency actions" for APA purposes because they deprive the public of a deeper understanding of a proposal's impacts and alternatives, thereby foreclosing opportunities for public officials to choose, and citizens to advocate for, a different course of action.

Three district courts—including two in this Circuit—have accordingly held or assumed that the APA authorizes judicial review of State Department cross-border permitting decisions for oil pipelines and other utility projects referenced in Executive Order 13,337, to enforce compliance with NEPA. *Sierra Club v. Clinton* held a NEPA challenge to the agency's issuance of a cross-border permit for another pipeline was reviewable, because "the State Department's FEIS constitutes a final agency action reviewable by this Court under the APA." 689 F. Supp. 2d 1147, 1157 (D. Minn. 2010). *Protect our Communities Foundation v. Chu* relied on *Clinton* to hold that the State Department took reviewable final agency action when it issued a cross-border permit and EIS for a power line. No. 12-cv-3062, 2014 WL 1289444, at *1, 4-6 (S.D. Cal. Mar. 27, 2017). *Border Power Plant Working Group v. Department of Energy* also adjudicated a NEPA challenge to a State Department cross-border power line permit, and recognized that "an agency's decision not to prepare an EIS under NEPA is a final administrative decision reviewable under the [APA]." 260 F. Supp. 2d 997, 1018 (S.D. Cal. 2013).

The federal Defendants try to distinguish *Clinton* and *Chu* on the ground that "an EIS standing alone is not a final agency action reviewable under the APA" in this Circuit, Fed. Br. 21, but that is not the law. The cases the federal Defendants rely on involved decisions an agency had either not yet made or had withdrawn. *See Rattlesnake Coal.*, 509 F.3d at 1103-04 (finding no jurisdiction over a NEPA claim where agency had not yet decided whether to disburse funds for a project); *Sprawldef v. FEMA*, No. 15-cv-02331, 2016 WL 6696046, at *2-3 (N.D. Cal. Nov. 15, 2016) (holding NEPA claim moot where agency had withdrawn its approval of the contested fire-prevention method and terminated the grants implementing the method, and would have to do further NEPA review before making further grants).

Here, the State Department's decision to issue the ROD, and to rely on and not supplement the January 2014 EIS, stand. Those decisions are especially consequential for NEPA purposes because the EIS could also inform other agency decisions that affect whether (or on what terms) Keystone XL moves forward. *See* ROD at 7 (Service, Bureau, Army Corps of Engineers, and other agencies were "cooperating agencies" on the EIS); 40 C.F.R. § 1506.3(c) (providing for a cooperating agency to "adopt" the lead agency's EIS). *See also* TransCanada Br. 17 (Keystone XL requires Bureau and Corps approvals). To the best of Plaintiffs' knowledge, and despite their repeated requests for supplementation, no federal agency plans to supplement the State Department's EIS before making further

decisions about Keystone XL. *See, e.g.*, SAC ¶¶ 114, 144-45. The EIS and ROD are independently reviewable as "final agency action."

### C. The Court has "meaningful standards" to apply in reviewing Plaintiffs' claims against the State Department, and no "foreign policy" or "security" considerations preclude review

The federal Defendants are also wrong to assert that there are no "meaningful standards" for the Court to apply in adjudicating Plaintiffs' NEPA and APA claims against the State Department. Fed. Br. 23 (arguing that even assuming the agency took "final agency action," the action is unreviewable). The "lack of meaningful standards" exemption to judicial review is narrow and applies only in "rare instances." *Kerry*, 803 F.3d at 1068 (quoting *Pinnacle Armor*, 648 F.3d at 719); *see also Mendez-Gutierrez v. Ashcroft*, 340 F.3d 865, 868 (9th Cir. 2003). Plaintiffs' claims against the State Department are a far cry from the ones courts have found unreviewable: NEPA, the APA, federal regulations, the agency's decision documents for Keystone XL, and case law all supply standards for their adjudication. That the State Department considered foreign policy and security issues does not insulate its actions from review pursuant to APA section 701(a)(2), as the Ninth Circuit has held in another case involving the agency.

//

//

//

//

### 1. NEPA, the APA, federal regulations, the State Department's decision documents for Keystone XL, and case law supply "meaningful standards"

Plaintiffs' first claim against the State Department concerns the agency's unlawful refusal to supplement its stale and inadequate 2014 EIS before issuing a cross-border permit. *See* SAC ¶¶ 146-52. The meaningful standards for this claim come from NEPA, the State Department's and other federal regulations implementing NEPA, and the many judicial opinions that address similar NEPA claims.[9] In suggesting that no statute dictated the factors the State Department used to decide whether to issue its permit, Fed. Br. 25; TransCanada Br. 27, Defendants ignore that Plaintiffs' claims focus on factors NEPA required the agency to consider. *See* SAC ¶¶ 39-49 (summarizing relevant provisions of NEPA and its implementing regulations); *Chu*, 2014 WL 1289444, at *7 (the "APA, NEPA, relevant regulations, and controlling case law" supplied meaningful standards to review State Department EIS for cross-border permit).

---

[9] *See supra* Arg. I.D. (quoting 22 C.F.R. §§ 161.7, 161.10); *compare* SAC ¶¶ 100-04, 109, 118-23, 125, 146-52 (discussing State Department's NEPA violations), *with League of Wilderness Defenders/Blue Mountains Biodiversity Proj. v. Connaughton*, 752 F.3d 755, 760-62 (9th Cir. 2014) (adjudicating claim that agency violated NEPA by failing to supplement an EIS); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 867-71 (9th Cir. 2005) (adjudicating claim that agency violated NEPA by failing to analyze the risk that a dock expansion would increase oil-tanker traffic and the risk of oil spills).

Meaningful standards also exist for review of Plaintiffs' second claim against the State Department, which concerns the agency's failure to provide a reasoned explanation for reversing course and granting TransCanada a cross-border permit. *See* SAC ¶¶ 159-63. First, the ROD that sets forth the agency's permitting decision repeatedly refers to and relies on findings in the 2014 EIS. *See id*. ¶¶ 117-23 (discussing ROD); ROD at 4-5, 14-32. This Court can assess the adequacy of those findings by referring to NEPA's standards. Second, to the extent that the State Department also considered factors NEPA did not require it to consider, this Court can still review the agency's decision in order to enforce the APA's prohibitions on arbitrary and capricious decisionmaking.

To find meaningful standards for this kind of review, courts may look not only to statutes, but also to "regulations, established agency policies, and judicial opinions," *Mendez-Gutierrez* 340 F.3d at 868, and "agency practice," *Kerry*, 803 F.3d at 1069. Factors the agency identified as relevant to a challenged decision can also supply meaningful standards, even if no statute dictated or limited the agency's selection of those factors.[10] To ascertain whether an agency complied

---

[10] *See, e.g., Spencer Enters., Inc. v. United States*, 345 F.3d 683, 688 (9th Cir. 2003) (so long as "regulations or agency practice provide a 'meaningful standard by which this Court may review [the agency's] exercise of discretion,'" the action is reviewable even if no statute limits that exercise (quoting *Socop-Gonzalez v. INS*, 208 F.3d 838, 844 (9th Cir. 2000))); *Mendez-Gutierrez*, 340 F.3d at 868-69 (refusal to reinstate an asylum application was reviewable using a standard the

with the APA's procedural requirements, courts can therefore rely on the factors the agency identified as important in its own decision-making documents. In *Organized Village of Kake v. USDA*, the Ninth Circuit, sitting *en banc*, found an agency acted arbitrarily and capriciously, in violation of APA section 706(a)(2)(A), by failing to provide a "reasoned explanation" for opening a forest to logging and road construction and reversing its earlier determination that the environmental costs of that action outweighed the economic benefits. 795 F.3d 956, 966-70 (9th Cir. 2015). The Court needed no statutorily prescribed standards, beyond those provided by the APA itself, to do this analysis. It simply reviewed the record and found the agency had relied on rationales that either contradicted, without explanation, those in its earlier decision to keep the forest closed, *id*. at 967-69, or were implausible, *id*. at 969-70.[11]

---

agency had specified for an analogous decisionmaking process, even though "no statute or regulation specifically govern[ed] reinstatement").

Although APA section 701 has been construed to preclude review where a statute evinces *Congress*'s intent to insulate a specific agency action from legal challenges under environmental laws, no such statute applies to the State Department decisions challenged here. *See, e.g.*, *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 795-96 (9th Cir. 1996) (rejecting National Forest Management Act (NFMA) and APA-based challenge to environmental review for timber sales, and emphasizing that the Rescissions Act, which authorized the sales, provided that compliance with its requirements "shall be deemed sufficient to satisfy the requirements of" NFMA and "all other applicable Federal environmental and natural resource laws").

[11] *See also Pinnacle Armor*, 648 F.3d at 719-21 (manufacturer "state[d] a claim for relief under the APA" based on allegations that the agency decertified its product based on test methods that "bear no relation to the standard" in the

This Court can do the same kind of analysis to determine whether the State Department gave a reasoned explanation, supported by the record, for deciding to reverse course and issue TransCanada a cross-border permit for Keystone XL. *See* SAC ¶¶ 107-09, 116-25, 159-63. The ROD identifies the factors the agency applied as well as the main documents (including the 2014 EIS) it considered to make this decision. *See* ROD at 2-32; SAC ¶¶ 117-25.

In short, the agency's own decision documents and regulations, combined with NEPA, the APA, and case law, supply the meaningful standards this Court needs to adjudicate Plaintiffs' claims against the State Department.

### 2. No foreign-policy or security considerations insulate the State Department's actions from judicial review

Defendants also suggest that the State Department's actions are unreviewable because the agency considered factors that "relat[e] to foreign affairs and national security," Fed. Br. 25; *see also* TransCanada Br. 27-28, but the cases they cite do not support this sweeping reading of APA section 701(a)(2). To the contrary, the Ninth Circuit has made clear that the State Department cannot avoid judicial review by invoking its consideration of "foreign policy" or "security" factors. *See infra* 25-27 (discussing *Kerry* and other authorities).

_____

agency's latest guidance document for certifications); *Socop-Gonzalez,* 208 F.3d at 844-85 (agency's refusal to reopen a deportation proceeding was reviewable by reference to an "exceptional situations" test the agency identified in earlier decisions on the same issue, even though no statute specified that test).

*Heckler v. Chaney* is inapposite because it concerned a decision "not to take enforcement action," a special type of decision the Supreme Court recognized is "generally committed to an agency's absolute discretion" by Congress. 470 U.S. 821, 831-33 (1983). *Webster v. Doe* concerned the firing of a covert technician who failed a security clearance, under a National Security Act provision that authorized termination whenever the CIA Director "shall *deem* [it] necessary and advisable in the interests of the United States." 486 U.S. 592, 600 (1988) (quoting 50 U.S.C. § 403(c)). The Court underscored the Act's unique language, which "fairly exudes deference," and its emphasis on protecting sensitive information, and found it would be impossible to review the firing without "cross-examination of the Director concerning his views of the Nation's security." *Id*. at 600-01. *Department of the Navy v. Egan* also concerned a security clearance and a defense agency's "'compelling interest' in withholding national-security information from unauthorized persons." 484 U.S. 518, 527 (1988); *see also id*. at 529-30.

Plaintiffs have not challenged a decision to forgo enforcement action under a statute that commits that decision to the agency's discretion, or to terminate national-security personnel over concerns about access to sensitive information. They challenge the adequacy of the State Department's *public* environmental review and rationale for permitting a private, commercial project, under laws that exist to ensure the public understands the reasons for and consequences of such

approvals. That the agency considered some foreign-policy and energy-security issues does not preclude this Court from assessing whether the agency provided the public with an adequate EIS and a reasoned explanation for its permitting decision.

*Kerry*, a recent Ninth Circuit case also cited by and involving the State Department, illustrates why APA section 701(a)(2) does not preclude review of the agency's actions here. An organization that was helping to administer the State Department's exchange visa program (EVP) for foreign nationals challenged sanctions the agency imposed on it, arguing they were "arbitrary and capricious." 803 F.3d at 1065-67. The agency argued that section 701(a)(2) barred review, because it established the EVP under a statute that did "not limit [its] discretion" and because its sanctions decision implicated "foreign relations." *Id*. at 1068-69. The court disagreed. It found it could "measure the Department's administration of the EVP against the Department's own regulations" without infringing on the agency's prerogative to create the program, or on national-security concerns. *Id.* at 1069. It emphasized that "a weak connection to foreign policy is not enough to commit an agency action to the agency's discretion." *Id*.; *see also Baker v. Carr*, 369 U.S. 186, 211 (1962) ("[I]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.").

The other Supreme Court and Ninth Circuit cases Defendants cite either do not concern section 701(a)(2) or are no longer good law on that section's scope.[12] The out-of-Circuit cases Defendants cite concern actions that Congress expressly committed to the agency's discretion, that involved core national-security matters, or both.[13] To the extent that these cases suggest that any action touching on foreign policy or national security is unreviewable, they do not square with *Kerry* and other post-*Heckler* decisions from the Ninth Circuit. In *Ground Zero*, for example,

---

[12] *Jensen* and *No Oilport! v. Carter*, 520 F. Supp. 334 (W.D. Wash. 1981), predate the Supreme Court's *Heckler* and *Webster* opinions, which "clarif[ied] 'what it means for an action to be committed to agency discretion by law" under section 701(a)(2) and confirmed the "extreme narrowness" of the exemption. *Pac. Nw. Generating Co-op v. Bonneville Power Admin.*, 596 F.3d 1065, 1078 n.8 (quoting *Webster*, 486 U.S. at 599) (questioning whether pre-*Heckler* case remained good law).

*Regan v. Wald* does not address the scope of judicial review under the APA. The Court reviewed a challenge to a regulation restricting travel-related economic transactions with Cuba. 468 U.S. 222, 224 (1984). The language the federal Defendants cite is from the Court's discussion of why it would not set aside the restriction on the merits. *See id.* at 242; *contra* Fed. Br. 15. *Chicago & Southern Airlines v. Waterman S.S. Corporation* does not discuss the APA and concerns a statute (since repealed) that expressly provided for the President to make the final decision. 333 U.S. 103, 104-06, 110-14 (1948) (referencing former section 801 of the Civil Aeronautics Act, 49 U.S.C. § 601). No such statute exists here, and here the State Department, not the President, made the final decision. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), predates the APA by more than a century.

[13] *See, e.g.*, *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n v. Maritime Admin.*, 215 F.3d 37, 41 (D.C. Cir. 2000) (declining to review vessel relocation decision, based on analysis that focused overwhelmingly on "national defense, the adequacy of the merchant marine, foreign policy, and the national interest"); *Legal Assistance for Vietnamese Asylum Seekers v. U.S. Dep't of State*, 104 F.3d 1349, 1352-53 (D.C. Cir. 1997) (statute committed decisions on where to process visa applications to State Department's discretion).

the court found it could review the Navy's implementation of a nuclear-missile-upgrade directive at a military base—unquestionably a "national security" matter—to assess whether the Navy complied with NEPA. 383 F.3d at 1089-91. And in *No GWEN Alliance of Lane County, Inc. v. Aldridge*, the court rejected the Air Force's argument that the political-question doctrine precluded judicial review of a NEPA challenge to construction of a nuclear-war communications network. 855 F.2d 1380, 1384 (9th Cir. 1988). The court noted that "[t]here is no 'national defense' exception to NEPA." *Id*.

If "foreign policy" and "security" considerations did not preclude review in *Kerry*, *Ground Zero*, and *No GWEN*, review is certainly not precluded here, where Plaintiffs challenge an agency's violations of NEPA and the APA in connection with its decision to allow a private company to build a commercial project on U.S. soil. *See also Clinton*, 689 F. Supp. 2d at 1156-57 (that the State Department considered "foreign affairs," and that its permit was for a border crossing, did "not insulate [its] analysis (or the alleged lack thereof) of the environmental impacts of the entire pipeline project from judicial review under the APA").

> ### D. The President has no power to exempt agencies from the APA and NEPA, and the Trump Memorandum and the State Department's regulations recognize that NEPA applies

For the reasons above, the State Department's decisions to issue a cross-border permit and ROD and to forgo further NEPA review for Keystone XL were

"final agency action" for purposes of APA section 704, and were not "committed to [its] discretion by law" within the meaning of section 701(a)(2). Plaintiffs' APA and NEPA claims against the State Department are accordingly reviewable, and the Defendants' references to general law on Executive Orders and presidential power are beside the point.

Because Plaintiffs are enforcing environmental and judicial-review rights that NEPA and the APA grant them, it is irrelevant that Executive Order 13,337 creates no "enforceable rights." *Contra* Fed. Br. 26 n.7; TransCanada Br. 24. The statute that provides for the President to delegate functions "vested in [him] by law" is irrelevant for the same reason: that the President can delegate his own functions to agency heads does not mean that he can relieve them from requirements Congress has imposed. *Contra* Fed Br. 2, 8 n.4 (citing 3 U.S.C. § 301). To the contrary, the President must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Courts "presume that Congress intends the executive to obey its statutory commands," and that Congress "expects the courts to grant relief when an executive agency violates such a command." *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 681 (1986).

That Congress has passed other laws that apply to Keystone XL (including at the border), and established border-permitting schemes for similar projects like natural gas pipelines, further undercuts the premise that this Court would

unconstitutionally infringe on *presidential* authority by adjudicating Plaintiffs'

NEPA and APA claims.[14] *See* U.S. Const. art. I, § 8, cl. 3 ("Congress shall have

Power … To regulate Commerce with foreign Nations"); *United States v. Clark*,

435 F.3d 1100, 1109, 1113 (9th Cir. 2005) (Constitution grants Congress

"sweeping powers" over foreign commerce); *United States v. 12 200-Ft. Reels of*

*Super 8mm. Film*, 413 U.S. 123, 126 (1973) (discussing Congress's power to

regulate the passage of goods across national borders).

The Trump Memorandum recognizes that the President cannot override

NEPA's and the APA's requirements, in the *specific context* of the cross-border

permit Plaintiffs challenge here. It says the Secretary of State "shall

. . . consider[]" the 2014 EIS adequate to satisfy NEPA and "any other provision

of law that requires executive department consultation or review" "[t]o the

maximum extent permitted by law." Trump Memorandum § 3(a)(ii)(A)-(B). If (as

Defendants claim) the State Department's decisions on Keystone XL were truly

"presidential" rather than "final agency action," there would be no need for the

Memorandum to refer to NEPA and other laws that govern agency actions and not

presidential ones.

---

[14] *See* TransCanada Br. at 17 (acknowledging that Keystone XL requires
approvals under the Clean Water Act and the Mineral Leasing Act, and that the
Mineral Leasing Act's requirements apply to the border crossing); *id.* at 24 n.6
(citing Natural Gas Act, 15 U.S.C. § 717 *et seq.*).

The State Department's own regulations also recognize that NEPA applies when the agency issues cross-border permits for oil pipelines. They say agency officers "shall review each major Departmental action having a potentially significant effect on the quality of the environment in the United States," 22 C.F.R. § 161.7, and go on to list, as an example, "*[i]ssuance of permits* for construction of international bridges *and pipeline* [*sic*] (see Executive Order 11423)."[15] *Id*. § 161.7(c)(1) (emphasis added); *see also id*. § 161.10 ("The Department is responsible for issuing international permits for the construction of … *oil pipelines that cross the international boundaries with Canada* . . . . The Office of Environment and Health will assist in preparation of *the required environmental analysis documentation for such permits*." (emphasis added)). The agency also acknowledged that NEPA applies to Keystone XL when it began preparing its EIS. *See* 74 Fed. Reg. 5019, 5020 (Jan. 28, 2009) (State Department "has concluded that the issuance of [the requested cross-border permit] would constitute a major Federal action that may have a significant impact upon the environment within the meaning of [NEPA].") The Court should reject the agency's theory that its cross-

---

[15] Executive Order 11,423 was issued in 1968 and is the precursor to Executive Order 13,337. Executive Order 13,337 was issued in 2004—after the State Department promulgated its NEPA regulations. *See* SAC ¶¶ 90-91 (discussing Orders); Fed. Br. 10-11 (same).

border permit, ROD, and EIS were exercises of "presidential" authority, Fed. Br.

16, to which NEPA and the APA are "inapplicable," ROD at 5.

### E.  This Court can redress the injuries caused by the State Department's NEPA and APA violations

Plaintiffs' claims against the State Department are redressable for the same

reasons already discussed: the APA authorizes this Court to set aside the cross-

border permit, as well as the ROD and January 2014 EIS, to ensure the agency's

compliance with the APA and NEPA. *Contra* Fed. Br. 28 (arguing claims are not

redressable because this Court cannot enjoin the permit). *Salmon Spawning &*

*Recovery Alliance v. Gutierrez* is distinguishable because the fishing limits the

defendant agency developed were written into a treaty that could be amended only

with Canada's consent.[16] *See* 545 F.3d 1220, 1227-28 (9th Cir. 2008). The cross-

---

[16] The other cases the State Department cites, *see* Fed. Br. 28, are also off point. *Center for Biological Diversity v. Hagel* concerned construction of a military base in Japan pursuant to an agreement between the U.S. and Japanese governments. 80 F. Supp. 3d 991, 994 (N.D. Cal. 2015), *appeal docketed*, 9th Cir. No. 15-15695. The district court found the political-question doctrine made the action effectively "irreversible" and unreviewable. *Id*. at 993-94, 1014-15, 1018-19. *Bancoult v. McNamara* did not involve Article III standing, NEPA, or the APA. Plaintiffs challenged tactics the U.S. government used to depopulate and establish a military base on British-controlled islands in the Indian Ocean. 445 F.3d 427, 430, 436-37 (D.C. Cir. 2006). The Court found the tactics were "inextricably intertwined with the underlying strategy of establishing a regional military presence," *id*. at 436, and that the political-question doctrine barred review. *Id*. at 429. As the Ninth Circuit's *No GWEN*, *Ground Zero* and *Kerry* decisions illustrate, that rationale does not apply to cases that seek to enforce the APA's and NEPA's procedural mandates— even where the underlying decision reflects the agency's exercise of foreign-policy or national-security responsibilities. *Supra* Arg. I.C.2.

border permit Plaintiffs challenge here is unilaterally revocable by State Department officials. Permit at 3, art. 1(1) ("This permit may be terminated or amended at any time at the discretion of the Secretary [of State] or the Secretary's proper delegate *or* upon proper application therefor."). This Court can therefore order the State Department to terminate or amend it, to cure the agency's NEPA and APA violations and redress Plaintiffs' injuries. *See* SAC ¶¶ 19-32, 100-04, 109, 118-25, 146-52, 159-163, A-B, D-E (describing agency's violations, Plaintiffs' requested relief, and Plaintiffs' standing to sue); *infra* Arg. II (discussing redressability prong of Article III).

## II. Plaintiffs have standing to pursue their claim against the Service

Defendants' opening briefs argued that the First Amended Complaint did not adequately allege standing as to Plaintiffs' claim against the Service. Fed. Br. Arg. III; TransCanada Br. Arg. IV. Plaintiffs have since filed a Second Amended Complaint that provides additional detail regarding Plaintiffs' standing on that claim, and the Court has issued an order making it the operative complaint for purposes of ruling on the motions to dismiss.[17] Plaintiffs accordingly respond by reference to their Second Amended Complaint.

---

[17] While Plaintiffs do not agree that their First Amended Complaint's allegations were inadequate, the Court need not address that issue in light of the amendment. *See, e.g.*, *Lefer v. Murry*, No. CV 13-06-BIL-DWM, 2013 WL 2070877, at *1 (D. Mont. May 14, 2013) (considering arguments in motion to

To establish Article III standing, a plaintiff must show (1) a concrete and particularized and actual or imminent injury in fact that is (2) fairly traceable to the challenged conduct and (3) likely to be redressed by a favorable court decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct" suffice. *Id.* at 561. Where a plaintiff claims procedural injury, the burden to show causation and redressability is relaxed. *NRDC v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014) (en banc) ("[V]iolations of [ESA] Section 7(a)(2)'s consultation requirement constitute a procedural injury for standing purposes.").

Plaintiffs' allegations are more than sufficient to establish standing as to their claim against the Service. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975). It is undisputed that Plaintiffs' missions are germane to this claim, and that neither the nature of the claim nor the relief requested requires the participation of Plaintiffs' individual members. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (explaining test for associational standing under Article III). Defendants question only whether Plaintiffs sufficiently allege (1) that their members are harmed by the actions challenged in this case, and (2) that a favorable decision would redress the harm. *See id.*; Fed. Br. 30-35; TransCanada Br. 28-30.

---

dismiss directed at Plaintiffs' First Amended Complaint "in the context of" a later-filed and "now-operative Second Amended Complaint").

Plaintiffs have met both requirements. Plaintiffs' members include people who "study and enjoy observing wild species whose survival and recovery are threatened by Keystone XL, including the critically endangered whooping crane and other federally protected Great Plains migratory birds like the interior least tern and piping plover." SAC ¶ 27. Some of Plaintiffs' members are "naturalists and birdwatchers who visit areas near the proposed project route to observe (or, for very rare birds like the whooping crane, in hopes of observing) these birds, and have plans to return to these areas in the future to continue observing these species in their natural habitat." *Id*. One member has "devoted his career to studying the whooping crane and other migratory birds in Nebraska, South Dakota, and Montana, and intends to continue studying these birds going forward." *Id.*

Construction and operation of the Keystone XL pipeline and supporting power lines will injure these protected birds and destroy their habitat, *id*. ¶¶ 7, 30, 77-89, threatening the species' survival and recovery and, by extension, the professional, recreational, conservational, and aesthetic interests of Plaintiffs' members, *id.* ¶ 30. These are injuries in fact. *Lujan*, 504 U.S. at 562-63 (the "desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing"); *Cantrell v. City of Long Beach*, 241 F.3d 674, 680-82 (9th Cir. 2001) (plaintiffs adequately pleaded injuries by alleging that they had visited an area in the past to watch birds in their natural

habitat, defendant planned to remove that habitat, and such removal would interfere with plaintiffs' ability to enjoy watching the birds in the future).

The injuries are also directly traceable to Defendants' actions. As discussed above and in the Second Amended Complaint, Keystone XL poses serious threats to the whooping crane, interior least tern, and piping plover by increasing the risk that these birds will suffer from power line collisions, predation, and oil spills, and by destroying and degrading their habitat. *Supra* Background; SAC ¶¶ 7, 30, 77-89. By failing to conduct a formal ESA consultation for Keystone XL, and by overlooking important threats and available mitigation measures, the Service neglected opportunities to lessen or prevent the project's negative impacts on these species. *See id.* ¶¶ 28, 30-31, 126-38. It takes "no attenuated chain of conjecture" to "link" these violations of law to Plaintiffs' and their members' injuries. *See Ecol. Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1152 (9th Cir. 2000) (no speculation required to conclude that defendant's alleged Clean Water Act violations lessened plaintiffs' enjoyment of a creek).

Article III's redressability requirement is likewise met. When asserting a procedural violation under Section 7 of the ESA, a plaintiff need only show that the relief requested—*i.e.*, that the agency engage in adequate consultation—*could* protect the plaintiff's concrete interest in a species. *Jewell*, 749 F.3d at 783.

Here, Plaintiffs seek an order setting aside the parts of the Service's May 2013 ESA concurrence that concern the whooping crane, tern, and plover, and requiring the Service to conduct a formal consultation that includes a complete and non-arbitrary analysis of Keystone XL's threats to these species. *See* SAC ¶¶ 172, C-E; 50 C.F.R. § 402.14(a). An adequate formal consultation could lead the Service to develop and mandate more effective, enforceable mitigation measures. *See* SAC ¶¶ 31, 56-61, 172; *see also Jewell*, 749 F.3d at 785 (adequate consultation could lead to better protections for delta smelt).

Alternatively, if the Service determined following consultation that no adequate measures exist to protect these species, it could find that Keystone XL would jeopardize the species in violation of the ESA and, in turn, require "reasonable and prudent alternatives" to the project to avoid jeopardy. *See* SAC ¶¶ 60-61, 172; 50 C.F.R. § 402.14(g)(5), (h)(3) (if Service issues "jeopardy" biological opinion, it must include reasonable and prudent alternatives, if any). This finding could also influence other officials' decisions about Keystone XL. *See* SAC ¶ 32 (requested relief would allow officials to make better-informed decisions about whether and on what terms to approve the project); 50 C.F.R. § 402.15(a) (in light of Service's biological opinion and ESA section 7's requirements, action agency must determine "whether and in what manner to proceed" with the project); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1044

(9th Cir. 2015) (reinitiating consultation could influence agency's ultimate decision whether to move forward, and on what terms). Either way, the remedy requested here—legally adequate consultation—could better protect the whooping crane, interior least tern, and piping plover, and, consequently, Plaintiffs' and their members' interests in these species.

These and other facts presented in Plaintiffs' Second Amended Complaint are sufficient to establish Article III standing. However, should the Court find that additional information is required, Plaintiffs are prepared to submit member testimony. *See Warth*, 422 U.S. at 501 (on a motion to dismiss for lack of standing, court may "allow" or "require the plaintiff to supply, by amendment to the complaint *or by affidavits*, further particularized allegations of fact deemed supportive of plaintiff's standing" (emphasis added)); *accord Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).[18]

## III. To promote judicial economy, if the agency has not yet acted, the Court should hold Plaintiffs' claim against the Bureau in abeyance

When Plaintiffs filed this case, TransCanada had already applied to the Bureau for rights of way to build Keystone XL across Bureau-controlled lands. Complaint, ECF No. 1 (Complaint), ¶ 111. To the best of Plaintiffs' knowledge,

---

[18] A separate line of cases provides that a court may only consider extra-pleading evidence on a motion to dismiss where the defendant has raised a factual attack on jurisdiction. *See Safe Air for Everyone*, 373 F.3d at 1039. It appears that both lines of cases remain good law.

the Bureau could have granted those rights of way at any time, without any public process. *See id.*; 43 C.F.R. § 2884.20(d) (Bureau is not required to hold public hearings on right-of-way applications). Because the State Department's January 2014 EIS for Keystone XL identifies the Bureau as a "cooperating agency," and Plaintiffs' requests to supplement that EIS went unanswered, Plaintiffs also reasonably expected that the Bureau would rely on the 2014 EIS for its approvals. Complaint ¶¶ 99, 108-13.

To the best of Plaintiffs' knowledge, none of these essential facts have changed. Five months have now passed since TransCanada requested rights of way. SAC ¶ 143. The Trump Memorandum directs the Bureau to process the requests "in an expedited manner." Trump Memorandum § 3(c). And, although their opening brief said it "*could be* several months" before the Bureau acts, Fed. Br. 29 (emphasis added), the federal Defendants have not disputed that the Bureau may grant the requests at any time, and rely on the 2014 EIS to do so. This would violate NEPA and the APA, for substantially the same reasons the State Department violated those laws by relying on the EIS to issue the cross-border permit and ROD. *See* SAC ¶¶ 146-58.

To promote judicial economy, and assuming that the Bureau has not taken final agency action on Keystone XL at the time this Court rules on the motions to dismiss, Plaintiffs respectfully request that the Court hold Plaintiffs' claim against

the Bureau in abeyance.[19] *See Harger v. U.S. Dep't of Labor*, No. CV-06-5071-RHW, 2007 WL 1430214, at *3-4 (E.D. Wash. May 14, 2007) (holding claims as to which defendants had not taken final agency action in abeyance until defendants issued final decision, or a certain amount of time had passed); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 64 F. Supp. 3d 128, 137 (D.D.C. 2014) (declining to address ripeness argument because agencies took final action while motions were pending). This would expedite and streamline review of Plaintiffs' claims against the State Department, Service, and Bureau, which draw on the same body of law and facts about Keystone XL, by making it more likely that the claims are adjudicated by a single judge. *See* Fed. R. Civ. P. 1 (encouraging the "just, speedy, and inexpensive determination of every action").

## CONCLUSION

The State Department suggests that the more squarely an agency decision implicates our "national interest," the less power the public and courts should have to question it. *See* Fed. Br. 25. But that is not the judgment Congress has made. That Keystone XL threatens so many people and resources and implicates our "broad national welfare," TransCanada Br. 28, underscores why it is so important

---

[19] If the Court declines to hold Plaintiffs' claim against the Bureau (their second claim for relief) in abeyance, Plaintiffs request in the alternative that the Court dismiss the claim without prejudice. *See Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017) (dismissal for lack of subject matter jurisdiction is generally without prejudice).

for this Court to ensure that federal agencies comply with laws that require them to study and mitigate Keystone XL's environmental impacts, and to explain their approval decisions to the public.

The State Department's decisions to issue a cross-border permit, ROD, and EIS for Keystone XL are final agency actions, reviewable by reference to meaningful standards. Plaintiffs have standing to seek judicial review of those actions, and the Service's. This Court should adjudicate Plaintiffs' claims against both Defendants, and adjudicate or hold in abeyance Plaintiffs' closely related claim against the Bureau. The motions to dismiss should be denied.

Respectfully submitted,

Dated: July 10, 2017

/s/ Doug Hayes
Doug Hayes (*pro hac vice*)
/s/ Eric Huber
Eric Huber (*pro hac vice*)
Sierra Club Environmental Law Program
1650 38th Street, Suite 102W
Boulder, CO 80301
(303) 449-5595
doug.hayes@sierraclub.org
huber@sierraclub.org

*Attorneys for Sierra Club and Northern Plains Resource Council*

/s/ Selena Kyle
Selena Kyle (*pro hac vice*)
Natural Resources Defense Council
20 North Wacker Drive, Suite 1600
Chicago, IL 60606
(312) 651-7906

skyle@nrdc.org
/s/ Cecilia Segal
Cecilia Segal (*pro hac vice*)
Natural Resources Defense Council
111 Sutter Street, Floor 21
San Francisco, CA 94104
(415) 875-6112
csegal@nrdc.org

*Attorneys for Bold Alliance and Natural
Resources Defense Council*

/s/ Jared Margolis
Jared Margolis (*pro hac vice*)
/s/ Amy Atwood
Amy R. Atwood (*pro hac vice*)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
(971) 717-6401
jmargolis@biologicaldiversity.org
atwood@biologicaldiversity.org

*Attorneys for Center for Biological Diversity
and Friends of the Earth*

/s/ Timothy M. Bechtold
Timothy M. Bechtold
(Montana Bar No. 4376)
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, Montana 59807
(406) 721-1435
tim@bechtoldlaw.net

*Attorney for all Plaintiffs*

## WORD COUNT CERTIFICATION

I certify that the foregoing brief contains 9,923 words, as counted with Microsoft Word's "word count" tool, and excluding material Local Civil Rule 7.1(d)(2)(E) omits from the word-count requirement. This is within the 11,000-word maximum the Court ordered for this brief. ECF No. 50.

/s/ Selena Kyle

**CERTIFICATE OF SERVICE**

I certify that I served the foregoing brief on all counsel of record via the

Court's CM/ECF system.


/s/ Selena Kyle