Doug Hayes (*pro hac vice*)
Sierra Club Environmental Law Program
1650 38th Street, Suite 102W
Boulder, CO 80301
(303) 449-5595
doug.hayes@sierraclub.org
Co-lead counsel for Plaintiffs
(additional counsel listed on signature pages)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| NORTHERN PLAINS RESOURCE COUNCIL, BOLD ALLIANCE, CENTER FOR BIOLOGICAL DIVERSITY, FRIENDS OF THE EARTH, NATURAL RESOURCES DEFENSE COUNCIL, INC., and SIERRA CLUB,<br><br>   Plaintiffs,<br><br>   v.<br><br>THOMAS A. SHANNON, JR., in his official capacity; U.S. DEPARTMENT OF STATE; RYAN ZINKE, in his official capacity; U.S. DEPARTMENT OF THE INTERIOR; BUREAU OF LAND MANAGEMENT; U.S. FISH AND WILDLIFE SERVICE,<br><br>   Defendants,<br><br>TRANSCANADA CORPORATION and TRANSCANADA KEYSTONE PIPELINE LP,<br><br>   Intervenor-Defendants. | CV 17-31-GF-BMM<br><br>**Third Amended Complaint for Declaratory and Injunctive Relief** (filed with opposing parties' written consent pursuant to Fed. R. Civ. P. 15(a)(2))<br><br>(National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*.; Endangered Species Act, 16 U.S.C. §§ 1531-1544; Administrative Procedure Act, 5 U.S.C. §§ 701-706) |

**INTRODUCTION**

1.      This case challenges federal agency approvals and environmental reviews for the proposed Keystone XL pipeline project (Keystone XL), which would move massive quantities of tar sands crude oil from Canada to the Gulf Coast via Steele City, Nebraska. Tar sands crude oil—named for its thick, tar-like consistency—is one of the planet's most environmentally destructive energy sources. Tar sands crude oil is an extremely carbon-intensive fuel, meaning that its production and use causes the release of very high levels of carbon dioxide and other greenhouse gases that cause climate change. The mining and transportation of tar sands also pollutes land, air, and water. Because of these effects, communities around the world have come together to oppose Keystone XL and the dirty fuel it would carry.

2.      In their haste to issue a cross-border permit requested by TransCanada Keystone Pipeline LP (TransCanada), Keystone XL's proponent, Defendants United States Department of State (State Department) and Under Secretary of State Shannon have violated the National Environmental Policy Act (NEPA) and Administrative Procedure Act (APA) and ignored significant new information that bears on the project's threats to the people, environment, and national interests of the United States. They have relied on an arbitrary, stale, and incomplete environmental review completed over three years ago, for a process that ended

with the State Department's denial of a cross-border permit. On information and belief, Defendants U.S. Department of the Interior and Bureau of Land Management are poised to issue additional approvals that rely on the same stale environmental review.

3.      Defendant State Department also erroneously concluded that Keystone XL is "not likely to adversely affect" several endangered and threatened species that would be harmed by the construction and operation of Keystone XL, in violation of the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544. That conclusion is contrary to the record and the best available science, and relies on inadequate and potentially unenforceable conservation measures. Defendant U.S. Fish and Wildlife Service's (Service's) concurrence in that erroneous determination likewise relied on outdated information and inadequate conservation measures, and was arbitrary and capricious, in violation of the ESA and APA.

4.      If it is ever built, Keystone XL will be one of the world's largest crude oil pipelines. Every day, it would move up to 830,000 barrels (≈35 million gallons) of tar sands crude oil from Canada to Steele City, Nebraska. In Steele City, Keystone XL would connect to existing pipelines that serve Gulf Coast refineries. Much of the refined oil would be exported to foreign countries.

5.      Keystone XL poses significant threats to people and the environment in this country and around the world. It takes a great deal of energy to transform tar

3

sands into finished oil products, and the generation of that energy causes the release of immense amounts of greenhouse gases that contribute to climate change. Tar sands must be harvested from the ground by open-pit strip mining or by injecting heat deep into the Earth to liquefy tar sands deposits so that they can be pumped up to the surface. Because it is so heavy, tar sands crude oil is also much more energy intensive to refine than conventional crude oil. The burning of gasoline and other refined products releases yet more greenhouse gases.

6. Keystone XL also poses significant threats to the many hundreds of streams, rivers, lakes, aquifers, and wetlands it would cross, due to construction-related impacts and the risk of oil spills during operation. Because tar sands crude oil is so heavy and viscous, spills are nearly impossible to clean up. The construction and operation of Keystone XL and its network of associated roads, power lines, and other facilities would harm the wildlife who live along its more than 1,200-mile route, including endangered species. Perhaps most alarming, an oil spill from Keystone XL could pollute aquifers and other precious water sources that supply drinking and irrigation water to millions of people.

7. Keystone XL also poses significant threats to species protected under the ESA, including the critically endangered whooping crane, the endangered interior least tern, and the threatened piping plover. The construction of power lines associated with the project will significantly increase the risk of collisions

and provide perching opportunities for predators that prey on these imperiled species. Habitat fragmentation from construction activities and inevitable oil spills during operation will cause further harm to these listed species and the habitats they depend on.

8.      In 2015, citing the project's climate impacts and other significant threats to human health and the environment, Defendant State Department found that Keystone XL was contrary to the national interest and denied TransCanada's application for a U.S.-Canada cross-border permit. On January 24, 2017, however, President Donald J. Trump issued a presidential memorandum inviting TransCanada to reapply for a cross-border permit and directing the State Department to make a permitting decision within sixty days of TransCanada's submission.

9.      On March 23, 2017, Under Secretary of State for Political Affairs Thomas A. Shannon, Jr., on behalf of the State Department, found that Keystone XL "would serve the national interest" and issued TransCanada a cross-border permit. In issuing the permit, Defendants Shannon and the State Department relied on an Environmental Impact Statement that the Department had completed in January 2014 (the 2014 EIS), pursuant to NEPA, 42 U.S.C. §§ 4321 *et seq.* Defendants Shannon and the State Department also referenced and relied on a May 2013 Biological Opinion completed by the Service, which concurs with the State

5

Department's December 2012 determination that Keystone XL is "not likely to adversely affect" whooping cranes, interior least terns, piping plovers, and other species protected under the ESA.

10. The State Department's 2014 EIS—inadequate at that time—is now woefully out of date, as Plaintiffs noted in a series of recent letters urging the State Department and other federal agencies to supplement their environmental review of Keystone XL before issuing any approvals. Most notably, the 2014 EIS grossly underestimates Keystone XL's impacts on the rate of tar sands development, concluding that substantially the same amount of tar sands would likely be mined, transported, and refined regardless of whether Keystone XL were built. That conclusion is wrong: Keystone XL will enable the mining, transport, refining, and consumption of millions of additional gallons of tar sands crude oil per day and cause significant environmental harm that would not occur otherwise.

11. The State Department's 2014 EIS also downplays or ignores other significant environmental impacts of Keystone XL, including harms to land, air, water, and wildlife. The document also does not account for recent oil-market changes and other developments that cast further doubt on the State Department's analysis of climate and other impacts and further undermine the conclusion that Keystone XL is in the national interest.

12.     By relying on a stale and inadequate EIS to issue a cross-border permit for Keystone XL, and arbitrarily reversing its earlier determination that Keystone XL is not in the United States' national interest, the State Department violated NEPA and the APA. The State Department's and Service's analysis of Keystone XL's harms to the whooping crane, interior least tern, and piping plover was also inadequate and violated the ESA and APA. In concluding that Keystone XL and its related infrastructure is "not likely to adversely affect" the crane, tern, and plover, Defendants relied on inadequate conservation measures and ignored the best available science. A lawful analysis of Keystone XL's threats to these birds, in accordance with the ESA, would have led the State Department and Service to formally consult, to develop strong and enforceable conservation measures to protect the species, and possibly, to develop a reasonable and prudent alternative to the project design that would avoid jeopardizing these species' continued existence.

13.     Because the pipeline would cross approximately forty-seven miles of federal land administered by the Bureau of Land Management (Bureau) at and south of the border crossing, TransCanada must also secure right-of-way grants from the Bureau. Like the State Department's issuance of a cross-border permit, the Bureau's granting of rights of way is "major federal action" for which NEPA requires the preparation of a current and complete environmental impact statement.

On information and belief, the Bureau could grant rights of way within a few months, and will do so in reliance on the State Department's stale and inadequate 2014 EIS and on the State Department's and Service's inadequate assessments of Keystone XL's threats to whooping cranes, interior least terns, and piping plovers.

14.     Plaintiffs Northern Plains Resource Council, Bold Alliance, Center for Biological Diversity, Friends of the Earth, Natural Resources Defense Council, Inc., and Sierra Club are non-profit organizations with members who will be harmed by the project. Plaintiffs participated in the comment process that culminated in the State Department's issuance of the 2014 EIS, and identified serious problems with that EIS that the State Department never cured. The U.S. Environmental Protection Agency (EPA) also found that the 2014 EIS was "insufficient" to satisfy NEPA and recommended that the State Department revise it to address many of the same issues Plaintiffs raised. The State Department ignored many of EPA's recommendations.

15.     By relying on a stale, incomplete, and inadequate EIS to approve Keystone XL, the State Department and Under Secretary Shannon have defeated NEPA's dual goals of ensuring informed government and promoting full public participation in agency actions that significantly affect the environment. The State Department has also arbitrarily reversed its position on whether Keystone XL is in the national interest. Finally, the State Department violated the ESA and APA

when it found that construction and operation of Keystone XL is "not likely to adversely affect" whooping cranes, interior least terns, and piping plovers. The Service has arbitrarily concurred in that determination, in violation of the ESA and APA. These decisions, and any Bureau and other federal approvals for the pipeline that rely on the State Department's and Service's inadequate environmental reviews, must be set aside.

## JURISDICTION AND VENUE

16. This case arises under NEPA, 42 U.S.C. §§ 4321 *et seq*., the ESA, 16 U.S.C. §§ 1531-1544, and the APA, 5 U.S.C. §§ 701-706. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (mandamus), 28 U.S.C. §§ 2201-2202 (declaratory judgment), 16 U.S.C. § 1540(c) & (g) (ESA), and 5 U.S.C. § 702 (APA). Plaintiffs have provided the State Department, Under Secretary Shannon, the Service, and Interior Secretary Zinke with at least sixty days' written notice of the ESA violations alleged in their Fifth Claim for Relief, in the form and manner required by the ESA, 16 U.S.C. § 1540(g)(2)(A)(i). A copy of Plaintiffs' May 24, 2017 notice letter is attached as Exhibit A to this Third Amended Complaint.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the proposed route for Keystone XL enters the United States in Montana, crosses Montana, and passes through Bureau-administered lands at and south of the border

crossing in Montana. Therefore, a substantial part of the events or omissions giving rise to the claim occurred in this district and a substantial part of the property that is the subject of this action is situated in this district. In addition, Plaintiff Northern Plains Resource Council resides in this district.

18.     Assignment to the Great Falls division of this Court is appropriate because Keystone XL would cross the U.S.-Canada border near Morgan, Montana, in Phillips County. The proposed route also crosses Valley County. Phillips and Valley Counties are both within the Great Falls Division. L.R. 1.2(c)(3).

**THE PARTIES**

19.     Plaintiff Northern Plains Resource Council (Northern Plains), based in Billings, Montana, organizes citizens to protect Montana's water, land, air, and working landscapes and pass them on unimpaired to future generations. Northern Plains was founded in the 1970s to protect Eastern Montana's people and agricultural economy from becoming a sacrifice zone for energy development. Northern Plains has over 3,000 members, many of whom live directly on the path of the Keystone XL pipeline and/or close to the pipeline route. Since the federal and state permitting processes for Keystone XL began in 2009, Northern Plains and its members have participated at every step. That includes working to improve reclamation and liability protections for member families whose land the pipeline would cross.

20.     Plaintiff Bold Alliance (Bold) is a network of individuals and not-for-profit environmental- and landowner-rights groups based in Nebraska and other rural states in the Midwest and South. It has more than 92,000 supporters across the country. Bold advocates for clean energy, fights fossil fuel projects, and works to protect rural landowners and landscapes, in cooperation with Tribal nations, farmers, ranchers, hunters, anglers, and environmentalists. Bold and its allies have spent years working to raise awareness of Keystone XL's threats to the people, land, wildlife, and water of Nebraska and other states, and to persuade our national and state officials to reject it.

21.     Plaintiff Center for Biological Diversity (the Center) is a national non-profit organization that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center has over 58,000 members and more than 1.3 million online supporters worldwide. One of the Center's central goals is to combat climate change and its impacts on habitats and communities. The Center's members and staff value and benefit from rare species' continued existence in the wild, and are concerned about new industrial development and associated trends like global climate change that threaten wild species' survival and recovery. The Center has worked for years to protect several imperiled species that would be harmed by Keystone XL, including

the critically endangered whooping crane, endangered interior least tern, and threatened piping plover.

22.    Plaintiff Friends of the Earth (FoE) is a non-profit advocacy organization founded in 1969. FoE has more than 275,000 members and more than 900,000 activists across the United States. It is a member of Friends of the Earth International, which is the world's largest grassroots environmental network with seventy-five affiliates worldwide. FoE's mission is to defend the environment and champion a healthy and just world. Ending destructive tar sands development is one of FoE's top priorities.

23.    Plaintiff Natural Resources Defense Council, Inc. (NRDC) is a national, not-for-profit public-health and environmental advocacy organization whose purpose is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends. NRDC has hundreds of thousands of members, including members who own land and live in states Keystone XL would cross. Since its founding in 1970, NRDC has worked to enforce environmental laws and to reduce air and water pollution from, threats to wildlife and habitat from, and destruction of natural lands by industrial activity. NRDC has fought to curb greenhouse-gas emissions that contribute to climate change, including by working to educate people about, and combat the threats posed by, Canadian tar sands crude oil. NRDC has also litigated to protect endangered wildlife and wild

lands, advocated for the addition of at-risk animals and plants to the ESA's lists of endangered and threatened species, and educated lawmakers and the public about the value of protecting and conserving these resources.

24.     Plaintiff Sierra Club is the nation's oldest grassroots organization dedicated to the protection and preservation of the environment. Sierra Club has over one million members and supporters dedicated to exploring, enjoying, and protecting the wild places of the Earth; practicing and promoting the responsible use of the Earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives. The Sierra Club has chapters and members in each of the states through which Keystone XL would pass. The Sierra Club's concerns encompass the protection of wildlands, wildlife and habitat, water resources, air, climate, public health, and the health of its members, all of which stand to be affected by Keystone XL.

25.     In bringing this lawsuit, Plaintiffs stand in the shoes of members, staff, and other supporters who live, work, and recreate in places threatened by Keystone XL and who use, study, and cherish the land, wildlife, and other resources that may be irrevocably damaged by the project. Plaintiffs have numerous members and other supporters who live in Montana, South Dakota, and Nebraska—the states that Keystone XL would cross. Plaintiffs' members, other

supporters, and staff include individuals who study and advocate for better protection of wildlife and other resources threatened by Keystone XL.

26. For example, some of Plaintiffs' members own property on and near the proposed pipeline route. The project threatens these individuals' use and enjoyment, and the economic value, of their property. Some of Plaintiffs' members also enjoy hiking, picnicking, fishing, and observing wildlife in parks and along rivers near the proposed pipeline route, and plan to return to those areas to pursue such activities in the future.

27. In addition, some of Plaintiffs' members study and enjoy observing wild species whose survival and recovery are threatened by Keystone XL, including the critically endangered whooping crane and other federally protected Great Plains migratory birds, such as the interior least tern and piping plover. One of these members is a birdwatcher who has visited crane, tern, and plover habitat in South Dakota and Nebraska, including habitat along major rivers the pipeline would cross (such as the Missouri and Platte), and seen terns and plovers there. This member plans to return to these areas to continue observing the birds in their natural habitat. Another member has devoted his career to studying the whooping crane and other migratory birds in Nebraska, South Dakota, and Montana, and intends to continue studying these birds going forward. Keystone XL—which

crosses the birds' migratory paths—would harm these members' ability to see and study the whooping crane, interior least tern, and piping plover in the future.

28.     Defendants' approvals and inadequate environmental reviews of Keystone XL threaten the health, recreational, economic, professional, scientific, and aesthetic interests of Plaintiffs' members, staff, and other supporters.

29.     For example, the State Department's 2014 EIS did not adequately address the risk of oil spills from the pipeline. A spill on a member's land would interfere with their use and enjoyment of the property, threaten their water supply, and decrease property values.

30.     Likewise, the Defendants' 2012 and 2013 ESA reviews for Keystone XL did not adequately consider or mitigate the impact of new power-line construction and habitat destruction and degradation on protected migratory bird species. These effects of the project threaten the survival and recovery of the endangered whooping crane and other protected migratory birds like the interior least tern and piping plover, and by extension, the professional, recreational, conservational, and aesthetic interests of individuals who study and enjoy seeing those birds.

31.     By refusing to prepare and publish a current and complete EIS for Keystone XL, by refusing to undertake formal ESA consultation for Keystone XL, and by neglecting the study and pursuit of viable alternatives and mitigation

measures, Defendants failed to reduce the project's negative impacts on and threats to Plaintiffs' members, other supporters, and staff. Defendants also deprived these individuals of their right to participate in and seek to influence the approval process and better protect the interests described above.

32. The declaratory and injunctive relief Plaintiffs seek in this lawsuit will redress their injuries by setting aside Defendants' approvals and requiring Defendants to comply with NEPA, the ESA, and the APA. This relief will give Plaintiffs, their members, other supporters, staff, and the general public more comprehensive and complete information regarding Keystone XL's threats to valued resources. It will allow Plaintiffs, their members and supporters, and others who are concerned about Keystone XL to advocate more effectively for denial of the project or changes to its design and operation that would help mitigate its adverse impacts (including but not limited to conservation measures that would better protect listed species). And it will give federal, state, and local decisionmakers the chance to make better-informed decisions about whether and on what terms to approve the project.

33. Defendant Department of State (the State Department) is a federal agency. The State Department decides whether to permit the construction, operation, and maintenance of oil pipelines that cross the U.S.-Canada border. In carrying out its permitting responsibilities, the State Department must comply with

NEPA, the ESA, and the APA, which apply generally to federal agencies. The State Department issued the cross-border permit for Keystone XL and prepared the NEPA documents for the permit. The State Department also submitted a Biological Assessment to the Service in accordance with the ESA.

34. Defendant Thomas A. Shannon, Jr. is the State Department's Under Secretary of State for Political Affairs. Under Secretary Shannon signed the State Department's March 23 cross-border permit and supporting record of decision and national interest determination for Keystone XL. In issuing these documents and making the findings they include, Under Secretary Shannon was required to ensure the State Department's compliance with NEPA, the ESA, and the APA.

35. Defendant Department of the Interior (Interior Department) is a federal agency. The Interior Department's chief administrator is the Secretary of the Interior. The Interior Department, through its sub-agency Bureau of Land Management, decides whether to grant rights of way for the construction, operation, and maintenance of oil pipelines and associated facilities that cross land administered by the Bureau. In carrying out its permitting responsibilities, the Interior Department must comply with NEPA, the APA, and the ESA. The Interior Department, through its sub-agency, the Fish and Wildlife Service, is also responsible for assuring other agencies' compliance with the ESA.

36.     Defendant Bureau of Land Management (Bureau) is a sub-agency of the Interior Department. The Bureau decides whether to grant rights of way for the construction, operation, and maintenance of oil pipelines and associated facilities that cross land it administers. In carrying out its permitting responsibilities, the Bureau must comply with NEPA, the ESA, and the APA.

37.     Defendant U.S. Fish and Wildlife Service (Service) is another sub-agency of the Interior Department. The Service is required by law to protect and manage the fish, wildlife, and native plant resources of the United States, including through implementation and enforcement of the ESA. The Service is responsible for reviewing the State Department's Biological Assessment and ensuring that the Keystone XL pipeline is not likely to jeopardize species protected under the ESA. In May 2013, the Service's Grand Island, Nebraska field office issued a Biological Opinion and written concurrence in the State Department's December 2012 Biological Assessment. The Service concurred with the State Department's determination that the pipeline is not likely to adversely affect certain endangered and threatened species, including the whooping crane, piping plover, and interior least tern.

38.     Defendant Ryan Zinke is the Secretary of the Interior. In his official capacity, Secretary Zinke, or his subordinates, are responsible for deciding whether to grant rights of way for the construction, operation, and maintenance of oil

pipelines and associated facilities that cross land administered by the Bureau. In carrying out these duties, Secretary Zinke must ensure the Interior Department's and Bureau's compliance with NEPA, the APA, and the ESA. Secretary Zinke must also ensure that the Service lawfully administers and complies with the ESA.

## STATUTORY AND REGULATORY BACKGROUND

**The National Environmental Policy Act (NEPA)**

39.     NEPA is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Congress enacted it in 1969 "to promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

40.     NEPA's goal is to ensure "that environmental information is available to public officials and citizens before decisions are made and before actions are taken" and to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(b), (c). When the federal government acts before fulfilling its NEPA obligations, courts may set the action aside until the government complies with NEPA.

41.     The Council on Environmental Quality (CEQ) is an agency created by NEPA and housed within the Executive Office of the President. 42 U.S.C. § 4342. CEQ has promulgated general regulations implementing NEPA. 40 C.F.R.

§§ 1500-1508. The State Department has adopted NEPA regulations that incorporate and supplement the CEQ regulations. *See* 22 C.F.R. §§ 161.1-161.12.

42.     NEPA requires all federal agencies to prepare a "detailed statement" for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement—commonly known as an environmental impact statement (EIS)—must describe the environmental impacts of the proposed action. *Id.* § 4332(2)(C)(i), (ii). The EIS is an "action-forcing device" that ensures NEPA's goals "are infused into the ongoing programs and actions" of the federal government. 40 C.F.R. § 1502.1.

43.     An EIS must include a "full and fair discussion" of the "direct," "indirect," and "cumulative" effects of the action, as well as a discussion of "[m]eans to mitigate adverse environmental impacts." *Id.* §§ 1502.1, 1502.16(a), (b) & (h), 1508.25(c). Direct impacts are "caused by the action and occur at the same time and place." *Id.* § 1508.8(a). Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative impacts are the "incremental impact[s] of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7. Cumulative impacts "can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

44.     Agencies must include analysis of any "connected" actions in the same EIS. *Id.* § 1508.25(a)(1). Connected actions are those that "[a]utomatically trigger other actions which may require environmental impact statements," "[c]annot or will not proceed unless other actions are taken previously or simultaneously," or "[a]re interdependent parts of a larger action and depend on the larger action for their justification." *Id.*

45.     The EIS must also inform federal agency decision-makers and the public of the "reasonable alternatives" that would "avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.* § 1502.1. This analysis of alternatives is the "heart" of the EIS—*i.e.*, where the agency should "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options." *Id.* § 1502.14. The EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives," including the alternative of "no action." *Id.* § 1502.14(a), (d).

46.     An EIS must also "specify the underlying purpose and need to which the agency is responding" in proposing the action the EIS describes and the alternatives the EIS identifies. *Id.* § 1502.13.

47.     Any federal agency that is considering approving an activity that may significantly affect the environment must first prepare a draft EIS. The agency

must solicit comments on that draft from the public, any other federal agency that has jurisdiction or special expertise on the subject matter, and Indian Tribes when the project may affect a reservation. *See id.* §§ 1502.9(a), 1503.1(a). The agency must then prepare a final EIS based on its consideration of those comments. *Id.* §§ 1502.9(b), 1503.4(a). The agency must respond to comments by either making changes to the EIS or explaining why the comments do not warrant further agency response. *Id.* §§ 1502.9(b), 1503.4(a). At the conclusion of the EIS process, an agency must issue a record of decision pursuant to 40 C.F.R. § 1505.2.

48.     If, after the EIS is prepared, there are significant new circumstances or information relevant to the environmental impacts of a proposed action, the agency must prepare a supplemental EIS before deciding whether to approve the action. *Id.* § 1502.9(c)(1). A supplemental EIS must be prepared and circulated in the same way as the draft EIS and final EIS. *Id.* § 1502.9(c)(4). State Department regulations similarly require preparation of a supplemental EIS if there are significant new circumstances or information relevant to the environmental impacts of a proposed action, or if a prior EIS is stale. 22 C.F.R. § 161.9(k).

49.     A "cooperating agency" is a federal agency other than the lead agency that has jurisdiction by law or special expertise about any environmental impact of the project. 40 C.F.R. § 1508.5. Cooperating agencies are required to participate in the NEPA process at the earliest possible time and assume responsibility, at the

lead agency's request, for preparing environmental analyses in areas concerning the cooperating agency's special expertise. *Id.* § 1501.6(b). A cooperating agency may adopt without recirculating the EIS of a lead agency "when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied." *Id.* § 1506.3(c).

**The Administrative Procedure Act (APA)**

50.     The APA provides for judicial review of federal agencies' and officials' compliance with NEPA and with the APA's own procedural requirements. Under the APA, courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2), and "compel agency action unlawfully withheld or unreasonably delayed," *id*. § 706(1).

**The Endangered Species Act (ESA)**

51.     Congress enacted the ESA in 1973 to provide for the conservation of endangered and threatened fish, wildlife, plants, and their natural habitats, with the express purpose of providing a "means whereby the ecosystems upon which endangered and threatened species depend may be conserved." 16 U.S.C. § 1531. Defendant Interior Department has delegated its responsibilities for implementing the ESA for terrestrial species to Defendant Service. 50 C.F.R. § 402.01.

52.     Species listed by the Service as "threatened" or "endangered" are accorded the ESA's protections. Under Section 7(a)(2) of the ESA, all federal "action agencies" must, "in consultation with" the Service, "insure" that the actions that they fund, authorize, or undertake are "not likely to jeopardize the continued existence of any endangered species or threatened species" or "result in the destruction or adverse modification" of critical habitat. 16 U.S.C. § 1536(a)(2).

53.     The ESA's regulatory definition of "action" is broad and includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas." 50 C.F.R. § 402.02. To "jeopardize" means to "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of … the survival [or] recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id*.

54.     Section 7(a)(2) and its implementing regulations set forth a detailed process that must be followed before agencies take or approve actions that may affect threatened or endangered species or critical habitat. Fulfillment of this process is the only means by which an agency ensures that its affirmative duties under Section 7(a)(2) are satisfied. In fulfilling the requirements of Section 7(a)(2) and the procedural requirements set forth in 50 C.F.R. Part 402, agencies must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

55.     Pursuant to this process, any agency considering whether to authorize, fund, or carry out an activity must first ask the Service whether any listed species are present in the relevant area for the proposed action (the "action area"). *Id.* § 1536(c)(1). The action area includes all areas that would be "affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. If the Service determines that listed species may be present in the action area, the action agency must prepare a "biological assessment" that "evaluate[s] the potential effects of the action" on listed species and their habitat. *Id.* §§ 402.02, 402.12.

56.     If the action agency concludes in its biological assessment that an action is "not likely to adversely affect" listed species, and the Service concurs with that determination in writing, the action agency typically relies on the biological assessment and concurrence (known as "informal consultation") to satisfy its ESA obligations. *See id.* §§ 402.13(a), 402.14(a)-(b). However, if the biological assessment does not provide an adequate factual basis for the Service's concurrence in a "not likely to adversely affect" finding, or if the Service's concurrence is otherwise arbitrary, capricious, an abuse of discretion, or not in accordance with the ESA, the Service's concurrence is unlawful and must be set aside. *See* 16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2).

57.     If an action agency determines in its biological assessment that an action "may affect" and is "likely to adversely affect" listed species or their critical habitat, or if the Service does *not* concur in the action agency's determination in its biological assessment that the action is "*not* likely to adversely affect" listed species or their critical habitat, the action agency must enter into a more extensive consultation process with the Service on the action's threats to listed species and their critical habitat (known as "formal consultation"). *See* 50 C.F.R. §§ 402.14(a)-(b), 402.12(k). The threshold for triggering this formal consultation requirement is very low. *See* 51 Fed. Reg. 19, 949, 19,949-50 (June 3, 1986).

58.     In formal consultation, the Service prepares a "biological opinion" which considers the "effects of the action" and determines "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(3)-(4).

59.     The "effects of the action" include consideration of the "direct" and "indirect" effects of the proposed action, the existing environmental conditions or "environmental baseline," and the effects of actions that are "interrelated or interconnected" with the proposed action. *Id*. § 402.02. "Interrelated actions are those that are part of a larger action and depend on the larger action for their justification," and "[i]nterdependent actions are those that have no independent

utility apart from the action under consideration." *Id*. The "effects of the action" must be considered together with the "[c]umulative effects," which are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id*.

60.     The biological opinion is the heart of the formal consultation process, and results in either a "likely to jeopardize" or a "no jeopardy" conclusion. 16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. § 402.14(h)(3). If the Service determines that "jeopardy" is likely to occur, it must prescribe in the biological opinion "reasonable and prudent alternatives" to avoid this result. 50 C.F.R. § 402.14(h)(3).

61.     If the Service concludes that an action is not likely to jeopardize listed species, it must provide the action agency with a written statement, commonly known as an "incidental take statement." *See* 16 U.S.C. § 1536(a)(2), (b)(4); 50 C.F.R. § 402.14(i). The incidental take statement must set forth those "reasonable and prudent measures" that are necessary or appropriate to minimize take, and the "terms and conditions" that must be complied with by the action agency to implement the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4)(C)(ii), (iv); 50 C.F.R. § 402.14(i)(1)(ii), (iv).

## FACTS

**The Keystone XL Pipeline Project**

62.     If built, the Keystone XL pipeline would be approximately 1,200-miles long and made of three-foot-wide steel pipe. It would stretch from Canada's tar sands mining region through Montana and South Dakota to southern Nebraska. TransCanada would build the pipeline in an approximately 110-foot-wide construction right of way; the permanent right of way for most stretches of the pipeline route would be fifty feet. The project would cross approximately forty-seven miles of federal lands administered by the Bureau of Land Management, including at the U.S.-Canada border crossing. Keystone XL's route through Nebraska remains undetermined and subject to approval by that state's Public Service Commission. In its March 23 record of decision, the State Department also noted "minor … alterations" from the route it analyzed in the January 2014 EIS, due to changes in right-of-way and easement agreements with local landowners.

63.     Keystone XL would import Canadian tar sands and other crude oil from Hardisty in Alberta, Canada to Steele City, Nebraska. In Steele City, Keystone XL would connect to TransCanada's existing pipeline network, which serves refineries and export terminals on the Gulf Coast. Connecting Keystone XL to the existing network would allow TransCanada to move as many as 830,000 additional barrels (about 35 million gallons) of crude oil from Canada to the Gulf

Coast every day. If TransCanada receives a waiver to operate the pipeline at higher pressure, its capacity may increase to 900,000 barrels per day. Keystone XL would be one of the largest oil pipelines ever built in the United States.

64.     There is no requirement that gasoline and other finished products made from Keystone XL's oil be sold on U.S. markets, and most of the refined product would likely be exported to other countries.

65.     Keystone XL would increase the extraction, transport, refining, and burning of oil derived from tar sands, one of the dirtiest and most destructive fuels on our planet. Tar sands crude oil—also known as oil sands crude oil, bitumen, or Western Canadian Sedimentary Basin crude oil—is an unconventional petroleum source that is mined from a mixture of sand and clay underlying the boreal forests and wetlands of Alberta, Canada. These tar sands deposits underlie an area roughly the size of Florida.

66.     Tar sands crude oil is not extracted from the ground like other types of oil. Instead, oil companies use two unconventional mining methods to extract oil from tar sands deposits: strip mining and in-situ drilling. At open-pit strip mines, large swaths of boreal forest are cleared so that excavators and trucks can dig the tar sands from the ground. At in-situ drilling operations, steam is injected into the ground to melt the subterranean tar sands deposits. The oil gathers in wells and is pumped up to the surface for processing. These tar sands mining methods are

energy intensive and cause significant air and water pollution. They also destroy

and fragment habitat for the wildlife of Canada's boreal forests, including lynx,

caribou, grizzly bears, songbirds, and waterfowl.

67.     The mining and subsequent processing of tar sands also generates

large amounts of carbon dioxide and other greenhouse gases that contribute to

climate change. As oil companies clear the land to create tar sands mines, they

destroy forests and wetlands, which serve as carbon sinks. It also takes a

significant amount of energy to mine tar sands; the burning of fossil fuels to create

that energy releases greenhouse gases. After it is mined from the ground, the

bitumen must be processed and diluted with various chemicals to make it liquid

enough to be pumped at high pressure through an oil pipeline. This process, which

converts the bitumen into "diluted bitumen," or "dilbit," requires yet more energy

and releases yet more greenhouse gases. Once the dilbit reaches refineries, the

added chemicals must be separated from the bitumen before the bitumen can be

refined into gasoline and other finished oil products. Refining heavy bitumen is

significantly more energy (and thus greenhouse-gas) intensive than refining

conventional crude oil. The ultimate use and burning of tar sands-derived products,

like gasoline, also releases significant amounts of greenhouse gases.

68.     During the NEPA process for Keystone XL, which ended in 2014, the

State Department and the EPA both concluded that greenhouse-gas pollution from

tar sands is much higher than that from other forms of crude oil—about seventeen percent higher, after accounting for the pollution caused by both producing and burning the refined crude oil. The State Department's March 23 record of decision quotes both that seventeen-percent estimate and EPA's 2015 comment that "oil sands crude is substantially more carbon intensive than reference crudes and its use will significantly contribute to carbon pollution."

69.     The significant greenhouse-gas emissions enabled by Keystone XL would exacerbate climate change, one of the predominant environmental crises of our age. The Earth's temperature is regulated by the greenhouse effect, through which visible radiation from the sun is absorbed and emitted as infrared radiation, some of which is trapped by carbon dioxide, methane, and other greenhouse gases in the atmosphere. The delicate balance between incoming solar energy and outgoing energy radiated into space maintains the Earth's average temperature. However, since the Industrial Revolution, humans have been releasing greater volumes of greenhouse gases into the atmosphere through the burning of fossil fuels, changes in land use (such as deforestation), and other processes associated with population growth and industrialization. Those additional greenhouse gases trap heat, causing the Earth's temperature to rise and its climate to change.

70.     According to the National Oceanic and Atmospheric Administration, 2016 was the hottest year on record and the third in a row to set a new record for

global average temperatures at the Earth's surface. Higher surface temperatures cause a wide range of human and ecological harms, including sea-level rise, coastal flooding, heat waves, increased risk of stronger hurricanes and extreme weather, increased risk of wildfires, water shortages, species extinction, habitat destruction, and shifting disease pathways.

71.     The movement of tar sands crude oil through the Keystone XL pipeline also poses other serious threats to human health and the environment. Oil pipelines routinely leak and spill oil, and dilbit is extremely difficult to clean up after a spill—much more so than conventional crude oils. The chemicals used to dilute the bitumen can vaporize into air or dissolve into water, leaving behind the heavy bitumen. Because it does not readily biodegrade and is incredibly viscous and sticky, bitumen is nearly impossible to remove from the natural environment, where it can linger and serve as a persistent source of oil pollution.

72.     Two recent dilbit spills from pipelines have highlighted how costly and damaging such spills can be. A 2010 tar sands crude oil spill in Michigan's Kalamazoo River led to a more than $1.2 billion cleanup effort, the most expensive oil pipeline cleanup in U.S. history. A 2013 spill in Mayflower, Arkansas contaminated an entire neighborhood and caused extensive health problems for residents, including headaches, nausea, fatigue, nosebleeds, bowel issues, and breathing problems.

73.     Problems with a Keystone XL predecessor, the Keystone I pipeline project, underscore the significant spill risks associated with crude oil pipelines. When it began shipping oil through Keystone I in June 2010, TransCanada claimed that "[c]onstruction and operation of the Keystone Pipeline system will continue to meet or exceed world class safety and environmental standards." But in its first year of operation alone, Keystone I leaked at least fourteen times and was temporarily shut down by U.S. authorities. Canadian authorities recorded more than twenty spills and other accidents between June 2010 and July 2011.

74.     Spills from Keystone XL could be particularly harmful because they threaten aquifers that serve as the main or sole source of drinking and irrigation water for many people. The proposed route described in the State Department's 2014 EIS would cross parts of the Northern High Plains Aquifer in South Dakota and Nebraska, including the Northern Great Plains Aquifer System that supplies communities in eastern Montana and the Ogallala Aquifer that supplies most of Nebraska's drinking and irrigation water. The Ogallala is the United States' largest freshwater aquifer. As development and climate change increase competition for and stress on water supplies, protecting our freshwater aquifers will become ever more important.

75.     Keystone XL's construction would also harm rivers and wetlands and threaten human health and welfare. The State Department's 2014 EIS found that

the proposed route would cross more than one thousand rivers and streams and more than three hundred acres of wetlands. TransCanada would drill tunnels under the largest rivers, which include the Yellowstone, Missouri, Milk, Frenchman, Cheyenne, Bad, White, Elkhorn, and Platte, and use an "open cut" method—excavating a trench in the streambed while water is flowing—to cross most other streams and rivers. In larger waterways, TransCanada would place construction equipment in the channel. These activities will increase sediment pollution and increase the risk of oil spills in waters that support fish and other wildlife and that people along the proposed route use for drinking, recreation, and agriculture.

76.     Construction in wetlands would be particularly damaging. Keystone XL would cut a 75-to-110-foot-wide path through wetlands along the proposed route. (For comparison, Interstate 15 in central Great Falls is approximately 115 feet wide.) Construction in wetlands can damage and destroy precious wildlife habitat, including foraging, nesting, spawning, rearing, and resting sites for migratory birds. It can also damage and destroy the wetland plants that influence water chemistry and trap sediments and other pollutants, harming water quality.

**Keystone XL's Threats to Critically Endangered Whooping Cranes and Other Federally Protected Bird Species**

77.     Keystone XL would pass through and damage areas used by endangered whooping cranes and two other imperiled and federally protected bird

species, the endangered interior least tern and threatened piping plover. The project's construction and operation would harm these birds and their habitat.

**Whooping Cranes**

78.     The whooping crane (*Grus americana*) is a critically endangered bird that has been on the endangered species list since 1967. Whooping cranes live only in North America. There are fewer than 350 birds in the main surviving wild population of whooping cranes, and studies have found that the population needs to reach at least 1,000 individuals to sustain itself in the wild. Twice a year, this wild population migrates between winter habitat on the Texas coast and summer habitat in central Canada. This migratory path takes them along the proposed Keystone XL route.

79.     For years, the Service, the Canadian Wildlife Service, and not-for-profit groups dedicated to studying and protecting the whooping crane have been collecting data on bird sightings and from radio tags placed on individual birds. This data shows that more than three hundred miles of the proposed Keystone XL route analyzed in the 2014 EIS fall within the central flyway of the whooping crane migration corridor, where the majority of whooping crane sightings have occurred.

80.     The primary cause of death for whooping cranes is collision with power lines. Whooping cranes collide with power lines because they do not see

them in time to avoid them. These collisions usually occur as whooping cranes are making short, low-altitude flights between foraging and roosting areas, most frequently around sunrise and sunset, when light levels are lower. Collisions are particularly likely to occur in bad weather that further decreases visibility (such as fog, snow, and rain) and in high winds (which make it harder for the birds to control their flight).

81. Because moving diluted bitumen hundreds of miles requires significant amounts of energy, the Keystone XL pipeline would be powered by and require the construction of approximately twenty pump stations in the United States, which in turn will require the construction of hundreds of miles of new power lines. Many of these new power lines will lie within the whooping cranes' main migratory corridor.

82. These power lines represent new collision hazards and are likely to kill whooping cranes. The Service once estimated that there are seventy-four places along the Keystone XL route where new power lines present collision hazards for migrating whooping cranes.

83. The severity of these new collision threats is compounded by the fact that many of these new power-line segments would cross the cranes' roosting and foraging habitat, including important wetland areas. Cranes will inevitably be

harmed as they conduct low-altitude flights between these areas around sunrise and sunset, when they are at high risk of collision.

84. Keystone XL's construction and operation will also damage whooping-crane habitat, including by fragmenting and degrading native grasslands and wetlands that provide important feeding and resting locations during the cranes' migration. Near-inevitable spills and leaks from the pipeline, as well as construction activities in and near rivers and streams, would pollute waters, wetlands, and other essential habitat areas and could result in the loss of roosting or feeding grounds. A large spill would be disastrous for the birds. As an example, the 2010 tar sands crude oil spill in Michigan's Kalamazoo River resulted in significant harm to migratory birds that move between the United States and Canada, including Canada geese, and contamination of essential habitat areas.

85. Because there are so few wild migratory whooping cranes alive today, and the birds reproduce and rebuild their numbers so slowly, many scientists believe that the loss of as few as one adult breeding whooping crane could jeopardize the survival of this iconic species.

**Interior Least Terns and Piping Plovers**

86. The interior least tern (*Sternula antillarum*) has been on the endangered species list since 1985. Much of its natural habitat has already been lost to development. Like whooping cranes, interior least terns are migratory. They

winter in Central and South America and along the Gulf Coast, and spend warmer months in northern and central states including Montana, South Dakota, and Nebraska. The terns' favored nesting areas include shorelines and sand and gravel bars along river channels, and some of the major river crossings along the proposed Keystone XL route analyzed in the 2014 EIS would cut through current and historic tern breeding areas. Predation by raptors (for example, hawks and eagles), who perch on power lines such as those required for the Keystone pipeline's pump stations, is another major threat to this imperiled species.

87.     The Northern Great Plains population of piping plovers (*Charadrius melodus*) has been on the threatened species list since 1985. Like whooping cranes and interior least terns, piping plovers are migratory. Plovers breed in the spring and summer in the northern United States and Canada. The birds nest on the shorelines and islands of lakes in North Dakota and Montana, and on sandbar islands and reservoir shorelines along the Missouri River and reservoirs in Montana, North Dakota, South Dakota, and the Platte River system in Nebraska.

88.     Piping plovers' nesting range has shrunk over the years, and the birds are very sensitive to human presence. Too much disturbance causes the parent birds to abandon their nests, and human foot or vehicle traffic through nesting areas can crush eggs and young birds. Human-caused changes to the landscape have also increased the number and type of piping-plover predators, particularly

raptors. Predation is a major factor affecting piping plovers, decreasing nest success and chick survival.

89.     Keystone XL's construction and operation would further imperil interior least terns, piping plovers, and their habitat by increasing development and human activity and attracting predators (such as powerline-perching raptors) to the waters, wetlands, and other areas these birds depend on to breed, nest, and feed.

**The State Department's Review and Rejection of a Cross-Border Permit for Keystone XL**

90.     In 1968, President Lyndon B. Johnson signed Executive Order 11,423, which provided that no oil pipeline could be constructed or operated across a United States border without a permit from the State Department. Exec. Order No. 11,423, 33 Fed. Reg. 11,741 (Aug. 16, 1968). The Order allowed the State Department to issue a permit only if, following consultation with other federal agencies, it found the pipeline would "serve the national interest." *Id.* § 1(b), (d).

91.     In 2004, President George W. Bush issued Executive Order 13,337, which amended the permitting process outlined in Executive Order 11,423. Exec. Order No. 13,337, 69 Fed. Reg. 25,299 (May 5, 2004). Under Executive Order 13,337, much like the previous order, the State Department may approve the construction, operation, and maintenance of an oil pipeline across a United States border only if it finds that issuance of the permit "would serve the national interest." *Id.* § 1(g). Before issuing a permit, the State Department must consult

with the heads of eight federal agencies specified in the order, including the Environmental Protection Agency. *Id.* § 1(b). The State Department makes the final decision on the permit unless one of the eight consulting agencies appeals that decision to the president. *Id.* § 1(i).

92.     TransCanada first applied for a U.S.-Canada cross-border permit for Keystone XL in September of 2008. Because the issuance of the permit is a "major federal action," triggering NEPA, the State Department acted as the lead agency on the preparation of an EIS for the project. The State Department issued a Draft EIS in April 2010, supplemented that draft in April 2011, and issued a Final EIS in August 2011.

93.     In November of 2011, the State Department announced that it needed to conduct further environmental review of Keystone XL's impacts, particularly those concerning the Ogallala Aquifer and Nebraska's Sand Hills region, where the Aquifer lies close to the surface, under a thin layer of porous, sandy soil.

94.     In December of 2011, Congress passed the Temporary Payroll Tax Cut Continuation Act of 2011, which required a final decision on TransCanada's cross-border permit application for Keystone XL within sixty days.

95.     In early 2012, the State Department denied TransCanada's application for a cross-border permit, explaining that the sixty-day deadline was arbitrary and

left the agency insufficient time to complete its consideration of Keystone XL's environmental impacts.

96.     Shortly after the State Department's 2012 decision to deny a cross-border permit for Keystone XL, TransCanada announced that it would proceed with construction of the southern segment of the original proposed pipeline, which runs from Cushing, Oklahoma to the Gulf Coast. TransCanada renamed this segment the "Gulf Coast Pipeline." Because the Gulf Coast Pipeline does not cross a U.S. border, TransCanada did not seek a cross-border permit before building it.

97.     On May 4, 2012, TransCanada submitted a new application to the State Department in which TransCanada requested a cross-border permit for the northern segment of the company's original proposed Keystone XL project. This segment would run from Alberta, Canada to Steele City, Nebraska.

98.     In March 2013, the State Department released a draft supplemental EIS on TransCanada's May 2012 cross-border permit application for Keystone XL (the Draft EIS). Plaintiffs and millions of others commented on the Draft EIS, noting mistaken assumptions and gaps in the analysis.

99.     In April 2013, EPA, pursuant to its legal authority under NEPA and the Clean Air Act, submitted a letter on the Draft EIS that criticized the analysis of greenhouse-gas emissions, pipeline safety, alternative routes, and environmental-justice impacts. EPA rated the Draft EIS "EO-2 ('Environmental Objections-

Insufficient Information')," meaning that the project had significant environmental impacts that must be avoided and that the Draft EIS provided insufficient information to evaluate those impacts.

100. In January 2014, the State Department issued a Final Supplemental EIS (the 2014 EIS) for Keystone XL. The 2014 EIS failed to cure many of the problems EPA, Plaintiffs, and others noted in their comments on the Draft EIS.

101. Perhaps most importantly, the State Department downplayed Keystone XL's climate impacts by claiming that, despite enabling the transport of 830,000 (or more) additional barrels per day of tar sands crude oil to Gulf Coast refineries, the project was unlikely to encourage Canadian tar sands extraction. Instead, the State Department asserted that development of the tar sands would likely occur at the same pace, whether or not Keystone XL was built. The State Department based this assertion on an assumption that oil prices would remain high and that sufficient additional export capacity—via pipeline or, more likely, rail—would become available absent Keystone XL, giving Canada's tar sands industry unfettered access to refinery markets.

102. Plaintiffs challenged the State Department's assumption in comments on the 2014 EIS. They noted that because tar sands deposits are landlocked in northern Alberta and are far more expensive to extract than conventional crude oil,

their continued development is particularly dependent on additional pipeline capacity.

103. In the 2014 EIS, as an additional basis for its assertion that Keystone XL would not cause a significant increase in tar sands development, the State Department assumed the construction of alternative infrastructure projects that still have not been built. One of those is Enbridge's proposed expansion of the Alberta Clipper (otherwise known as the "Line 67") tar sands pipeline project, for which the State Department has also been considering a cross-border permit since 2012.

104. The State Department also failed to fully analyze a reasonable range of action alternatives in the 2014 EIS. These include clean energy and alternative pipeline routes, which were feasible and would have resulted in fewer impacts than the proposed project. The State Department also failed to include a proper no-action alternative in the 2014 EIS. Here again, the State Department relied on its erroneous assumption that substantially the same amount of tar sands crude oil would move by pipeline or rail, even if Keystone XL were never built.

105. In the spring of 2014, the State Department suspended its review of Keystone XL in response to state-court litigation that made it impossible for the Department to know what route the project would take through Nebraska. (Although the Department resumed the NEPA process in January 2015, TransCanada still does not have a state-approved route through Nebraska.)

106. On February 2, 2015, EPA submitted a comment letter on the 2014 EIS. EPA's letter pointed out that oil prices had already dropped dramatically, and that this drop further undermined the State Department's conclusion that Keystone XL would have no substantial effect on tar sands development. EPA also found that the 2014 EIS failed to evaluate a reasonable range of alternatives. EPA recommended that the State Department revise the EIS to correct these errors.

107. On November 3, 2015, then-Secretary of State John Kerry, on behalf of the State Department and pursuant to the process outlined in Executive Order 13,337, determined that Keystone XL would not serve the national interest and denied TransCanada's request for a cross-border permit. The State Department also issued a record of decision pursuant to NEPA.

108. In a letter explaining the permit denial, Secretary Kerry wrote that he had "based this decision on key findings by the State Department" in the 2014 EIS. He acknowledged the State Department's conclusion that Keystone XL would not "by itself" significantly impact the rate of tar sands development or crude oil demand, but also referenced concerns about the project's impacts on local communities and water supplies, and noted that it would "facilitate the transportation to the United States of one of the dirtiest sources of fuel on the planet." He wrote that "[t]he critical factor in my determination was this: moving forward with this project would significantly undermine [the United States'] ability

to continue leading the world in combatting climate change." He added that "[t]he United States cannot ask other nations to make tough choices to address climate change if we are unwilling to make them ourselves."

109. Developments over the more than three years since the State Department published its 2014 EIS have further undermined that document's core assumptions and associated predictions about Keystone XL's environmental impacts. Oil prices have dropped and stayed low, and are predicted by reputable sources to remain low for decades. Rail transport of tar sands crude oil has also failed to emerge as a viable alternative to pipelines. Safety regulations finalized in 2015 require the phase out of some puncture-prone tank cars and place speed, braking, and other restrictions on oil trains that restrict rail capacity for oil transport. Community opposition to on- and off-loading terminals for oil trains has also made it more difficult to build these facilities and further limited the amount of tar sands crude oil that can be transported by rail.

**The State Department's Reversal of its Decision on and Issuance of a Cross-Border Permit for Keystone XL**

110. On January 24, President Trump issued a presidential memorandum (the Trump memorandum) "invit[ing]" TransCanada "to promptly re-submit its application to the Department of State" for a cross-border permit for Keystone XL. Mem. § 2, Construction of the Keystone XL Pipeline, 82 Fed. Reg. 8663 (Jan. 30, 2017). The Trump memorandum instructed the State Department to expedite the

approval process under Executive Order 13,337 by "reach[ing] a final permitting decision, including a final decision as to any conditions on issuance of the permit that are necessary or appropriate to serve the national interest, within 60 days of TransCanada's submission of the permit application." *Id*. The memorandum also called on the Department of Interior, Bureau of Land Management, and other federal agencies to expedite their reviews. *Id.* § 3.

111. The Trump memorandum did not direct the State Department to approve the permit, nor did it purport to waive applicable environmental review laws. Rather, it stated that the State Department "shall," to the "maximum extent permitted by law," deem the 2014 EIS sufficient to satisfy NEPA and any other provision of law that requires executive department consultation. *Id.* § 3(a)(ii).

112. The Trump memorandum did purport to waive provisions of Executive Order 13,337 that allow other federal agencies to object to the State Department's final national interest determinations and appeal those decisions to the president. Executive Order 13,337 requires the State Department to notify eight consulting agencies of the proposed granting or denial of a cross-border permit, and gives those agencies fifteen days to request that the State Department refer the application to the president to resolve any disagreements about whether the permit should be granted. The Trump memorandum states that those provisions are "waived on the basis that, under the circumstances, observance of these

requirements would be unnecessary, unwarranted, and a waste of resources." *Id.* § 3(a)(iv). The memorandum thus removed the only mechanism by which the State Department's permitting decision for Keystone XL could be referred to the President himself.

113.   On or about January 26, TransCanada filed a new application for a Keystone XL cross-border permit with the State Department.

114.   On January 27, February 22, and March 13 and 17, Plaintiffs wrote to the State Department to note that significant new circumstances and information relevant to the environmental impacts of Keystone XL have arisen since publication of the 2014 EIS. These developments require the State Department and cooperating federal agencies, including the Bureau of Land Management, to prepare and take public comment on a supplemental EIS before deciding whether to issue approvals for Keystone XL. *See* 40 C.F.R. § 1502.9(c).

115.   On February 16, TransCanada applied to Nebraska's Public Service Commission for approval of a Keystone XL route through Nebraska. Nebraska law requires the Commission to issue a final decision within seven months of receiving TransCanada's application. The Commission can extend that period by five months for just cause, but in no case can the period extend more than eight months past the State Department's issuance of a cross-border permit for the project (*i.e.*, past on or about November 23, 2017). More than 100 people and organizations, including

47

more than ninety landowners, three labor unions, the Nebraska Ponca and Yankton Sioux Tribes, Bold Alliance, the Nebraska Chapter of the Sierra Club, and other environmental and public-health advocacy groups, have petitioned to intervene in the Commission's proceeding. TransCanada's proposed route through Nebraska still threatens the Sand Hills, and Keystone XL's impacts to this precious and vulnerable region still have not been adequately addressed.

116. On March 23, Under Secretary of State for Political Affairs Shannon signed and the State Department issued a cross-border permit and accompanying record of decision and national interest determination for Keystone XL. The cross-border permit purports to allow TransCanada "to construct, connect, operate, and maintain pipeline facilities at the international border of the United States and Canada at Morgan, Montana, for the import of crude oil from Canada to the United States," subject to conditions specified in the document.

117. In its March 23 record of decision and national interest determination, the State Department asserts that NEPA, the APA, the ESA, and "other similar laws and regulations" are "inapplicable" to its decision to issue a cross-border permit for Keystone XL, but goes on to say that the State Department's review of Keystone XL "has, as a matter of policy, been conducted in a manner consistent with NEPA."

118.    The State Department's March 23 decision refers to and paraphrases the 2014 EIS. It includes little to no new information on the issues NEPA required the State Department to address before issuing a cross-border permit.

119.    With respect to Keystone XL's impacts on tar sands development, the State Department asserts, consistent with its conclusions in the 2014 EIS, that Keystone XL "is unlikely to have a substantial effect on the rate of extraction of the oil sands" or "to directly result in significant change in production."

120.    With respect to greenhouse-gas pollution, the State Department now acknowledges—based on a supplemental EIS it prepared for the Alberta Clipper pipeline project—that "[greenhouse gas] emissions from [Western Canadian Sedimentary Basin] crude may be five to 20 percent *higher* than previously indicated" (emphasis added). It also acknowledges that oil prices are roughly half what they were when it published the 2014 EIS: Crude oil that sold for more than $98 a barrel then now sells for $48 a barrel. But the State Department denies the significance of this and other new information. It asserts that the 2014 EIS still "reflects the expected environmental impacts" of Keystone XL and "continues to inform the Department's national interest determination" on topics including the state of the oil market and greenhouse-gas pollution.

121.    The State Department also denies the significance of new information about the dangers of an oil spill from Keystone XL. It acknowledges that there

have been several new studies on cleanup of diluted bitumen since it published the 2014 EIS, and notes that a 2016 National Academy of Science (NAS) study "found that diluted bitumen presents more challenges for cleanup response than other types of oil commonly moved by pipeline." The Department also notes that, according to the 2016 NAS study, EPA, the Coast Guard, the Pipeline and Hazardous Materials Safety Administration, and first responders are all "in need of more training and better communication in order to adequately and effectively address spills." Nonetheless, the State Department goes on to assert that the mitigation measures it described in the 2014 EIS, without the benefit of this and other new information, "adequately address" spill and cleanup concerns.

122.   With respect to Keystone XL's other threats to water supplies and public health in Montana, South Dakota, and Nebraska, the State Department simply summarizes the information and conclusions it included in its 2014 EIS and older documents. It does the same with respect to Keystone XL's threats to wetlands. For wildlife, the State Department says it consulted with the Service on possible impacts to two species added to the endangered species list as threatened species in 2015, and "received confirmation from [the Service] that [ESA] Section 7 consultations need not be reinitiated for any other species and that, following implementation of the conservation measures contained within [the Service's 2013

Biological] Opinion, no other species included in the project area would be adversely affected."

123.    The State Department relies on simple summaries of its 2014 EIS to discuss alternatives to Keystone XL and the cumulative effects of Keystone XL and other projects. For cumulative effects, this means that a half-decade after receiving cross-border permit applications for Keystone XL and the Alberta Clipper expansion project, the State Department still has not analyzed the combined effects on tar sands development and greenhouse-gas pollution of the 1.3 million barrels per day of additional oil these two pipelines could carry.

124.    The State Department lists a series of factors that informed its determination to issue a cross-border permit for Keystone XL. Many of those factors are ones the State Department referenced in its November 2015 decision to deny a cross-border permit. With respect to climate, the State Department acknowledges its 2015 finding that approving Keystone XL "would have undercut the credibility and influence of the United States in urging other countries to address climate change." It asserts that "[s]ince then, there have been numerous developments related to global action to address climate change, including announcements by many countries of their plans to do so. In this changed global context, a decision to approve this proposed Project at this time would not undermine U.S. objectives in this area." The State Department does not discuss

what impact its approval of Keystone XL may have on "global action to address climate change." Nor does it refer to or purport to analyze the impacts of other major Trump-administration actions that are likely to spur new fossil-fuel development and greenhouse-gas pollution.

125.   The State Department did not prepare a supplemental EIS, or any other new NEPA document, before issuing its March 23 cross-border permit, record of decision, and national interest determination for Keystone XL. The State Department also never answered Plaintiffs' January, February, and March 2017 letters requesting supplementation of the 2014 EIS, nor acknowledged much of the new information those letters referenced. The State Department did say it had "taken all information provided by [TransCanada] into account in making the national interest determination." The State Department cited 2015 and February and March 2017 TransCanada letters that it has not yet released to the public.

**The State Department's Determination and Service's Concurrence that Keystone XL Will Not Adversely Affect Whooping Cranes, Interior Least Terns, and Piping Plovers**

126.   In June 2012, following TransCanada's May 2012 application for a cross-border permit, the Service and the State Department began informally consulting on Keystone XL's threats to protected species, pursuant to Section 7 of the ESA. In September 2012, a contractor for TransCanada completed a draft Biological Assessment and submitted it to the State Department. On December 21,

2012, the State Department submitted a final Biological Assessment to the Service ("Biological Assessment" or "Assessment"), on behalf of itself and other cooperating agencies, including the Bureau. The Assessment explained that the Department was "the lead federal agency for the initial evaluation of anticipated impacts of TransCanada Keystone Pipeline LP's (Keystone) proposed Keystone XL Pipeline Project (Project) on federally protected and candidate species and federally designated critical habitat," and referenced the Department's and TransCanada's "consultation" with the Service, the Bureau, and state agencies concerning those impacts.

127.    The Biological Assessment concluded that the pipeline is "not likely to adversely affect" the whooping crane, interior least tern, and piping plover. The State Department did determine that the pipeline was "likely to adversely affect" the American burying beetle, and initiated formal consultation with the Service on that species.

128.    On May 15, 2013, the Service's Grand Island field office issued a Biological Opinion and concurrence statement for Keystone XL. The Service stated that, pursuant to the ESA, it "concur[red]" with the Biological Assessment's conclusions that Keystone XL was "not likely to adversely affect" the whooping crane, interior least tern, and piping plover. The Biological Opinion and concurrence identified the State Department as "the lead federal agency for the

environmental review of the proposed Project consistent with [NEPA]," and "also the lead agency consulting with the [Service] consistent with section 7 of the ESA."

129.    The Biological Assessment did not fully or adequately analyze the effects of Keystone XL's power lines on these protected birds. The State Department improperly assumed that such effects would be considered at a later time, by TransCanada or by other non-federal entities (such as the local power providers who will operate the power lines needed to power the pipeline's pump stations), even though the lines are "interrelated or interconnected" with the proposed action for ESA purposes. *See* 50 C.F.R. § 402.02.

130.    The Service's Biological Opinion and concurrence statement also did not fully analyze or provide for adequate mitigation of Keystone XL's threats to these protected birds. The Service set forth some vague "conservation measures" that purport to mitigate threats to whooping cranes, interior least terns, and piping plovers; however, the record indicates that these conservation measures are inadequate to prevent adverse effects to these species.

131.    The main conservation measure the State Department and Service identified that responds directly to the threats the power lines pose to whooping cranes is the placement of "bird flight diverters" or avian markers on some power-

line segments, near major water crossings on the U.S. portion of the proposed Keystone XL route.

132.    Although bird diverters may alert birds to the presence of lines and thereby reduce the potential for collisions, the best available science indicates that they are not effective when they are not visible, such as during fog events, or at low light levels, in the mornings and evenings, when cranes are most at risk, or during high wind events, when cranes may not be able to avoid even visible lines.

133.    To the extent that bird flight diverters may reduce the potential for collisions, the State Department and the Service failed to rely on critical data that would have informed where those diverters should be placed. That data would also have been essential for developing other conservation measures, including line placement and locating specific areas that should be avoided in order to minimize risk of harm to protected bird species.

134.    On information and belief, in making its "not likely to adversely affect" determination, the State Department did not consider any of the available whooping-crane sighting or telemetry data. On information and belief, the Service also did not consider sighting or telemetry data in concurring in the State Department's "not likely to adversely affect" determination. Neither the Biological Assessment nor the Biological Opinion refers to this data. This data shows the precise location of habitat areas used by whooping cranes, and would indicate

whether the proposed power lines will be placed between foraging and roosting areas, increasing the risk of collisions.

135. Instead, the Service relied primarily on informal discussions with local power providers (non-federal entities, who are not subject to the consultation provisions of Section 7 of the ESA), and their pledge to install bird diverters at unidentified locations on their lines as a conservation measure, to support its conclusion that whooping cranes are unlikely to be adversely affected by power-line collisions (and the pipeline in general).

136. Neither the Biological Assessment nor the Biological Opinion analyze the potential for impacts to whooping cranes from construction and operation of Keystone XL in Canada, even though the Canadian portion of the project is interconnected with the U.S. portion and would have direct and indirect impacts on the migratory whooping cranes. Oil spills have the potential to contaminate essential or important whooping crane habitat areas in Canada, and power-line construction for pump stations in Canada would increase the risk of collisions, adversely affecting this imperiled species. It remains unclear whether bird diverters would even be used to mark power lines in Canada.

137. In making its "not likely to adversely affect" determination for interior least terns and piping plovers, the State Department relied on the use of pole-top raptor guards to prevent increased raptor perching and predation. The Service

similarly relied on pole-top raptor guards to concur in the State Department's "not likely to adversely affect" determination for interior least terns and piping plovers. Both agencies relied on a stale guidance document that, at the time of their analysis, had been updated to state that perch discouragers "are intended to move birds from unsafe location to safe location and do not prevent perching." The updated guidance explains that although these devices are effective at keeping raptors away from certain dangerous areas on utility poles and protecting them from electrocution, they are not effective at preventing perching generally across a power line. Therefore, their use would not appreciably mitigate the predation threats that Keystone XL will pose to interior least terns and piping plovers.

138.   As a consequence of the State Department's "not likely to adversely affect" determination for whooping cranes, interior least terns, and piping plovers, and the Service's concurrence in that determination, the State Department and the Service have not fully considered and accounted for Keystone XL's threats to these protected birds. Had the agencies done so, they would have been required to proceed with "formal consultation" to ensure that the proposed project will not jeopardize the species' continued existence or destroy or adversely modify their designated critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. Part 402.

//

**The Bureau of Land Management's Consideration of Right-of-Way Grants for Keystone XL**

139.    As described in the State Department's 2014 EIS, Keystone XL would cross approximately forty-seven miles of Bureau-administered land in Montana, including at and extending south from the U.S.-Canada border.

140.    Under the Mineral Leasing Act of 1920, the Bureau must approve any right-of-way grants and temporary-use permits for pipelines that cross Bureau-administered land. 30 U.S.C. § 185(a); 43 C.F.R. Part 2880. These grants must comply with all applicable NEPA requirements. 30 U.S.C. § 185(h)(1).

141.    Similarly, under the Federal Land Policy and Management Act, the Bureau must approve any right-of-way grants for other types of facilities on Bureau-administered land, such as electrical power generation, transmission, and distribution systems. 43 U.S.C. § 1761(a); 43 C.F.R. Part 2800. These grants must comply with all applicable laws, including NEPA requirements. *See* 43 U.S.C. § 1764(c); 43 C.F.R. § 2804.2(d)(1).

142.    To build Keystone XL, TransCanada needs right-of-way grants from the Bureau for the parts of the pipeline that cross Bureau-controlled land, and for electrical transmission lines that would power the proposed pumping stations. *See* 74 Fed. Reg. 5019, 5020 (Jan. 28, 2009). TransCanada applied for grants in 2008, but withdrew its application after the State Department denied TransCanada a cross-border permit in November 2015.

143.   In early February 2017, TransCanada reapplied to the Bureau for right-of-way grants for the Keystone XL pipeline and associated electrical transmission lines. The Bureau's regulations indicate that, in most instances, it will process an application for a right-of-way grant within sixty calendar days. 43 C.F.R. §§ 2804.25(c), 2884.21(b).

144.   The Bureau has not responded to Plaintiffs' January, February, and March 2017 letters noting significant new information and requesting supplementation of the State Department's 2014 EIS, which identifies the Bureau as a cooperating agency. On information and belief, the Bureau does not plan to issue a supplemental EIS before granting rights of way for Keystone XL.

145.   On information and belief, the Bureau could grant rights of way for Keystone XL within the next few months, and is likely to do so in reliance on the State Department's 2014 EIS.

## FIRST CLAIM FOR RELIEF

**Violation of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*., and Administrative Procedure Act, 5 U.S.C. §§ 701-706, by Defendants State Department and Under Secretary Shannon**

146.   Plaintiffs incorporate by reference all preceding paragraphs.

147.   The State Department's issuance of a cross-border permit for the Keystone XL pipeline was a major federal action that requires compliance with

NEPA. 42 U.S.C. § 4332(2)(C). The Department, as lead agency, prepared an EIS before approving the permit. That EIS was last supplemented in January 2014.

148. The State Department, in violation of NEPA, did not include in the 2014 EIS a full and fair analysis of Keystone XL's significant direct, indirect, and cumulative environmental effects. *Id.*; 40 C.F.R. §§ 1502.1, 1502.16(a), (b) & (h), 1508.25(c). Among other things, the State Department did not adequately analyze Keystone XL's significant negative climate, air quality, water quality, pipeline safety, and biological impacts, including impacts that would occur within the United States and trans-boundary impacts that would occur outside the United States. The State Department also did not adequately analyze the impact of connected actions, including, but not limited to, the many power lines that will serve the project, and cumulative actions, including, but not limited to, the Enbridge Alberta Clipper (Line 67) pipeline expansion and TransCanada's Gulf Coast Pipeline. 40 C.F.R. § 1508.25. The Department relied on an arbitrary, outdated, and incomplete analysis of greenhouse-gas emissions to conclude that Keystone XL is unlikely to have significant climate impacts.

149. The State Department also violated NEPA by failing to articulate a clear, rational "purpose and need" for, or analyze a reasonable range of alternatives to, Keystone XL. 40 C.F.R. §§ 1502.1, 1502.13, 1502.14. The State Department did not analyze a proper no-action alternative. It also failed to analyze action

alternatives that would reduce the project's impacts, including viable clean-energy alternatives and reasonable route alternatives.

150.    The State Department also violated NEPA by arbitrarily and unlawfully refusing to prepare a supplemental EIS in response to significant new information and circumstances that bear on Keystone XL's threats to people and the environment and the question of whether the project is in the United States' national interest. 40 C.F.R. § 1502.9(c); 22 C.F.R. § 161.9(k). That new information includes, but is not limited to, (a) a large drop in oil prices and other market developments that weaken commercial demand for Keystone XL that further undermine the State Department's January 2014 assessment of the project's purpose and need and pollution impacts; (b) new impediments to the rail transport that the State Department assumed would result in substantially the same amount of oil being transported, refined, and burned with or without Keystone XL; (c) new spills and analyses that underscore the risks of moving tar sands crude oil by pipeline; and (d) associated concerns about Keystone XL's threats to drinking and irrigation water for communities along the route. There is also ongoing uncertainty about Keystone XL's route through Nebraska. The EIS the State Department published more than three years ago is patently insufficient to support federal approvals today and in the future.

151. The State Department has violated NEPA by issuing a cross-border permit for Keystone XL. The State Department's permitting decision is arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of the APA.

152. Unless and until the State Department prepares an EIS that complies with NEPA, and provides for public comment on that EIS, Plaintiffs and their members will be irreparably harmed. The relief Plaintiffs seek will redress these injuries by setting aside the State Department's cross-border permit for Keystone XL and requiring the State Department to comply with NEPA and the APA.

## SECOND CLAIM FOR RELIEF

**Violation of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*.,
and Administrative Procedure Act, 5 U.S.C. §§ 701-706,
by Defendants Interior Department, Bureau of Land Management,
and Secretary Zinke**

153. Plaintiffs incorporate by reference all preceding paragraphs.

154. At the U.S.-Canada border and through Montana, the proposed Keystone XL route crosses approximately forty-seven miles of federal land administered by the Bureau of Land Management. Before TransCanada can build the Keystone XL pipeline and associated facilities, the Bureau must grant rights of way under the Mineral Leasing Act and the Federal Land Policy and Management Act. 30 U.S.C. § 185(a); 43 U.S.C. § 1761(a).

155. The Bureau is a cooperating agency under NEPA because it has jurisdiction by law over the land on which TransCanada seeks rights of way. 40

C.F.R. § 1508.5. As a cooperating agency, the Bureau must undertake an independent review of the EIS before granting any rights of way. *Id.* § 1506.3(c).

156. In early February, TransCanada reapplied for right-of-way grants. On information and belief, the Bureau could grant rights of way for the Keystone XL pipeline and the associated electrical transmission lines within the next few months. On information and belief, the Bureau will rely on the State Department's 2014 EIS to purport to satisfy its NEPA obligations.

157. For the same reasons pleaded in the first claim for relief, if it relies on the 2014 EIS and fails to prepare a supplemental EIS before granting rights of way for Keystone XL, the Bureau will be in violation of NEPA. The Bureau's action will also be arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of the APA.

158. Unless and until the Bureau prepares (or cooperates in the preparation of) an EIS that complies with NEPA, and provides for public comment on that EIS, Plaintiffs and their members will be irreparably harmed. The relief Plaintiffs seek will redress these injuries by setting aside the Bureau's right-of-way grants for Keystone XL and requiring the Bureau to comply with NEPA and the APA.

//

## THIRD CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*., by Defendants State Department and Under Secretary Shannon**

159.   Plaintiffs incorporate by reference all preceding paragraphs.

160.   On November 3, 2015, the State Department, pursuant to the process outlined in Executive Order 13,337, denied TransCanada a cross-border permit for Keystone XL, finding that the pipeline would be contrary to the national interest. The State Department issued a record of decision and national interest determination explaining its reasoning.

161.   On March 23, the State Department reversed course and issued TransCanada a cross-border permit for Keystone XL, pursuant to a new record of decision and national interest determination in which the Department found that the pipeline would "serve the national interest." The State Department made this finding in reliance on the same 2014 EIS and other federal agency review documents that existed in 2015, when it denied a cross-border permit for Keystone and found that the pipeline would not serve the national interest.

162.   The State Department's March 23 issuance of a cross-border permit and supporting record of decision and national interest determination for Keystone XL violated the APA and NEPA. The State Department has failed to adequately explain and justify (a) its reversal of positions on whether Keystone XL is in the

national interest, and (b) its reliance on a stale and inadequate environmental review.

163.    Unless and until the State Department complies with the APA and NEPA by providing a reasoned explanation for its issuance of a cross-border permit for Keystone XL and the reversal of its earlier record of decision and national interest determination for Keystone XL, Plaintiffs and their members will be irreparably harmed. The relief Plaintiffs seek will redress these injuries by setting aside the State Department's cross-border permit, record of decision, and national interest determination for Keystone XL and requiring the State Department to comply with the APA and NEPA.

## FOURTH CLAIM FOR RELIEF

**Violation of the Endangered Species Act, 16 U.S.C. §§1531-1544, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706, by Defendants Interior Department, Service, and Secretary Zinke**

164.    Plaintiffs incorporate by reference all preceding paragraphs.

165.    Section 7(a)(2) of the ESA requires action agencies to ensure that their actions are not likely to jeopardize the continued existence of endangered or threatened species, and are not likely to destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2). To do so, agencies must complete the procedural requirements set forth in the ESA's implementing regulations, relying on the best scientific information available. 50 C.F.R. Part 402.

166. The Service has a duty to review a biological assessment to determine whether the proposed action is likely to adversely affect any listed species or critical habitat. To complete the informal consultation process, the Service must concur, in writing, in any "not likely to adversely affect" determination. If the Service finds that a project may adversely affect listed species, formal consultation is required. 50 C.F.R. §§ 402.13(a), 402.14(b).

167. A Service concurrence that a proposed action is not likely to adversely affect listed species, or is not likely to destroy or adversely modify critical habitat, is final agency action reviewable under Section 706(2)(A) of the APA.

168. Power lines built to support Keystone XL will increase collision risks for endangered whooping cranes. This is likely to adversely affect and jeopardize the continued existence of this critically endangered, iconic species. Power lines built to support Keystone XL will also encourage raptor perching and increase predation of endangered interior least terns and threatened piping plovers, and will likely adversely affect those species.

169. Construction and operation of Keystone XL will increase the risk of oil spills and cause habitat loss and fragmentation, all of which will adversely affect whooping cranes, interior least terns, and piping plovers.

170. The December 2012 final Biological Assessment for Keystone XL did not adequately consider the effects of Keystone XL's power lines to these

protected birds, on the improper basis that they may be considered later by local, non-federal power providers (against whom such measures may be difficult or impossible to enforce). The Assessment ignored other significant threats to these protected birds, including oil spills, further habitat disturbance and loss, and all impacts associated with Keystone XL's construction and operation in Canada; erroneously relied on inadequate and incomplete mitigation measures to conclude that Keystone XL would not adversely affect the protected birds; and ignored important and readily available sighting and telemetry data for whooping cranes, contrary to the best available science.

171.   In concurring in the "not likely to adversely affect" determination for whooping cranes, interior least terns, and piping plovers, the Service also failed to consider the full range of threats Keystone XL poses to these protected birds (in the United States as well as in Canada); improperly relied on incomplete and inadequate mitigation measures that are unsupported by the best available science; improperly relied on informal discussions with local power providers who are not subject to ESA Section 7 to implement those conservation measures; and ignored important and readily available data for whooping cranes that is essential for developing effective conservation measures. The Service's concurrence in the Biological Assessment's determination regarding these effects was therefore contrary to the ESA and in violation of the APA.

172.    Until the Service complies with the ESA and APA, Plaintiffs and their members will be irreparably harmed. The relief Plaintiffs seek will redress those injuries by setting aside the Service's concurrence in the determination that Keystone XL is "not likely to adversely affect" the whooping crane, interior least tern, and piping plover, and requiring the Service to conduct a complete and non-arbitrary analysis of Keystone XL's threats to these federally protected species through formal consultation. Doing so would lead the Service to insist on adequate, enforceable mitigation measures to protect the cranes, terns, and plovers from Keystone XL's threats (to the extent such measures exist), or else to find that the project would jeopardize these species in violation of the ESA.

## FIFTH CLAIM FOR RELIEF

### Violation of the Endangered Species Act, 16 U.S.C. §§ 1531-1544, and Administrative Procedure Act, 5 U.S.C. §§ 701-706, by Defendants State Department and Under Secretary Shannon

173.    Plaintiffs incorporate by reference all preceding paragraphs.

174.    Section 7(a)(2) of the ESA requires action agencies to ensure that their actions are not likely to jeopardize the continued existence of endangered or threatened species, and are not likely to destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2). To do so, agencies must complete the procedural requirements set forth in the ESA's implementing regulations, and rely on the best scientific information available. *Id.*; 50 C.F.R. Pt. 402.

175. The State Department has a duty to analyze Keystone XL's potential adverse impacts to listed species before issuing approvals for the project. The State Department was required to prepare a biological assessment for Keystone XL that adequately evaluated the project's potential effects on listed species and their habitat, based on the best available science. Power lines built to support Keystone XL will increase collision risks for endangered whooping cranes. This is likely to adversely affect and jeopardize the continued existence of this critically endangered, iconic species. Power lines built to support Keystone XL will also encourage raptor perching and increase predation of endangered interior least terns and threatened piping plovers, and will likely adversely affect those species. Construction and operation of Keystone XL will increase the risk of oil spills and cause habitat loss and fragmentation, all of which will adversely affect whooping cranes, interior least terns, and piping plovers.

176. The State Department's December 2012 final Biological Assessment for Keystone XL violated the ESA and APA. It did not adequately consider the effects of Keystone XL's power lines to these protected birds, on the improper basis that such effects may be considered later by local, non-federal power providers (against whom such measures may be difficult or impossible to enforce). The State Department also ignored other significant threats to these protected birds, including oil spills, further habitat disturbance and loss, and all impacts

associated with Keystone XL's construction and operation in Canada; arbitrarily relied on inadequate and incomplete mitigation measures to conclude that Keystone XL would not adversely affect the protected birds; and ignored important and readily available sighting and telemetry data for whooping cranes, contrary to the best available science. The State Department's determinations regarding the effects of the project on whooping cranes, interior least terns, and piping plovers therefore violated the ESA and APA.

177. Had the State Department prepared a biological assessment for Keystone XL that complied with the ESA and APA, the agency would have concluded that the project is "likely to adversely affect" these species, and would have been bound to engage in formal consultation with the Service before issuing a cross-border permit.

178. Until the State Department complies with the ESA and APA, Plaintiffs and their members will be irreparably harmed. The relief Plaintiffs seek will redress those injuries by setting aside the State Department's determination that Keystone XL is "not likely to adversely affect" the whooping crane, interior least tern, and piping plover, and remanding the determination to the State Department to comply fully with the ESA through completion of formal ESA consultation. Lawful formal consultation would lead the Service to require adequate, enforceable mitigation measures to protect the cranes, terns, and plovers

from Keystone XL's threats (to the extent such measures exist). Alternatively, the Service may find that the project (in the form described in TransCanada's most recent cross-border permit application and assumed by the State Department's cross-border permit) would jeopardize these species, in violation of the ESA, and require the State Department to undertake reasonable and prudent alternatives to the project to avoid jeopardy, should the State Department decide to continue with it.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.  Declare that Defendants State Department, Under Secretary Shannon, Interior Department, and Bureau of Land Management have violated NEPA and the APA by issuing a cross-border permit and any right-of-way grants for Keystone XL, in reliance on an arbitrary, stale, and incomplete EIS;

B.  Declare that Defendants State Department and Under Secretary Shannon violated the APA by reversing, without a reasoned justification, the State Department's earlier determination that Keystone XL would not serve the United States' national interest and that TransCanada should not be granted a cross-border permit;

C.  Declare that Defendants State Department and Under Secretary Shannon violated Section 7 of the ESA and the APA by failing to ensure that

Keystone XL would not jeopardize the continued existence of whooping cranes, interior least terns, and piping plovers, and by making an erroneous "not likely to adversely affect" determination for the crane, tern, and plover.

D.     Declare that Defendants Interior Department and Service violated the APA and ESA by arbitrarily and capriciously concurring in the State Department's "not likely to adversely affect" determination for whooping cranes, interior least terns, and piping plovers;

E.     Issue an injunction requiring Defendants State Department, Under Secretary Shannon, Interior Department, Bureau of Land Management, and Secretary Zinke to comply with NEPA and the APA, and requiring Defendants State Department, Under Secretary Shannon, Interior Department, Service, and Secretary Zinke to comply with the APA and ESA;

F.     Issue an injunction setting aside the Department's cross-border permit, January 2014 EIS, and record of decision for Keystone XL; setting aside the parts of the State Department's 2012 Biological Assessment and the Service's May 2013 ESA concurrence for Keystone XL that concern the whooping crane, interior least tern, and piping plover; setting aside any Bureau right-of-way grants for Keystone XL; and prohibiting any activity in furtherance of the construction or operation of Keystone XL and associated facilities;

G.	Award Plaintiffs their costs of litigation, including reasonable attorney

and expert witness fees; and

H.	Grant such other and further relief as the Court deems just and proper.


Dated:	August 4, 2017	/s/ Doug Hayes
Doug Hayes (*pro hac vice*)
/s/ Eric Huber
Eric Huber (*pro hac vice*)
Sierra Club Environmental Law Program
1650 38th Street, Suite 102W
Boulder, CO 80301
(303) 449-5595
doug.hayes@sierraclub.org
huber@sierraclub.org

*Attorneys for Sierra Club and Northern*
*Plains Resource Council*

/s/ Selena Kyle
Selena Kyle (*pro hac vice*)
Natural Resources Defense Council
20 North Wacker Drive, Suite 1600
Chicago, IL 60606
(312) 651-7906
skyle@nrdc.org
/s/ Cecilia Segal
Cecilia Segal (*pro hac vice*)
Natural Resources Defense Council
111 Sutter Street, Floor 21
San Francisco, CA 94104
(415) 875-6112
csegal@nrdc.org

*Attorneys for Bold Alliance and Natural*
*Resources Defense Council*

/s/ Jared Margolis
Jared Margolis (*pro hac vice*)
/s/ Amy Atwood
Amy R. Atwood (*pro hac vice*)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
(971) 717-6401
jmargolis@biologicaldiversity.org
atwood@biologicaldiversity.org

*Attorneys for Center for Biological Diversity
and Friends of the Earth*

/s/ Timothy M. Bechtold
Timothy M. Bechtold
(Montana Bar No. 4376)
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, Montana 59807
(406) 721-1435
tim@bechtoldlaw.net

*Attorney for all Plaintiffs*