# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVER ALLIANCE,<br><br>    and<br><br>NORTHERN PLAINS RESOURCE COUNCIL, et al.,<br><br>        Plaintiffs,<br><br>    vs.<br><br>UNITED STATES DEPARTMENT OF STATE, et al.,<br><br>        Defendants<br><br>    and<br><br>TRANSCANADA KEYSTONE PIPELINE and TRANSCANADA CORPORATION,<br><br>        Defendant-Intervenors. | **CV-17-29-GF-BMM**<br><br>**CV-17-31-GF-BMM**<br><br><br><br>**ORDER** |

Plaintiffs Indigenous Environmental Network and Northern Plains Resource Council (collectively "Plaintiffs") bring this action against the United States Department of State ("the Department") and various other governmental agencies and agents in their official capacities. Plaintiffs allege that the Department violated

the Administrative Procedure Act ("APA"), the National Environmental Policy Act ("NEPA"), and the Endangered Species Act ("ESA") when it published its Record of Decision ("ROD") and National Interest Determination ("NID") and issued the accompanying Presidential Permit to allow defendant-intervenor TransCanada Keystone Pipeline, LP ("TransCanada") to construct a cross-border oil pipeline known as Keystone XL ("Keystone"). Plaintiffs have moved for summary judgment. (Docs. 139 & 145.) The Department and TransCanada (collectively "Defendants") have filed cross motions for summary judgment. (Docs. 170 & 172.)

## BACKGROUND

The Court detailed the background of this case in its Order regarding the Department's and TransCanada's Motion to Dismiss for Lack of Jurisdiction. (Doc. 99.) The Court will only recite those facts that have arisen since its Partial Order on Summary Judgment Regarding NEPA Compliance. ("Partial Order") (Doc. 210.)

The Court directed the Department, in its Partial Order, to supplement the 2014 final supplemental EIS ("2014 SEIS") to consider the Mainline Alternative route as approved by the Nebraska Public Service Commission. (Doc. 210 at 12.) The Court declined, however, to vacate the Presidential Permit. The Court instead ordered the Department to file a proposed schedule to supplement the 2014 SEIS in

a manner allowing appropriate review before TransCanada's planned construction activities. *Id.*

The Department published the Notice of Intent to Prepare a SEIS in the Federal Register on September 17, 2018. 83 Fed. Reg. 46,989 (Sept. 17, 2018). The Department published the Notice of Availability of the Draft SEIS in the Federal Register on September 24, 2018. 83 Fed. Reg. 48,358 (Sept. 24, 2018). The Court will address each remaining issue in turn.

## LEGAL STANDARD

A court should grant summary judgment where the movant demonstrates that no genuine dispute exists "as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment remains appropriate for resolving a challenge to a federal agency's actions when review will be based primarily on the administrative record. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

The APA standard of review governs Plaintiffs' claims. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011); *Bennett v. Spear*, 520 U.S. 154, 174 (1997). The APA instructs a reviewing court to "hold unlawful and set aside" agency action deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A rational connection must exist between the facts found and the conclusions made in support

of the agency's action. *Kraayenbrink*, 632 F.3d at 481. The Court reviews the Department's compliance with NEPA and the ESA under the arbitrary and capricious standard pursuant to the APA. *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008).

DISCUSSION

## I.    Did the Department Violate NEPA when it Approved Keystone?

Plaintiffs first allege that the Department violated NEPA when it approved Keystone. (Doc. 140 at 20.) NEPA serves as the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA requires federal agencies to prepare a "detailed statement" for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The agency's detailed statement is known as an environmental impact statement ("EIS"), and must describe the environmental impacts of the proposed action. 42 U.S.C. § 4332(2)(C)(i), (ii).

The EIS must include a "full and fair discussion" of the effects of the proposed action, including those on the "affected region, the affected interests, and the locality." 40 C.F.R. §§ 1502.1, 1508.27(a). An agency also may be required to perform a supplemental analysis "if significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its

impacts" arise during the NEPA review. 40 C.F.R. § 1502.9(c)(1)(ii). The Court

must ensure that the agency has taken a "hard look" at the environmental

consequences of its decision. *Churchill Cnty. v. Norton*, 276 F.3d 1060, 1072 (9th

Cir. 2001).

### A. Purpose and Need Statement

Plaintiffs challenge the reasonableness of the Department's purpose and

need statement. (Doc. 146 at 22.) Plaintiffs allege that the Department violated

NEPA when it focused the purpose and need narrowly on TransCanada's private

interests and improperly restricted the scope of the 2014 SEIS. *Id.*

NEPA requires agencies to "briefly specify the underlying purpose and need

to which the agency is responding in proposing the alternatives including the

proposed action." 40 C.F.R. § 1502.13. Courts afford agencies "considerable

discretion to define the purpose and need of a project." *Westlands Water Dist. v.*

*U.S. Dept. of Interior*, 376 F.3d 853, 866 (9th Cir. 2004). NEPA permits an agency

to consider the needs and goals of the parties involved in the application. 40 C.F.R.

§ 1508.18(b)(4). The agency may consider the context of the action proposed, as

well as the objectives of the private applicant. *Alaska Survival v. Surface Transp.*

*Bd.*, 705 F.3d 1073, 1085 (9th Cir. 2013). A purpose and need statement will fail,

however, if it unreasonably narrows the alternatives in a manner that preordains the

outcome. *Id.* at 1085. The Court's duty requires it to review the purpose and need statement for reasonableness. *Westlands Water Dist.*, 376 F.3d at 866.

The purpose and need statement reasonably defines both TransCanada's and the Department's purposes. For TransCanada, "the primary purpose of [Keystone] is to provide the infrastructure to transport Western Canadian Sedimentary Basin ("WCSB") crude oil from the Canadian border, to existing pipeline facilities near Steele City, Nebraska, for onward delivery to Cushing, Oklahoma, and the Texas Gulf Coast area." DOSKXLDMT0005756. Most of the crude oil ultimately would be delivered to refineries in the Gulf Coast area. *Id.* TransCanada maintains contractual obligations to transport approximately 555,000 barrels per day ("bpd") of WCSB crude oil to the Gulf Coast area. *Id.* Keystone would serve to fulfill TransCanada's need to meet contractual demand, compete with other transportation options, and to provide refiners a reliable supply of light crude oil from the WCSB and the Bakken. *Id.* at 5757.

The Department's purpose stems from the President's authority to require permits for transboundary projects. Executive Order 13,337 delegates to the Secretary of State ("Secretary") the authority to receive applications for cross-border permits. 69 Fed. Reg. 25,299 (April 30, 2004). As part of this delegation, the Secretary must determine if issuance of a permit would serve the national interest. *Id.* at 25,300.

The Department's purpose, therefore, stems from Keystone's crossing of the international border between the United States and Canada. This crossing requires a cross-border permit. DOSKXLDMT0005757. The Department must put forth a ROD approving or denying TransCanada's cross-border permit application. *Id.* The Department needed to consider Keystone's application and whether it would serve the national interest. *Id.* The Department reached a national interest determination based on its evaluation of the Keystone's potential environmental, cultural, economic, and other impacts. *Id.*

No error exists in the Department's purpose and need statement. The Department possesses broad discretion to define the purpose of its actions. The Department may consider private interests as part of its purpose and need. *See Alaska Survival*, 705 F.3d at 1085. The Department reasonably stated that it sought to determine whether approval of the permit would serve the national interest. DOSKXLDMT0005757. The Department's purpose and need statement further proves reasonable when it considered both TransCanada's private interests and the Department's own requirements for issuing cross-border permits.

**B. Adequacy of Alternatives**

Plaintiffs next allege that the Department violated NEPA by failing to consider a reasonable range of alternatives in approving Keystone. (Doc. 146 at

24-25.) Plaintiffs allege that the Department unreasonably dismissed alternatives that did not satisfy TransCanada's purpose. Plaintiffs further contend that the Department failed to consider feasible, environmentally beneficial alternatives. *Id.*

### 1. Dismissal of Alternatives

Plaintiffs allege that the Department only analyzed alternatives that satisfied TransCanada's private needs. *Id.* at 23-24. NEPA requires that an agency "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14. An agency's consideration of alternatives is dictated by the "nature and scope of the proposed action." *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1538 (9th Cir. 1997). An agency need not analyze alternatives that do not meet the agency's purpose and need. *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1071 (9th Cir. 2012). However, "[t]he existence of reasonable but unexamined alternatives renders an EIS inadequate." *Ctr. for Biological Diversity v. U.S. Dept. of Interior,* 623 F.3d 633, 643 (9th Cir. 2010) (quoting *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998)).

The Department adequately examined proposed alternatives and reasonably excluded those that did not meet the Project's purpose and need. The factors that the Secretary deemed relevant to the national interest included the following: "foreign policy; energy security; environmental, cultural, and economic impacts; and compliance with applicable law and policy." DOSKXLDMT0002493. The 2014 SEIS articulated and analyzed the proposed Project and the alternatives. The 2014 SEIS also provided a separate section that detailed the alternatives considered, but excluded from further consideration. *Id.* at 6082. The Department set forth reasonable explanations for why each excluded alternative did not meet the private needs of TransCanada. Further, the Department explained why it excluded the alternatives due to national interest factors including environmental and cultural resources, or increased spill risk. The Department's analysis of both the private interest of TransCanada and the Department's national interest considerations (i.e. environmental and cultural impacts) proves reasonable in its dismissal of alternatives.

## 2.  Range of Alternatives

Plaintiffs next argue that the Department failed to analyze a reasonable range of alternatives because it did not consider more environmentally beneficial alternatives. (Doc. 146 at 24.) The alternatives requirement "is the heart of the environmental impact statement." 40 C.F.R. § 1502.14. An agency must

"[r]igorously explore and objectively evaluate all reasonable alternatives," including the "alternative of no action." 40 C.F.R. § 1502.14(c). The range of alternatives "must be bounded by some notion of feasibility." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551-52 (1978). The Court limits its review of the sufficiency of alternatives to whether the agency considered alternatives "necessary to permit a reasoned choice." *Cal. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982).

The Department set forth four alternatives, including a no action alternative. DOSKXLDMT0005946. Each alternative chosen, including the no action alternative, comports with the Project's underlying purpose and need, as they address both the private interests of TransCanada and the Department's national interest. The 2014 SEIS's comparison of the chosen alternatives also provides the Department with a reasoned choice. *See Block*, 690 F.2d at 767. Accordingly, the range of alternatives analyzed by the Department proves reasonable.

### 3. No Action Alternative

Plaintiffs next allege that the Department failed to establish a true no action alternative. (Doc. 140 at 26.) NEPA requires a "full and fair discussion" of direct, indirect, and cumulative effects of the proposed action. 40 C.F.R. §§ 1502.1, 1502.16(a), (b), (h), 1508.25(c). NEPA also requires that "all reasonable

alternatives" to the proposed action, including no action be addressed. 40 C.F.R. §

1502.14(a), (d). Part of the no action alternative includes consideration of the

"predictable actions of others." 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981).

The Department's no action alternative articulates four scenarios that would

occur in the absence of the pipeline. The Status Quo Baseline scenario represents

the first alternative. "Under the Status Quo Baseline, the proposed Project would

not be built." DOSKXLDMT0006050. Accordingly, the 2014 SEIS concludes that

the environmental conditions would remain the same under this scenario. *Id.* The

Department also analyzed three intermodal options including a "Rail/Pipeline

Scenario," "Rail/Tanker Scenario," and a "Rail direct to the Gulf Coast Scenario."

*Id.* at 6061-81. The Department purported to analyze these scenarios as

illustrations of the likely potential impacts associated with transport of crude oil in

the absence of Keystone. *Id.* at 61.

Plaintiffs correctly note that NEPA obligates agencies to provide only a

single no action alternative. *See* 40 C.F.R. § 1502.14(d). More importantly,

however, the Court must consider whether providing more than one alternative

proves arbitrary and capricious. Plaintiffs rely on *Conservation Nw. v. Rey*, 674

F.Supp.2d 1232 (W.D. Wash. 2009), in which parties challenged a forest

management plan as part of the protracted litigation involving the spotted owl. The

Forest Service analyzed two no action alternatives that represented its attempt to

reconcile the latest iteration of the forest management plan with the effects of recent litigation. *Id.* at 1246-47. The district court determined that having two no-action alternatives in the environmental analysis proved irrational when only one baseline could exist. *Id.* at 1247. The district court determined that NEPA required the Forest Service "to provide a single, comprehensive no-action alternative that accurately represented the status quo at the time of the 2007 Final Supplement." *Id.*

By contrast, Defendants argue that nothing in NEPA prohibits analysis of multiple no action scenarios. Defendants cite *Mont. Wilderness Ass'n v. McAllister* 658 F.Supp.2d 1249, 1264 (D. Mont. 2009); aff'd, 666 F.3d 549 (9th Cir. 2011); 460 Fed. App'x 667 (9th Cir. 2011), where parties challenged the Forest Service's revised travel management plan for the Gallatin National Forest. The Forest Service evaluated two alternatives as the "no action alternatives." *McAllister*, 658 F.Supp.2d at 1264. Alternative 1 considered "off road motorized vehicle as it was prior to 2001" when an off-highway vehicle ban had been approved. *Id.* Alternative 2 contemplated "the possibility that use generally will continue on road and trails being used" at the time of the proposed travel plan amendment. *Id.* The district court determined that each of the "no action alternatives" reasonably reflected the exemptions, discretion, and latitude in the Forest Service's current management policies. *Id.*

The Ninth Circuit agreed that having two no-action alternatives emphasized the validity of the Forest Service's alternatives analysis. 460 Fed. App'x at 671. The Ninth Circuit reasoned that the Forest Service had "constructed *two* no action alternatives" due to uncertainty as to how it ultimately would implement the ban on off-highway travel. *Id.* (emphasis in original). The Ninth Circuit deemed nothing unreasonable about the Forest Service's formulation of these no-action alternatives under those circumstances. *Id.* The same reasoning applies to the alternatives articulated by the Department. Uncertainty regarding what would happen in the absence of Keystone supported the discussion of three no action alternatives in the 2014 SEIS.

### C. Keystone's Impact on Tar Sands Production

#### 1. The Department's "Market Analysis"

Plaintiffs suggest that the "market analysis" section of the EIS improperly supports a conclusion that the same level of tar sands production would be inevitable regardless of whether the Department approved Keystone. Plaintiffs argue that this unsubstantiated assumption led to an arbitrary conclusion that Keystone would have no impact on the world's climate. (Doc. 140 at 20.) NEPA's "full and fair discussion" requirement directs an agency to look at a Project's "direct" and "indirect" effects. 40 C.F.R. § 1508.8(a)-(b). Indirect effects include

those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b).

Defendants argue, and the Court agrees, that the 2014 SEIS contained a full and fair discussion of the market demand for oil. (Doc. 173 at 31.) The 2014 SEIS set forth 140 pages of modeling why Keystone would not affect significantly the rate of extraction of oil from Canadian oil sands. *Id.* at 36 (citing DOSKXLDMT0005760-5908). The 2014 SEIS determined that the pipeline would not affect significantly oil extraction in Canada. As a result of this determination, the 2014 SEIS reasoned that the emissions associated with transporting 830,000 bpd of tar sands crude oil (Keystone's capacity), would occur regardless of the pipeline's existence. To reach this conclusion, the 2014 SEIS analyzed numerous factors, including the price of oil, transportation costs, and supply and demand for oil. DOSKXLDMT0005760.

The WCSB produced 1.8 million bpd of crude oil when the Department issued the 2014 SEIS. The 2014 SEIS estimated that production would increase to at least 5 million bpd by 2030. *Id.* at 5789. The 2014 SEIS further concluded that increased transportation capacity of oil from Canada by other pipelines and rail transportation would meet demand. *Id.* at 5803. The 2014 SEIS reasoned that existing pipeline capacity stood at 3.3 million bpd in 2014. The 2014 SEIS also concluded that rail capacity supported 700,000 bpd, and estimated that rail capacity

would increase to 1.1 million bpd by the end of 2014. *Id.* at 5804. Defendants argue that rail transportation would fill any void in crude oil transportation in the absence of construction of expanded pipeline capacity. (Doc. 173 at 35.)

The Court must limit its review to determining whether the 2014 SEIS took a "hard look" at the effects of Keystone on oil markets. *See Norton*, 276 F.3d at 1072. The Department met this "hard look" requirement in its market analysis and its conclusion that Keystone would not impact the rate of tar sands extraction. The Department provided sufficient analysis that went beyond mere assumptions of the rate of oil sands extraction rates in 2014. The Court finds no error in the Department's 2014 analysis of the rate of tar sands extraction and its impact on climate change.

## 2. New Information Since 2014

Plaintiffs argue, however, that significant new information has come forth since 2014 regarding oil markets, rail transportation, and greenhouse gas emissions that requires a supplement of the Project's impacts. (Doc. 140 at 35.) NEPA imposes a continuing duty on federal agencies to supplement new and relevant information. *Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1508-09 (9th Cir. 1997). NEPA requires a supplemental EIS if an "agency makes substantial changes in the proposed action that are relevant to environmental

concerns; or there are significant new circumstances or information relevant to

environmental concerns and bearing on the proposed action or its impacts." 40

C.F.R. § 1502.9(c)(i)-(ii). An agency is not required, however, to "supplement an

EIS every time new information comes to light after the EIS is finalized." *Marsh v.*

*Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989). A supplement proves necessary

"if the new information [presented] is sufficient to show the remaining action will

'affec[t] the quality of the human environment' in a significant manner or to a

significant extent not already considered[.]" *Id.* at 374 (quoting 42 U.S.C. §

4332(2)(C)).

### a. Change in Oil Markets

Plaintiffs first argue that the Department failed to consider a decrease in oil

prices in the 2014 SEIS. (Doc. 140 at 27.) The 2014 SEIS analyzed the possibility

of moderate fluctuations in oil prices and the possibility of a low oil price scenario.

The 2014 SEIS failed to address, however, the significant changes in oil prices that

have occurred since 2014. This lack of analysis fails to satisfy NEPA's hard look

requirement. The 2014 SEIS stated that "pipeline constraints are unlikely to impact

production given expected supply-demand scenarios, prices, and supply costs.

Over the long term, lower-than-expected oil prices could affect the outlook for oil

sand production[.]" DOSKXLDMT0005895. The Department acknowledges that a

significant drop in oil prices materially could change the analysis. The 2014 SEIS conditioned much of its analysis, however, on the price of oil remaining high.

The record demonstrates the need to supplement. The 2014 SEIS stated the price of crude oil would range from $100 per barrel to $140 per barrel over twenty years. *Id.* at 5864. The 2014 SEIS predicts the price of oil needed to fall within the range of $65-$75 per barrel in order for Keystone to break even. *Id.* at 5767. The 2014 SEIS concedes that Keystone would be affected by supply costs if the oil prices fell within or below that range. *Id.*

The United States Energy Information Administration predicts that the price of oil likely will remain below $100 for decades. *Id.* at 1849. The record shows further that a dramatic drop in oil prices occurred soon after publication of the 2014 SEIS that lowered the price to nearly $38 per barrel. The Department suggests that the current price of oil stands at roughly $60 per barrel. (Doc. 173 at 49.) This drop constitutes more than a mere fluctuation in oil prices.

Plaintiffs also present evidence that the Environmental Protection Agency called upon the Department to revisit the EIS's conclusions after the 2015 oil prices dropped. (Doc. 140 at 36 (citing DOSKXLDMT0000973-74).) Oil prices have remained below the "break-even" numbers established in the 2014 SEIS. This new and relevant information bears upon the Department's earlier analysis in the

2014 SEIS. The Court makes no suggestion of whether this information should alter the Department's analysis. Such an analysis proves material, however, to the Department's consideration of Keystone's impact on tar sands production.

### b. Transportation of Crude Oil by Rail

Plaintiffs next argue that the 2014 SEIS incorrectly concluded that significant amounts of crude oil would be transported by rail in the absence of Keystone. (Doc. 140 at 37.) Plaintiffs assert that the 2014 SEIS wrongly predicted the amount of tar sands that would be shipped by rail, and that new federal regulations requiring updated train safety measures require a supplement. Defendants contend that only immaterial changes in crude by rail have occurred since 2014. (Doc. 173 at 77.) The 2014 SEIS predicts that loading capacity would increase from 700,000 bpd to 1.1 million bpd. DOSKXLDMT0005805. The ROD estimates that current rail loading capacity will exceed 1,075,000 bpd. *Id.* at 2504. These numbers do not rise to the level of a material discrepancy in capacity.

Plaintiffs argue that tar sands crude oil has not been moving by rail at a significant rate. (Doc. 140 at 37.) The rate of transportation fails to present a material issue that would require a supplement. The capacity to transport the amount predicted in the 2014 SEIS represents the critical issue. Plaintiffs have the burden of showing that transportation capacity materially differs from its capacity

in 2014. Plaintiffs have presented no evidence of a significant difference between current capacity and the 2014 SEIS projections.

### c. Greenhouse Gas Emissions

Plaintiffs next allege that the Department violated NEPA by failing to evaluate the cumulative climate impacts of Keystone in combination with other pipelines. (Doc. 140 at 27-28.) Plaintiffs argue that the 2014 SEIS viewed Keystone in isolation. Plaintiffs allege that this isolated view failed to account for the expansion of the Alberta Clipper pipeline from 450,000 bpd to 880,000 bpd, and failed to use updated emissions modeling. (Doc. 140 at 29.)

The Department announced in 2013 that it would prepare an EIS for the Alberta Clipper pipeline expansion. The Department issued a permit for the Alberta Clipper expansion in 2017. When Keystone was proposed, Plaintiffs urged the Department to evaluate the cumulative climate impacts of Keystone and the Alberta Clipper expansion in the Keystone 2014 SEIS. The Department acknowledged the proposed expansion of the Alberta Clipper in the Keystone 2014 SEIS. DOSKXLDMT0005805. The Department failed, however, to analyze the cumulative greenhouse gas emissions impacts of both pipelines. The Department instead limited its analysis of emissions to the capacity of Keystone alone.

19

The Department analyzed the cumulative emissions of Keystone and the Alberta Clipper in the Alberta Clipper EIS. The Alberta Clipper EIS also used the updated Greenhouse Gas, Regulated Emissions, and Energy Use in Transportation ("GREET") model to analyze greenhouse gas emissions. *Id.* at 2501. The GREET model results in estimates of greenhouse gas emissions that are up to 20% higher than the model used in the 2014 SEIS. Plaintiffs argue that the development of the Alberta Clipper expansion, and the new GREET model constitute new and relevant information that warrants supplement. (Doc. 140 at 42.)

NEPA requires that an EIS consider the cumulative impacts of the proposed action. 40 C.F.R. § 1508.7. "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-Federal) or person undertakes such other actions." *Id*. The cumulative impacts analysis must do more than merely catalogue relevant projects in the area.

Cumulative impacts instead must give sufficiently detailed analysis about these projects and the differences between them. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971 (9th Cir. 2006). This provision requires an agency to discuss and analyze in sufficient detail to assist "the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts." *Churchill*

*Cnty.*, 276 F.3d at 1080 (quoting *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1160 (9th Cir. 1997)). Further, the environmental consequences must be considered together when several projects that may have cumulative environmental impacts are pending concurrently. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976).

Defendants failed to analyze cumulative climate impacts along with the pending Alberta Clipper expansion. The Court considers the Department's analysis of Keystone in the Alberta Clipper EIS as a cumulative action. *See* 40 C.F.R. § 1508.7. The Department similarly should have analyzed the Alberta Clipper pipeline's emissions in the Keystone SEIS. The Department argues that the Keystone SEIS obtained a full picture of the pipeline's climate change impacts. (Doc. 173 at 43.) The Department also admits, however, that the 2014 SEIS failed to analyze greenhouse gas emissions associated with the Alberta Clipper. (Doc. 173 at 50-51.) The Department thus failed to paint a full picture of emissions for these connected actions, and, therefore, ignored its duty to take a "hard look." *See Norton*, 276 F.3d at 1072.

The Department argues that the cumulative analysis in the Alberta Clipper EIS obviated the need for it to conduct a separate cumulative analysis for Keystone. The Department equates this omission to harmless error. In determining whether a NEPA violation proves harmless, a court considers "whether the error

'materially impeded NEPA's goals – that is, whether the error caused the agency not to be fully aware of the environmental consequences of the proposed action, thereby precluding informed decisionmaking and public participation, or otherwise materially affected the substance of the agency's decision.'" *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 860 F.3d 1244, 1252 (9th Cir. 2017) (quoting *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016)).

The Keystone SEIS indicated that greenhouse gas emissions associated with the pipeline would range annually from 1.3 to 27.4 MMTCO2e. The Alberta Clipper EIS determined that combined greenhouse gas emissions associated with both pipelines would range annually from 2.1 to 49.9 MMTCO2e. A difference of this magnitude cannot be dismissed simply as harmless error. The error left out significant information from the climate analysis in the Department's possession. The Department should have considered the cumulative impacts of both projects. The Court recognizes the Department's decision to issue the permit regarding the Alberta Clipper expansion. The Court cannot assume without reasoned analysis, however, that the Department would reach the same conclusion for the Keystone permit. The Department must supplement this analysis to include the same information. Further, the Department must supplement the environmental analysis

to include the same updated GREET model analysis used in the Alberta Clipper EIS.

**D. Impacts in Canada**

Plaintiffs next argue that the Department violated NEPA by failing to consider sufficiently potential environmental impacts in Canada. (Doc. 146 at 28.) The 2014 SEIS explains that Keystone would transport heavy crude oil 1,204 miles from its existing facilities in Hardisty, Alberta, Canada to Steele City, Nebraska. In total, the Project would consist of approximately 327 miles of pipeline in Canada, and 875 miles in the United States. DOSKXLDMT0005752. The 2014 SEIS analyzed the pipeline's impacts along the 875 miles from the Canadian border to Steele City.

The 2014 SEIS contained no comprehensive analysis of the impacts in Canada. The 2014 SEIS provided a section detailing "extraterritorial concerns" that explained the Canadian government's independent environmental review. *Id.* at 7358. The Department included information of potential impacts in Canada "as a matter of policy." *Id.* Defendants argue that the language of NEPA does not expressly extend NEPA's applications outside of the territorial United States. (Doc. 173 at 55.) Defendants also urge that the 2014 SEIS's incorporation of the

Canadian government's analysis of the impacts within Canada fulfills its obligations under NEPA. *Id.* at 60.

Plaintiffs rely on *Backcountry Against Dumps v. Chu*, 215 F.Supp.3d 966 (S.D. Cal. 2015), to support NEPA's extraterritorial application. The district court in *Backcountry* examined the validity of a Department of Energy ("DOE") cross-border permit to connect a transmission line across the United States – Mexico border. *Id.* at 972. The transmission line would run approximately 1.65 miles in total, including a 0.65 mile stretch in the United States. *Id.* The terminus of the project was to be a planned wind turbine facility in Mexico. *Id.* The court considered (1) whether the extraterritorial effects of the proposed transmission line must be considered, and (2) whether the effects of the wind project itself in both Mexico and the United States must be considered. *Id.* at 980.

The district court determined that Congress intended NEPA to apply extraterritorially. *Id.* The district court in a subsequent order regarding remedies recognized, however, that the government of Mexico had conducted significant environmental review of that portion of the project within Mexico. *Backcountry Against Dumps v. Perry,* 2017 WL 3712487, at *3 (S.D. Cal. Aug. 29, 2017). The district court determined that DOE could attach and incorporate by reference any environmental documents prepared by the government of Mexico to satisfy its NEPA obligations. *Id.*

The Canadian National Energy Board ("CNEB") provided substantial environmental review of those portions of Keystone within Canada. The 2014 SEIS detailed that review. DOSKXLDMT0007358-86. CNEB conducted analyses, identified issues, held hearings, and issued findings. *Id.* The CNEB identified potential adverse environmental effects, including wildlife habitat, groundwater impacts, and greenhouse gas emissions. *Id.* at 7362-63. The CNEB further provided mitigation measures. *Id.* The CNEB review process also involved participation by impacted Tribal Nations. *Id.* at 7379.

CNEB's involvement in Keystone, its environmental review within Canada, and the incorporation of that review into the 2014 SEIS proves material. NEPA procedures ensure that the agency makes environmental information available to the public. 40 C.F.R. § 1500.1(b). The 2014 SEIS's incorporation of the Canadian government's environmental review sufficiently informed officials and citizens of impacts in Canada before the Department made a decision and took action on Keystone. *See Id.*

### E. Other Environmental Impacts

Plaintiffs allege three additional areas where the Department failed to provide a "full and fair discussion." These areas include Keystone's impacts to cultural resources, the adequacy of comment responses, and oil spills.

### 1. Cultural Resources

NEPA requires agencies to analyze impacts to cultural resources. 40 C.F.R. §§ 1502.16(g), 1508.8. Plaintiffs argue that Keystone poses risks of direct damage to cultural resources within the Project area. (Doc. 146 at 36.) Plaintiffs contend that the social, cultural, and health impacts run the length of Keystone, and that over 1,000 acres remain unsurveyed for potential cultural resources. *Id.*

The record reflects that the Department entered into an agreement with other federal agencies and state historic preservation officers. DOSKXLDMT0006553-54. This agreement governs identification of historic properties and consultation regarding potential adverse impacts. *Id*. The Department also consulted with Indian tribes, federal agencies, and local governments regarding cultural resources. *Id.*

The 2014 SEIS identified 397 cultural resources that may be affected by the Project. *Id.* at 6521. The 2014 SEIS states, however, that "[a]s of December 2013, approximately 1,038 acres remained unsurveyed and are the subject of ongoing field studies." *Id.* at 6522. The Department offered no supplemental information on the unsurveyed acres before it issued the 2017 permit. The Department describes the surveys as "ongoing." (Doc. 173 at 68.) The Department contends, therefore, that it will work to identify cultural resources and mitigate harm to them throughout the process. This explanation proves outdated.

Neither party has provided information regarding whether the Department, any other federal agency, state historic officer, or local government surveyed the remaining 1,038 acres between 2014 and 2017. The 2014 SEIS fails to provide a "full and fair discussion of the potential effects of the project to cultural resources" in the absence of further information on the 1,038 unsurveyed acres. *See Native Ecosystems Council v. U.S. Forest Serv., an Agency of U.S. Dept. of Agric.*, 418 F.3d 953, 965 (9th Cir. 2005). "NEPA ensures that [agencies] will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh*, 490 U.S. at 371. The Department appears to have jumped the gun when it issued the ROD in 2017 and acted on incomplete information regarding potential cultural resources along the 1,038 acres of unsurveyed route. The Department must supplement the information on the unsurveyed acres to the 2014 SEIS's cultural resources analysis, in order to comply with its obligations under NEPA. *See* 40 C.F.R. §§ 1502.16(g), 1508.8.

## 2. Comments

Plaintiffs next argue that Defendants failed to respond adequately to public comments that it received on the Draft 2014 SEIS. (Doc. 146 at 44.) NEPA requires a federal agency to solicit public comments on draft environmental impact statements and consider comments both individually and collectively. 40 C.F.R. § 1504(a). The affected agency possesses the following options to respond to those

27

comments: modifying alternatives; developing and evaluating alternatives not previously given serious consideration; supplementing, improving, or modifying its analyses; making factual corrections; or, explaining why the comments do not warrant further agency response. 40 C.F.R. § 1504(a)(1)-(5). The degree that the comments bear "on the environmental effects of the proposed action" shapes the scope of an agency's responsibility to respond to comments. *Block*, 690 F.2d at 773.

The 2014 SEIS adequately addressed the comments. The 2014 SEIS first organized comments into themes based on subject matter. The 2014 SEIS dedicated a significant portion to responding to the categories and opposing viewpoints. DOSKXLDMT0007723. The Department was under no duty to set forth full length views of its disagreements. *See Block*, 690 F.2d at 773. The Department did not violate NEPA in its comments analysis.

### 3. Oil Spills

Plaintiffs next allege that the Department failed to consider new information regarding oil spills. Plaintiffs contend that numerous oil pipeline spills have occurred since the 2014 SEIS. (Doc. 140 at 39.) Plaintiffs argue that these new spills indicate a higher likelihood of spills from Keystone than the Department had anticipated in 2014. *Id.* Plaintiffs also argue that new studies showing a greater

difficulty in cleaning up spills warrant a supplement. *Id.* at 40. Defendants note that the 2014 SEIS discussed twelve leaks from Keystone I that occurred in its first year of operation. (Doc. 173 at 78.) Defendants further contend that the mitigation measures provided in the 2014 SEIS adequately address any concern raised by the new studies. (Doc. 171 at 81.)

The 2014 SEIS predicts no more than 1.1 spills from Keystone every ten years. DOSKXLDMT0012067-68. The 2014 SEIS relies on Pipeline and Hazardous Material Safety Administration ("PHMSA") data from 2002 to 2012 to reach its conclusions. *Id.* at 11317-19. During this period, PHMSA's data indicated that there were 1,692 spill or leak incidents nationwide. *Id.* at 11319. Plaintiffs cite eight major spills that have occurred between 2014 and 2017, including a major spill on Keystone I. *Id.* at 1239. Plaintiffs argue that the Department should have considered this more recent information in its 2017 permitting decision. (Doc. 140 at 39.) Plaintiffs argue further that the Department failed to analyze a new study regarding the difficulty of cleaning up tar sands crude oil spills. (Doc. 140 at 40.)

The ROD acknowledges that "several new studies related to cleanup of diluted bitumen have been published." DOSKXLDMT0002506. The ROD cites a study by the National Academy of Sciences ("NAS") that Plaintiffs argue should have been evaluated in the 2014 SEIS. (Doc. 140 at 40.) NAS conducted the study at the direction of Congress. Specifically, Congress asked NAS to address

29

"whether the transport of diluted bitumen in pipelines has potential environmental consequences that are sufficiently different from those of commonly transported crude oils to warrant changes in regulations governing spill response planning, preparedness, and cleanup." *Id.* at 1379. The study found that diluted bitumen presents more challenges for cleanup response than other types of oil moved by pipeline. *Id.* at 1391. The study also determined that responders need more training and better communication to address these spills adequately. *Id.*

The major spills that occurred between 2014 and 2017 qualify as significant. The Department would have evaluated the spills in the 2014 SEIS had the information been available. Further, the risk of spills likely would affect Keystone's potential impact on other areas of the ROD's analysis, including risks to water and wildlife. These new spills and the information provided by them warrant an update.

The ROD similarly fails to show how the 2014 SEIS adequately addressed the NAS study regarding tar sands oil. The ROD merely asserts that Keystone has agreed to consult with local emergency responders and update its mitigation response plans as new information becomes available. This conclusory statement fails to meet NEPA's "hard look" requirement. The absence of this information from the 2014 SEIS's mitigation measures demonstrates that the agency acted

upon incomplete information in setting forth its mitigation measures. *Marsh*, 490 U.S. at 371. The Department must supplement this information.

Plaintiffs also argue that the Department failed to analyze sufficiently potential impacts of Keystone's spills and leaks to water resources. The Court's determination that the Department must supplement information regarding spills allows the Department to address how the updated information on spills will impact water resources.

## F. The Department's Change in Course Between 2015 and 2017

An agency must provide a detailed justification for reversing course and adopting a policy that "rests upon factual findings that contradict those which underlay its prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Agency action qualifies as "arbitrary and capricious if the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Org. Vill. of Kake v. U.S. Dept. of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

### 1. Compliance with the APA standard for a policy change

The United States Supreme Court established a four part test in *Fox* to determine whether a policy change complies with the APA: (1) the agency displays "awareness that it is changing position;" (2) the agency shows that "the new policy is permissible under the statute;" (3) the agency "believes" the new policy is better; and (4) the agency provides "good reasons" for the new policy. *Fox*, 556 U.S. at 515-16; *See also Kake*, 795 F.3d at 966. The new policy must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy," if the new policy rests upon factual findings that contradict those underlying its prior policy. *Id.*

The Ninth Circuit examined in *Kake* whether the United States Department of Agriculture ("USDA") properly reversed course after having declined to exempt the Tongass National Forest in Alaska from the "Roadless Rule" in a 2001 ROD. *Kake*, 795 F.3d at 967. In 2003, "[on] precisely the same record," USDA concluded that the "social and economic hardship to Southeast Alaska outweigh[ed] the potential long-term ecological benefits of the Roadless Rule" *Id.* (citing 68 Fed. Reg. 75,136, 75,141 (Dec. 30, 2003) (internal citations omitted)). The Ninth Circuit determined that the USDA had satisfied the first three elements of *Fox*: (1) USDA was aware it was changing course; (2) USDA determined that the new policy was permissible under the statutes; and (3) USDA believed the new

policy was better. *Kake*, 795 F.3d at 967. USDA failed on the fourth element, however, when it provided no "good reason" for adopting the new policy. *Id.*

Here, as in *Kake*, the central issue involves whether the 2017 ROD rests on factual findings that contradict those in the 2015 ROD. And if the 2017 ROD's factual findings contradict the 2015 ROD, the Court must analyze whether the 2017 ROD contains a "reasoned explanation." *Id.* at 967.

### 2. The Department's Conclusions on Climate Change

The Department denied the permit in its 2015 ROD. The Department relied heavily on the United States's role in climate leadership. DOSKXLDMT0001188. The Department issued a new ROD in 2017. The new ROD noted that "there have been numerous developments related to global action to address climate change, including announcements by many countries of their plans to do so" since the 2015 ROD. *Id.* at 2518. Moreover, the new ROD suggested that "a decision to approve [the] proposed Project would support U.S. priorities relating to energy security, economic development, and infrastructure." *Id.* The Department argues that this about-face constitutes a mere policy shift, and that on its own, cannot be found arbitrary and capricious. (Doc. 173 at 88.)

The Department possesses the authority to give more weight to energy security in 2017 than it had in 2015. *See Kake*, 795 F.3d at 968. *Kake* and *State*

*Farm* make clear, however, that "even when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation." *Id.* The Department did not merely make a policy shift in its stance on the United States's role on climate change. It simultaneously ignored the 2015 ROD's Section 6.3 titled "Climate Change-Related Foreign Policy Considerations." DOSKXLDMT0001182.

Section 6.3 of the 2015 ROD determined that the United States's climate change leadership provided a significant basis for denying the permit. The Department acknowledged science supporting a need to keep global temperature below two degrees Celsius above pre-industrial levels *Id.* at 1182-83. The Department further recognized the scientific evidence that human activity represents a dominant cause of climate change. *Id.* The Department cited trans-boundary impacts including storm surges and intense droughts. *Id.* And finally, the Department accepted the United States's impact as the world's largest economy and second-largest greenhouse gas emitter. *Id.*

The 2017 ROD initially tracked the 2015 ROD nearly word-for-word. The 2017 ROD, without explanation or acknowledgment, omitted entirely a parallel section discussing "Climate Change-Related Foreign Policy Considerations." The 2017 ROD ignores the 2015 ROD's conclusion that 2015 represented a critical time for action on climate change. The 2017 ROD avoids this conclusion with a

34

single paragraph. The 2017 ROD simply states that since 2015, there have been "numerous developments related to global action to address climate change, including announcements by many countries of their plans to do so." *Id.* at 2518. Once again, this conclusory statement falls short of a factually based determination, let alone a reasoned explanation, for the course reversal. "An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate." *Fox*, 556 U.S. at 573.

The Department's 2017 conclusory analysis that climate-related impacts from Keystone subsequently would prove inconsequential and its corresponding reliance on this conclusion as a centerpiece of its policy change required the Department to provide a "reasoned explanation." *See Kake*, 795 F.3d 968. The Department instead simply discarded prior factual findings related to climate change to support its course reversal.

## II. Did the Department and FWS Violate the ESA and APA in Approving Keystone?

### A. The ESA

Section 7(a)(2) requires agencies, in consultation with the expert wildlife agency (here, the U.S. Fish and Wildlife Service ("FWS")), to ensure "that any action authorized, funded, or carried out by [an] agency . . . is not likely to

jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat[.]" 16 U.S.C. § 1536(a)(2), (4). To "jeopardize" means to "reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

The agencies must initiate formal consultation if the actions may adversely affect listed species. 50 C.F.R. § 402.14. Formal consultation requires a detailed inquiry known as a Biological Opinion ("BiOp"). *Id.* The BiOp analyzes whether the action likely would cause jeopardy to listed species. 16 U.S.C. § 1536(b)(3)(A). The agencies must use "the best scientific and commercial data available" to reach their conclusions. 16 U.S.C. § 1533(b)(1)(A). The best available data requirement prohibits an agency from "disregarding available scientific evidence that is in some way better than the evidence [it] relies on." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006) (quoting *Sw. Ctr. For Biological Diversity v. Babbit*, 215 F.3d 58, 60 (D.C. Cir. 2000)). FWS "cannot ignore available biological information." *Id.* (quoting *Conner v. Burford*, 848 F.3d 1441, 1454 (9th Cir. 1988)).

**B. Factual Background**

36

The Department entered into formal consultation in 2012 with FWS under ESA Section 7. The Department issued its Biological Assessment ("BA") in December of 2012. The Department identified thirteen federally listed threatened or endangered species in the proposed Project area. DOSKXLDMT0002510. The FWS issued a BiOp to the Department in May 2013 regarding seven of the thirteen species. *Id.* The species discussed included the American burying beetle, endangered black-footed ferret, interior least tern, whooping crane, pallid sturgeon, piping plover, and western prairie fringed orchid. *Id.*

Since 2013, FWS has listed as threatened the northern long-eared bat and the rufa red knot. FWS identified the American burying beetle as the only listed species likely to be affected adversely by Keystone after it was proposed again in 2017. *Id.* FWS issued a concurrence to the 2013 BiOp. FWS concluded that consultation did not need to be reinitiated. *Id.* The Nebraska PSC approved the Mainline Alternative Route ("MAR") in Nebraska, however, on November 20, 2017. Accordingly, the Department reopened consultation with FWS on January 31, 2018, regarding the MAR. (Doc. 179 at    3.)

Plaintiffs argue that the Department violated the ESA and APA when it approved Keystone. Plaintiffs allege that the Department failed to use the best available science to assess harm to whooping cranes, interior least terns, and piping plovers. Plaintiffs allege that the Department failed to address oil spills and

extraterritorial impacts. Plaintiffs allege finally that the Department failed to analyze reasonably impacts to the black-footed ferret, rufa red knot, northern long-eared bat, and western prairie fringed orchid.

### C. Whooping Crane

The whooping crane is a migrating bird that occurs only in North America. FWS000000000663. FWS listed the whooping crane as endangered on March 11, 1967. FWS estimated the total wild population in 2006 to be 338 birds. *Id.* Studies show that the whooping crane population must reach at least 1,000 individuals to be genetically viable. *Id.*

The whooping crane migrates throughout much of Keystone's proposed area. *Id.* The BA identifies power lines associated with Keystone as collision hazards to whooping cranes. *Id.* at 670. The BA determined, however, that Keystone's commitment to follow recommended conservation measures would avoid and minimize disturbance of migrating whooping cranes. *Id.* at 674. The BA ultimately concluded that the Project was not likely to adversely affect the whooping crane. *Id.*

Plaintiffs argue that FWS's consideration of the impacts on the whooping crane failed to satisfy the "best available science" standard of ESA Section 7. Plaintiffs argue that neither the BA, nor FWS's concurrence analyzed the best

available science, including telemetry data. *Id.* at 56. Defendants argue that the telemetry data does not impact the adequacy of the agencies' conclusions. (Doc. 173 at 92.)

### 1. The Telemetry Data Does Not Undermine the Agencies' Analysis

The Department relied on historical sightings data to make its determinations regarding the whooping crane. Historical sightings data includes over fifty years of observations compiled by FWS regarding whooping crane migration. (Doc. 153-1 at 31.) This data shows the boundaries of the whooping crane migration corridor and recurring stop-over locations. Both parties agree that historical sightings data represents the best available science. *Id.* The parties disagree, however, as to whether use of telemetry data would alter the Department's analysis. Plaintiffs argue that the 2014 SEIS underestimated the risk of collisions with power lines without the use of telemetry data. (Doc. 140 at 59.)

The United States Geological Survey ("USGS") maintains telemetry data through the Whooping Crane Tracking Partnership's ("WCTP") Telemetry Project. (Doc. 118 at 7.) The Telemetry Project collects telemetry data from radio-tagged cranes. *Id.* The WCTP captures whooping cranes and attaches a transmitter to their leg. This transmission sends a signal received by satellite in a frequency of every six hours. *Id.* The telemetry data comes from 20% of the whooping crane

population that was radio-tagged. *Id.* at 8. The Telemetry Project seeks to document whooping crane movement within their migratory corridor and to gather behavioral data. *Id.*

Defendants' expert asserts that the use of telemetry data has numerous limitations and flaws. Defendants' expert states, for example, that the WCTP collected telemetry data over a short span of time (2010-2014), whereas the historic sightings date back as far as the 1950s. (Doc. 128-4 at 18.) Defendants' expert also opines that the telemetry data points may represent the same individual bird traveling within a small area on one stopover. *Id.* Further, telemetry data does not account for altitude, so it may not distinguish between birds flying at lower altitudes in migration, or at elevations where altitude was inconclusive. *Id.*

Importantly, Plaintiffs' expert does not explain how the telemetry data undermines the historical sightings data used by the Department. Plaintiffs' expert instead "observed that several of the historical [FWS] sightings . . . were at the same locations as recent telemetry data records. In fact the telemetry data only identified a few locations . . . that were not identified using the historical data." (Doc. 118 at 16.) Plaintiffs' expert concludes that the telemetry data confirms site fidelity observed in historical sighting data. *Id.* at 16.

"The determination of what constitutes the best scientific data available belongs to the agency's special expertise." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (internal quotations omitted). Accordingly, an agency possesses discretion to determine the best available science. Further, both parties' experts conclude that telemetry data confirms, rather than undermines sightings data. At best, the telemetry data provides additional information regarding how recent specific areas are used by whooping cranes. (Doc. 118 at 15.) Plaintiffs fail to show how this information would change the agencies' analysis. The agencies' failure to consider the telemetry data in their analysis does not provide a sufficient basis to conclude that the agencies acted arbitrarily and capriciously.

## 2. The Conservation Measures Are Reasonable

Plaintiffs also argue that the conservation measures set forth in the BA are insufficient. (Doc. 140 at 64-65.) Plaintiffs question the ability of FWS to implement the measures, and their effectiveness. *Id.* The conservation measures, however, include avoiding designated critical habitat, applying a five-mile buffer to high-use areas, and burying power lines within one mile of suitable migration habitat. FWS000000000674. Conservation measures also include marking new lines and installing bird flight diverters. *Id.* Site-specific consultations with electric utilities are also required to minimize impacts to whooping cranes. *Id.* at 769.

These measures were adequately evaluated and explained by FWS. Plaintiffs have not provided a sufficient basis for the Court to divert from the expertise FWS possesses to recommend and implement conservation measures. *See Jewell*, 747 F.3d at 602.

### D. Interior Least Tern and Piping Plover

Plaintiffs argue that FWS failed to analyze adequately impacts to endangered interior least terns and threatened piping plovers from increased raptor predation attributable to the Project. (Doc. 140 at 70.) The BA concludes that power line routes associated with Keystone likely would attract raptors. FWS000000000660. The BA proposes the use of perch deterrents to be installed in coordination with FWS. *Id.* at 2069-70. The BA determines that "[p]rotection measures could be implemented by electrical service providers to minimize raptor perching in accordance with the Avian Power Line Interaction Committee ("APLIC"), Suggested Practices for Avian Protection on Power Lines (APLIC 1996)." *Id.* at 654. Plaintiffs argue that a 2006 edition of the APLIC contradicted BA's conclusion. The 2006 edition recognizes that perch discouragers intend "to move birds from an unsafe location to a safe location and do not prevent perching." (Doc. 143-1 at 36.) The 2006 APLIC further determines that the use of perch deterrents is not recommended to prevent predation. *Id.*

The raptor predation protection measures that reference the 1996 guidance address dangers to black-footed ferrets, rather than dangers to terns or plovers. FWS000000000654. The use of this guidance would not apply to Plaintiffs' arguments regarding terns and plovers. The 2006 guidance does not disavow the use of perch deterrents. (Doc. 143-1 at 17.) The guidance simply cautions that perch deterrents do not prevent perching, but are intended to manage where birds perch. *Id.* In the end, the guidance suggests that electric utilities and agencies work together to identify predation risk to sensitive species. *Id.* Finally, the BA discusses other conservation measures, including pre-construction surveys and rerouting of power lines. These steps and other measures should be coordinated with FWS. FWS000000000719. These proposed conservation measures prove reasonable under the circumstances.

### E.  Oil Spills

Plaintiffs next argue that the Department and FWS failed to consider properly the potential impacts of pipeline spills on listed species. (Doc. 146 at 52.) Plaintiffs argue that the agencies failed to account for potential spill risk to listed species other than the American burying beetle. *Id.* at 55. The Department must supplement new and relevant information regarding the risk of spills. The 2014 SEIS, the BA, and the BiOp relied on outdated information regarding potential oil spills and the agencies must account for the supplemental information. The

Department and FWS must use the "best scientific and commercial data available" in all respects, including the effects of potential oil spills on endangered species. 16 U.S.C. § 1536(a)(2). Section 7 requires consultation with FWS to ensure the proposed action is "not likely to jeopardize the continued existence of any endangered species . . . " 16 U.S.C. § 1536(a)(2). The Department must consider the new information regarding oil spills in the 2014 SEIS with respect to potential effects on listed species. The Department must also coordinate with FWS in making its determination.

### F.  Extraterritorial Impacts

Plaintiffs argue that the Department failed to initiate consultation with regard to listed species, including potential impacts to Whooping Cranes in Canada. (Doc. 146 at 56.) The "action area" determines the geographic scope of ESA consultation. The ESA defines the "action area" as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. The determination of an action area requires an agency to apply scientific methodology. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002).

The action area as defined by FWS stretches from the border of the United States with Canada to Steele City, Nebraska. FWS000000002085. Plaintiffs

contend that consultation should have occurred along the entire Project, including within Alberta, Canada. Plaintiffs provide no authority that directs the ESA's application outside of the United States. Plaintiffs instead cite the ESA's statutory language requiring agencies to consider direct and indirect impacts to species in "all areas to be affected." 50 C.F.R. § 402.02.

No evidence in the record indicates that Congress intended agencies to engage in ESA consultation related to permitting decisions made in another country. To the contrary, the ESA limits required consultation to "affected States." 16 U.S.C. § 1536(a)(2). Absent contrary intent, legislation of Congress applies only within the territorial jurisdiction of the United States. *Morrison v. Natl. Australia Bank Ltd.,* 561 U.S. 247, 255 (2010). Plaintiffs have failed to indicate any contrary intent that the statutory language of Section 7 should apply outside of the United States.

The Court notes that the government of Canada separately requires environmental review of Keystone's impacts. CNEB conducted an environmental review of Keystone's Alberta, Canada section that includes evaluation of listed species, mitigation plans, and protections. This evaluation includes impacts to the endangered whooping crane. The Court finds no support in the record to apply Section 7 in Canada. The Court will defer to the government of Canada's environmental review of Keystone's impacts within its own jurisdiction.

45

## G. Remainder of Species

Plaintiffs argue that the Department and FWS failed to analyze impacts to the black-footed ferret, rufa red knot, northern long-eared bat, and western prairie fringed orchid. (Doc. 146 at 51-63.) The Court will analyze each species in turn.

### 1. Black-Footed Ferret

Plaintiffs assert that the agencies inadequately analyzed impacts to the black-footed ferret. (Doc. 146 at 57-58.) The parties do not dispute that the proposed Project would pass through no known black-footed ferret habitat. Plaintiffs' argument instead relies on Keystone's crossing of prairie dog towns, as prairie dogs represent a potential ferret population recovery habitat. (Doc. 146 at 58.)

FWS determined that no wild populations of black-footed ferrets exist along the proposed route of the Project. FWS000000000651. The primary species population have been captured and provide the basis for an ongoing breeding program operated by FWS. *Id.* Several reintroduced populations occur outside of the Project area in Montana, South Dakota, and Kansas. *Id.* at 652.

The black-footed ferret depends on prairie dogs, both for food and habitat. *Id.* As a result, the FWS surveyed the proposed route in Montana, South Dakota, and Nebraska, for prairie dog towns as potential black-footed ferret habitat. *Id.* The

survey identified no impacts in Montana. *Id.* at 653. The survey identified eight prairie dog towns found along the proposed route in South Dakota and Nebraska. *Id.* FWS recommended no mitigation measures or additional consultation under the ESA as the black-footed ferrets associated with these towns have been designated as non-essential experimental populations. *Id.*

Potential Project impact to prairie dog towns requires no mitigation or additional consultation regarding black-footed ferrets. FWS releases experimental populations at its discretion. FWS must determine whether the population "is essential to the continued existence of an endangered or a threatened species." 16 U.S.C. § 1539(j)(2)(B). FWS's determination that the experimental black-footed ferret populations are not essential to the continued existence of the species allows FWS to treat these populations as a species proposed to be listed. 16 U.S.C. § 2539(j)(2)(C)(i). Section 7 requires consultation for listed species only when an action likely would jeopardize that listed species. 16 U.S.C. § 1536(a)(2), (4). FWS correctly determined that no consultation and mitigation were required for the non-essential experimental black-footed ferret populations potentially associated with the prairie dog towns. FWS000000000653.

### 2.  Rufa Red Knot & Northern Long-Eared Bat

Plaintiffs next argue that the Department failed to analyze impacts to the rufa red knot and the northern long-eared bat. (Doc. 146 at 59-60.) FWS listed the rufa red knot in December of 2014 and the northern long-eared bat in April of 2015. The 2012 BA, the 2013 BiOp, and the 2014 SEIS did not discuss these yet-to-be listed species. The Department reinitiated consultation in July 2015, however, regarding the rufa red knot, and in 2017 regarding the northern long-eared bat. The Department has satisfied Section 7's consultation requirements through this re-initiation of consultation for recently listed species.

Plaintiffs provide no additional data or studies upon which the Department should have relied to reach its conclusion that the Project is "not likely to adversely affect" the rufa red knot. Plaintiffs also argue that the Department's analysis of potential threats to the northern long-eared bat proved inadequate because the Department failed to identify conservation measures associated with construction impacts. *Id.* at 60. The listing decision determined, however, that no habitation limitations constrain the northern long-eared bat. 81 Fed. Reg. 1,900, 1,903 (Jan. 14, 2016). Moreover, development actions have shown no negative impacts to northern long-eared bat populations. *Id.*

FWS's listing decision focused primarily on white-nose syndrome ("WNS") as the main threat to the northern long-eared bat. *Id.* at 1901. FWS identifies WNS within zones. FWS maps evidence of WNS within a county as a positive detection

48

for the entire county. *Id.* at 1902.  FWS adds a 150-mile buffer to the county line as part of the zone. *Id.*

The Department's 2017 consultation determined that portions of the proposed Project encompassed WNS zones. FWS0000000002742. The Department identified two conservation measures to address WNS in its 2017 BA. *Id.* at 2742. The first measure includes a commitment by TransCanada to refrain from removing any trees within 0.25-mile buffer around known WNS zones. *Id.* The second measure requires TransCanada to avoid cutting or destroying any other trees within a 150-foot radius of known maternity roost trees. *Id.* at 2742-43. The Court finds no error in these proposed conservation measures or FWS's concurrence that the Project is "not likely to adversely affect" the bat. *Id.* at 2749.

### 3.  Western Prairie Fringed Orchid

Plaintiffs argue that the Department failed to provide adequate conservation measures to the western prairie fringed orchid. (Doc. 146 at 60.) Plaintiffs argue that the conservation measures rely solely on efforts by TransCanada's employees to avoid the plant. *Id.* at 61. Plaintiffs further allege that these proposed measures fail to address the risk of invasive species and herbicide use. *Id.* The 2014 SEIS conservation measures propose a complete habitat suitability survey before construction. FWS00000002065. Plaintiffs have presented no proposed method of

conservation superior to a complete survey that could detect the plant early in its growth cycle. The conservation measures also adequately address the risk of invasive species. TransCanada has developed a weed and vegetation monitoring plan to prevent the spread of invasive species. DOSKXLDMT0001020-21. The conservation measures further require habitat restoration and revegetation. FWS000000002066. The Department's "not likely to adversely affect" conclusion regarding the orchid proves reasonable under the circumstances.

## CONCLUSION AND REMEDIES

Plaintiffs have asked the Court to issue an injunction that would require the Department to comply fully with NEPA, the ESA, and the APA. Plaintiffs have asked the Court to enjoin and set aside the Department's cross-border permit and ROD. Plaintiffs also have requested an injunction to set aside the BA, BiOp and FWS concurrence. Finally, Plaintiffs have requested that the Court prohibit activity in furtherance of construction or operation of Keystone and associated facilities.

An agency action is deemed invalid when not promulgated in compliance with the APA. *Kake*, 795 F.3d at 970. Upon remand, a court should provide the agency with specific instructions to address its errors. *Alliance for the Wild Rockies v. Zinke*, 265 F.Supp.3d 1161, 1181 (D. Mont. 2017). The Court provides the following instructions.

Claim 1: The Department's "purpose and need" statement in the 2014 SEIS did not violate NEPA. The Department's range of alternatives analyzed in the 2014 SEIS did not violate NEPA. 40 C.F.R. §§ 1502.1, 1502.13, 1502.14. Further, the Department did not violate NEPA when it set forth its no-action alternative in the 2014 SEIS. Similarly, the Department did not violate NEPA in its analysis of transportation of crude oil by rail in the 2014 SEIS. The Department's response to public comments on the draft 2014 SEIS comported with its obligations under NEPA. And finally, the Department's incorporation of the CNEB's analysis of impacts in Canada satisfied NEPA.

The Department's analysis of the following issues fell short of a "hard look" and requires a supplement to the 2014 SEIS in order to comply with its obligations under NEPA:

- The effects of current oil prices on the viability of Keystone (Section I (C)(2)(a));

- The cumulative effects of greenhouse gas emissions from the Alberta Clipper expansion and Keystone (Section I (C)(2)(c));

- A survey of potential cultural resources contained in the 1,038 acres not addressed in the 2014 SEIS (Section I (E)(1)); and

- An updated modeling of potential oil spills and recommended mitigation measures (Section I (E)(3)).

51

These omissions require a remand with instructions to the Department to satisfy its

obligations under NEPA to take a "hard look" at the issues through a supplement

to the 2014 SEIS.

Claim 2: Plaintiffs' second group of claims relate to the need for

TransCanada to obtain a right of way across BLM-owned land. The parties' current

motions for summary judgment do not address these claims. The Court defers

ruling on these claims until the parties have submitted motions and supporting

briefs.

Claim 3: NEPA and the APA require a detailed justification for reversing

course and adopting a policy that "rests upon factual findings that contradict those

which underlay its prior policy." *Fox*, 556 U.S. at 515.  The Department must give

"a reasoned explanation for disregarding facts and circumstances that underlay or

were engendered by the prior policy." *Kake*, 795 F.3d at 996. The Court previously

determined in its Order denying Defendants' Motion to Dismiss (Doc. 99) that it

possessed jurisdiction to review the ROD as a final agency action under NEPA and

the APA. *Id.* at 8-9. The Department failed to comply with NEPA and the APA

when it disregarded prior factual findings related to climate change and reversed

course. The Court vacates the 2017 ROD and remands with instructions to provide

a reasoned explanation for the 2017 ROD's change in course. *Kake*, 795 F.3d at

996.

Claims 4 and 5: Section 7(a)(2) of the ESA requires that an agency ensure its actions are not likely to jeopardize the continued existence of endangered or threatened species, and are not likely to destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2). The agency must rely on the best available science and commercial data available in reaching its conclusions. 16 U.S.C. § 1533(b)(1)(A). The Department did not violate the ESA when it did not use the telemetry data to assess potential harm to whooping cranes. The Department did not violate the ESA when it put forth mitigation measures related to the western prairie fringed orchid. The Department did not violate the ESA in its analysis of the black-footed ferret, the rufa red knot, the northern long-eared bat or terns and plovers. Further, the Department did not violate the ESA when it did not apply Section 7 in Canada.

The Department's 2012 BA, and FWS's 2013 BiOp and concurrence shall be set aside and remanded to the Department with instructions to consider potential adverse impacts to endangered species from oil spills associated with Keystone in light of the updated data on oil spills and leaks. The Court declines at this time to require the Department to re-initiate formal consultation with FWS pending the outcome of FWS's updated analysis of the oil spill data.

**ORDER**

(1)     Plaintiffs' Motions for Summary Judgment (Docs. 139 & 145) are

GRANTED IN PART and DENIED IN PART in accordance with the above

Order;

(2)     Defendants' Cross–Motions for Summary Judgment (Docs. 170 & 172) are

GRANTED IN PART and DENIED IN PART;

(3)     It is further ordered that the Department's ROD issued on March 23, 2017, is

VACATED.

(4)     Plaintiffs' request for injunctive relief is GRANTED. The Court enjoins

Federal Defendants and TransCanada from engaging in any activity in furtherance

of the construction or operation of Keystone and associated facilities until the

Department has completed a supplement to the 2014 SEIS that complies with the

requirements of NEPA and the APA.

(5)     This matter is REMANDED to the Department for further consideration

consistent with this order.

        DATED this 8th day of November, 2018.

Brian Morris
United States District Court Judge