Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net
*Attorney for Northern Plains Plaintiffs*
(additional counsel listed on signature pages)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVER ALLIANCE, | |
| and | |
| NORTHERN PLAINS RESOURCE COUNCIL, et al., | CV 17-29-GF-BMM |
| Plaintiffs, | CV 17-31-GF-BMM |
| v. | **Northern Plains Plaintiffs' Opposition to TransCanada's Motion to Amend the Court's Order on Summary Judgment** |
| UNITED STATES DEPARTMENT OF STATE, et al., | |
| Defendants, | |
| TRANSCANADA KEYSTONE PIPELINE and TRANSCANADA CORPORATION, | |
| Defendant-Intervenors. | |

# TABLE OF CONTENTS

Introduction .................................................................................................1

Background ..................................................................................................1

Standard of Review .....................................................................................4

Argument.....................................................................................................4

I.      All field activities except those necessary to complete the revised
        environmental review should remain enjoined......................................5

        A.      The field activities will cause irreparable harm ....................6

        B.      Remedies available at law are inadequate...........................16

        C.      The balance of hardships tips in Plaintiffs' favor ...............17

        D.      A permanent injunction is in the public interest .................24

II.     The scope of the injunction is narrowly tailored to Plaintiffs' harms............26

Conclusion ................................................................................................28

# TABLE OF AUTHORITIES

## Cases

*Adtrader, Inc. v. Google LLC*,
    No. 17-CV-07082-BLF, 2018 WL 1876950 (N.D. Cal. Apr. 19, 2018).......19

*Alaska Conservation Council v. U.S. Army Corps of Eng'rs*,
    472 F.3d 1097 (9th Cir. 2006) .................................................................. 21-22

*Alaska Ctr. for the Env't v. West*,
    31 F. Supp. 2d 714 (D. Alaska 1998) ............................................................22

*Alaska Survival v. Surface Transp. Bd.*,
    704 F.3d 615 (9th Cir. 2012) ...................................................................22, 23

*Amoco Prod. Co. v. Vill. of Gambell*,
    480 U.S. 531 (1987)...................................................................................10, 16

*Arlington Coal. on Transp. v. Volpe*,
    458 F.2d 1323 (4th Cir. 1972) ..................................................................26, 27

*Colo. Wild Inc. v. U.S. Forest Serv.*,
    523 F. Supp. 2d 1213 (D. Colo. 2007) ....................................................14, 15

*Comm. of 100 on Fed. City v. Foxx*,
    87 F. Supp. 3d 191 (D.D.C. 2015).........................................................22, 23

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015) .................................................................10, 16

*Davis v. Mineta*,
    302 F.3d 1104 (10th Cir. 2002) .....................................................................20

*Desert Citizens Against Pollution v. Bisson*,
    231 F.3d 1172 (9th Cir. 2000) .......................................................................20

*Diné Citizens Against Ruining Our Env't v. U.S. Office of Surface
    Mining Reclamation & Enf't,*
    No. 12-cv-01275-JLK, 2015 WL 1593995 (D. Colo. Apr. 6, 2015)............20

*Earth Island Inst. v. U.S. Forest Serv.,*
    442 F.3d 1147 (9th Cir. 2006) ......................................................25

*High Country Conservation Advocates v. U.S. Forest Serv.,*
    67 F. Supp. 3d 1262 (D. Colo. 2014) ......................................16, 25

*James River Flood Control Ass'n v. Watt,*
    680 F.2d 543 (8th Cir. 1982) ......................................................23

*Kona Enters., Inc. v. Estate of Bishop,*
    229 F.3d 877 (9th Cir. 2000) ........................................................4

*League of Wilderness Defs./Blue Mountains Biodiversity Project
    v. Connaughton,*
    752 F.3d 755 (9th Cir. 2014) ................................................11, 21

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010)....................................................................6

*Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining,*
    No. CV 15-106-M-DWM, 2017 WL 5047901
    (D. Mont. Nov. 3, 2017) ..................................................11, 21, 27

*Mont. Wilderness Ass'n v. Fry,*
    408 F. Supp. 2d 1032 (D. Mont. 2006) ............................21, 24, 25

*N. Alaska Envtl. Ctr. v. Hodel,*
    803 F.2d 466 (9th Cir. 1986) ......................................................21

*N. Cheyenne Tribe v. Hodel,*
    851 F.2d 1152 (9th Cir. 1988). ...............................................14, 20

*Nat'l Audubon Soc'y v. Dep't of Navy,*
    422 F.3d 174 (4th Cir. 2005) .................................... 11-12, 13, 27

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
    241 F.3d 722 (9th Cir. 2001) ...................................................................8, 21

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    No. 3:01-cv-0640-SI, 2017
    WL 1829588 (D. Or. Apr. 3, 2017) ........................................... 10-11, 13, 27

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*,
    817 F. Supp. 2d 1290 (D. Or. 2011) ..............................................................8

*San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.*,
    657 F. Supp. 2d 1233 (D. Colo. 2009) .........................................................21

*S. Fork Band Council of W. Shoshone of Nev. v. DOI*,
    588 F.3d 718 (9th Cir. 2009) ..................................................................22, 26

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007) ................................................................24, 25

*Sierra Club v. Marsh*,
    872 F.2d 497 (1st Cir. 1989) ........................................................................15

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    645 F.3d 978 (8th Cir. 2011) .......................................................................19

*Swan View Coal. v. Weber*,
    52 F. Supp. 3d 1160 (D. Mont. 2014) ........................................................20

*W. Watersheds Project v. BLM*,
    774 F. Supp. 2d 1089 (D. Nev. 2011) .........................................................26

*Wood v. Ryan*,
    759 F.3d 1117 (9th Cir. 2014) .......................................................................4

*Yurok Tribe v. U.S. Bureau of Reclamation*,
    231 F. Supp. 3d 450 (N.D. Cal. 2017).........................................................8

## Statutes

5 U.S.C. § 706(2)(A) ................................................................5

16 U.S.C. §§ 703-12 ...............................................................11

16 U.S.C. § 1536(d) ............................................................16, 25

## Regulations

40 C.F.R. § 1506.1(a) ..................................................5, 7, 13, 16, 25

83 Fed. Reg. 48,358 (Sept. 24, 2018) ...............................................2

83 Fed. Reg. 62,398 (Dec. 3, 2018) .................................................3

## Other Authorities

John Benny & Julie Gordon, *TransCanada Eyes Joint Ventures, Sales, to Fund Keystone XL*, Reuters (Nov. 1, 2018), https://www.reuters.com/article/us-transcanada-results/transcanada-eyes-joint-ventures-sales-to-fund-keystone-xl-idUSKCN1N64RH ...............................................................19

Julie Gordon & Valerie Volcovici, *TransCanada to Start Work on Keystone XL in Montana in Fall 2018: Letter*, Reuters (May 3, 2018), https://www.reuters.com/article/us-transcanada-keystone/transcanada-to-start-work-on-keystone-xl-in-montana-in-fall-2018-letter-idUSKBN1I42DL ...............................................................19

Karl Puckett, *In the Path of the Pipeline: Montanans View Benefits, Risks Differently*, Great Falls Tribune (Nov. 28, 2018), https://www.greatfallstribune.com/story/news/2018/11/28/montana-keystone-xl-pipeline-oil-taxes-protest-risk/1893505002/. ................. 8, 12-13

Rod Nickel, *EXPLAINER-What Is at Stake in the Keystone XL Pipeline Ruling?*, Reuters (Nov. 9, 2018), https://www.cnbc.com/2018/11/09/reuters-america-explainer-what-is-at-stake-in-the-keystone-xl-pipeline-ruling.html .............19

## INTRODUCTION

On November 8, 2018, this Court held that the State Department violated the National Environmental Protection Act (NEPA), the Endangered Species Act (ESA), and the Administrative Procedure Act (APA) when it approved the cross-border permit for Keystone XL. Accordingly, the Court vacated the Record of Decision and the NEPA and ESA review documents and prohibited any activities in furtherance of construction or operation of the pipeline and its associated facilities. Yet TransCanada wishes to continue conducting on-the-ground activities, including preparing several worker camps that would house thousands of workers, transporting and storing pipe, and clearing the pipeline right of way. These activities constitute construction of the project, will cause irreparable environmental harm, and will prejudice ongoing federal decision making. As such, they run afoul of the Court's November 8 Order and the law. The Court should decline to amend the injunction to allow these activities and deny TransCanada's motion.

## BACKGROUND

The facts giving rise to this action are detailed in Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment. ECF No. 132.

On August 15, 2018, the Court issued a partial order on summary judgment in Plaintiffs' favor. ECF No. 202. The Court held that the State Department

violated NEPA when it failed to prepare a supplemental Environmental Impact Statement (EIS) analyzing the pipeline's newly approved route through Nebraska, known as the Mainline Alternative Route. *Id.* at 8-12. The State Department released a draft supplemental EIS of the Mainline Alternative Route on September 24, 2018. 83 Fed. Reg. 48,358 (Sept. 24, 2018). The State Department also reinitiated ESA consultation with the U.S. Fish and Wildlife Service on the Mainline Alternative Route. Decl. of Jill Reilly, ECF No. 168 ¶ 3.

On November 8, 2018, the Court issued an order resolving Plaintiffs' remaining claims against the State Department. ECF No. 211. The Court held that the State Department's analysis of oil prices, cumulative climate impacts, cultural resources, and oil spills in the 2014 EIS fell short of NEPA's "hard look" requirement and failed to take into account relevant new information. *Id.* at 15-23, 28-31, 51-52. The Court likewise found that the State Department's failure to consider new information on oil spills violated the ESA. *Id.* at 43-44, 53. The Court also held that the State Department violated NEPA and the APA when it failed to provide a reasoned explanation for discarding prior factual findings on climate change and reversing course on its decision to approve the cross-border permit. *Id.* at 33-35, 52. The Court instructed the State Department to address these errors on remand; vacated the March 23, 2017 Record of Decision, 2012 Biological Assessment, and 2013 Biological Opinion and concurrence; and

enjoined "Federal Defendants and TransCanada from engaging in any activity in furtherance of the construction or operation" of the project until the State Department completes a legally compliant environmental review. *Id.* at 51-54.

On November 20, 2018, TransCanada filed a motion to amend the Court's November 8 Order, requesting that it be allowed to conduct certain "preconstruction activities," as described in paragraphs 16-18 of the Declaration of Norrie Ramsay. ECF No. 215; ECF No. 216-1.

The parties appeared before the Court for a telephonic status conference on November 28, 2018. Northern Plains Plaintiffs indicated that they did not oppose TransCanada's motion as it applies to activities described in paragraphs 16-17 of the Ramsay declaration, and the Court subsequently clarified the scope of the injunction to allow those activities. *See* ECF No. 222. With the exception of field surveys, Northern Plains Plaintiffs oppose amending the Court's Order to allow the activities described in paragraph 18 of the Ramsay declaration, which include preparation of pipe storage and contractor yards, transportation and storage of pipes, preparation of worker campsites, mowing the right of way, patrolling areas to discourage migratory bird nesting, and maintaining a security presence.

The State Department recently issued a Notice of Intent to Prepare a Supplemental [EIS] for the Proposed Keystone XL Pipeline. 83 Fed. Reg. 62,398 (Dec. 3, 2018).

## STANDARD OF REVIEW

While district courts have broad discretion to amend or grant relief from a final judgment under Federal Rules of Civil Procedure 59(e) and 60(b), these are "extraordinary remed[ies], to be used sparingly in the interests of finality and conservation of judicial resources." *Wood v. Ryan*, 759 F.3d 1117, 1121 (9th Cir. 2014) (per curiam) (quoting *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000)); *see also id.* at 1120.

## ARGUMENT

TransCanada seeks to amend the Court's injunction as it applies to certain "preconstruction activities"; it does not contest the injunction against construction and operation of the pipeline, and its counsel has acknowledged that the pipeline cannot be built until the State Department completes its forthcoming NEPA review. *See* ECF No. 216; ECF No. 216-1 ¶¶ 16-18. After the November 28 status conference, the only remaining issue for this Court to address is whether the activities described in paragraph 18 of the Ramsay declaration should be permitted, notwithstanding the November 8 Order vacating the Record of Decision and suspending any activity in furtherance of the construction of Keystone XL. *See* ECF No. 222.

While Northern Plains Plaintiffs recognize that surveys are necessary for ongoing environmental review and permitting processes, and do not contest them,

4

the other activities set forth in paragraph 18 of the Ramsay declaration (hereinafter

"field activities") will cause irreparable environmental harm and prejudice federal

decision making, and in fact, are prohibited by NEPA until the State Department

issues a new record of decision. 40 C.F.R. § 1506.1(a) (prohibiting activities that

would "[h]ave an adverse environmental impact" or "[l]imit the choice of

reasonable alternatives" during ongoing NEPA review). For the reasons described

below, the Court should deny TransCanada's motion regarding these activities.

## I.    All field activities except those necessary to complete the revised environmental review should remain enjoined

As Plaintiffs previously explained, vacatur of unlawful agency action is the

presumptive remedy under the APA, 5 U.S.C. § 706(2)(A). *See* Northern Plains

Pls.' Reply in Supp. of Mot. for Partial Summ. J. at 96-99, ECF No. 172. Neither

Federal Defendants nor TransCanada argued that there is any reason to depart from

that remedy in this case, and TransCanada makes no such argument in its motion to

amend. As such, the Court's vacatur of the Record of Decision stands, and the

Keystone XL pipeline cannot be built or operated until Federal Defendants comply

with NEPA, the ESA, and the APA.[1]

---

[1] Should the Court reconsider its Order vacating the Record of Decision and barring construction activities, Plaintiffs respectfully request an opportunity to submit further briefing and evidence, and to conduct discovery where necessary.

TransCanada's focus on the scope of the injunction, however, suggests that it does not view the vacatur as having this effect. Indeed, through its present motion, TransCanada has demonstrated its belief that it can carry out field activities without federal approvals in place and before adequate environmental review is complete. The current injunction appropriately ensures that TransCanada does not proceed with *any* ground-disturbing activities and "guard[s] against [the] present or imminent risk of likely irreparable harm" to Plaintiffs. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010). Plaintiffs also satisfy the four-factor test for an injunction: (1) they will suffer an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) a remedy in equity is warranted, considering the balance of the hardships between Plaintiffs and Defendants; and (4) the public interest would not be disserved by a permanent injunction. *Id.* at 156-57.

## A.    The field activities will cause irreparable harm

TransCanada's proposed field activities pose two types of irreparable harm: environmental degradation and prejudice to ongoing federal decision making.

As an initial matter, the Ramsay declaration provides no details on the extent of "preconstruction" activities to be conducted, and suggests that the examples of activities provided in paragraph 18 are not an exhaustive list. This vagueness is problematic, as the full scope of what TransCanada considers to be

6

"preconstruction" remains unclear. TransCanada's line between "preconstruction" and "construction" is also arbitrary. Why does "mowing" constitute a *pre*construction activity? How much machinery will it entail? Will TransCanada simultaneously engage in broader clearing activities, like tree and shrub removal? Because the distinction between "preconstruction" and "construction" activities is ambiguous, the most appropriate way to ensure NEPA compliance is by disallowing any field activities, except those activities necessary for completing environmental review (such as surveys). *See* 40 C.F.R. § 1506.1(a).[2]

Despite the lack of detail provided in the Ramsay declaration and TransCanada's use of the label "preconstruction," the 2014 EIS shows that the proposed field activities are more extensive, and carry far greater environmental impacts, than TransCanada indicates. TransCanada intends to construct eight worker camps and at least 20 pipe yards. DOS 6958; *see also* FWS 619 (indicating that temporary work areas "would be required on both sides of all conventionally-crossed waterbodies to stage construction, fabricate the pipeline, and store materials," and that, "[b]efore construction, temporary bridges . . . would be installed across all perennial waterbodies to allow construction equipment to

---

[2] If the Court allows any of these activities to continue, Plaintiffs request that it require TransCanada to provide detailed and specific work plans and schedules of all intended activities, and/or restrict TransCanada to the specific activities listed in paragraph 18.

cross"). Each camp will be 50-100 acres in size and house up to 1,300 workers, 300 recreational vehicles, convenience stores, wastewater treatment facilities, and recreational and fitness facilities. DOS 6937, 6960.[3]

The establishment of these camps—along with pipe yards, access roads, and temporary work areas—will cause long-term and permanent damage to soil, air, and waterways along the pipeline route. *See, e.g.*, DOS 6719-20. The increased human presence, noise, pollution, and general disturbance associated with these and other field activities will also directly and adversely affect wildlife, potentially including wildlife listed under the ESA. DOS 6826 (explaining that increased human presence, traffic, and noise associated with pipeline construction will likely cause big-game animals to experience increased agitation, physiological stress, and use of sub-optimal habitat); DOS 6829-30 (describing harm to birds from increased human presence, loss of vegetation cover, and access roads and other aboveground facilities).

---

[3] *See also* Karl Puckett, *In the Path of the Pipeline: Montanans View Benefits, Risks Differently*, Great Falls Tribune (Nov. 28, 2018), https://www.greatfallstribune.com/story/news/2018/11/28/montana-keystone-xl-pipeline-oil-taxes-protest-risk/1893505002/. The Court may consider extra-record evidence to determine whether Plaintiffs will suffer irreparable harm in the absence of injunctive relief. *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1300 (D. Or. 2011) (citing *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001)); *Yurok Tribe v. U.S. Bureau of Reclamation*, 231 F. Supp. 3d 450, 470 (N.D. Cal. 2017).

Mowing and other activities aimed at clearing the right of way, such as applying pesticides, will likewise cause long-term, if not permanent, changes to the natural landscape and the structure and value of wildlife habitat. DOS 6824. Some vegetation removed during this process could require up to 50 years to reestablish; tree removal would be permanent. DOS 7390 (labeling these as construction impacts). Removal of vegetation—including the associated use of machinery, vehicles, and open burning—will cause soil erosion and the loss of valuable topsoil, encourage noxious weeds and other invasive plants, and release over 50 tons of greenhouse gas emissions. DOS 6720, 6824, 7209-10. Use of pesticides and herbicides also threatens to contaminate surrounding soil and nearby groundwater and surface water. DOS 6720. Taken together, these effects will prevent revegetation and permanently degrade the right of way and its surrounding habitat.

The concerns stemming from TransCanada's field activities are echoed by Plaintiffs' members who live along the pipeline right of way. For example, one member asserts that the pipeline route would "cut through an area of native grassland that [his] family has chosen to leave in its natural state, never putting it under a plow." Decl. of Robert Allpress, ECF No. 132-1 ¶ 27. Clearing that area would "eliminate native plants . . . [and] be a host for invasive weeds and damaging insects." *Id.* Plaintiffs' members would also be harmed by increased

9

noise and traffic in the area, the presence of worker camps, and the effects of this activity on wildlife. *Id.* ¶¶ 8-9, 18; Decl. of Dena Hoff, ECF No. 132-5 ¶ 18; Decl. of Chastity Jewett, ECF No. 132-6 ¶¶ 10-12, 15.

As these member declarations and the 2014 EIS make clear, TransCanada's proposed field activities will have on-the-ground impacts and cause irreparable harm. "Environmental injury, by its nature, . . . is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). And, where a case involves harm to endangered and threatened species and the ecosystems that support them, "establishing irreparable injury should not be an onerous task for plaintiffs." *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015). Here, the record shows that the field activities will disturb and adversely affect soils and waterways, increase greenhouse gas emissions, and harm wildlife (possibly including listed species) through habitat degradation, increased noise and human presence, increased sediment and contaminants in waterways, and efforts to patrol the right of way to discourage migratory bird nesting.[4] *Cf. Nat'l Wildlife Fed'n v. Nat'l Marine*

---

[4] TransCanada's plan to patrol the right of way to discourage migratory bird nesting, ECF No. 216-1 ¶ 18, is particularly alarming. The 2014 EIS mentions this activity only in passing regarding one species and one pump station in Montana (DOS 6913). TransCanada now proposes the much broader activity of discouraging all migratory bird nesting along the *pipeline* right of way, which was apparently never analyzed by the State Department or Fish and Wildlife Service. Plaintiffs further note that actions that take (i.e., harm or harass) migratory birds

*Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018) (observing that harm to members of a listed species is irreparable); *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) (stating that "logging of mature trees, if indeed incorrect in law," constitutes irreparable harm); *Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining*, No. CV 15-106-M-DWM, 2017 WL 5047901, at *3 (D. Mont. Nov. 3, 2017) (finding that environmental injury was irreparable because "federal coal, once mined, cannot be put back into the ground" and "coal combustion pollution and greenhouse gas[es] . . . once released into the atmosphere, cannot be removed by any judicial action"). These field activities constitute construction and pose irreparable environmental injury. Because TransCanada intends to undertake these activities even without a Record of Decision in place and prior to obtaining all necessary approvals, *see supra* section I, maintenance of the permanent injunction is warranted.

TransCanada attempts to sidestep the Court's Order and NEPA's prohibitions by claiming that these field activities are merely "preconstruction" and likening them to the activities allowed in *National Audubon Society v. Department*

---

are regulated pursuant to the Migratory Bird Treaty Act (MBTA), 16 U.S.C. §§ 703-12. On information and belief, Plaintiffs understand that neither TransCanada nor the State Department has complied with the MBTA, which does not allow unauthorized take. Although Plaintiffs did not bring claims under the MBTA given the current state of the law governing MBTA citizen suits, it is nonetheless important to note this issue here, as TransCanada appears to be asking for this Court's permission to undertake activities that would violate federal law.

*of Navy*, 422 F.3d 174 (4th Cir. 2005). ECF No. 216 at 12-13. But the activities

described in *National Audubon Society* mirror the activities described in

paragraphs 16 and 17 of the Ramsay declaration, which have already been

permitted by this Court, and the surveys described in paragraph 18, which

Plaintiffs do not oppose. *See* 422 F.3d at 204-05 (describing the activities as

including site-specific studies; surveys, title searches, and appraisals; land

purchases from willing sellers; architectural and engineering work necessary for

the planning and design of a site and for a permit application process; and applying

for permits). The court in *National Audubon Society* concluded that these activities

"do not include cutting even a single blade of grass" and thus posed no

environmental harm. *Id.* at 206.

That is plainly untrue of the field activities at issue here: preparing worker

camps, storage yards, and contractor yards; transporting and storing pipes; mowing

and patrolling the right of way; and maintaining a security presence at project sites.

A recent news article underscores the magnitude of these activities. Only a few

weeks ago, TransCanada was shipping pipe by rail to Glendive, Montana, and

delivering 25-28 semi-truck loads of pipe per day to a pipe yard in northern

Phillips County, Montana. Puckett, *supra* note 3. In August, TransCanada

improved 47 miles of Montana roads. *Id.* And during this time, a worker camp was

also "under construction," resulting in a "large open area [with] the appearance of

a football field" with "[d]ust [] rising in the air as bulldozers push[ed] dirt around." *Id.* These field activities involve more than the "cutting [of] a single blade of grass." *Nat'l Audubon Soc'y*, 422 F.3d at 206. They pose significant and irreparable environmental harm and must remain suspended. *See* 40 C.F.R. § 1506.1(a) (prohibiting activities that would "[h]ave an adverse environmental impact" during ongoing NEPA review).

This environmental harm is compounded by a second, related injury: a "biased NEPA process." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 3:01-cv-0640-SI, 2017 WL 1829588, at *12, *14 (D. Or. Apr. 3, 2017) (finding the "bureaucratic momentum" theory persuasive and holding that allowing "hundreds, tens, or even millions of dollars" to be spent on the project "during the NEPA remand period is likely to cause irreparable harm by creating a significant risk of bias in the NEPA process"); 40 C.F.R. § 1506.1(a) (prohibiting activities that would "[l]imit the choice of reasonable alternatives" during ongoing NEPA review). Despite TransCanada's conclusory assertions to the contrary, clearing the right of way, establishing worker camps and storage yards, and other similar field activities will further entrench the project and predetermine its route. The result is a prejudiced decision-making process, in which the State Department and other federal agencies are discouraged from rejecting the project altogether or altering its

route to account for its revised environmental review of, among other things, the Mainline Alternative Route in Nebraska and new information on oil spills.

Indeed, since spills and leaks could have devastating impacts on drinking water supplies and habitat for species—including species listed under the ESA— the State Department might determine, after looking more closely at spill risk, that Keystone XL should be relocated or otherwise altered to prevent harm to waterbodies and the people and species that rely on them. But the more resources TransCanada pours into "preconstruction" activities that determine the location of the project—such as clearing the right of way and establishing work camps and pipe yards near the current route, which would be difficult and expensive to relocate—the more fixed its preferred route will be and the less likely the State Department will be to take the steps needed to adequately protect people and wildlife from oil spills. This sort of "[b]ureaucratic rationalization and bureaucratic momentum are real dangers" that must be guarded against. *N. Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988).

Recognizing such harm, the court in *Colorado Wild Inc. v. U.S. Forest Service* enjoined construction of a resort village and related access roads when it held that the reviewing agency had failed to comply with NEPA. 523 F. Supp. 2d 1213, 1224 (D. Colo. 2007). The court found that the defendants had "understate[d] the amount of on-the-ground harm that would result from

14

construction" of these facilities and that, more importantly, they ignored the "related difficulty of stopping 'a bureaucratic steam roller' once it is launched." *Id.* at 1220-21. The court reasoned that the proposed activities implemented and relied on a challenged agency decision, and thus "represent[ed] a link in the chain of bureaucratic commitment that will become progressively harder to undo the longer it continues." *Id.* at 1221 (quoting *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989)). Likewise here, the "bureaucratic momentum" created by TransCanada's field activities would "skew the analysis and decision-making" of the State Department "towards its original, non-NEPA compliant" record of decision. *Id.*

That TransCanada has previously conducted some of these activities is irrelevant. This Court has since ruled that the State Department violated NEPA, the ESA, and the APA when it issued a Record of Decision that relied on outdated environmental review documents and lacked a reasoned explanation for the agency's change in course. Without a valid Record of Decision and other necessary approvals from the U.S. Army Corps of Engineers, the U.S. Bureau of Land Management, and other agencies, TransCanada has no right to forge ahead with business as usual, or claim that its field activities will be harmless. To fulfill the statutory purposes of NEPA, the ESA, and the APA, Federal Defendants must revisit and revise their earlier environmental analyses on a clean slate, free of

15

activity that will bias their review process. *See High Country Conservation Advocates v. U.S. Forest Serv.*, 67 F. Supp. 3d 1262, 1265 (D. Colo. 2014); 40 C.F.R. § 1506.1(a); 16 U.S.C. § 1536(d) (prohibiting activities that would result in an irreversible or irretrievable commitment of resources that would foreclose implementation of reasonable and prudent alternative measures). TransCanada's attempt to short-circuit this process by moving ahead with ground-disturbing activities aimed at implementing the project must be rejected.

In short, the field activities at issue here will cause irreparable environmental and procedural harm if they do not remain suspended until Federal Defendants complete their environmental review and issue a supplemental EIS, Biological Assessment, Biological Opinion, and Record of Decision that abide by NEPA, the ESA, and the APA. The Court should preserve the status quo until Federal Defendants comply with the law.

### B.    Remedies available at law are inadequate

The second prong of the injunction test is "generally not at issue in environmental cases." *Cottonwood Envtl. Law Ctr.*, 789 F.3d at 1090. "Environmental injury, by its nature, can seldom be adequately remedied by money damages." *Amoco Prod. Co.*, 480 U.S. at 545. The environmental injuries discussed above cannot be compensated by remedies at law; thus, this prong is satisfied.

### C.    The balance of hardships tips in Plaintiffs' favor

TransCanada's motion seeks permission to engage in what it considers "preconstruction" activities; however, it attempts to skew the balance of hardships in its favor by weighing harm to Plaintiffs from *preconstruction* activities against alleged harms to TransCanada from a delay of *construction and operation* of the pipeline. ECF No. 216 at 10-11; ECF No. 216-1 ¶¶ 24-29 (discussing financial harms from delay in pipeline construction and operation). The Court should disregard TransCanada's alleged construction and operation harms. Given that TransCanada does not have legal authority to undertake construction activities at this time, TransCanada's argument is meritless and the balance of hardships tips in Plaintiffs' favor.

TransCanada's assessment of harm is premised on the incredible assertion that it still plans to start construction as early as "the second half of the first quarter of 2019," which Plaintiffs interpret to mean February 2019. ECF No. 216-1 ¶ 19. TransCanada's argument ignores the Court's vacatur of the State Department's Record of Decision, which is unlikely to be remedied in such a short time. Dr. Ramsay even admits that supplementation of the 2014 EIS as required by the Court "is likely to take at least well into the first quarter of 2019 . . . if not longer." *Id.* ¶ 20. Indeed, past experience shows that it is extremely unlikely that Federal Defendants will be able to complete the NEPA and ESA processes by the end of

17

February—less than three months from now. TransCanada fails to explain how the injunction against "preconstruction" activities—rather than the project's non-compliance with NEPA, the ESA, and the APA—is causing the delay. Furthermore, TransCanada still lacks necessary permits from the Army Corps of Engineers and Bureau of Land Management. ECF No. 216 at 4 (acknowledging that TransCanada is "continuing discussions" regarding these permits). TransCanada's claims regarding harm are therefore speculative, given that a February 2019 construction start date remains unlikely regardless of whether the Court permits the activities set forth in the Ramsay Declaration at this time.

And of course, TransCanada's stated harms from a delay in construction and operation improperly assume that the government agencies will approve the project. *See infra* section II. This Court has ordered a supplemental EIS that must be used to inform the agencies of the project's full range of environmental impacts *before* they decide whether to approve the project. TransCanada cannot assume these permits will be granted, and it has no legal right to move forward with pipeline construction in February 2019. As such, the Court should ignore any harm TransCanada claims from construction delays.

In fact, while TransCanada continues to state publicly that it is working toward starting construction in 2019, it has not yet made a "final investment

decision" on whether to go forward with Keystone XL.[5] Recently, TransCanada announced that it was exploring joint ventures, asset sales, and other options to fund the project before making a final investment decision, bolstering the speculative nature of TransCanada's alleged harm.[6]

To the extent TransCanada would suffer any actual harm from a delay of the field activities described in paragraph 18 of the Ramsay Declaration, those harms are self-inflicted and should be disregarded. *See, e.g.*, *Adtrader, Inc. v. Google LLC*, No. 17-CV-07082-BLF, 2018 WL 1876950, at *4 (N.D. Cal. Apr. 19, 2018) (declining to weigh self-inflicted harm in balancing injunction factors). By moving forward with any "preconstruction" activities on Keystone XL prior to receiving all necessary federal permits and approvals, TransCanada has assumed the risk that the project will be denied or delayed. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 997 (8th Cir. 2011) (finding financial injury was "self

---

[5] *See, e.g.*, Julie Gordon & Valerie Volcovici, *TransCanada to Start Work on Keystone XL in Montana in Fall 2018: Letter*, Reuters (May 3, 2018), https://www.reuters.com/article/us-transcanada-keystone/transcanada-to-start-work-on-keystone-xl-in-montana-in-fall-2018-letter-idUSKBN1I42DL; Rod Nickel, *EXPLAINER-What Is at Stake in the Keystone XL Pipeline Ruling?*, Reuters (Nov. 9, 2018), https://www.cnbc.com/2018/11/09/reuters-america-explainer-what-is-at-stake-in-the-keystone-xl-pipeline-ruling.html.

[6] John Benny & Julie Gordon, *TransCanada Eyes Joint Ventures, Sales, to Fund Keystone XL*, Reuters (Nov. 1, 2018), https://www.reuters.com/article/us-transcanada-results/transcanada-eyes-joint-ventures-sales-to-fund-keystone-xl-idUSKCN1N64RH.

inflicted" because parties who "jump the gun" or "anticipate[] a pro forma result" in permitting applications become "largely responsible for their own harm" (quoting *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002), *abrogated on other grounds by Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016))). Indeed, Dr. Ramsay himself details the numerous hurdles Keystone XL has faced since 2008, ECF No. 216-1 ¶¶ 7-16, belying any notion that approval and construction of the project is a sure bet.

In addition to moving forward prior to receiving all necessary permits, TransCanada has compounded its assumption of risk by proceeding with "preconstruction" activities even after initiation of this litigation. *See N. Cheyenne Tribe*, 851 F.2d at 1157 ("[I]nvestments should not be considered here when the lessees made their bids with full awareness of the Tribe's suit and chose to gamble on the EIS being adequate."); *Swan View Coal. v. Weber*, 52 F. Supp. 3d 1160, 1161-62 (D. Mont. 2014) ("[A]rguments regarding the difficulties and potentially adverse consequences of complying with the law carry little weight here, where the troubles complained of resulted from the Forest Service's failure to follow the law in the first instance.").[7]

---

[7] *Accord Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1187 (9th Cir. 2000) (discounting harm where federal agency and private party "acted at their peril"); *Diné Citizens Against Ruining Our Env't v. U.S. Office of Surface Mining Reclamation & Enf't*, No. 12-cv-01275-JLK, 2015 WL 1593995, at *3 (D. Colo. Apr. 6, 2015) (holding "responsibility for . . . delay and expense" of vacatur

Regardless, TransCanada's claims of economic hardship do not tip the balance in its favor. "A third party's potential financial damages from an injunction generally do not outweigh potential harm to the environment." *Mont. Envtl. Info. Ctr.*, 2017 WL 5047901, at *4 (quoting *Mont. Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1034 (D. Mont. 2006)); *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 738 (economic harm to tour operator if injunction issued does not outweigh potential irreparable damage to environment); *N. Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 471 (9th Cir. 1986) (more than pecuniary harm must be shown to outweigh environmental harm).

That is especially true where, as here, any financial harm to TransCanada would be temporary. *See Connaughton*, 752 F.3d at 766 (holding that "irreparable environmental injuries outweigh the temporary delay intervenors face in receiving a part of the economic benefits of the project"); *San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.*, 657 F. Supp. 2d 1233, 1242 (D. Colo. 2009) (finding harm to applicant uncompelling because a "delay in drilling the exploratory wells[] is not irreparable"). TransCanada has not articulated how "a delay in [preconstruction] activities caused by the court's injunction will reduce significantly any future economic benefit" from the pipeline. *See Alaska*

---

"lies with Respondents [federal agency and officers who violated NEPA] and not with Petitioners").

21

*Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1101 (9th Cir. 2006). If the project is eventually approved and constructed, TransCanada would ultimately realize the project's economic benefits. Thus, that TransCanada must wait until NEPA review is complete is "not of consequence sufficient to outweigh irreversible harm to the environment." *Alaska Ctr. for the Env't v. West*, 31 F. Supp. 2d 714, 723 (D. Alaska 1998).

The same is true for employment loss. If TransCanada must wait for the NEPA review to be completed before proceeding with preconstruction (assuming, as TransCanada does, that Keystone XL will be approved and built), those jobs would not disappear altogether; they would simply be delayed until the project complies with the law. *See S. Fork Band Council of W. Shoshone of Nev. v. DOI*, 588 F.3d 718, 728 (9th Cir. 2009) (per curiam) (asserting that the hardship "is cast principally in economic terms of employment loss, but that may for the most part be temporary").

TransCanada argues that the financial injury it would suffer from a delay of construction should weigh against an injunction, but the cases on which it relies are distinguishable in that they dealt with public rather than private economic injuries. *See, e.g.*, *Alaska Survival v. Surface Transp. Bd.*, 704 F.3d 615, 616 (9th Cir. 2012) (considering delay costs of a taxpayer-funded project); *Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 219 (D.D.C. 2015) (noting only that a private

company *argued* economic harm, but basing its decision on the public interest).

These cases also involved motions for preliminary injunctions where the balancing

was based primarily on the plaintiffs' failure to show a likelihood of success on the

merits; here, the Court has already ruled for Plaintiffs on the merits. *See James*

*River Flood Control Ass'n v. Watt*, 680 F.2d 543, 544 (8th Cir. 1982) (per curiam);

*Alaska Survival*, 704 F.3d at 616; *Comm. of 100 on Fed. City*, 87 F. Supp. 3d at

219.

In addition, the harm from lost jobs and revenue TransCanada claims in its

motion and the accompanying Ramsay Declaration is inflated and misleading.

TransCanada's motion vaguely states that the injunction would constitute a

"threat" to almost 700 preconstruction jobs. ECF No. 216 at 10. However,

TransCanada fails to state how many jobs would actually be lost due to an

injunction against the preconstruction activities at issue here or whether, for

example, a portion of that number are TransCanada employees that would simply

be diverted to other matters. This Court has also already allowed all activities

described in paragraphs 16-17 of the Ramsay Declaration to move forward, ECF

No. 222, and, as set forth above, Northern Plains Plaintiffs do not oppose

TransCanada performing survey work. The resumption of those activities ensures

that at least a significant portion of the preconstruction workforce can continue.

TransCanada's arguments regarding economic hardship are misleading and inapposite. To the extent TransCanada would suffer economic harm from a delay in field activities, that harm is clearly outweighed by the environmental and procedural harm that would result from allowing those activities to continue before Keystone XL complies with the law.

### D.    A permanent injunction is in the public interest

This factor weighs decidedly in Plaintiffs' favor. The "most basic premise of Congress' environmental laws" is that "the public interest is best served when the law is followed." *Mont. Wilderness Ass'n*, 408 F. Supp. 2d at 1038. The State Department violated NEPA, the ESA, and the APA when it relied on outdated and incomplete environmental review documents to issue a record of decision approving a permit for Keystone XL. November 8 Order, ECF No. 211 at 50-53. "[A]llowing a potentially environmentally damaging program to proceed without an adequate record of decision runs contrary to the mandate" of these laws. *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007).

Permitting TransCanada to continue conducting ground-disturbing activities will also adversely and irreparably affect air, soil, water quality, and wildlife along the pipeline's route. The preservation of these natural resources, as required by NEPA, the ESA, and the APA, "is clearly in the public interest." *Sierra Club v.*

24

*Bosworth*, 510 F.3d at 1033 (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1177 (9th Cir. 2006)).

The public interest is further served by requiring Federal Defendants to engage in a new environmental review process unprejudiced by TransCanada's continued investment of resources in the project. *See* 40 C.F.R. § 1506.1(a); 16 U.S.C. § 1536(d). As discussed above, TransCanada's field activities will further entrench the project and predetermine its route. But the State Department's decision on remand is not "a foregone conclusion." *High Country Conservation Advocates*, 67 F. Supp. 3d at 1265. The main purpose of requiring Federal Defendants to comply with NEPA, the ESA, and the APA on remand "is to give them a chance to perform a complete, non-arbitrary review" of Keystone XL, and to do so on "a clean slate." *Id.* TransCanada's field activities would undercut this purpose. *See id.*; *see also Mont. Wilderness Ass'n*, 408 F. Supp. 2d at 1037 ("[T]he public's interest in the NEPA process will be degraded if [it] is reduced to a series of hurdles to be cleared en route to a predetermined result.").

TransCanada contends that the public-interest factor weighs in its favor because the 2017 Record of Decision concluded that Keystone XL would serve the national interest. But that Record of Decision is premised on an unlawful environmental review and has since been vacated. November 8 Order, ECF No. 211 at 54. Even assuming that the State Department makes the same national

25

interest determination when it issues a new record of decision, any harm to that interest from delayed construction of the project is simply temporary, *see S. Fork Band Council of W. Shoshone of Nev.*, 588 F.3d at 728, and outweighed by the statutory purposes of NEPA, the ESA, and the APA, *Arlington Coal. on Transp. v. Volpe*, 458 F.2d 1323, 1326 (4th Cir. 1972) (holding that "even essential highway construction must yield to the congressionally structured priority" espoused by NEPA).[8]

In sum, the public interest is best served by continuing to bar TransCanada from conducting any field activities.

## II.   The scope of the injunction is narrowly tailored to Plaintiffs' harms

TransCanada contends that the injunction is overbroad, but this argument fails because the injunction against the field activities at issue here narrowly addresses Plaintiffs' irreparable injuries: environmental degradation and biased federal decision making. As described above, allowing on-the-ground activities to continue would harm the air, land, water, and wildlife along Keystone XL's route. And such activities would effectively predetermine the pipeline's location and

---

[8] TransCanada's reliance on *Western Watersheds Project v. BLM*, 774 F. Supp. 2d 1089 (D. Nev. 2011), is misplaced. In that case, the defendants alleged that delay would cause a loss of federal funding and tax credits, making it likely that the project would not be built at all. *Id.* at 1103. TransCanada makes no such allegations here. *See* ECF No. 216 at 10 (alleging only that an injunction against field activities would cause TransCanada to "miss[] the 2019 construction season"); ECF No. 216-1 ¶¶ 19-29 (similar).

approval, making the remand process a "hollow gesture." *Arlington Coal. on Transp.*, 458 F.2d at 1327 (directing district court to suspend all further work on highway construction because "[f]urther investment of resources . . . in the proposed route would render alteration or abandonment of the proposed route increasingly costly and, therefore, increasingly unwise"). Enjoining the field activities forestalls these harms, satisfying the requirement that there be a "sufficient causal connection" between the irreparable injury and the activity to be enjoined. *See Nat'l Wildlife Fed'n*, 886 F.3d at 819.

As discussed above, the planning and permitting activities allowed by the court in *National Audubon Society* fall outside the scope of this Court's injunction. *Supra* section I.A; ECF No. 222. Thus, that case is inapposite. And, although the court in *Montana Environmental Information Center* agreed to narrow the scope of the injunction, that case was based on a set of "unique facts": plaintiff's harm stemmed from the extraction and combustion of both private and federal coal, and would not be fully addressed by an injunction against all mining of federal coal. 2017 WL 5047901, at *5. Here, Plaintiffs' irreparable harms stem wholly from TransCanada's intended field activities, which amount to construction of a project that does not have the required permits and approvals. And TransCanada concedes that no part of the project can be built until the State Department completes its supplemental environmental review—even those portions situated on private land.

27

Therefore, no field activities should occur on any portion of the project until the State Department complies with NEPA, the ESA, and the APA. The present injunction fully addresses, and is narrowly tailored to, Plaintiffs' harms.

## CONCLUSION

For the foregoing reasons, Northern Plains Plaintiffs respectfully request that this Court deny TransCanada's motion and make clear that, with the exception of field surveys, TransCanada is enjoined from conducting the activities described in paragraph 18 of the Ramsay Declaration.

Respectfully submitted,

Dated:      December 4, 2018        /s/ Doug Hayes
Doug Hayes (*pro hac vice*)
/s/ Eric Huber
Eric Huber (*pro hac vice*)
Sierra Club Environmental Law Program
1650 38th Street, Suite 102W
Boulder, CO 80301
(303) 449-5595
doug.hayes@sierraclub.org
eric.huber@sierraclub.org
*Attorneys for Sierra Club and Northern Plains Resource Council*

28

/s/ Jaclyn Prange
Jaclyn Prange (*pro hac vice*)
/s/ Cecilia Segal
Cecilia Segal (*pro hac vice*)
Natural Resources Defense Council
111 Sutter Street, Floor 21
San Francisco, CA 94104
(415) 875-6100
prange@nrdc.org
csegal@nrdc.org
*Attorneys for Bold Alliance and Natural*
*Resources Defense Council*

/s/ Jared Margolis
Jared Margolis (*pro hac vice*)
/s/ Amy Atwood
Amy R. Atwood (*pro hac vice*)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
(971) 717-6401
jmargolis@biologicaldiversity.org
atwood@biologicaldiversity.org
*Attorneys for Center for Biological Diversity*
*and Friends of the Earth*

/s/ Timothy M. Bechtold
Timothy M. Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net
*Attorney for all Plaintiffs*

29

## WORD COUNT CERTIFICATION

I certify that the foregoing brief contains 6,408 words, as counted with Microsoft Word's "word count" tool, and excluding material Local Civil Rule 7.1(d)(2)(E) omits from the word-count requirement.

/s/ Cecilia Segal

## CERTIFICATE OF SERVICE

I certify that I served the foregoing brief on all counsel of record via the

Court's CM/ECF system.

/s/ Cecilia Segal