# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVER ALLIANCE,<br><br>    and<br><br>NORTHERN PLAINS RESOURCE COUNCIL, et al.,<br><br>        Plaintiffs,<br><br>  vs.<br><br>UNITED STATES DEPARTMENT OF STATE, et al.,<br><br>        Defendants<br><br>  and<br><br>TRANSCANADA KEYSTONE PIPELINE and TRANSCANADA CORPORATION,<br><br>        Defendant-Intervenors. | CV-17-29-GF-BMM<br><br>CV-17-31-GF-BMM<br><br><br><br>**SUPPLEMENTAL ORDER REGARDING MOTION TO STAY** |

Plaintiffs Indigenous Environmental Network and Northern Plains Resource Council (collectively "Plaintiffs") moved for summary judgment in this matter. (Docs. 139 & 145.) The United States Department of State ("Department") and TransCanada (collectively "Defendants") filed cross motions for summary judgment. (Docs. 170 & 172.)

1

The Court granted Plaintiffs' motions in part, and Defendants' motions in part, in the Court's Order on Plaintiffs' and Defendants' Motions for Summary Judgment ("Summary Judgment Order"). (Doc. 211.) The Court vacated the Department's Record of Decision ("ROD") issued on March 23, 2017. The Court granted Plaintiffs' request for injunctive relief and remanded the matter to the Department for further consideration consistent with the Summary Judgment Order. *Id.* The Court entered Final Judgment on November 15, 2018. (Doc. 212.)

TransCanada moved the Court pursuant to Rule 59(e) and Rule 60(b) to amend the Court's Summary Judgment Order, and Final Judgment. (Docs. 211 & 212.) TransCanada sought clarification of the Court's Orders to ensure certain preliminary project activities would not be enjoined. (Doc. 215.) The Court granted in part TransCanada's motion to amend. (Doc. 232.) The Court determined that TransCanada could conduct activities as defined in Paragraphs 16-17 of the Ramsay Declaration. (Doc. 216-1 at 6-7.) The Court allowed TransCanada to conduct cultural, biological, civil and other surveys, and to maintain security at project sites, as set forth in Paragraph 18 of the Ramsay Declaration. *Id.* at 7. All remaining preconstruction activities outlined in Paragraph 18 remained enjoined in accordance with the Court's Summary Judgment Order until the Department has complied with its NEPA and APA obligations and the Department has issued a new ROD. (Doc. 211.)

TransCanada filed a Notice of Appeal on December 21, 2018. (Doc. 233.) TransCanada also filed a Motion to Stay the permanent injunction pending its appeal (Doc. 234.) TransCanada asks the Court to allow three off-right-of-way activities to continue (hereafter "off-right-of-way activities"): (1) preparation of off-right-way pipe storage and contractor yards; (2) transportation, receipt, and off-loading of pipe at off-right-of-way storage yards; and (3) preparation of sites for off-right-of-way construction camps. TransCanada argues that each of these activities will involve only private action, will impact only private land, and will fall beyond the scope of any NEPA analysis. TransCanada further argues that it will suffer irreparable harm absent a stay of the off-right-of-way activities. *Id.* at 2. Finally, TransCanada argues that the off-right-of-way activities serve the public interest and will not substantially injure Plaintiffs.

## LEGAL STANDARD

The United States Supreme Court has set forth a four-factor test for granting a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). A party requesting a stay pending appeal bears the burden of showing that the circumstances justify an

exercise of the court's discretion. *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012).

## DISCUSSION

The Court held a hearing on TransCanada's Motion to Stay on January 14, 2019. (Doc. 249.) TransCanada discussed further details regarding the importance of continuing the off-right-of-way activities pending the Department's NEPA review and TransCanada's appeal. TransCanada clarified that it was asking to continue only the three off-right-of-way activities. TransCanada does not contest the Court's decision to enjoin mowing and patrolling the right-of-way to discourage migratory bird nesting.

TransCanada emphasized that the off-right-of-way activities occur solely on private land. TransCanada either owns or leases this private land from private parties. Further, TransCanada asserted that none of the off-right-of-way activities would be subject to the NEPA review process. TransCanada submitted an updated Status Report. (Doc. 246.) The updated Status Report demonstrates that the off-right-of-way activities will not cross or be in proximity to water bodies, will not involve removal of trees, and will not involve the application of pesticides or herbicides. (Doc. 246-1 at 9.) Further, TransCanada asserts that the proposed off-right-of-way activities will occur in areas that already have been surveyed for the presence of protected species and cultural resources. *Id* at 9-10. Finally,

TransCanada alleges that it has obtained all state and local permits needed to perform the activities. *Id.* The Court makes the following determinations in light of the new information presented at the hearing.

## I.      TransCanada's Likelihood of Success on the Merits of Its Appeal

TransCanada asserts five arguments in support of its likelihood of success on appeal. Plaintiffs oppose each argument. The Court will address each of TransCanada's arguments in turn.

### A. The Department's Decision to issue the Permit

TransCanada first argues that the Department's issuance of the cross-border permit should not be subject to review under NEPA or the APA. (Doc. 235 at 11.) TransCanada argues that the Department acted pursuant to an express delegation of the President's inherent authority over foreign affairs. *Id.* TransCanada argues that the Department's issuance of the permit constituted a presidential action, rather than an agency action. TransCanada asserts that judicial review would be inapplicable under these circumstances. *Id.*

The Court considered two factors in determining whether issuance of the permit constituted presidential action: 1) whether the President carried out the final action himself and the manner in which he did so; and 2) whether Congress has curtailed in any way the President's authority to direct the "agency" in making

policy judgments. *Natural Res. Def. Council v. U.S. Dep't of State*, 658 F.Supp.2d 105, 111 (D.C. Cir. 2009).

The President waived any right in his Memorandum to review the Department's decision under Executive Order 13337. The Department's obligation to study the environmental impacts of its decision fundamentally does not stem from the foreign relations power. The Department's own NEPA regulations recognize that the issuance of a Presidential Permit represents a "major Departmental action" subject to Congress's mandates in NEPA. 22 C.F.R. §§ 161.7, 161.7(c)(1). The Department prepared, on its own initiative, an SEIS and published a corresponding ROD/NID in this case. (Doc. 61 at 6.)

The Department took final agency action when it published the ROD/NID for Keystone and issued the accompanying Presidential Permit. The Ninth Circuit has determined that "once an EIS's analysis has been solidified in a ROD, the agency has taken final agency action, reviewable under [APA section] 706(2)(A)." *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1118-19 (9th Cir. 2010); *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1088 (9th Cir. 2003). The publication of the ROD/NID led to the Department's issuance of the accompanying Presidential Permit. TransCanada would not be likely to succeed on appeal under this argument.

TransCanada next alleges that NEPA and APA limit the Court's authority to the border-crossing area, rather than the length of the entire project. The Court rejected this argument in its Order on Partial Summary Judgment. (Doc. 202.) The Permit states that Keystone "must be constructed and operated as described in the 2012 and 2017 permit applications." Notice of Issuance of a Presidential Permit, 82 Fed. Reg. 16467-02 (Apr. 4, 2017). The Department was required to "analyze all of the environmental consequences of [the] project." *Save Our Sonoran, Inc.*, 408 F.3d at 1118. The Court possessed authority to enjoin the entire project.

### B. Agency Discretion

A strong presumption exists that Congress intends judicial review of administrative action. *ASSE Int'l v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015). Two narrow exceptions apply: (1) when Congress expressly bars review by statute, or (2) where an agency action is "committed to agency discretion by law." *Id.* TransCanada argues that the APA does not apply because a national interest determination remains committed to agency discretion and stands exempt from judicial review. (Doc. 235 at 17.)

Congress commits agency action to agency discretion in those rare instances where Congress draws statutes in such broad terms that no law exists to apply in a given case. 5 U.S.C. § 701(a)(2). Congress's decision to draft a statute in such broad terms leaves the court "with no meaningful standard against which to judge

the agency's exercise of discretion." *Id.* Courts must consider "the language of the statute" and whether judicial review would endanger "the general purposes of the statute." *Cnty. Of Esmeralda v. Dep't of Energy*, 925 F.2d 1216, 1218 (9th Cir. 1991).

Congress has provided a meaningful standard in the form of NEPA against which to judge the Department's conduct. Congress enacted NEPA to "protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1131 (9th Cir. 2011). NEPA, as enacted by Congress, its regulations, and any judicial opinions that address similar NEPA claims, have developed these standards more fully. 42 U.S.C.A. § 4332(2)(C); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971).

## C. NEPA Supplementation

TransCanada next asserts that no circumstances presented in the administrative record warranted NEPA supplementation. TransCanada argues that nothing in the administrative record required the Department to supplement its NEPA analysis with regard to the following areas: the Mainline Alternative Route ("MAR"); oil markets; greenhouse gas emissions; cultural resources; and oil spills.

*1. The MAR*

TransCanada argues that no circumstances regarding the change in the route through Nebraska required the Department to provide a supplement to the SEIS with regard to the MAR. TransCanada contends that the Department had completed its decision-making process before the State of Nebraska had approved the MAR rather than TransCanada's preferred route. (Doc. 235 at 20.)

The Court determined in its Order on Partial Summary Judgment (Doc. 202) that the Department wrongly had suggested that information about the MAR postdated the Department's issuance of the Presidential Permit. TransCanada, instead, included the MAR as one of two alternatives in its February 16, 2017, application to the Nebraska PSC. The Department knew before it had issued the permit on March 23, 2017, that the Nebraska PSC could approve the MAR. This contingency obligated the Department to supplement the SEIS to reflect the MAR.

Changed circumstances obligate an agency to prepare a post-decision supplemental EIS when a project has not been fully constructed or completed. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 367-72. The Supreme Court determined that "NEPA does require that agencies take a 'hard look' at the environmental effects of their planned action, even after a proposal has received initial approval." *Id.* at 374.

The Department retained a meaningful opportunity to evaluate the MAR. The MAR differs from the route analyzed in the 2014 SEIS. The MAR crosses five different counties. The MAR crosses different water bodies. The MAR would be longer. Finally, the MAR would require an additional pump station and accompanying power line infrastructure. TransCanada appears unlikely to succeed on the merits of its appeal under this argument.

### 2. Oil Markets

TransCanada next alleges that ongoing changes in oil markets did not necessitate an updated NEPA analysis. (Doc. 235 at 21.) TransCanada argues that low oil prices not contemplated in the 2014 SEIS do not correlate to significantly different environmental impacts.

The 2014 SEIS analyzed the possibility of moderate fluctuations in oil prices and the possibility of a low oil price scenario. Significant changes in oil prices occurred, however, after the release of the 2014 SEIS. The Department acknowledged in its 2014 SEIS that a significant drop in oil prices materially could change its analysis. The 2014 SEIS conditioned much of its analysis on the price of oil remaining high.

The 2014 SEIS stated that the price of oil needed to fall within the range of $65-$75 per barrel in order for Keystone to break even on the project. The record demonstrates that the price of oil dropped to nearly $38 per barrel shortly after the

release of the 2014 SEIS. Oil prices have remined below the "break-even" numbers established in the 2014 SEIS. This new and relevant information that surfaced between the release of the 2014 SEIS and the 2017 ROD bears upon the Department's analysis. The information has the potential to constitute a material change to the Department's consideration of Keystone's impact on tar sands production.

### 3. *Greenhouse Gas Emissions*

TransCanada next argues that it had analyzed sufficiently the cumulative impacts of the project in conjunction with the Alberta Clipper pipeline to excuse the preparation of any updated analysis of cumulative impacts. TransCanada also argues that NEPA's best available science mandate did not require it to use the updated Greenhouse Gas, Regulated Emissions, and Energy Use in Transportation ("GREET") model to analyze greenhouse gas emissions. (Doc. 235 at 25.)

The Department announced in 2013 that it would prepare an EIS for the Alberta Clipper pipeline expansion. The Department issued a permit for the Alberta Clipper expansion in 2017. The Department acknowledged the proposed expansion of the Alberta Clipper in the Keystone 2014 SEIS. The Department failed to analyze, however, the cumulative greenhouse gas emissions impacts of both pipelines. The Department instead viewed Keystone in isolation.

The Department analyzed the cumulative emissions of Keystone and the Alberta Clipper in the Alberta Clipper EIS. DOSKXLDMT0002501. The Alberta Clipper EIS also used the updated GREET model to analyze greenhouse gas emissions. *Id.* The GREET model estimates that greenhouse gas emissions are up to 20% higher than the model used in the 2014 SEIS. *Id.*

NEPA requires that an EIS consider the cumulative impacts of the proposed action. 40 C.F.R. § 1508.7. "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-Federal) or person undertakes such other actions." *Id.* The cumulative impacts analysis must do more than merely catalogue relevant projects in the area, but rather must give sufficiently detailed analysis about these projects and the differences between them. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971 (9th Cir. 2006).

This mandate requires an agency to discuss and analyze in sufficient detail to assist "the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts." *Churchill Cnty v. Norton*, 276 F.3d 1060, 1080 (2001) (*quoting City of Carmel-by-the-Sea v. United States Dep't of Transp.*, 123 F.3d 1142, 1160 (9th Cir. 1997)). Moreover, when several projects that may have cumulative environmental impacts are pending concurrently, NEPA requires that

12

the environmental consequences should be considered together. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976).

TransCanada argues that the Court's reasoning in its Summary Judgment Order was that "[the Department] was unaware of the cumulative impacts of both projects notwithstanding the fact that it disclosed in the 2017 EIS for the Alberta Clipper the potential cumulative GHG emissions of both pipelines." (Doc. 235 at 25.) TransCanada's argument does not reach the purpose of the required supplement. The Department failed to paint a full picture when it ignored the cumulative impacts of the two pipelines in the 2014 SEIS for Keystone. *See Churchill Cnty*, 276 F.3d at 1072.

The Department's analysis of the greenhouse gas emissions of both pipelines in the later Alberta Clipper EIS does not alleviate the error resulting from its omission in the earlier 2014 SEIS. The error caused the Department to lack full awareness of the environmental consequences of both actions. This error precluded informed decision-making and public participation based on complete information about potential greenhouse gas emissions. *See Ground Zero Ctr. For Non-Violent Action v. United States Dep't of Navy*, 860 F.3d 1244, 1252 (9th Cir. 2017). The updated GREET model used by the Department in the Alberta Clipper SEIS also constituted new and relevant information that required a supplement.

*4. Cultural Resources*

TransCanada argues that no provision of NEPA required the Department to supplement information regarding over 1,000 acres of unsurveyed land along the pipeline's route. (Doc. 235 at 26.) TransCanada argues that the Department's agreement with other federal agencies and state historic preservation officers satisfied its NEPA obligations.

The record reflects that the Department entered into an agreement with other federal agencies and state historic preservation officers to govern identification of historic properties and consultation regarding potential adverse impacts. DOSKXLDMT0006553-54. The Department also consulted with Indian tribes, federal agencies, and local governments regarding cultural resources. *Id.* The SEIS identified 397 cultural resources that may be affected by the project. *Id.* at 6521. The SEIS states, however, that "[a]s of December 2013, approximately 1,038 acres remained unsurveyed and are the subject of ongoing field studies." DOSKXLDMT0006522.

Consequently, the 2014 SEIS failed to provide a "full and fair discussion of the potential effects of the project to cultural resources." *See, Native Ecosystems Council v. U.S. Forest Service, an agency of U.S. Dept. of Agriculture*, 418 F.3d 953, 965 (9th Cir. 2005). "NEPA ensures that [agencies] will not act on incomplete information, only to regret its decision after it is too late to correct" *Marsh*, 490

U.S. at 371. The agreement with the state, local, and tribal agencies entered by the Department regarding the additional studies does not relieve the Department of its NEPA obligations. The Department must supplement this information. This supplementation further will allow the public to review and comment on the newly surveyed areas as part of the NEPA process.

*5. Oil Spills*

Major oil pipeline spills have occurred since the publication of the 2014 SEIS and the issuance of the ROD in 2017. TransCanada argues that new oil spill data would not alter the Department's analysis to the point of requiring a supplement. (Doc. 235 at 22.) TransCanada incorrectly argues that the Court needed to find that new spill data indicates that Keystone would impact the environment in a manner not analyzed by the Department.

The Court possesses no duty to analyze the impacts of updated oil spill data on the environment. The Department possessed the duty to analyze the updated oil spill data between 2014 and 2017 that constituted new and relevant information. Without this information, the Department acted upon incomplete data in its analysis of the likelihood of spills. *See Marsh*, 490 U.S. at 371. The Department also acted upon incomplete information when it failed to address the National Academy of Sciences ("NAS") study. The absence of this information from the 2014 SEIS's mitigation measures demonstrates that the Department acted upon

incomplete information in setting forth its mitigation measures. *See Marsh*, 490
U.S. at 371.

### D. The Department's Policy Shift

TransCanada next alleges that the Department adequately explained its
policy change. TransCanada again asserts that the APA does not authorize review
of the ROD because it remains committed to agency discretion. (Doc. 235 at 28.)
The Court already has determined that the ROD should be subject to judicial
review under the APA. (Doc. 93.) NEPA provides the appropriate standard of
review for the Court to follow. Further, TransCanada argues that the Department
adequately explained its change in policy. (Doc. 235 at 28.)

An agency possesses authority to give more weight to certain policy
considerations than it had in the past. *Org. Vill. of Kake v. U.S. Dept. of
Agriculture,* 795 F.3d 956, 968 (9th Cir. 2015). An agency must provide a detailed
justification, however, for reversing course and adopting a policy that "rests upon
factual findings that contradict those which underlay its prior policy" *Kake*, 795
F.3d at 966 (*quoting FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515
(2009)). "Even when reversing a policy after an election, an agency may not
simply discard prior factual findings without a reasoned explanation." *Kake*, 795
F.3d at 968.

The Department's 2015 ROD provided a section titled "Climate Change-Related Foreign Policy Considerations." The 2015 ROD determined that the United States's climate change leadership provided a significant basis for denying the permit. In reaching its decision, the Department recognized science supporting a need to keep global temperature below two degrees Celsius above pre-industrial levels, and scientific evidence that human activity represents a dominant cause of climate change.

After tracking the 2015 ROD nearly word-for-word, the 2017 ROD omitted entirely a parallel "Climate Changed-Related Foreign Policy Considerations" section. The Department's discretion to give more weight to energy security does not excuse it from ignoring the 2015 ROD's factually-based determinations. The Department instead avoided the 2015 ROD's conclusion that 2015 represented a critical time for action on climate change with a single paragraph that simply stated that since 2015, there have been "numerous developments related to global action to address climate change, including announcements of many countries of their plans to do so." DOSKXLDMT0002518. This explanation falls short of a factually based determination, or reasoned explanation, and TransCanada appears unlikely to prevail on appeal. *Kake*, 795 F.3d at 968.

### E. FWS's review under the ESA

TransCanada next argues that the Department's 2012 Biological Assessment ("BA") and FWS's 2013 Biological Opinion ("BiOp") and concurrence should not have been set aside for the purpose of considering updated data on oil spills. The Court has determined that TransCanada is not likely to succeed on the merits of its appeal of the Court's requirement that the Department supplement the 2014 SEIS. The Department must supplement information regarding oil spills. This information affects the Department's analysis of potential impacts to listed species.

The Department and FWS must use the "best scientific and commercial data available" in all respects, including the effects of potential oil spills on endangered species. 16 U.S.C. § 1536(a)(2). An agency must reinitiate consultation when "new information" suggests the action may impact listed species "in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(b). The Department's and FWS's prior conclusions regarding the effects of oil spills on listed species proves outdated due to the requirement that the Department supplement the 2014 SEIS. The agencies must account for the supplemental information. The Department must consider the new information regarding oil spills in its supplement to the 2014 SEIS. The Department also must coordinate with FWS in making its determination.

## II.    Irreparable Injury

TransCanada asserts that it will suffer irreparable injury in the absence of a stay pending its appeal. (Doc. 235 at 31.) TransCanada argues that if the Court's injunction halts its off-right-of-way activities, TransCanada would be forced to lay off a significant portion of its workforce, face tremendous delay costs, miss the 2019 construction season, and lose substantial revenues. (Doc. 248 at 14.) Plaintiffs argue that the financial harms that TransCanada alleges are temporary and self-inflicted. Plaintiffs also contend that TransCanada exaggerates its alleged harms related to the difficulty of retaining skilled workers. (Doc. 247 at 14.)

The Court determined in its Order on TransCanada's Motion to Amend that a limited modification of the scope of the injunction proved necessary. (Doc. 232 at 13.) The Court reasoned that activities related to the NEPA process required an injunction pending the Department's review. *Id.* at 15. The Court further determined that those activities unrelated to NEPA review could continue. *Id.* Finally, the Court determined that the hardship to TransCanada from enjoining activities unrelated to the Department's NEPA review required a limited modification of the injunction. *Id.* at 13.

TransCanada argues that irreparable injury will occur if it is not allowed to proceed with the three proposed off-right-of-way activities. TransCanada alleges

that an injunction of the off-right-of-way activities threatens 700 jobs, the loss of skilled workers, the potential of missing the 2019 construction season, and lost earnings of approximately $949 million. TransCanada asserts that each of these alleged injuries will occur if it remains unable to continue with the off-right-of-way activities during the pendency of its appeal.

TransCanada also has demonstrated that engaging in the off-right-of-way activities unrelated to the NEPA process would not result in the construction of any portion of the pipeline. The transportation of pipe, preparation of pipe storage yards, and preparation of construction camps, all represent activities to be performed at TransCanada's peril during the pendency of its appeal. TransCanada will suffer irreparable injury, however, if its planned construction schedule otherwise proves accurate, but it is further delayed because the off-right-of-way activities could not be completed on time. This factor weighs in favor of TransCanada.

III.     **Substantial Injury to Other Parties Interested in the Proceeding**

The Court also determined in its Order on TransCanada's Motion to Amend, that potential injuries to the Plaintiffs warranted an injunction of certain preconstruction activities. The Court determined that Plaintiffs demonstrated irreparable injury with respect to the actual construction and operation of Keystone in the absence of complete environmental review. (Doc. 232 at 11.) Plaintiffs also

have demonstrated substantial injury in the form of environmental harm and a "biased NEPA process." *Id.* The Court concluded that an injunction of certain preconstruction activities could skew the Department's future analysis and decision-making with regard to Keystone. *See Colorado Wild Inc. v. U.S. Forest Serv.,* 523 F.Supp.2d 1213, 1221 (D. Colo. 2007).

The Ninth Circuit determined in *Save Our Sonaran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2005), that "when environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* at 1125. The Ninth Circuit examined a district court's injunction of a United States Army Corps of Engineers ("Corps") Section 404 dredge and fill permit for the construction of a gated community. *Id.* at 1118. The plaintiffs sought an injunction based on alleged NEPA and Clean Water Act ("CWA") violations. *Id.*

The controversy involved 31.3-acres of washes that constituted approximately 5 percent of the property. *Id.* The district court determined that the washes on the property presented potential geological impacts to the entire property. *Id.* The Corps evaluated the Section 404 permit application and issued an environmental assessment and finding of no significant impact. *Id.* In its analysis, the Corps examined only the washes, rather than the entire project. *Id.* The district court reasoned that, even though the washes cover only 5 percent of acreage, they

critically impacted the entire parcel. *Id.* The district court enjoined the project pending a hearing on the merits. *Id.*

The Ninth Circuit upheld the district court's injunction on appeal. *Id.* at 1121. The Ninth Circuit reasoned that "the impact of the permit on the environment at large determines the [agency's] NEPA responsibility." *Id.* at 1122. The Ninth Circuit further concluded that "[t]he authority to enjoin development extends only so far as the [agency's] permitting authority." *Id.* at 1123. The district court limited the scope of the injunction, therefore, to stopping the developer from acts that required a Corps permit. *Id.* Further, the district court's determination that the washes remained subject to federal jurisdiction under the CWA and could not be separated from the private lands, authorized the district court to enjoin the entire project. *Id.*

Both parties rely on *Save Our Sonoran* to argue that the third factor weighs in their respective favor. Plaintiffs argue that the Ninth Circuit's affirmation of the injunction of the entire project site requires a similar blanket-injunction of Keystone and all related activities. (Doc. 247 at 26.) TransCanada argues, on the other hand, that the Court's authority extends only to the Department's permitting authority and accompanying NEPA analysis. (Doc. 235 at 30.) TransCanada contends, therefore, that the three proposed off-right-of-way activities fall beyond

the scope of the Department's permitting authority and NEPA review and cannot be enjoined. *Id.*

TransCanada incorrectly argues that the three off-right-of-way activities were beyond the scope of the Department's NEPA review. The 2014 SEIS frequently discussed the impacts of the off-right-of-way activities to the following issues: the potential impacts to natural resources, cultural resources, and greenhouse gas emissions. *See* DOSKXLDMT0007000, 7107, 7340. TransCanada asserts that the off-right-of-way activities would occur on land that TransCanada either owns or leases. TransCanada must obtain all state and local permits to transport pipe, refurbish pipe, construct storage yards, or construct labor camps. TransCanada asserts that it has obtained these necessary permits.

The 2014 SEIS defines Keystone's "action area" as "construction of the pipeline [right-of-way] and land affected by the above ground ancillary facilities (i.e., additional temporary work space areas, pipe stockpile sites, rail sidings, contractor yards, construction camps, pump stations, delivery facilities, and access roads)." DOSKXLDMT0010626. The 2014 SEIS also defines the "Project Area" as "the area of physical disturbance associated with the proposed Project limits; that is, in and along the pipeline right-of-way construction corridor and its ancillary facilities (e.g. access roads, pump stations, and construction camps)." DOSKXLDMT0007268.

TransCanada asserted at the hearing on its motion to stay that all areas where work camps and pipe yards will be constructed have been surveyed. (Doc. 249.) TransCanada's January 7, 2019, status report states that preconstruction activities will not require construction of new private roads. (Doc. 254-1 at 9.) The status report also states that all off-right-of-way areas have been surveyed for protected species and cultural resources. *Id.* at 9-10. The 2014 SEIS explains, however, that additional cultural resource surveys within the Keystone corridor, including "ancillary facilities," remain "ongoing." DOSKXLDMT0007340 (n. 7.) The SEIS defines ancillary facilities to encompass pipe yards and construction camps. *Id.* at 10626. The 2014 SEIS also states that Keystone may affect cultural resources on or near the right-of-way and in the locations of ancillary facilities including access roads and construction camps. DOSKXLDMT0007000.

The 2014 SEIS makes clear that at least a portion of the off-right-of-way activities that TransCanada seeks to perform were to occur on land not yet surveyed for cultural resources. DOSKXLDMT0007340. The contradiction between the information provided in the 2014 SEIS and TransCanada's current assertions demonstrates the reason that the Department must supplement the SEIS with updated information regarding cultural surveys. Neither the 2014 SEIS, nor the administrative record, provide information to the Court or the public that TransCanada has completed cultural resource surveys at all the proposed "ancillary

facilities" that encompass the off-right-of-way areas. TransCanada's bare assertions that these areas have been surveyed for cultural resources since the publication of the 2014 SEIS proves insufficient to allow the off-right-of-way activities to continue in these areas not yet surveyed for cultural resources when the 2014 SEIS was issued in the absence of complete environmental review.

TransCanada attempts to distinguish the Department's permitting authority in this case from the Corps's authority in *Save Our Sonoran*. The washes at issue in *Save Our Sonoran* ran through the entire parcel "the way capillaries run through tissue." *Save Our Sonoran*, 408 F.3d at 1119 (*quoting Save Our Sonoran, Inc. v. Flowers*, 227 F.Supp.2d 1111, 1114 (D. Ariz. 2002)). The geological impact of the washes' connection to the entire project site provided the reason that the district court could completely enjoin the project including private land.

The 2014 SEIS included "ancillary facilities" as part of its "action area" and "project area," and within its scope and review. The required supplemental review, along with the 2014 SEIS's conclusions with regard to impacts at proposed construction camps and storage yards, demonstrates the difficulty in attempting to "segregate[]" the three proposed off-right-of-way activities from Keystone itself. *See Save Our Sonoran*, 408 F.3d at 1123. Allowing TransCanada to begin construction in areas that the Court has ordered the Department to supplement its review would run counter to the need for a such a supplement and undermine the

purpose of NEPA. These areas subject to the supplement include the MAR in Nebraska and those approximately 1,000 acres not yet surveyed for cultural resources along the pipeline route. (Doc. 235 at 26.)

TransCanada further argues that the three proposed off-right-of-way activities do not affect the potential for "bureaucratic momentum" or risk a biased NEPA process. (Doc. 235 at 32.) The Court determined in its Order on TransCanada's Motion to Amend that the risk of "bureaucratic momentum" created by certain preconstruction activities could bias the Department's NEPA analysis. (Doc. 232 at 10.) The concern regarding "bureaucratic momentum" involves the potential of a skewed NEPA analysis if certain preconstruction activities were allowed to proceed during the NEPA review. *See Colorado Wild,* 523 F.Supp.2d at 1221. TransCanada asserts that the three proposed off-right-of-way activities would not impact the Department's supplemental review.

The 2014 SEIS consistently discussed the three proposed off-right-of-way activities. TransCanada would perform these off-right-of-way activities entirely on private land owned or leased by TransCanada. The 2014 SEIS determines, however, that potential impacts that appear to be material to the supplemental review, may occur at the off-right-of-way sites. *See, e.g.*, DOSKXLDMT0010626, 7268.

The private nature of the three proposed off-right-of-way activities lessens the risk of "bureaucratic momentum" as raised by the court in *Colorado Wild*, 523 F.Supp.2d at 1221. The connection between the private activities and the impacts on the Department's required supplement, however, could skew the Department's analysis. The construction camps present a significant activity that could impact the Department's analysis. The 2014 SEIS focuses frequently on the potential impacts posed by the preparation of the construction camps. The 2014 SEIS describes the construction camps as containing at least 80-acres of contractor yards, housing, and administration facilities. DOSKXLDMT0005983. The camps would be constructed using modular units and include infrastructure necessary for complete food service, housing, and personal needs. *Id.* The construction camps would be fully fenced and include guard stations. *Id.* at 7840. The construction camps would also include stores, recreation and fitness facilities, entertainment facilities, dining and laundry facilities, and security units. *Id.* The 2014 SEIS "conservative[ly]" estimates that each camp would house approximately 1,000 residents. *Id.* The pipe yards, on the other hand, involve minimal ground disturbance and are designed for the mere purpose of off-loading pipe. The construction camps' similarities to small towns prove distinguishable from the relatively minor impacts of the pipe storage yards. The significant impacts from the

construction camps risks the potential for a "bureaucratic steamroller" that the Court determined to be present in its Injunction Order. (Doc. 232.)

This factor weighs in favor of Plaintiffs for those areas that had not been surveyed and subject to public review and comment by the time of the 2014 SEIS. These areas include the proposed construction camps, the MAR in Nebraska, and the 1,000 acres of not yet surveyed for cultural resources. (Doc. 235 at 26.) This factor weighs in favor of TransCanada, however, only for those off-right-of-way activities that would take place entirely within areas that had been the subject of completed cultural surveys and public review and comment by the time of the 2014 SEIS.

## IV.    Public Interest

Finally, TransCanada argues that the public interest warrants a stay of the injunction. (Doc. 235 at 34.) The Court addressed these same concerns in its Order on TransCanada's motion to Amend. The Court determined that Plaintiffs had met their burden regarding the public's interest in ensuring that the Department conduct a complete environmental review before construction and operation of Keystone. (Doc. 232 at 14.) The public possesses an interest in the Department's compliance with NEPA's environmental review requirements and informed decision-making. *See Colorado Wild*, 523 F.Supp.2d at 1222.

The Court permanently has enjoined the actual construction and operation of Keystone. TransCanada has not sought to engage in actual construction or operation pending its appeal. The Court has determined that the off-right-of-way activities that would impact areas not yet surveyed for cultural resources cannot be segregated from the Department's supplemental review obligation. The 2014 SEIS demonstrates that the off-right-of-way activities potentially could impact adversely areas not yet surveyed for cultural resources. DOSKXLDMT0010626, 7268.

TransCanada's assertion that all off-right-of-way areas have since been surveyed has no bearing upon the Department's supplemental NEPA review. At least some of those areas, especially along the MAR in Nebraska, have not been surveyed for cultural resources and made subject to public review and comment by the time of the 2014 SEIS. The public's interest in ensuring compliance with NEPA's requirements and informed decision-making would be threatened by the three proposed off-right-of-way activities in those areas that were not the subject of cultural resource surveys and public review and comment by the time of the 2014 SEIS. This factor weighs in favor of Plaintiffs for those areas not yet surveyed for cultural resources.

## CONCLUSION AND ORDER

The Court continues to believe that TransCanada remains unlikely to succeed on the merits of its appeal. TransCanada has shown that it will suffer

potential irreparable injury if it is unable to perform the three proposed off-right-of-way activities. Plaintiffs have shown irreparable injury in the form of the actual construction and operation of Keystone and potential "bureaucratic momentum." The potential injuries to Plaintiffs would be further threatened by the off-right-of-way activities that would occur in areas that had not been surveyed for cultural resources, or were not a part of the 2014 SEIS, including the public review and comment process. The public interest rightfully weighs in favor of a complete NEPA review. The preparation of storage yards and construction camps in areas not yet surveyed for cultural resources when the Department issued the 2014 SEIS have the potential to impact adversely the public's interest in an informed NEPA process.

Accordingly, TransCanada's Motion to Stay the application of the permanent injunction with respect to its right to engage in the three proposed off-right-of-way activities (Doc. 234) is **GRANTED, IN PART, AND DENIED, IN PART**.

The Court emphasizes that the partial stay of its injunction contemplated by this Order applies only to those off-right-of-way activities, limited to transportation of pipe and preparation of pipe storage and container yards, that would occur only on those areas that had been surveyed for cultural resources and had been subjected to the public review and comment process when the Department issued the 2014

SEIS. TransCanada may continue to perform these limited off-right-of-way activities that will be conducted by private parties, take place on private land, and only on those lands for which TransCanada has obtained permits from state and local governments, if necessary, to engage in these activities:

1) Preparation of off-right-of-way pipe storage and container yards; and

2) Transportation, receipt, and off-loading of pipe at these off-right-of-way storage and container yards.

The following activity shall remain enjoined:

1) Preparation of sites for off-right-of-way construction camps.

The remainder of the Court's Summary Judgment Order (Doc. 211), Final Judgment (Doc. 212), and Supplemental Order Regarding Permanent Injunction (Doc. 232), shall remain in full force and effect.

DATED this 15th day of February, 2019

Brian Morris
United States District Court Judge